**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**JOHN M. FIFE, CHICAGO VENTURE PARTNERS, L.P., ILIAD RESEARCH AND TRADING, L.P., ST. GEORGE INVESTMENTS LLC, TONAQUINT, INC., AND TYPENEX CO-INVESTMENT, LLC.**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **Civil Action No.** _____<br>)<br>)  **Honorable** _____<br>)<br>)  **Jury Trial Demanded**<br>)<br>)<br>) |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC") alleges as follows:

## NATURE OF THE ACTION

1.      From at least 2015 through the present Defendant John M. Fife ("Fife") and five entities he owns and controls – Chicago Venture Partners, L.P. ("CVP"), Iliad Research and Trading, L.P. ("Iliad"), St. George Investments LLC ("St. George"), Tonaquint, Inc. ("Tonaquint"), and Typenex Co-Investment, LLC ("Typenex") (collectively, the "Entity Defendants") – bought and sold billions of newly-issued shares of microcap securities (*i.e.*, penny stocks) and generated millions of dollars from those sales.

2.      In doing so, Fife – who is a recidivist violator of the federal securities laws – and the Entity Defendants (together with Fife, "Defendants") have violated, and continue to violate, the mandatory dealer registration requirements of the federal securities laws.

3.      Defendants' business model has been to buy convertible promissory notes—a type of security—from penny stock issuers, convert the notes into newly-issued shares of stock, and rapidly sell those shares into the public market at a profit. During 2015 through 2019, Defendants purchased more than 250 such notes from approximately 135 different microcap issuers. Defendants demanded and received highly favorable terms for these notes, including terms that gave Defendants deep discounts from the prevailing market price for the shares of counterparty microcap issuers. By engaging in a regular business of buying convertible notes and then selling the resulting newly-issued shares of microcap companies' stock into the public market, Defendants operated as unregistered securities dealers and collectively generated more than $61 million in net profits.

4.      In violating the dealer registration requirements of the federal securities laws, Defendants avoided regulatory obligations for dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records in accordance with applicable regulatory requirements.

5.      Through these activities, the Defendants violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") by acting as unregistered securities dealers. [*See* 15 U.S.C. § 78o(a)(1)] The SEC requests, among other things, that this Court enjoin Defendants from committing further violations of the federal securities laws as alleged in this Complaint, and order them to pay disgorgement and monetary penalties based upon these violations.

## JURISDICTION AND VENUE

6.      The SEC brings this action pursuant to the authority conferred by Section 21(d) of

the Exchange Act [15 U.S.C. § 78u(d)] seeking to restrain and enjoin Defendants from engaging in the acts, practices, transactions and courses of business alleged herein, and for such other equitable relief as may be appropriate or necessary for the benefit of investors.

7.     The SEC also seeks a final judgment ordering Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon, and ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

8.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u(d) and 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. These transactions, acts, practices and courses of business occurred in the Northern District of Illinois, which is where the Entity Defendants are located and where Fife resides and does business on the Entity Defendants' behalf.

9.     Defendants have, directly and indirectly, made, and are making, use of the mails, and of the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

10.     There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this Complaint, and transactions, acts, practices and courses of business of similar purport and object.

## DEFENDANTS

11.     **John M. Fife**, age 59, resides in Chicago, Illinois. In 2007, the SEC charged Fife with violations of 10(b) of the Exchange Act and Rule 10b-5 thereunder for his participation in

an annuity market timing scheme. *SEC v. Fife*, No. 07-C-0347 (N.D. Ill. Jan. 18, 2007). That case settled after Fife consented to an injunction, monetary relief, and a bar from associating with an investment adviser, with the right to reapply after 18 months. In 2012, in an unrelated action, the Financial Industry Regulatory Authority ("FINRA") barred Fife from association with any FINRA member for failing to respond to FINRA requests for information. FINRA Case No. 2011029203701 (March 2012).

12.    **Chicago Venture Partners, L.P.** is a Utah limited partnership, with its principal place of business in Chicago, Illinois. Fife solely owns and controls CVP.

13.    **Iliad Research and Trading, L.P.** is a Utah limited partnership, with its principal place of business in Chicago, Illinois. Fife solely owns and controls Iliad.

14.    **St. George Investments, LLC** is a Utah limited company, with its principal place of business in Chicago, Illinois. Fife solely owns and controls St. George.

15.    **Tonaquint, Inc.** is a Utah corporation, with its principal place of business in Chicago, Illinois. Fife solely owns and controls Tonaquint.

16.    **Typenex Co-Investment, LLC** is a Utah limited liability company, with its principal place of business in Chicago, Illinois. Fife solely owns and controls Typenex.

## FACTS

**Defendants' Regular Business Of Buying Convertible Notes From Penny Stock Issuers, Converting The Notes Into Shares Of Stock, And Selling The Shares In The Market**

17.    Defendants have operated a regular business through which they buy convertible notes, a type of short-term debt security, from penny stock issuers in need of cash. After typically holding the notes for a holding period required by an SEC rule (six months for issuers that are required to file periodic and other reports with the SEC, one year for issuers that are not required to do so), Defendants convert the notes into newly-issued shares of stock at a deep

discount to the prevailing market price. After conversion, Defendants promptly sell that stock into the market, locking in a substantial profit. During 2015 through 2020, Defendants sold into the public market more than 21 billion newly-issued shares of penny stock from convertible notes that they purchased from approximately 135 penny stock issuers. Defendants' collective net profits from this business during 2015 through 2020 were approximately $61 million, the majority of which came from the spread between Defendants' discounted acquisition cost for the stock and the prevailing market price.

18.     Fife has the ultimate decision-making power over the Entity Defendants, including the power to decide whether to enter each of the convertible deals, to negotiate and approve the final deal terms, and to monitor the status of the Entity Defendants' investments and their sales of stock. Several full-time employees of the Entity Defendants assist Fife in locating, negotiating, and managing the entities' transactions.

19.     Fife, personally or through employees of the Entity Defendants, negotiated the terms of the convertible notes that Defendants purchased from penny stock issuers (as well as amendments to the original terms). Fife or employees of the Entity Defendants also signed the contracts by which the Entity Defendants acquired the convertible notes.

20.     Defendants held themselves out to the public as being willing to buy convertible notes at a regular place of business, which was in Chicago, Illinois. For example, Defendants operated a public website, located at www.chicagoventure.com, that advertised to issuers that the Defendants operated businesses engaged in private investment in public equity ("PIPE") transactions through which Defendants would buy the issuers' stock. Defendants also directly solicited microcap issuers by cold calling or emailing issuer representatives. In these direct issuer solicitations through phone or email, Defendants typically represented to issuer representatives

that Defendants sought to invest in the issuer's stock and explained the benefits of a convertible debt transaction. Defendants also attended conferences at which they solicited penny stock issuers in person

21.     Beyond advertising on their website and directly soliciting issuers by phone, email, and in person, Defendants also relied on third-party finders, who worked on commission, to solicit issuers who were willing to sell convertible notes in exchange for financing from the Defendants.

22.     Because the counterparty microcap issuers in Defendants' convertible note deals often had minimal assets, negative cash flow from operations, and unstable operating histories, these companies were typically unable to obtain financing from banks. Therefore, Defendants were able to negotiate highly favorable terms governing the deals with the financially-strapped issuers.

23.     In soliciting issuers for potential convertible note deals, Defendants generally targeted microcap issuers that had historically strong trading volumes and a large number of authorized but unissued shares. Defendants targeted these types of issuers with the goal of easily converting and selling the issuers' shares acquired through the deals.

24.     Defendants sought to engage in convertible note deals with microcap issuers in industries that had recently generated attention. For instance, Defendants entered into convertible note deals with microcap issuers in the marijuana, blockchain, bitcoin, vapor, lithium, and gold mining industries. Defendants sought out these deals because they believed that public interest in these industries typically meant that individual investors would be willing to buy the shares that Defendants acquired through the deals.

25.     Defendants obtained nearly all of the stock that they sold in their business directly

from the issuers, through note conversions, as opposed to purchases in the secondary market. The shares that Defendants obtained through their deals with microcap issuers were newly-issued, and the sales of the shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals. Selling large quantities of newly-issued shares into the market is a common attribute of a securities dealer.

26.    In addition to profiting from stock sales, the Entity Defendants also charged counterparty microcap issuers transaction fees, generally ranging from between $5,000 and $25,000 per deal. During the relevant period, the Entity Defendants collected at least $2.12 million in transaction fees from counterparty microcap issuers.

27.    SEC Rule 144 enables non-affiliates who acquire restricted stock directly from the issuer in a private transaction to resell it free of restriction into the market after observing a holding period, among other requirements.  [*See* 17 C.F.R. § 210.144] Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144. For that reason, Defendants generally waited either six months (the required Rule 144 holding period for securities issued by SEC-reporting companies) or one year (the required Rule 144 holding period for securities issued by non-SEC-reporting companies) after purchasing a convertible note before they began to exercise their right to convert the note to stock. Fife personally, or through employees acting at his direction, arranged for the converted stock to be transferred to Defendants' brokerage accounts either electronically or via mailed certificates. As part of this process, Defendants obtained attorney opinion letters to assure brokerage firms that the converted stock was not restricted and could be resold to the public.

28.    The convertible notes that Defendants bought from the issuers entitled them to receive issuer stock at a substantial discount from the prevailing market price. Each note

provided for a discount, which ranged between 7 and 60 percent less than the prevailing market price of the stock preceding the conversion request. Defendants normally sold the stock as soon after conversion as the market would bear the sales. Defendants did so to lock in their profits. Defendants used the telephone and the Internet to place these sell orders. The majority of Defendants' profits resulted from the discounted prices at which they acquired shares from the issuers to sell into the market. This mechanism, which gave Defendants a spread or markup on the stock that they sold, is a common attribute of a securities dealer.

29. After holding the convertible debt acquired in a convertible note deal for the six-month period or one-year period required by Rule 144, Defendants typically sent a conversion notice to a counterparty issuer and its transfer agent showing the number of shares owed to Defendants. Defendants then worked with the issuer's transfer agent and broker to have the shares issued and deposited into Defendants' brokerage accounts as quickly as possible, including often paying rush fees to expedite this process.

30. Once brokers deposited the converted shares from the counterparty issuers into the Defendants' brokerage accounts, Defendants typically began selling the shares into the public market immediately. However, Defendants generally did not sell all the shares they acquired in a convertible note deal all at once. Rather, Defendants staggered their sales over multiple trading days in an effort to avoid placing too much sudden downward pressure on the counterparty issuer's stock price in a single trading day. Defendants typically limited their sales in a single trading day, aiming for their sales to account for no more than roughly 9 to 15 percent of the stock's daily trading volume.

31. Defendants' practice then was to sell the shares they had acquired in a convertible note deal continuously on a daily or near-daily basis until Defendants had sold all of their shares

into the market. Defendants mostly completed this process in a couple of weeks or less.

32.     Defendants typically aimed to convert only as many shares at a time as they believed they could sell into the market within the 10 to 20 days after a conversion. Therefore, Defendants commonly converted counterparty issuers' shares in several different cycles.

33.     Notwithstanding Defendants' efforts to limit the amount of shares they would sell into the market in a single day, Defendants' conduct frequently depressed the stock price of counterparty microcap issuers. Defendants' practice of selling thousands of a counterparty issuer's newly-issued shares into the market on multiple trading days, as well as their practice of converting additional shares soon after they sold previously-converted shares, frequently led to a significant decrease in the company's stock price over time.

34.     While Defendants' dealer activities frequently depressed the stock price of counterparty issuers, causing a decrease in the value of the holdings of those companies' shares owned by other shareholders, Defendants frequently reaped large profits. Defendants obtained their profits from the discounts in the purchase price that they negotiated with the counterparty issuers, rather than from any appreciation in the stock's price.

35.     Moreover, many of Defendants' agreements with counterparty microcap issuers contained "true-up" provisions that compelled the issuer to issue additional shares to Defendants if the issuer's stock price decreased in the 15 to 20 business days following a conversion. Defendants' sales of thousands of newly-issued shares into the market frequently led to a decrease in the stock price, and, consequently, triggered the true-up provision in these agreements. For deals that included these true-up provisions, Defendants essentially guaranteed themselves a profit by insulating themselves against any risk of a decrease in the counterparty issuer's stock price.

36.     Defendants' dealer business was very lucrative.  The following are examples of transactions in which Defendants acquired convertible notes from penny stock issuers, exercised their conversion rights, and sold the resulting newly-issued stock into the market for a significant profit:

    a.    ("HEMP")

        i.    On March 31, 2015, Defendant Iliad entered into a securities purchase agreement with Hemp Inc., a company whose stock was listed for trading on the over-the-counter market (OTCMKTS, "HEMP"). According to HEMP's public filings, HEMP's business is to provide products and services to the medical and recreational marijuana industries and to provide products made from industrial hemp.

        ii.    Under Iliad's securities purchase agreement with HEMP, Iliad agreed to purchase a convertible note in the amount of $680,000 issued by HEMP. Under the securities purchase agreement, Iliad's purchase price for the convertible note was $500,000, after an origination discount and transaction expenses were set off against the principal amount of the note. Iliad made a $375,000 payment on March 31, 2015 and an approximately $125,575 payment on April 20, 2015.

        iii.    Pursuant to the terms of the convertible note that Iliad acquired under the securities purchase agreement with HEMP, Defendants converted the amounts that HEMP owed under the agreement on

three occasions between May 23, 2016 and August 15, 2016.  In so doing, Defendants received a total of over 56 million newly-issued HEMP shares.

iv.  Pursuant to the favorable terms that Defendants negotiated, the conversion price for these HEMP shares was 40% less than the average of the two lowest closing prices for HEMP stock in the 20 trading days preceding each conversion.  The terms that Defendants negotiated allowed them to spend significantly less money to acquire the shares than they would have paid on the open market.

v.  Defendants sold the shares shortly after the shares from each conversion were deposited into their accounts, generating net profits of $1,083,410, most of which were attributable to the discounted acquisition prices that they negotiated.

b.  ("OPMZ")

i.  On December 10, 2015, Defendant Typenex entered into a securities purchase agreement with 1PM Industries, Inc., a company whose stock was listed for trading on the over-the-counter market (OTCMKTS, "OPMZ"). According to OPMZ's public filings at the time, OPMZ was primarily in the business of selling wellness and edible marijuana products to the public.

ii. Under Typenex's securities purchase agreement with OPMZ, Typenex agreed to purchase a convertible note in the amount of $170,000 issued by OPMZ. Under the securities purchase agreement, the purchase price of the note was $150,000, after an origination discount and transaction expenses were set off against the principal amount of the note. Typenex made payments to OPMZ of $45,000 on December 15, 2015; $45,000 on March 18, 2016; $45,000 on March 22, 2016; $22,500 on July 18, 2016, and $22,500 on November 14, 2016. Typenex also made payments to a finder for the OPMZ deal of $5,000 on December 15, 2015; $5,000 on March 18, 2015; $2,500 on July 18, 2016; and $2,500 on November 14, 2016, as part of the purchase price.

iii. Pursuant to the terms of the convertible note that Typenex acquired under the securities purchase agreement with OPMZ, Defendants converted the amounts that OPMZ owed under the agreement into shares of OPMZ stock on 18 separate occasions between August 2016 and November 2017. In so doing, Defendants received a total of over 777 million newly-issued shares of OPMZ stock.

iv. Pursuant to the favorable terms that Defendants negotiated, the conversion price for these shares of OPMZ was at least 30% less than the average of the three lowest closing prices for the stock in the 20 trading days preceding each conversion. The terms that Defendants negotiated allowed them to spend significantly less

money to acquire the shares than they would have paid on the open market.

v. Defendants sold the shares shortly after the converted shares were deposited into Defendants' accounts, generating net profits of $738,751, most of which were attributable to the discounted acquisition prices that they negotiated.

c. ("VAPE")

i. On December 3, 2014, Defendant Typenex purchased a convertible note from Vape Holdings, Inc., a company whose stock was listed for trading on the over-the-counter market (OTCMKTS, "VAPE"). According to VAPE's public filings, VAPE's business is to manufacture and distribute vaporization products, which could be used in, among other applications, e-cigarettes.

ii. Under Typenex's securities purchase agreement with VAPE, Typenex agreed to purchase a convertible note in the amount of $560,000 issued by VAPE. Under the securities purchase agreement, the purchase price of the note was $500,000, after an origination discount and transaction expenses were set off against the principal amount of the note. Typenex made a $475,000 payment to VAPE on December 4, 2014, and a $25,000 payment to another entity on behalf of VAPE that same day as part of the purchase price.

    iii.   Pursuant to the terms of the convertible note that Typenex acquired under the securities purchase agreement with VAPE, Defendants converted the amounts that VAPE owed under the agreement into shares of VAPE stock on 17 occasions between August 2015 and February 2016. In so doing, Defendants received a total of over 91 million newly issued shares of VAPE stock.

    iv.   Pursuant to the favorable terms that Defendants negotiated, the conversion price for these shares of VAPE was at least 30% less than the average of the three lowest closing prices for the stock in the 10 trading days preceding each conversion. The terms that Defendants negotiated allowed them to spend significantly less money to acquire the shares than they would have paid on the open market.

    v.   Defendants sold the shares shortly after the converted shares were deposited into Defendants' accounts, generating net profits of $454,354, most of which were attributable to the discounted acquisition prices that they negotiated.

37.    Defendants continue to convert shares acquired in the convertible debt transactions with counterparty microcap issuers and then sell those shares into the market.

**<u>Defendants Violated The Federal Securities Laws By Acting As Unregistered Dealers</u>**

38.    Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer.

[15 U.S.C. § 78o(a)(1)].

39.     Defendants used means or instrumentalities of interstate commerce to buy and sell securities as part of their regular business. For example, Defendants used the internet to solicit microcap issuers, transferred cash through wire transfers, and used email and the telephone to negotiate and effectuate sales transactions. Defendants engaged in much of the conduct described in this Complaint at their Chicago, Illinois addresses in this District.

40.     While Defendants engaged in this conduct, they were not registered with the SEC as dealers or associated with dealers registered with the SEC.

41.     A person who seeks to register with the SEC as a dealer must file an application on a form called Form BD. Form BD asks questions about the applicant and its principals, controlling persons, and employees. An applicant must file the Form BD with the Central Registration Depository, which is operated by FINRA. To register as a dealer, the applicant must meet the statutory requirements to engage in a business that involves high professional standards.

42.     Registration with the SEC requires the dealer to provide important information to the SEC about its business, including but not limited to the names of the direct and indirect owners and executive officers of the business; certain arrangements with other persons or entities, the identities of those who control the business; the states in which the dealer does business; past criminal or regulatory actions against the dealer or any affiliated person that controls the business; and financial information, including bankruptcy history. Further, registration requires the dealer to join a self-regulatory organization, such as FINRA, or a national security exchange, which assist the SEC in regulating the activities of registered dealers. Finally, registered dealers are subject to inspection by the SEC and FINRA to ensure that they comply with the securities laws.

**Defendants Sold Penny Stock**

43.     Defendants sold stock that did not meet any of the exceptions from the definition

of a "penny stock," as defined by Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51–

1. [*See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1].

44.     Defendants therefore participated in the offering of penny stock by acting as

securities dealers engaged in the selling of penny stocks.

**COUNT**

**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)]**

**[All Defendants]**

45.     The SEC realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 44 above.

46.     By engaging in the conduct described above, Defendants made use of the mails or

other means or instrumentalities of interstate commerce to effect transactions in, to induce, and

to attempt to induce, the purchase and sale of, securities as part of a regular business while not

registered with the SEC as a dealer and when Defendants were not associated with an entity

registered with the SEC as a dealer.

47.     By reason of the foregoing, Defendants violated, and unless enjoined will likely

again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

**RELIEF REQUESTED**

**I.**

**(Injunctive Relief Against Future Securities Law Violations)**

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their

officers, agents, servants, employees, attorneys and those persons in active concert or

participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## II.

### (Disgorgement of Ill-Gotten Gains)

Issue an Order requiring Defendants to disgorge, jointly and severally, the ill-gotten gains that they received, directly or indirectly, including prejudgment interest.

## III.

### (Civil Penalties)

Issue an Order imposing appropriate civil penalties upon Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.

### (Penny Stock Bar)

Issue an Order permanently restraining and enjoining Defendants from participating in the offering of any penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

## V.

### (Retention of Equitable Jurisdiction)

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief

within the jurisdiction of this Court.

## VI.

### (Other Relief)

Grant such orders for further relief the Court deems appropriate.

### JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the SEC demands that this

case be tried before a jury.


Dated: September 3, 2020            Respectfully submitted,

                                    **UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**


                                    /s/ Eric M. Phillips
                                    Eric M. Phillips
                                    Amy S. Cotter
                                    Jaclyn J. Janssen
                                    Attorneys for Plaintiff
                                    Securities and Exchange Commission
                                    175 W. Jackson Blvd., Suite 1450
                                    Chicago, IL 60604
                                    Telephone: (312) 353-7390
                                    Facsimile: (312) 353-7398

                                    *Attorneys for Plaintiff*
                                    *U.S. Securities and Exchange Commission*