# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> JOHN M. FIFE, CHICAGO VENTURE PARTNERS, L.P., ILIAD RESEARCH AND TRADING, L.P., ST. GEORGE INVESTMENTS LLC, TONAQUINT, INC., and TYPENEX CO-INVESTMENT, LLC, <br><br> Defendants. | Case No. 1:20-cv-05227 <br><br> Judge Robert M. Dow, Jr. <br><br> Magistrate Judge Heather K. McShain <br><br> **Oral Argument Requested** |

## DEFENDANTS' BRIEF
## IN SUPPORT OF MOTION TO DISMISS

Michael J. Diver
Elliott M. Bacon
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200
michael.diver@katten.com

Helgi C. Walker*
Brian A. Richman*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
hwalker@gibsondunn.com

Barry Goldsmith*
M. Jonathan Seibald*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2440
bgoldsmith@gibsondunn.com

*Attorneys for Defendants*

December 7, 2020
_____

* *pro hac vice*

# TABLE OF CONTENTS

Page

Introduction ............................................................................................................................. 1

Background .............................................................................................................................. 2

    A.   Brokers And Dealers. ................................................................................................ 2

    B.   Chicago Venture Partners, L.P. ................................................................................ 3

Argument ................................................................................................................................. 7

I.   The SEC's Theory Is Legally Baseless ........................................................................... 7

    A.   The Exchange Act's Plain Text Forecloses SEC's Redefinition Of "Dealer." ...................... 7

        1.   CVP Is Not Regularly "Buying And Selling Securities." ..................................... 9

        2.   CVP Is Not Engaged In The "Regular Business" Of Providing Dealer Services To Others. ................................................................................... 12

    B.   "Dealer's" Ordinary Meaning Further Supports The Plain-Text Interpretation ............ 16

    C.   The Broader Statutory Scheme Confirms The Plain-Text Interpretation. ................... 17

    D.   The SEC's Theory Is Fundamentally Flawed. ......................................................... 19

II.   Due Process Forbids Any Liability Based On The SEC's Novel Interpretation ................... 21

III.   Other Constitutional Limitations Also Require Dismissal ............................................... 25

    A.   The SEC Lacks Constitutional Authority To Bring This Enforcement Action. ................. 25

    B.   The Regulatory Regime Is Unconstitutionally Structured. ....................................... 27

IV.   The Complaint Does Not State A Viable Claim For Disgorgement ................................... 29

    A.   The SEC Fails To Allege A Causal Link Between The Alleged Unlawful Activity And Any Disgorgement. ................................................................................... 29

    B.   Congress Has Not Authorized Disgorgement In These Circumstances. ...................... 30

Conclusion .............................................................................................................................. 30

**TABLE OF APPENDICES**

APPENDIX A:  C.H. Meyer, Law of Stock Brokers and Stock Exchanges § 43-a (Supp. 1933)

APPENDIX B:  SEC, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker, *Introduction* (1936)

APPENDIX C:  Webster's New International Dictionary, *dealer* (2d ed. 1934)

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Air Wisc. Airlines Corp. v. Hoeper,*
   571 U.S. 237 (2014) ............................................................................................................ 13

*Alvarez v. United States,*
   862 F.3d 1297 (11th Cir. 2017) ........................................................................................ 30

*Ames v. Comm'r,*
   B.T.A.M. (P-H) P 35,017 (1935) ...................................................................................... 14

*Biedron v. Futures,*
   1989 WL 134796 (N.D. Ill. Oct. 17, 1989) ...................................................................... 30

*Bond v. United States,*
   572 U.S. 844 (2014) ............................................................................................................ 16

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ................................................................................................................ 28

*CFTC v. S. Tr. Metals, Inc.,*
   894 F.3d 1313 (11th Cir. 2018) ........................................................................................ 30

*CFTC v. Sidoti,*
   178 F.3d 1132 (11th Cir. 1999) ........................................................................................ 29

*Chapel Invs., Inc. v. Cherubim Interests, Inc.,*
   177 F. Supp. 3d 981 (N.D. Tex. 2016) ....................................................................... 15, 18

*Charles Schwab & Co. v. Carter,*
   2005 WL 2369815 (N.D. Ill. Sept. 27, 2005) .................................................................. 17

*Christopher v. SmithKline Beecham Corp.,*
   567 U.S. 142 (2012) ..................................................................................................... 21, 24

*Cox v. Louisiana,*
   379 U.S. 559 (1965) ............................................................................................................ 24

*Cranberry Growers Coop. v. Layng,*
   930 F.3d 844 (7th Cir. 2019) ............................................................................................ 15

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ....................................................................................................... 25

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
    575 U.S. 43 (2015) ...................................................................................... 27, 28

*Dervan v. Gordian Grp. LLC*,
    2017 WL 819494 (S.D.N.Y. Feb. 28, 2017) .......................................................22

*Donander v. Comm'r*,
    29 B.T.A. 312 (1933) .................................................................................. 13, 17

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ...........................................................................................18

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ...........................................................................21, 22, 23

*FEC v. NRA Political Victory Fund*,
    6 F.3d 821 (D.C. Cir. 1993) ..............................................................................25

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) .................................................................................26, 27, 28

*Gutierrez-Brizuela v. Lynch*,
    834 F.3d 1142 (10th Cir. 2016) .........................................................................25

*Estate of Hall v. Comm'r*,
    29 B.T.A. 1255 (1934) .......................................................................................14

*Harriman Nat'l Bank v. Comm'r*,
    43 F.2d 950 (2d Cir. 1930) ................................................................................14

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015) ...........................................................................................27

*Howmet Corp. v. EPA*,
    614 F.3d 544 (D.C. Cir. 2010) ..........................................................................21

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) .................................................................................... 26, 27

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
    502 U.S. 183 (1991) ...........................................................................................13

*Johnson v. Winslow*,
    279 N.Y.S. 147 (Sup. Ct. 1935) ..........................................................................7

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010) ...........................................................................................17

*Kansas City v. Butt,*
    88 Mo. App. 237 (1901) ............................................................................... 10, 11

*Lebron v. Nat'l R.R. Passenger Corp.,*
    513 U.S. 374 (1995) .............................................................................................27

*Leocal v. Ashcroft,*
    543 U.S. 1 (2004) ................................................................................................12

*Liu v. SEC,*
    140 S. Ct. 1936 (2020) ........................................................................................30

*Lorillard v. Pons,*
    434 U.S. 575 (1978) .............................................................................................15

*Lucia v. SEC,*
    138 S. Ct. 2044 (2018) ................................................................................. 26, 28

*Myers v. United States,*
    272 U.S. 52 (1926) ..............................................................................................26

*Nat'l Archives & Records Admin. v. Favish,*
    541 U.S. 157 (2004) ..............................................................................................8

*Ne. Sur. Co. v. Comm'r,*
    29 B.T.A. 297 (1933)...........................................................................................14

*New Prime Inc. v. Oliveira,*
    139 S. Ct. 532, 540 (2019) ..................................................................................20

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019) ..........................................................................................14

*Oceana Capitol Grp. v. Red Giant Entm't, Inc.,*
    150 F. Supp. 3d 1219 (D. Nev. 2015) ............................................................ 15, 18

*Oil Shares, Inc. v. Comm'r,*
    29 B.T.A. 664 (1934)........................................................................................8, 14

*PHH Corp. v. CFPB,*
    839 F.3d 1 (D.C. Cir. 2016) ................................................... 21, 22, 23, 24, 25

*PHH Corp. v. CFPB,*
    881 F.3d 75 (D.C. Cir. 2018) (en banc)........................................................ 21, 26

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
    490 U.S. 477 (1989) .............................................................................................18

*Roth v. SEC*,
    22 F.3d 1108 (D.C. Cir. 1994) ................................................................. 3, 15, 17

*Satellite Broad. Co. v. FCC*,
    824 F.3d 1 (D.C. Cir. 1987) ........................................................................ 21

*Sec. Allied Corp. v. Comm'r*,
    B.T.A.M. (P-H) P 34,427 (1934) ................................................................ 14

*SEC v. Almagarby*,
    2020 WL 4783405 (S.D. Fla. Aug. 17, 2020) ....................................... 19, 20

*SEC v. Benger*,
    2015 WL 6859168 (N.D. Ill. Nov. 9, 2015) ............................................. 29

*SEC v. Berry*,
    2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ..................................... 29, 30

*SEC v. Big Apple Consulting USA, Inc.*,
    783 F.3d 786 (11th Cir. 2015) ................................................................... 20

*SEC v. Blinder, Robinson & Co.*,
    855 F.2d 677 (10th Cir. 1988) ................................................................... 26

*SEC v. City of Victorville*,
    2014 WL 12588688 (C.D. Cal. Oct. 14, 2014) ................................... 29, 30

*SEC v. Federated Alliance Grp.*,
    1996 WL 484036 (W.D.N.Y. Aug. 21, 1996) ................................7, 16, 19, 22

*SEC v. Keener*,
    2020 WL 4736205 (S.D. Fla. Aug. 14, 2020) ..................................... 19, 20

*SEC v. Mapp*,
    240 F. Supp. 3d 569 (E.D. Tex. 2017) ...................................................... 17

*SEC v. Razmilovic*,
    738 F.3d 14 (2d Cir. 2013) ........................................................................ 29

*SEC v. Ridenour*,
    913 F.2d 515 (8th Cir. 1990) .................................................................... 15

*SEC v. River N. Equity LLC*,
    415 F. Supp. 3d 853 (N.D. Ill. 2019) ........................................................ 19

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ................................................................... 25, 26, 27

*Smith v. Comm'r,*
    B.T.A.M. (P-H) P 36,060 (1936) ................................................................. 14

*State v. San Patricio Canning Co.,*
    17 S.W.2d 160 (Tex. App. 1929) .......................................................... 10, 11

*State v. Yearby,*
    82 N.C. 561 (1880) .................................................................................. 9, 10

*Stokeling v. United States,*
    139 S. Ct. 544 (2019) ................................................................................ 8, 10

*Stoller v. CFTC,*
    834 F.2d 262 (2d Cir. 1987) ........................................................................ 24

*Tager v. SEC,*
    344 F.2d 5 (2d Cir. 1965) ............................................................................ 17

*United States v. Am. Nat'l Can Co.,*
    126 F. Supp. 2d 521 (N.D. Ill. 2000) .......................................................... 21

*United States v. Germaine,*
    99 U.S. 508 (1878) ...................................................................................... 28

*United States v. Hartwell,*
    73 U.S. (6 Wall.) 385 (1867) ....................................................................... 28

*United States v. Rosenbohm,*
    564 F.3d 820 (7th Cir. 2009) ...................................................................... 13

*United States v. Thompson/Ctr. Arms Co.,*
    504 U.S. 505 (1992) .................................................................................... 17

*Upton v. SEC,*
    75 F.3d 92, 98 (2d Cir. 1996) ............................................................... 23, 24

*Util. Air Regulatory Grp. v. EPA,*
    573 U.S. 302 (2014) ...................................................................................... 7

*Vaughan v. Comm'r,*
    85 F.2d 497 (2d Cir. 1936) ......................................................................... 14

*Waters v. Churchill,*
    511 U.S. 661 (1994) .................................................................................... 19

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................................. 9, 17

*Wisc. Cent. Ltd. v. United States*,
138 S. Ct. 2067 (2018) .......................................................................................... 9

*Wisc. Res. Protection Council v. Flambeau Min. Co.*,
727 F.3d 700 (7th Cir. 2013) ............................................................................... 21

*Zwick v. Inteliquent, Inc.*,
83 F. Supp. 3d 804 (N.D. Ill. 2015) ...................................................................... 4

**Constitutional Provisions**

U.S. Const. amend. V ................................................................................................ 21

U.S. Const. art. II, § 2, cl. 2 .............................................................................. 28, 29

**Statutes**

15 U.S.C.
§ 77b(a)(12) ....................................................................................................... 20
§ 78aa ................................................................................................................. 27
§ 78bbb .............................................................................................................. 28
§ 78c(a)(4)(A) ................................................................................................ 2, 27
§ 78c(a)(5) .......................................................................................................... 20
§ 78c(a)(5)(A) ............................................................................................ 3, 9, 20
§ 78c(a)(5)(B) ........................................................................................... 9, 12, 13
§ 78ccc(a) ........................................................................................................... 27
§ 78ccc(a)(1) ................................................................................................ 27, 28
§ 78ccc(a)(2)(A) .......................................................................................... 17, 27
§ 78ccc(b)(4) ...................................................................................................... 28
§ 78ccc(b)(7) ...................................................................................................... 28
§ 78ccc(c)(2) ................................................................................................ 28, 29
§ 78ccc(e)(3) ...................................................................................................... 28
§ 78eee ............................................................................................................... 27
§ 78f(b)(2) .......................................................................................................... 17
§ 78ff(a) ........................................................................................................ 17, 28
§ 78fff-4(c) ......................................................................................................... 17
§ 78ggg(b) .......................................................................................................... 28
§ 78ggg(c)(2) ...................................................................................................... 28
§ 78jjj(a) ............................................................................................................. 28
§ 78kkk(a) ........................................................................................................... 28
§ 78o(a)(1) ..................................................................................................... 3, 29
§ 78o(b)(1) ................................................................................................... 18, 29
§ 78o(c)(3)(A) .................................................................................................... 17
§ 78o(e) .............................................................................................................. 17
§ 78q(b)(1) ......................................................................................................... 29
§ 78u(d) .............................................................................................................. 27
§ 78u(d)(5) ......................................................................................................... 30

Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999) ...................................... 8, 13, 15

Revenue Act of 1928, ch. 852, 45 Stat. 791 ............................................................................. 13

Securities Act of 1933, ch. 38, 48 Stat. 74 ............................................................................... 13

Securities Exchange Act of 1934, ch. 404, 48 Stat. 881 ............................................................. 12

**Regulations**

17 C.F.R.
§ 230.144 ....................................................................................................................... 4
§ 230.144(d)(1)(i) ......................................................................................................... 4
§ 230.144(d)(3)(ii) ........................................................................................................ 5
§ 230.144(e) (2006) ....................................................................................................... 4
§ 240.15b1-1 ........................................................................................................... 17, 29

FINRA
Rule 1220(b)(2)(B) ........................................................................................................ 18
Rule 2010 ...................................................................................................................... 29
Rule 5210.03(a) ............................................................................................................. 29
Rule 5290 ...................................................................................................................... 29

**Other Authorities**

1 Annals of Cong. 499 ........................................................................................................... 25

*Adoption of Rule 15Ba2-1*, 1975 WL 163406 (Oct. 15, 1975) ...................................................... 22

*Burton Sec.*,
1977 WL 10680 (SEC No-Action Letter Dec. 5, 1977) .................................................... 3, 6, 8, 22

Bylaws of SIPC (rev. no. 17, June 2020), https://tinyurl.com/y2sb4zdc .................................... 28

R.L.D. Colby et al., What Is a Broker-Dealer, *in* Broker-Dealer Regulation (updated
2016), *available at* https://tinyurl.com/yyapd5r7 ................................................... 10, 12, 22

R. Copeland, *Steven A. Cohen's Point72 Earns Big 2014 Trading Profit*, Wall St. J. (Jan. 5,
2015), https://tinyurl.com/y53e4ggu ................................................................................. 25

*Continental Grain Co.*,
1987 WL 108902 (SEC No-Action Letter Nov. 6, 1987) ...................................................... 22

*Davenport Mgmt., Inc.*,
1993 WL 120436 (SEC No-Action Letter Apr. 13, 1993) ..................................................... 22

Definition of Terms, 67 Fed. Reg. 67,496 (Nov. 5, 2002) ....................................................... 22

Definition of Terms, 68 Fed. Reg. 8686 (Feb. 24, 2003) ......................................................... 22

Div. of Trading & Markets, SEC, Staff Compliance Guide to Banks on Dealer
Statutory Exceptions and Rules, https://tinyurl.com/yxlkrvps (last visited Dec.
6, 2020) ............................................................................................................... 23

Div. of Trading & Markets, SEC, Compliance Guide to Banks on Dealer Statutory
Exceptions and Rules (2007), https://tinyurl.com/yxlkrvps .............................. 22

Div. of Trading & Markets, SEC, Guide to Broker-Dealer Registration (2008),
https://tinyurl.com/y5s35gdb .................................................................. 3, 11, 22

Exchange Act Release No. 9064, 1971 WL 128397 (Jan. 22, 1971) ........................ 27

F. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527 (1947) ......................... 8

Further Definition of Swap Dealer, 77 Fed. Reg. 30,596 (May 23, 2012) ....................... 10, 12

*In re Gary L. McDuff*,
2015 WL 1873119 (Apr. 23, 2015) ...................................................................... 23

*In re Gordon Wesley Sodorff*,
1992 WL 224082 (Sept. 2, 1992) .............................................................. 12, 14, 15, 22

H.R. Doc. No. 75-707 (1938) ........................................................................................ 12

*Henry A. Meyer*,
2006 WL 3900164 (N.Y.S.E. Dec. 11, 2006) ...................................................... 11

*J.J.B. Hilliard, W.L. Lyons, Inc.*,
2007 WL 1725802 (N.Y.S.E. May 16, 2007) ...................................................... 11

*In re Jay T. Comeaux*,
2014 WL 4160054 (Aug. 21, 2014) ..................................................................... 29

*In re John Thomas Capital Mgmt. Grp.*,
2020 WL 5291417 (Sept. 4, 2020) ...................................................................... 27

*Joseph McCulley Sales*,
1972 WL 9127 (SEC No-Action Letter Sept. 1, 1972) ...................................... 11

14B G. Lander, U.S. Securities Law for Int'l Financial Transactions and Capital
Markets (updated Nov. 2020) ............................................................................. 22

*Louis Dreyfus Corp.*,
1987 WL 108160 (SEC No-Action Letter July 23, 1987) ............................... 15, 22

23 J. Markham & T. Hazen, Broker-Dealer Operations Under Securities and
Commodities Laws (updated Nov. 2020) ........................................................... 22

C.H. Meyer, Law of Stock Brokers and Stock Exchanges (Supp. 1933) ................. 2, 8, 10, 12

*Nat'l Council of Savings Institutions*,
1986 WL 67129 (SEC No-Action Letter July 27, 1986).................................................22

OTC Derivatives Dealers, 63 Fed. Reg. 59,362 (Nov. 3, 1998)..............................................22

*Public Printing*,
1903 WL 3830 (Pa. Att'y Gen. June 12, 1903)...........................................................10

Revision of Holding Period Requirements in Rules 144 and 145,
62 Fed. Reg. 9242 (Feb. 28, 1997).....................................................................4, 5

Revisions to Rules 144 & 145, 72 Fed. Reg. 71,546 (Dec. 17, 2007) ...................4, 5, 6, 18, 24

*In re S.A.C. Capital Advisors, L.P.*,
2014 WL 2915930 (June 27, 2014)......................................................................25

*Samuel M. Krieger*,
1982 WL 29327 (SEC No-Action Letter July 12, 1982)....................................................11

SEC, EDGAR: Company Filings,
https://tinyurl.com/q9wltbz (last visited Dec. 4, 2020) ..................................................4

SEC, Form BD, https://tinyurl.com/yxsbuear (last visited Dec. 4, 2020).....................................17

SEC, Report on the Feasibility and Advisability of the Complete Segregation of the
Functions of Dealer and Broker (1936), *available at* https://tinyurl.com/y69rj58e .............8, 10, 13

*Series 7: General Securities Representative Exam*, FINRA,
https://tinyurl.com/yxnk94t3 (last visited Dec. 6, 2020) ................................................18

Testimony of B. Barbash, Div. of Inv. Mgmt., 1995 WL 641412 (Oct. 31, 1995)................................15

Testimony of Richard L. Lindsey, Div. of Mkt. Reg., 1998 WL 781102 (Oct. 1, 1998) ..........................8

Webster's New International Dictionary (2d ed. 1934)...........................................................10

## INTRODUCTION

This case is premised on a government bait-and-switch. To encourage lenders to participate in certain types of private securities transactions, the Securities and Exchange Commission twice shortened the time that lenders must hold restricted securities before they can resell them into the market. And for decades, the Commission, through published guidance and no-action letters, has reassured lenders (and other market participants) that they would *not* need to register as a "dealer," so long as they refrained from engaging in traditional dealer activities, such as effecting customer transactions or offering investment advice. This regulatory regime was designed to promote the Commission's policy goal of broadening access to capital for smaller public companies.

Chicago Venture Partners, L.P., and the other entity defendants (collectively, "CVP"), along with their owner, John Fife, responded to the Commission's encouragement. CVP began offering loans, in the form of convertible debt, to small companies that would otherwise have struggled to obtain affordable capital. It did so with Mr. Fife's money alone, not that of public customers. And the company acted in a manner that it understood—based on the plain text of the Securities Exchange Act, over a century of legal and business precedent, and the Commission's repeated and consistent guidance—would not require registration as a dealer. At the same time, CVP and its counterparties publicly disclosed to the SEC and the market exactly what CVP was doing. The SEC said nothing.

Now, years later, the Commission claims that CVP should have been registered as a dealer all along. And the Commission bases its claim on the very securities transactions that it invited CVP to conduct in the first place to give small businesses access to capital. Worse, in filing this suit, the Commission ignores its own guidance that existed at the time of CVP's activity, which makes clear CVP is not a "dealer," but instead applies a new, made-for-litigation view of what a "dealer" is.

The law, however, does not countenance this. The SEC's new and novel interpretation of the

1

term "dealer" cannot be squared with the text or structure of the Exchange Act. Nor can the Commission's *retroactive* application of its new interpretation be reconciled with bedrock principles of due process and fair notice. The Commission, moreover, lacks authority to bring this case, and wrongly seeks to punish CVP for declining to subject itself to an unconstitutional regulatory regime. For these and other reasons detailed below, this case must be dismissed.

## BACKGROUND

### A.    Brokers And Dealers.

Brokers and dealers have long played a pivotal role in maintaining the efficiency of our securities markets. For more than a century, they have served public investors by effecting customers' securities transactions, providing customers investment advice, taking custody of customers' securities and funds, and offering other customer services. *See, e.g.*, C.H. Meyer, Law of Stock Brokers and Stock Exchanges § 43-a, at 33 (Supp. 1933) ("Law of Stock Brokers 1933") (discussing the relationship between "stock *broker* and customer or stock *dealer* and customer"); SEC Br. at 8, *XY Planning Network LLC v. SEC*, No. 19-2886(L) (2d Cir. Mar. 3, 2020) (noting that brokers and dealers have been providing investment advice to their customers "since before the federal securities laws were enacted").

Brokers and dealers occupy two sides of the same coin. While a broker effectuates a client's trades as an agent—buying and selling securities "*for*" the customer "as the customer's representative"—a dealer effectuates a client's trades as a "principal"—buying and selling securities "*from* his customer[ ]" and "*to* his customer." Law of Stock Brokers 1933, at 32–34 (emphases added); *see id.* at 32 ("the broker does not himself sell to or buy from the customer"; such "a person is a security *dealer* as distinguished from a *broker*"). Congress has long recognized this distinction—defining brokers and dealers in functional terms of *how* they effectuate customer transactions. Thus, a "broker" is a person "engaged in the business of effecting transactions in securities for the account of others" (as an agent), 15 U.S.C. § 78c(a)(4)(A), while a "dealer" is a person "engaged in the business of buying and selling

securities . . . for such person's own account" (as a principal), *id.* § 78c(a)(5)(A).

Under the Exchange Act, both brokers and dealers are required to register with the Commission. *See* 15 U.S.C. § 78o(a)(1). Registration is the "keystone of the entire system of broker-dealer regulation." *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994). The purpose of this regulatory scheme is customer protection. Once a broker or dealer has registered, that entity is "bound to abide by numerous regulations designed to protect prospective purchasers of securities, including standards of professional conduct, financial responsibility requirements, recordkeeping requirements, and supervisory obligations over broker-dealer employees." *Id.* All in all, the broker and dealer registration system ensures that "securities are [only] sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells." *Id.*

Not just anyone who trades securities is subject to these requirements. Consistent with the traditional understanding of what a dealer is, along with the purpose of registration—*i.e.*, protecting investors—the SEC has long considered brokers and dealers to be only those entities that engage in a public securities business by effecting customer transactions, offering investment advice, quoting two-way markets, and the like. And for nearly half a century, the agency has identified—and reiterated, over and over again—these and similar customer-service-related factors to determine whether a firm may be a dealer. *See, e.g.*, Guide to Broker-Dealer Registration (2008), https://tinyurl.com/y5s35gdb; *Burton Sec.*, 1977 WL 10680, at *1 (SEC No-Action Letter Dec. 5, 1977); *infra* pp. 8, 21–22.

### B.    Chicago Venture Partners, L.P.

CVP is a family office: It manages and invests the money of its owner, John Fife—not the money of outside investors or customers. *See* Compl. ¶¶ 12–16. CVP is also a lender: It loans Mr. Fife's money to small businesses. These loans take many forms. Some are simple promissory notes, where the borrower agrees to repay CVP in cash. *See, e.g.*, CIK No. 0000924168, Form 10-K, at 10

(Mar. 24, 2020), https://tinyurl.com/y3yzfqyo.[1]  Others are *convertible* notes, where the borrower agrees either to repay the loan in cash *or* to satisfy the debt by converting the debt into shares of the borrower and transferring those shares to CVP—shares that CVP may "resell" to "recoup [its] capital."  Revision of Holding Period Requirements in Rules 144 and 145, 62 Fed. Reg. 9242, 9244 (Feb. 28, 1997); *see, e.g.*, CIK No. 0001455819, Form 8-K, at 2 (Dec. 8, 2014), https://tinyurl.com/y38hjdgc ("company may make such payments in cash . . . [or] shares of common stock"), *incorporated by reference in* Compl. ¶ 36(c) (Vape Holdings).  This case is about the second type of loan.

When small businesses cannot raise capital in public markets, they often turn to private transactions.  The securities (here, notes) they may issue as part of those transactions generally must (under SEC Rule 144, 17 C.F.R. § 230.144) be "restricted"—meaning the liquidity provider, typically a lender, cannot resell securities converted from the notes for some period of time.  *See* Compl. ¶ 27.  That creates "more risk" than many lenders are willing to bear, Revisions to Rules 144 & 145, 72 Fed. Reg. 71,546, 71,562 (Dec. 17, 2007), because the longer the holding period drags on, the more can go wrong (especially with a small business) that would prevent the lender from being "able to recoup [its] capital," 62 Fed. Reg. at 9244.[2]  To encourage lenders to nonetheless participate in private transactions with smaller companies, and to do so at a reasonable cost, the SEC twice slashed the minimum holding period—first in 1997, and again in 2007.  *See id.* at 71,564 (codified at 17 C.F.R. § 230.144(d)(1)(i)); 62 Fed. Reg. at 9243.  After the 1997 amendments, lenders could engage in a "*limited* resale" of restricted securities after one year (rather than two), and "*unlimited* resales" after two years (rather than three). 62 Fed. Reg. at 9243 (emphases added); *see, e.g.*, 17 C.F.R. § 230.144(e) (2006) (limiting the number of

---

[1]  SEC filings are publicly available on the SEC's EDGAR database (https://tinyurl.com/q9wltbz), where each filer is identified by a Central Index Key ("CIK") number.  The Court may take "judicial notice" of "SEC filings," as "matters of public record."  *Zwick v. Inteliquent, Inc.*, 83 F. Supp. 3d 804, 807 n.1 (N.D. Ill. 2015).

[2]  *Compare, e.g.*, CIK No. 0001425808, Form 8-K, Exh. 10.1 (Oct. 22, 2015), https://tinyurl.com/y6488x2s (reporting convertible loan from Defendant Typenex), *with In re Hydrocarb Energy Corp.*, No. 16-bk-31922 (Bankr. S.D. Tex. filed Apr. 13, 2016) (declaring bankruptcy before making a payment).

shares that could be resold within the first two years). In 2007, the SEC sliced both holding periods to just six months, disproportionally cutting the waiting time for "unlimited public resales." 72 Fed. Reg. at 71,551. At the same time, it adopted rules specifically designed to facilitate *convertible* transactions. *Id.* at 71,555 (codified at 17 C.F.R. § 230.144(d)(3)(ii)). The goal was explicit: By permitting lenders to "resell[ ]" on a shorter timeline restricted securities, including convertible securities, the Commission hoped to draw more lenders into the market. *Id.* at 71,564. And by removing "volume of sale limitations" on those resells—so that lenders could recoup *any* size investment by reselling an "unlimited" number of shares—the Commission hoped to draw in larger loans as well—all to "promote capital formation, particularly for smaller companies." *Id.* at 71,551, 71,563, 71,564.

CVP answered the Commission's call. In full compliance with the Rule 144 process established by the Commission to promote small-business access to capital, CVP provided small-cap companies with loan financing in exchange for convertible notes. *See* Compl. ¶¶ 27, 29. This type of funding is critical to small, emerging companies and their shareholders, because it provides access to capital that these companies generally cannot obtain from other sources. 72 Fed. Reg. at 71,564. And it does so while preserving the companies' flexibility. The terms of those notes generally authorize the borrower either to repay the note in cash or to satisfy the outstanding debt by converting the debt—after "wait[ing] . . . six months," per "the required Rule 144 holding period," Compl. ¶ 27—into shares of the borrower's stock and transferring that stock to CVP, so that CVP can recoup its investment by "resell[ing]" the stock into the market, 72 Fed. Reg. at 71,564. As the Commission has recognized for years, the conversion occurs "at a discount" from the market price to "compensate[ ]" CVP for the risk that it incurs. 62 Fed. Reg. at 9243. Many borrowers choose to repay the note in cash. *See, e.g.*, CIK No. 0001386049, Form 10-K, at 7–8 (Apr. 12, 2019), https://tinyurl.com/y5kc2lfd (although note was "convertible into shares of common stock," company opted to "satisfy the outstanding balance with cash"). Others opt not to repay the note in cash; instead, they convert the debt

into shares and transfer those shares to CVP, in which case, CVP—just as the Commission expected—"resells" the shares into the market. 72 Fed. Reg. at 71,564; *see, e.g.*, Compl. ¶ 27. In virtually all cases, the borrower fully discloses the terms of the note to its shareholders, the investing public, and the SEC itself. *See, e.g.*, CIK No. 0001455819, Form 8-K (Dec. 8, 2014), https://tinyurl.com/y38hjdgc, *incorporated by reference in* Compl. ¶ 36(c) (Vape Holdings); CIK No. 0000859747, Form 8-K, at 4 (Apr. 4, 2016), https://tinyurl.com/y4jvvyu4, *incorporated by reference in* Compl. ¶ 36(b) (1PM Industries).

In fact, the SEC has known about CVP's business activities for years. CVP's (and other convertible note lenders') counterparties have long informed the SEC about their convertible note transactions, appending the loan agreements to thousands of 10-Ks, 10-Qs, and 8-Ks publicly filed with the SEC.[3] CVP has disclosed many of these deals to the SEC as well.[4] Yet no one at the SEC ever suggested that CVP was a "dealer" or otherwise needed to register with the Commission.

Until now, many years later. In this suit, the SEC claims that CVP has been a dealer all along—not because CVP is alleged to have offered investment advice, held customer funds, executed customer transactions, quoted a two-way market, advertised itself as a dealer, or offered any other "services which are usually provided by dealers," *Burton Sec.*, 1977 WL 10680, at *1—but because CVP supposedly "bought" convertible notes (*i.e.*, *loaned* money), "convert[ed] the notes" into stock (when the borrower elected not to repay the loan in cash), and "s[old]" that stock into the market, Compl. ¶¶ 3, 28. All in undisputed compliance with Rule 144, *see id.* ¶ 27, and in connection with deals that were fully disclosed to the Commission and the investing public for the better part of a decade.

---

[3] *See, e.g.*, CIK No. 0001289496, Form 10-K, at 5 (Apr. 1, 2013), https://tinyurl.com/y2zaw7kv (company issued "Convertible" note to Defendant Tonaquint, which could "convert" the balance "into shares"); CIK No. 0001464830, Form 8-K, at 1–2 (Apr. 10, 2012), https://tinyurl.com/yyb746wr (company "issued [Defendant] Iliad a Convertible Promissory Note," which may be paid "either [in] cash or shares"); CIK No. 0001364560, Form 10-Q, at 12 (Nov. 5, 2010), https://tinyurl.com/y3gb6m5p ("convertible note . . . was issued to [Defendant] St. George . . . convertible into common stock, six months after the date of the note").

[4] *See, e.g.*, CIK No. 0001455819, Schedule 13G (Sept. 29, 2015), https://tinyurl.com/y6mxp5ak (Vape Holdings); CIK No. 0001455819, Schedule 13G (Nov. 18, 2016), https://tinyurl.com/y2bb68wz (1PM Industries).

**ARGUMENT**

The SEC's case is fundamentally flawed. It is based on a new interpretation of "dealer" that is contrary to the plain text of the Exchange Act, along with nearly a century of precedent interpreting the term. And it seeks to apply that new and flawed interpretation *retroactively*, violating fundamental principles of due process and fair notice to boot. What is more, the Commission lacks the constitutional authority to bring this case, and wrongly seeks to punish CVP for declining to subject itself to a regulatory scheme that itself flouts the Constitution's structural safeguards. The Commission, moreover, demands as part of this flawed endeavor sweeping disgorgement remedies, but Congress has not authorized that relief in these circumstances, and, in any event, the Commission does not—and cannot—allege a causal link between the alleged registration violation and any amount that could even conceivably be disgorged. For these reasons, this case should be dismissed.

## I.    The SEC's Theory Is Legally Baseless.

The Exchange Act's plain meaning precludes the SEC from adopting a definition of "dealer" so broad that it sweeps in virtually any business that "purchase[s] and s[ells]" securities, Compl. ¶ 46—including every family office, hedge fund, investment company, and day trader—regardless of the presence of customers or typical dealer activities. *See, e.g., SEC v. Federated Alliance Grp.*, 1996 WL 484036, at *5 (W.D.N.Y. Aug. 21, 1996) (rejecting such an "excessively broad definition," which would "embrace as a dealer every securities trader who makes money through buying and selling securities"). Indeed, "[w]hen an agency claims to discover in a long-extant statute [such] an unheralded power to regulate a significant portion of the American economy," the courts must "greet its announcement with a measure of skepticism." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (cleaned up).

### A.    The Exchange Act's Plain Text Forecloses SEC's Redefinition Of "Dealer."

A "dealer" is a known quantity under our nation's securities laws. By the time of the Exchange Act, the concept of a "dealer" had "been before the courts for adjudication repeatedly," *Johnson v.*

*Winslow*, 279 N.Y.S. 147, 156 (Sup. Ct. 1935) (quoting Law of Stock Brokers 1933, at 32), *aff'd* 246 A.D. 800 (N.Y. App. Div. 1936), and had received a "long [and] continued executive construction," *Oil Shares, Inc. v. Comm'r*, 29 B.T.A. 664, 669 (1934). Congress knew of and "legislated against [the] background" of that historical construction. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 169 (2004). And thus, when Congress took the word "dealer" and replanted it in the federal code, "it br[ought] the old soil with it," retaining the substance of the tradition it had engaged. *Stokeling v. United States*, 139 S. Ct. 544, 551 (2019) (cleaned up) (quoting F. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).

That tradition was clear: A dealer (in the words of the Exchange Act) was engaged in the historical "business of dealing." Pub. L. No. 106-102, § 202, 113 Stat. 1338, 1390 (1999) (codified at 15 U.S.C. § 78c(a)(5)). It carried "on a public securities business," where it "deal[t] directly with public investors," Testimony of Richard L. Lindsey, Div. of Mkt. Reg., 1998 WL 781102, at *2 n.2 (Oct. 1, 1998), by facilitating trades for "[its] customer[s]," SEC, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker, at XIV (1936) ("SEC Report on Feasibility"), *available at* https://tinyurl.com/y69rj58e, offering "investment advice," SEC Br. at 8, *XY Planning* (describing dealers "before the federal securities laws"), and the like. That is how every dealer has operated. And that is how the SEC itself has defined "dealers" for decades:

> [A dealer] handle[s] other people's money or securities; . . . hold[s] himself out as being willing to buy and sell securities for his own account on a continuous basis; and . . . furnish[es] the services which are usually provided by dealers, such as quoting the market in one or more securities, rendering incidental investment advice, or extending or arranging for the extension of credit in connection with securities transactions.

*Burton Sec.*, 1977 WL 10680, at *1; *supra* pp. 2–3; *infra* pp. 21–22 & n.8.

The Exchange Act, of course, contains definitional provisions that further guide how "dealer" should be interpreted. But none of those provisions suggest that Congress discarded the settled meaning of "dealer," let alone provide the "clear" "textual commitment" one would expect had Congress

really wanted to "alter" such a "fundamental detail[ ]" of the "regulatory scheme." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes."). Rather, the definitional provisions confirm that Congress was referring to the traditional conception of a dealer—a public securities business serving its customers. As relevant here, the definition of "dealer" has two elements, both of which Congress borrowed from pre-existing law to cabin the meaning of "dealer" to its historical roots. The first element limits the definition of "dealer" to those "buying and selling securities . . . for [their] own account[s]," 15 U.S.C. § 78c(a)(5)(A), while the second exempts those not acting "as a part of a regular business," *id.* § 78c(a)(5)(B).

The SEC ignores both elements. The first element—"buying and selling securities"—plainly excludes CVP because that phrase, in 1934, reached only those entities that bought and sold the *same* article in the *same* condition, like a typical market maker, and CVP undisputedly trades *different* securities in *different* conditions. *See, e.g.*, Compl. ¶ 3 (alleging that CVP "buy[s] convertible promissory notes" from hundreds of different issuers, "convert[s]" those "notes" into "stock," and "sell[s]" the "stock"). And the second element—"part of a regular business"—likewise excludes CVP because it encompasses only those firms that are in the regular business of providing traditional dealer services for customers, such as quoting a two-way market, and CVP is not alleged to have ever engaged in those activities. In no world, then, is CVP a dealer. The Commission's case fails as a matter of law.

### 1. CVP Is Not Regularly "Buying And Selling Securities."

CVP is not a dealer because, even taking the complaint's allegations at face value, CVP is not regularly "buying and selling securities." 15 U.S.C. § 78c(a)(5)(A).

*a.* To regularly "buy[ ] and sell[ ] securities" is to buy and sell the *same* type of security, in the *same* condition, around the *same* time. That is how the phrase "buying and selling" was understood "at the time Congress enacted the statute." *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018). *State v. Yearby*, 82 N.C. 561 (1880), is instructive. There, the court confronted a similarly worded state

law. And it held that the legislature, "by coupling the two acts of buying and selling" in the statute, intended to "render the law more explicit," such that a "dealer" would include only those entities that "buy and sell *the same article* and in *the same condition*." *Id.* at 562. That interpretation was soon adopted around the country. Thus, under similar dealer statutes: a butcher was not a dealer in livestock, *Public Printing*, 1903 WL 3830, at *1 (Pa. Att'y Gen. June 12, 1903); an icemaker was not a dealer in water, *see Kansas City v. Butt*, 88 Mo. App. 237, 240 (1901); and a shrimp canner was not a dealer in shrimp, *State v. San Patricio Canning Co.*, 17 S.W.2d 160, 162 (Tex. App. 1929). Even though the latter, for instance, bought (raw) shrimp and sold (canned) shrimp, it was not "buying and selling shrimp" in the statutory sense, because the shrimp were not in the same "form and condition." *Id.*

The same limitation applies here. When Congress replanted the "buying and selling" language in the Exchange Act—the only place it appears in the original Act—it brought the established meaning of that phrase along with it. *See Stokeling*, 139 S. Ct. at 551; *see also* SEC Report on Feasibility, at XIV ("The characteristic activities of a dealer in securities are similar to those of a dealer . . . in merchandise."); Law of Stock Brokers 1933, at 35 (similar). That conclusion applies with special force here, where the ordinary meaning, in 1934, of "a *dealer* in stocks" was one who buys and sells stocks "*without altering their condition*." Webster's New Int'l Dictionary 675 (2d ed. 1939) (second emphasis added).

    *b.* The SEC itself has read the coupling of "buying and selling" in the statutory text to place a significant limitation on the reach of the dealer definition. The "conjunctive 'buying *and* selling,'" the SEC has explained, "connotes a degree of offsetting two-sided activity," meaning that "two-sided markets" are plainly "relevant for identifying . . . dealers." Further Definition of Swap Dealer, 77 Fed. Reg. 30,596, 30,607 & n.174 (May 23, 2012) (emphasis added). Such offsetting activity generally involves "buying and selling *the same security simultaneously*," R. Colby, Chief Legal Officer, FINRA & Former Deputy Director, Div. of Trading & Mkts., SEC, et al., What Is a Broker-Dealer, *in* Broker-Dealer Regulation § 2:3.2, at 2-62 (updated 2016), *available at* https://tinyurl.com/yyapd5r7 (emphasis

added)—or as the SEC's website today puts it, "a *particular security* on a *continuous basis*," Guide to Broker-Dealer Registration (2008), https://tinyurl.com/y5s35gdb (emphases added).  Such offsetting activity does not exist where the buy and sell are of different forms.  *See, e.g.*, *Samuel M. Krieger*, 1982 WL 29327, at *1 (SEC No-Action Letter July 12, 1982) (no registration required where purchases were in the United States, but redemptions were abroad); *Joseph McCulley Sales*, 1972 WL 9127, at *1 (SEC No-Action Letter Sept. 1, 1972) (no registration where advertisements were for buys, but not for sells).

*c.*    Under these well-established and settled principles and precedents, CVP does not come close to "buying and selling securities" within the meaning of the Exchange Act.

CVP does not buy and sell the same security in the same condition.  CVP *loans* money to fully reporting public companies, and even if *lending* somehow qualifies as *buying*, the face of the complaint makes clear that CVP does not buy and sell the same security in the same form.  The complaint itself alleges that CVP "*buy*[s] convertible promissory notes . . . from approximately 135 different microcap issuers . . . *convert[s] th[ose] notes into newly-issued shares of stock*, and . . . *sell[s] those shares* into the public market."  Compl. ¶ 3 (emphases added).  But just as buying raw shrimp, "convert[ing] [that shrimp] into" canned shrimp, and "s[elling]" the canned shrimp is not dealing in the same article in the same condition, *San Patricio Canning Co.*, 17 S.W.2d at 162, "buy[ing]" a convertible note, "convert[ing]" that note into stock, and later "sell[ing]" that stock is not dealing in the same security in the same condition, Compl. ¶ 3.  To be sure, the stock may be the "product" of the original investment, *San Patricio Canning Co.*, 17 S.W.2d at 162; *Butt*, 88 Mo. App. at 240, just as canned shrimp is the product of raw shrimp, but it is not the same article.  The securities are such different products, with such different restrictions and different risk profiles, that the Commission itself would charge a firm with fraud just for saying it had "purchased [stock] shares," when "[i]n reality," it acquired "convertible promissory note[s]." Compl. ¶ 27, *SEC v. Gross*, No. 08-cv-81039 (S.D. Fla. Sept. 22, 2008), 2008 WL 5359264; *see also J.J.B. Hilliard, W.L. Lyons, Inc.*, 2007 WL 1725802, at *5 (N.Y.S.E. May 16, 2007); *Henry A. Meyer*, 2006 WL

11

3900164, at *4 (N.Y.S.E. Dec. 11, 2006).  In these circumstances, the Commission cannot plausibly claim that CVP is "buying and selling" the same securities in the same condition, and the complaint's allegations make that crystal clear.

Nor can the Commission claim that the buys and sells exhibit the temporal connection associated with "offsetting two-sided activity," 77 Fed. Reg. at 30,607 n.174, much less that the buys and sells are "simultaneous[ ]," Colby et al., What Is a Broker-Dealer, at 2-62.  Here, if CVP sells anything at all, it sells an entirely different security *more than six months* after the alleged buy.  *See, e.g.*, Compl. ¶ 27.  In no way is that "buying and selling securities" within the meaning of the Exchange Act.

### 2. CVP Is Not Engaged In The "Regular Business" Of Providing Dealer Services To Others.

The SEC's case fails for a second reason:  Congress excluded from the definition of "dealer" any "person that buys or sells securities . . . *but not as a part of a regular business.*"  15 U.S.C. § 78c(a)(5)(B) (emphasis added).  To be a dealer, then, one must buy and sell securities "as part of a regular business."

*a.* By "regular business," Congress plainly meant the traditional business of dealing.  Statutory language must be read "in its context and in light of the terms surrounding it."  *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004).  And here, when Congress referred to a "regular business" in the context of a paragraph about—and titled after—a very particular business model whose "rights and duties [had] been before the courts for adjudication" for decades, Law of Stock Brokers 1933, at 32, Congress was plainly referring to *that* business model.  *See In re Gordon Wesley Sodorff*, 1992 WL 224082, at *5 (Sept. 2, 1992) (acknowledging that the "phrase" "a regular business" excludes "from the definition of 'dealer' members of the public who" act "as ordinary traders").

That is why, for example, when Congress instructed the Commission, in the original Act, to study the "advisability of the complete segregation of the functions of dealer and broker," Securities Exchange Act of 1934, ch. 404, § 11(e), 48 Stat. 881, 892, the agency did not run off and study just any firm that bought or sold stock as part of a business—although there were plenty of those, *see* H.R.

Doc. No. 75-707 (1938) (study of investment companies). Rather, the Commission knew from context exactly what Congress meant: a business engaged in the "characteristic activities of a dealer"—*i.e.*, "sell[ing] securities to" and "buy[ing] securities from [its] customers." SEC Report on Feasibility, at XIV. *That* is the entity Congress was addressing and that is the entity the Commission studied—a firm "engaged in the business of dealing" (as Congress later titled the relevant provision). 113 Stat. at 1390 (codified at 15 U.S.C. § 78c(a)(5)(B)); *see INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("the title . . . can aid in resolving an ambiguity"). Indeed, "if Congress wanted to encompass *any*" business that engaged in trading, "it certainly knew how to do so and could have worded the statute more broadly"—but did not. *United States v. Rosenbohm*, 564 F.3d 820, 824 (7th Cir. 2009); *cf.* Securities Act of 1933, ch. 38, § 2(12), 48 Stat. 74, 75 (regulating "dealing *or trading*" (emphasis added)).

The legal background against which Congress acted further confirms that the term "dealer" reaches only those firms that perform traditional dealer services for customers. At the time the Exchange Act was enacted, the word "dealer" already appeared in federal law. *See* Revenue Act of 1928, ch. 852, § 118, 45 Stat. 791, 826. And Internal Revenue regulations already excluded from that term's reach any person that bought or sold securities "not in the course of an established business." *Donander Co. v. Comm'r*, 29 B.T.A. 312, 313 (1933). When Congress, in the Exchange Act, reused that same exclusionary phrase—nearly verbatim—it is "presum[ed]" to have "adopt[ed] the cluster of ideas" that were attached to "the body of learning from which [the phrase] was taken." *Air Wisc. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014).

That body of learning plainly excluded from the definition of "dealer" any firm that did not perform traditional public-facing dealer services. As one court put it in 1933, "regardless of the number of purchases and sales" of stock, the term "dealer" "ha[d] application [only] to a merchant who h[eld] himself out to sell to customers." *Donander*, 29 B.T.A. at 314–15. Thus, a firm that traded stock "for making a market" or "for sale to customers"—traditional dealer activities—was a "dealer."

13

*Vaughan v. Comm'r*, 85 F.2d 497, 499 (2d Cir. 1936); *see also, e.g.*, *Harriman Nat'l Bank v. Comm'r*, 43 F.2d 950, 952 (2d Cir. 1930) (dealer "purchased securities to fill specific orders" and "h[eld] them for customers"); *Estate of Hall v. Comm'r*, 29 B.T.A. 1255, 1260 (1934) (dealer "held itself out as a merchant of securities"). In contrast, a firm that traded—even heavily—for its own "speculation," sans customers, was not. *Vaughan*, 85 F.2d at 499; *see also, e.g.*, *Sec. Allied Corp. v. Comm'r*, B.T.A.M. (P-H) P 34,427 (1934) ("investment trust" was not a dealer, even though its "activities . . . consisted in the buying and selling of securities"); *Oil Shares*, 29 B.T.A. at 668 ("investment business," which "buys and sells shares of stock" for "its own profit," "is not a dealer in securities").

Whether a company held itself out as a dealer was a key component of the "legal backdrop" "against which 'Congress legislated.'" *Nielsen v. Preap*, 139 S. Ct. 954, 967 (2019). While a dealer would "h[o]ld itself out generally as a dealer in securities," *Hall*, 29 B.T.A. at 1257, a trader or other non-dealer would not. So even where a trader "devoted his entire time to [a] business of trading in securities," he was not considered a "dealer" unless "he held himself out as a dealer in the sense that he invited the trading public to purchase and sell through him." *Ames v. Comm'r*, B.T.A.M. (P-H) P 35,017 (1935); *see also, e.g.*, *Smith v. Comm'r*, B.T.A.M. (P-H) P 36,060 (1936) ("[H]e did not advertise as a dealer in securities, or hold himself out, by correspondence or orally, as a dealer in securities. Hence, it clearly appears that the petitioner is not a dealer or merchant of securities . . . ."); *Ne. Sur. Co. v. Comm'r*, 29 B.T.A. 297, 298–99 (1933) (holding that company was "clearly . . . not a merchant or dealer in securities" where "it did not advertise or otherwise hold itself out to the public as a dealer in securities").

*b.* The Commission and the courts have likewise interpreted "dealer" in light of traditional dealer activities performed for public customers. In *Sodorff*, for example, the Commission held that a market participant was a dealer because he "solicited investors and handled their money and securities, rendered investment advice, and sent subscription agreements to investors for their review and signature, all of which are characteristics of dealer activity." 1992 WL 224082, at *5. Then, in a

14

sentence that all but decides the present case, the Commission made clear that "*[t]hese factors* distinguish the activities of a dealer" (who must register with the Commission) "from those of a private investor or trader" (who need not). *Id.* at *5 n.27 (emphasis added). Congress confirmed and "adopt[ed]" this understanding, just a few years later, "when it re-enact[ed]" the regular-business requirement "without change," *Cranberry Growers Coop. v. Layng*, 930 F.3d 844, 852 (7th Cir. 2019) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)), even titling the reenacted paragraph "business of dealing," 113 Stat. at 1390.

Courts, too, have followed the Commission's lead: "To be considered a dealer, a person must be engaged in the securities business, such as soliciting investor clients, handling investor clients' money and securities, rendering investment advice to investors, and sending investors subscription agreements for their review and execution." *Chapel Invs., Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016); *see also, e.g.*, *Oceana Capitol Grp. v. Red Giant Entm't, Inc.*, 150 F. Supp. 3d 1219, 1226 (D. Nev. 2015) ("dealer means buying and selling regularly *in the service of others*" (emphasis added) (citing *Sodorff*, 1992 WL 224082, at *5)). As in 1934, a dealer is an entity that holds itself out to the public as such. It "attempt[s] to obtain and keep a regular clientele," *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990), by "solicit[ing] clients and consummat[ing] transactions," *Roth*, 22 F.3d at 1110. Again, that is what "distinguish[es] the activities of a dealer from those of a private investor or trader." *Chapel Invs.*, 177 F. Supp. 3d at 991 (quoting *Sodorff*, 1992 WL 224082, at *5 n.27).

*c.* Under these principles, CVP is not and cannot be a dealer, because it is not in a "public securities business." Testimony of B. Barbash, Div. of Inv. Mgmt., 1995 WL 641412, at *13 n.80 (Oct. 31, 1995). It does "not structure its trading so as to 'run a book'"; "does not act as a financial intermediary between counterparties"; "does not know the identity of the ultimate purchaser[s]" of the securities it sells; "does not make a market through [a] Broker"; "is under no obligation to enter any quotes, nor does it ever do so at the request of another party"; and does not "utilize [a] Broker's screen to place a bid and an offer simultaneously for the same security." *Louis Dreyfus Corp.*, 1987 WL

15

108160, at *2 (SEC No-Action Letter July 23, 1987); *see Federated Alliance*, 1996 WL 484036, at *5 (similar). And under no circumstances has it held itself out as anything but a lender or investor. Put simply, CVP is not in the "regular business" of offering dealer services to the investing public.

### B. "Dealer's" Ordinary Meaning Further Supports The Plain-Text Interpretation.

The ordinary meaning of "dealer" further supports the plain-text interpretation, especially here, where "there is [a] dissonance between" the "ordinary meaning of [the] defined term" and "the reach of the [term's] definition" under the SEC's theory. *Bond v. United States*, 572 U.S. 844, 861 (2014).

*Bond* is illustrative. There, the government prosecuted an individual for violating the Chemical Weapons Convention Implementation Act, on the theory that she used a "chemical weapon" for a non-"peaceful purpose," to wit: spreading on a doorknob a small amount of a chemical commonly used in printing photographs, thereby giving someone a "minor thumb burn readily treated by rinsing with water." 572 U.S. at 848, 852, 856–57. Even though the literal definition of "chemical weapon" under the Act—any "toxic chemical"—could "reach" such benign conduct, *id.* at 866, the Court held that a narrower reading was a more "realistic assessment[ ] of congressional intent," lest the act "sweep in" a whole host of chemicals "no one would ordinarily describe . . . as 'chemical weapons,'" *id.* at 862.

"The ordinary meaning of [dealer] plays a similar limiting role here." *Id.* If CVP has really been operating as an unregistered "dealer," just because its "business model has been to buy" one type of security and months later "sell . . . into the public market" another type of security, Compl. ¶ 3, then so, too, has every family office, hedge fund, investment company, and day trader—since 1934. But that cannot be right. Neither those firms nor CVP are "of the sort that an ordinary person," in 1934 or today, "would associate" with dealing. *Bond*, 572 U.S. at 861. Which is why, outside the convertible lending context, the SEC has never accused a family office, hedge fund, investment company, or day trader of being a dealer on the ground that it buys and sells stock—and why not a single one of the currently active dealers who joined FINRA in the last ten years (who is not a member of a

stock exchange)[5] has indicated that its sole line of business is buying and selling securities.[6] If Congress really wanted to override the ordinary meaning of the term "dealer"—and sweep in thousands of businesses that no one would ordinarily call a "dealer"—it would not have hid that "elephant" in the "mousehole" of an "ancillary" definitional provision, as the SEC advocates here. *Whitman*, 531 U.S. at 468; *see also Donander*, 29 B.T.A. at 315 (if Congress wanted "the word 'dealer' to include a speculator or investor, we think that it would have used language which would more aptly convey that thought"). Even more so because the Exchange Act "has criminal applications" (*see* 15 U.S.C. § 78ff(a)), so courts must resolve any ambiguity against the government. *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality op.); *see, e.g.*, *SEC v. Mapp*, 240 F. Supp. 3d 569, 586 n.3 (E.D. Tex. 2017).

## C. The Broader Statutory Scheme Confirms The Plain-Text Interpretation.

The foregoing interpretation accords with the dealer-registration provision's "place in the statutory scheme and, in particular, its relationship to the other protections that the Act affords." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 348 (2010).

Registration of dealers "is a means of protecting" a dealer's customers. *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). It ensures that "securities are . . . sold by a salesman who understands and appreciates . . . his responsibilities to the investor to whom he sells." *Roth*, 22 F.3d at 1109. A registered dealer must take a variety of steps to protect its customers, including (among other things) providing "notice[s] to its customers," 15 U.S.C. § 78o(e), meeting "financial responsibility" standards for the "custody and use of customers' securities," *id.* § 78o(c)(3)(A), joining a fund to insure the dealer's "obligations . . . to each of its customers," *id.* § 78fff-4(c); *see id.* § 78ccc(a)(2)(A), and associating with

---

[5] To join a stock exchange, a company must register as a broker or dealer. *See* 15 U.S.C. § 78f(b)(2).

[6] "A person who seeks to register with the SEC as a dealer . . . must file the Form BD with the Central Registration Depository, which is operated by FINRA." Compl. ¶ 41; *see* 17 C.F.R. § 240.15b1-1(b). FINRA makes a registrant's answers—including the types of business it is engaged in, *see* Form BD, question 12, https://tinyurl.com/yxsbucar—available via BrokerCheck (https://tinyurl.com/y2y3mdks), a source susceptible to "judicial notice," *Charles Schwab & Co. v. Carter*, 2005 WL 2369815, at *7 n.11 (N.D. Ill. Sept. 27, 2005).

a self-regulatory organization (*i.e.*, FINRA), 15 U.S.C. § 78o(b)(1); Compl. ¶ 42, which requires training on seeking business "from Customers," "Evaluating Customers' Financial Profile," "Provid[ing] Customers with Information," and "Verif[ying] Customers' Purchase and Sale Instructions," *Series 7: General Securities Representative Exam*, FINRA, https://tinyurl.com/yxnk94t3 (last visited Dec. 6, 2020); *see* FINRA Rule 1220(b)(2)(B) (requiring Series 7 examination). That is all well and good for entities *with customers*, but entirely nonsensical for businesses—like CVP—without; CVP has "*counterpart[ies]*" to its loan transactions, *see* Compl. ¶¶ 3, 22, 26, 29, 30, 32, 33, 34, 35, 37, but no *customers*, much less customers seeking dealer services. The customer-centric nature of dealer registration is yet more evidence that the Exchange Act does not contemplate the registration of businesses like CVP.

Related provisions in the Securities Act provide more evidence still. Supreme Court precedent teaches that the Securities Act and the Exchange Act must "be construed harmoniously because they 'constitute interrelated components of the federal regulatory scheme governing transactions in securities.'" *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484–85 (1989) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)). Accordingly, courts will not read the registration requirements under one Act in a way that would "eliminate the benefit" of an exemption from registration claimed under the other. *Oceana Capitol*, 150 F. Supp. at 1226; *see also Chapel*, 177 F. Supp. 3d at 990.

That interpretive principle, alone, should resolve this matter. As detailed above, CVP operates in full compliance with Rule 144. *See, e.g.*, Compl. ¶ 27. That Rule not only exempts the securities CVP receives in connection with its loans from the Securities Act's registration requirements, but also explicitly contemplates that firms like CVP will "resell[ ]" an "unlimited" number of those securities in Rule-144-compliant transactions. 72 Fed. Reg. at 71,551, 71,564. It would make no sense for those same resales, which are carved out of the Securities Act's registration requirements, to now (somehow) trigger a separate registration requirement under the Exchange Act. Congress, and the Commission that adopted Rule 144, could not have had such a nonsensical scheme in mind.

### D.     The SEC's Theory Is Fundamentally Flawed.

More broadly, the SEC appears to believe that any person who buys or sells stock for "profit[ ]," Compl. ¶¶ 3, 17, 26, 28, 34, 35, 36, 36(a)(v), 36(b)(v), 36(c)(v)—a word that does not appear in the "dealer" definition—is nevertheless a "dealer" within the meaning of the Act.  That is just not true.  *See, e.g.*, *Federated Alliance*, 1996 WL 484036, at *5 (rejecting SEC's "excessively broad" theory).

Yes, a few non-precedential district court opinions appear to have adopted the "SEC's meager legal argument," *Federated Alliance*, 1996 WL 484036, at *5, in connection with defendants involved in convertible note transactions (although in different circumstances than this case).  *See SEC v. Alma-garby*, 2020 WL 4783405 (S.D. Fla. Aug. 17, 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019).  But those decisions are wrong, distinguishable, and do not help the SEC anyway.  They do not help the SEC because the defendants in those cases wrongly *conceded* that the text of the Exchange Act "appears to broadly cover anyone in the business of buying and selling securities."  *E.g.*, Mot. to Dismiss 10, *Keener*, No. 1:20-cv-21254 (June 22, 2020), 2020 WL 4919483.  The courts, therefore, had no occasion to decide—and did not decide—to what extent the statutory text, properly analyzed in light of its plain, original meaning, cabined "dealer" to its historical roots, as CVP argues here.  Those "cases cannot be read as foreclosing an argument that they never dealt with."  *Waters v. Churchill*, 511 U.S. 661, 678 (1994).

The decisions are also distinguishable.  "[I]nstead of providing funding directly to issuers," as CVP and other lenders do, the defendants in *River North* and *Almagarby* bought securities from third parties, and "immediately" sold stock into the market.  SEC Summ. J. Mot. 2, 4, *Almagarby*, No. 17-cv-62255 (Oct. 18, 2019), 2019 WL 6520684; *see Almagarby*, 2020 WL 4783405, at *1; *River North*, 415 F. Supp. 3d at 857.  Neither case addresses the situation here, where a lender loans money directly to an issuer, while strictly complying with SEC-mandated holding periods.  Moreover, in both *Almagarby*

19

and *Keener*, the defendants' "*entire* business model was predicated on the purchase and sale of securities," SEC Opp'n 7, *Keener*, No. 1:20-cv-21254 (July 6, 2020), 2020 WL 5611950; *accord Almagarby*, 2020 WL 4783405, at *5, which, again, is not this case. CVP is a lender; it makes (or loses) money through loans—only a portion of which permit, let alone result in, stock sales. *See, e.g.*, CIK No. 0000946644, Form 10-Q, at 20 (Aug. 14, 2019), https://tinyurl.com/y6dex2h4 (cash-only loan); *supra* pp. 3–4.

Beyond that, the decisions adopting the SEC's theory are just wrong. They purport to apply the Eleventh Circuit's decision in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015). *See, e.g.*, *Almagarby*, 2020 WL 4783405, at *4. But *Big Apple* interpreted a different statute, with different text, using a methodology that the Supreme Court has expressly rejected. *Big Apple* concerned the *Securities* Act, not the *Exchange* Act. 783 F.3d at 809. And loose *dicta* equating the two aside, *id.* at 809 n.11, the Securities Act adopts a materially broader definition of "dealer" than does the Exchange Act.[7] So to say that a person is a "dealer" under the former says little about his status under the latter.

Regardless, the Supreme Court has since rejected the exact interpretive methodology—indeed, the exact source—employed by the Eleventh Circuit. In *New Prime Inc. v. Oliveira*, the Court reiterated the cardinal rule of statutory construction that terms must be interpreted "with evidence of the term's meaning at the time of the Act's adoption." 139 S. Ct. 532, 539 (2019). A copy of *Black's Law Dictionary* published seventy years after the fact, the Court explained, does not cut it. *See id.* Yet that is the *only* source the *Big Apple* court consults. *See* 783 F.3d at 809. It does not mention, let alone analyze, any of the contemporaneous historical sources detailed above. *Big Apple*, for instance, does not attempt to interpret the statutory phrase "buying and selling" (which does not appear in the Securities Act)— yet that phrase unambiguously confines "dealer" in the Exchange Act to those who buy and sell the

---

[7] Neither of the limiting phrases in the Exchange Act's text—(i) "buying and selling securities" as part of a (ii) "regular business," 15 U.S.C. § 78c(a)(5)—appear in the Securities Act's definition, *see id.* § 77b(a)(12). Rather, the Securities Act broadly encompasses anyone who, "for all or part of his time," acts "as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities." *Id.*

*same* security in the *same* condition.  That limitation makes a big difference here.  *Supra* pp. 9–12.

## II.     Due Process Forbids Any Liability Based On The SEC's Novel Interpretation.

Even if the SEC's redefinition of "dealer" were permissible (it is not), fundamental principles of fair notice embodied in the U.S. Constitution would still bar the imposition of liability here.

**A.**     The Due Process Clause forbids the SEC from retroactively imposing liability without giving "fair notice of [the] conduct that is forbidden."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  This "bedrock due process principle" precludes "'an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule.'"  *PHH Corp. v. CFPB*, 839 F.3d 1, 46, 49 (D.C. Cir. 2016) (Kavanaugh, J.), *reinstated on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) (quoting *Satellite Broad. Co. v. FCC*, 824 F.3d 1, 3–4 (D.C. Cir. 1987)).  Accordingly, an agency cannot "change an interpretation" when "doing so would impose new liability . . . for past actions which were taken in good-faith reliance on agency pronouncements."  *PHH Corp.*, 839 F.3d at 47 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012)); *see United States v. Am. Nat'l Can Co.*, 126 F. Supp. 2d 521, 530 (N.D. Ill. 2000) ("cannot enforce unforeseen interpretations").

**B.**     The SEC violates this basic constitutional requirement by threatening liability based on a novel interpretation of "dealer" that contradicts the Exchange Act and jettisons decades of agency and judicial application.  It was entirely impossible for CVP to have "identif[ied]" at the time of the challenged conduct, let alone with the requisite "ascertainable certainty," "the standards with which the" SEC now "expects parties to conform."  *Wisc. Res. Protection Council v. Flambeau Min. Co.*, 727 F.3d 700, 708 (7th Cir. 2013) (quoting *Howmet Corp. v. EPA*, 614 F.3d 544, 553–54 (D.C. Cir. 2010)).

The SEC's long-standing interpretation and guidance established the prevailing standard for evaluating whether a person was a "dealer."  That standard, repeated time and again over a number of decades, tracked the plain, original meaning of "dealer," and thus turned on whether a person engaged in traditional dealer activities, such as quoting a two-way market , holding customer funds, or offering

investment advice[8]—activities that CVP is not alleged to have ever engaged in:

| | Dealer Factors Listed In Commission Guidance | 1975 | 1977 | 1987 | 1992 | 1993 | 1998 | 2002 | 2003 | 2007 | 2008 | CVP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(1)** | Handles other people's money or securities or carrying securities accounts | | ✓ | ✓ | ✓ | | | ✓ | | | ✓ | ✗ |
| **(2)** | Solicits investors; or advertises or holds itself as a dealer, or as being willing to buy and sell securities on a continuous basis. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ |
| **(3)** | Quotes a market in any security | | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ |
| **(4)** | Renders incidental investment advice | | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✗ |
| **(5)** | Extends or arranges the extension of credit in connection with others' securities transactions | | ✓ | ✓ | | ✓ | | ✓ | | | ✓ | ✗ |
| **(6)** | Acts as an underwriter or participates in a selling group in any distribution of securities | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✗ |
| **(7)** | Carries a dealer inventory in securities | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✗ |
| **(8)** | Other (i.e., sends subscription agreements to investors; lends securities; issues or originates securities that it buys and sells; runs a matched book of repurchase agreements; or writes derivatives contracts that are securities) | | | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✗ |

These factors are "widely known and relied on" in the industry. *PHH Corp.*, 839 F.3d at 45. They are frequently cited by the SEC. *See supra* note 8. They are reflected in "leading treatise[s]." *PHH Corp.*, 839 F.3d at 45.[9] And they have been "acknowledged" by courts for years. *Id.*; *see, e.g., Dervan v. Gordian Grp.*, 2017 WL 819494, at *10 (S.D.N.Y. Feb. 28, 2017); *Federated Alliance*, 1996 WL 484036, at *4.

In casting those factors aside now, the SEC made the same error as the FCC in *Fox*. There,

---

8    **1975:** *Adoption of Rule 15Ba2-1*, 1975 WL 163406, at *3 (Oct. 15, 1975); **1977:** *Burton Sec.*, 1977 WL 10680, at *1; **1987:** *Continental Grain Co.*, 1987 WL 108902, at *10-12 (SEC No-Action Letter Nov. 6, 1987); *Nat'l Council of Savings Institutions*, 1986 WL 67129, at *2 (SEC No-Action Letter July 27, 1986); *Louis Dreyfus Corp.*, 1987 WL 108160, at *2; **1992:** *Sodorff*, 1992 WL 224082, at *5 & n.27; **1993:** *Davenport Mgmt., Inc.*, 1993 WL 120436, at *12 (SEC No-Action Letter Apr. 13, 1993); **1998:** OTC Derivatives Dealers, 63 Fed. Reg. 59,362, 59,370 n. 61 (Nov. 3, 1998); **2002:** Definition of Terms, 67 Fed. Reg. 67,496, 67,499 & n.31 (Nov. 5, 2002); **2003:** Definition of Terms, 68 Fed. Reg. 8686, 8688 & n.22 (Feb. 24, 2003); **2007:** Compliance Guide to Banks on Dealer Statutory Exceptions and Rules (2007), https://tinyurl.com/yxlkrvps; **2008:** Guide to Broker-Dealer Registration (2008), https://tinyurl.com/y5s35gdb.

9    *See, e.g.*, Colby et al., What Is a Broker-Dealer, at 2-60 to 2-62; 14B G. Lander, U.S. Securities Law for Int'l Financial Transactions and Capital Markets § 13:23 (updated Nov. 2020); 23 J. Markham & T. Hazen, Broker-Dealer Operations Under Securities and Commodities Laws § 3:4 (updated Nov. 2020).

the Supreme Court invalidated an enforcement action where the parties did not have "sufficient no-tice" of what conduct the agency claimed was "proscribed." 567 U.S. at 254. Agency guidance had provided that a "key consideration" in assessing whether an indecency violation had occurred was whether a broadcaster "dwell[ed] on" expletives or "repeat[ed] [them] at length." *Id.* Without warning, however, the agency "changed course" and fined a broadcaster for only "fleeting expletives." *Id.* The Supreme Court reversed. It held that at the time the broadcaster transmitted the fleeting expletives, it did not, given the preexisting guidance, have adequate "notice" that such conduct "could be action-ably indecent." *Id.* As a result, the agency's action did not "comply with due process." *Id.* at 253.

The Commission's new interpretation of "dealer," along with its attempt to apply that inter-pretation retroactively to CVP, suffers from the same infirmity. Like the broadcaster in *Fox*, CVP has structured its affairs in light of "consideration[s]" identified in the agency's guidance. *Id.* at 254; *see also In re Gary L. McDuff*, 2015 WL 1873119, at *2 (Apr. 23, 2015) (requiring "consideration of several factors"); Staff Compliance Guide to Banks on Dealer Statutory Exceptions and Rules, https://ti-nyurl.com/yxlkrvps (last visited Dec. 6, 2020) (advising that industry "might want to consider the following questions"). For the SEC to turn around now and say, in effect, as then-Judge Kavanaugh put it, "just kidding," and attempt to "sanction[ ] [CVP] for actions [it] took in reliance on the [Com-mission's]" guidance "amounts to a serious due process violation." *PHH Corp.*, 839 F.3d at 48.

The Commission's actions are particularly problematic here, where the SEC has known about CVP's operations for years—but has never, until this litigation, so much as hinted that it thought registration was required. That years-long silence is fatal to the Commission's case. In *Upton v. SEC*, for instance, the court held that the Commission could "not sanction" a firm where there was "un-certainty" about the Commission's interpretation and where the Commission had been "aware . . . [for] two years before the events in [the] case took place" that firms were engaging in the exact type of conduct that the agency was now targeting. 75 F.3d 92, 98 (2d Cir. 1996). Here, the Commission

has not just known for years that firms in CVP's line of work were not registered as dealers; CVP and its counterparties repeatedly informed the agency for the better part of a decade that CVP was engaging in convertible note transactions, *see supra* p. 6—yet the SEC "took no steps" to inform CVP that "it believed" doing so without registering "was questionable." *Id.* This "lengthy period of conspicuous inaction" made the "potential for unfair surprise [particularly] acute." *SmithKline*, 567 U.S. at 158; *see also id.* ("[W]hile it may be 'possible for an entire industry to be in violation of the [law] for a long time without the [agency] noticing,' the 'more plausible hypothesis' is that the [agency] did not think the industry's practice was unlawful."); *Stoller v. CFTC*, 834 F.2d 262, 266 (2d Cir. 1987) ("The apparently commonplace nature of such trading . . . combined with the absence of enforcement, would further buttress a reasonable inference that the conduct was permissible.").

If anything, the Commission *encouraged* CVP to enter the convertible debt market to pursue the agency's policy goal of expanding small-business access to capital. The SEC, after all, twice shortened the required holding period for firms to "*resell[ ]*" an "*unlimited*" number of restricted securities in order to encourage firms to lend to or invest in "smaller companies" through "private securities transactions," without indicating that registration as a dealer was necessary, and CVP answered the SEC's call. 72 Fed. Reg. at 71,551, 71,564 (emphases added). The lack of due process here is thus worse than the hypothetical from then-Judge Kavanaugh's opinion in *PHH*. There, the court hypothesized a police officer telling a "pedestrian that the pedestrian can lawfully cross the street at a certain place" and then, when the pedestrian gets to the other side, handing him "a $1,000 jaywalking ticket." 839 F.3d at 49. "No one," Judge Kavanaugh wrote for the court, "would seriously contend that the officer had acted fairly or in a manner consistent with basic due process in that situation." *Id.*; *cf. Cox v. Louisiana*, 379 U.S. 559, 571 (1965) (so holding in analogous scenario). Here, it is as if the police officer not only told the pedestrian that he could cross the street, but actively encouraged the pedestrian to do so in order to bring the policeman something he wanted. "The Due Process Clause does

24

not countenance [such] gamesmanship." *PHH*, 839 F.3d at 49.

That is especially true where the agency's about-face "seems to have been contrived." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). The Commission is not applying its new conception of "dealer" to the thousands of family offices, hedge funds, mutual funds, venture capital funds, and the like that "purchase and s[ell]" (Compl. ¶ 46) far more securities than CVP does. The family office Point72, for example, bought and sold *billions* of dollars of securities each year. *E.g.*, R. Copeland, *Steven A. Cohen's Point72 Earns Big 2014 Trading Profit*, Wall St. J. (Jan. 5, 2015), https://tinyurl.com/y53e4ggu. Yet the Commission never claimed that *that* firm was a "dealer." Indeed, it was the SEC itself that ordered Steve Cohen to "transfer" his trading activity to a "family office" not registered with the Commission. *In re S.A.C. Capital Advisors, L.P.*, 2014 WL 2915930, at \*4 (June 27, 2014). It is evidently only firms like CVP that the SEC has retroactively targeted with its new definition of dealer—a move that smacks of hostility to the small- and micro-cap market. The agency's apparent dislike of "penny stocks," Compl. ¶¶ 1, 3, 17, 19, 20, 36, 43, 44, however, is not a legitimate reason "to bend existing law[ ], to reinterpret and apply [it] retroactively in novel ways and without advance notice" in order to choke off the flow of capital to the types of firms that are "unpopular" with today's Commission, *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring).

## III. Other Constitutional Limitations Also Require Dismissal.

The above infirmities are sufficient to dismiss the complaint. But lest there be any doubt as to the frailty of the SEC's action, additional constitutional shortcomings confirm the case for dismissal.

### A. The SEC Lacks Constitutional Authority To Bring This Enforcement Action.

The Commissioners who authorized this action are so removed from "the President's oversight"—and sit so far outside Article II's "'chain of dependence,'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2203 (2020) (quoting 1 Annals of Cong. 499 (J. Madison))—that the SEC "lacks authority to bring this enforcement action," *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 822 (D.C. Cir. 1993).

25

The Constitution empowers the President, who is directly accountable to the people, to hold other executive officers to account by removing them from office, if necessary. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483 (2010) (citing *Myers v. United States*, 272 U.S. 52 (1926)). And the Supreme Court has recognized two—and "only two"—exceptions to the President's "unrestricted" power to remove, *Seila Law*, 140 S. Ct. at 2192: "one for inferior officers with limited duties," and "one for multimember expert agencies that do not wield substantial executive power," *id.* at 2199–2200. "These two exceptions . . . represent . . . the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* at 2199.

The Commission does not satisfy either exception, yet "the Commissioners . . . cannot themselves be removed by the President," except for cause, *Free Enter. Fund*, 561 U.S. at 487. The first exception does not apply because the Commissioners are principal, not inferior officers. *See Lucia v. SEC*, 138 S. Ct. 2044, 2050 (2018); *Free Enter. Fund*, 561 U.S. at 512–13. And the second exception does not apply because the Commissioners "exercis[e] substantial executive authority." *PHH Corp.*, 881 F.3d at 173 (Kavanaugh, J., dissenting); *see also Free Enter. Fund*, 561 U.S. at 511, 514. As the Supreme Court has made clear, such an agency—unmoored from presidential supervision—has "no place in our constitutional structure." *Seila Law*, 140 S. Ct. at 2201.

*Seila Law* establishes that prior decisions upholding the SEC's structure no longer stand. Before *Seila Law*, lower courts erroneously believed that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), permitted Congress to "authorize an independent agency to bring civil law enforcement actions where the President's removal power was restricted." *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 682 (10th Cir. 1988). That is no longer correct, if it ever was. *Seila Law* clarified that "the *Humphrey's Executor* exception depend[ed] upon the characteristics of the agency before the Court," the "FTC (as it existed in 1935)." 140 S. Ct. at 2198. And *that* agency, "[r]ightly or wrongly," was viewed as exercising "'no part of the executive power.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 628). The

26

SEC is a different animal entirely. It unquestionably exercises the executive power—and is doing so right now: "[W]henever the Commission brings an enforcement action . . . it is acting in an *executive* capacity." *In re John Thomas Capital Mgmt. Grp.*, 2020 WL 5291417, at *25 (Sept. 4, 2020). Such "power to seek daunting monetary penalties," *Seila Law*, 140 S. Ct. at 2200; *see* 15 U.S.C. § 78u(d); Compl. 16–17, is "a quintessentially executive power not considered in *Humphrey's Executor*," 140 S. Ct. at 2200. The SEC therefore falls well outside the "constitutional limits" established in that case. *Id.*

### B. The Regulatory Regime Is Unconstitutionally Structured.

The SEC's case fails for yet another reason: The SEC cannot punish CVP for declining to subject itself to the "here-and-now" injury inflicted by an unconstitutional regulatory regime. *Free Enter. Fund*, 561 U.S. at 513. Registering as a dealer would "automatically" have made CVP a member of the Securities Investor Protection Corporation (SIPC), 1971 WL 128397, at *1 (Jan. 22, 1971); *see* 15 U.S.C. § 78ccc(a)(2)(A)—an entity that flouts the Constitution's structural limitations. CVP cannot be fined for "resist[ing]" such an unconstitutional regime. *Horne v. Dep't of Agric.*, 576 U.S. 350, 370 (2015) (defendants should "be relieved of the obligation to pay the fine and associated civil penalty").

SIPC is a statutorily created entity (15 U.S.C. § 78ccc(a)) charged with overseeing the liquidation of member firms that close (*e.g.*, § 78eee), and maintaining and administering a fund (§ 78ddd)—by levying assessments on its members (§ 78ddd(c))—to insure customers' account balances in certain instances (§ 78fff-4). Despite these—and other—statutory duties, SIPC is organized "not [as] an agency . . . of the United States Government," but as a private, "nonprofit corporation." 15 U.S.C. § 78ccc(a)(1). Therein lies the rub: Congressional disclaimers notwithstanding, SIPC "is 'part of the government' for constitutional purposes." *Free Enter. Fund*, 561 U.S. at 486 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)). It must therefore operate in a manner that is "consistent with the design and requirements of the Constitution, including those provisions relating to the separation of powers." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 54 (2015). SIPC comes up short.

27

The Commission cannot seriously dispute that SIPC is subject to the Constitution's structural limitations, just like other purportedly private, nonprofit corporations, including the Public Company Accounting Oversight Board and Amtrak. *See Ass'n of Am. R.Rs.*, 575 U.S. at 54–55; *Free Enter. Fund*, 561 U.S. at 486. SIPC performs an important public function, and may adopt any "rules as may be necessary or appropriate to carry out" its statutory mandate. 15 U.S.C. § 78ccc(b)(4). And like Amtrak: **(1)** SIPC "was created by the Government," *Ass'n of Am. R.Rs.*, 575 U.S. at 53; *see* 15 U.S.C. § 78ccc(a)(1); **(2)** a "majority of [SIPC's] Board is appointed by the President and confirmed by the Senate," 575 U.S. at 53; *see* § 78ccc(c)(2)(C); **(3)** SIPC's "Board members must possess certain qualifications" set by Congress, 575 U.S. at 51; *see* § 78ccc(c)(2)(C)(i)–(ii); **(4)** SIPC must submit "annual reports" to the government, 575 U.S. at 52; *see* § 78ggg(c)(2); **(5)** SIPC must pursue "goals defined by statute," 575 U.S. at 53; *see* § 78ggg(b); **(6)** SIPC must make certain records available for public inspection, 575 U.S. at 52; *see* § 78kkk(a); and **(7)** the government may "specify many of [SIPC's] day-to-day operations," 575 U.S. at 55; *see* § 78ccc(e)(3). That is a government entity for constitutional purposes.

As such, SIPC's leadership must be appointed in conformity with the Appointments Clause. SIPC's President & CEO, for example, is plainly an "Officer[ ] of the United States." U.S. Const. art. II, § 2, cl. 2. She "exercise[s] significant authority pursuant to the laws of the United States." *Lucia*, 138 S. Ct. at 2051 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)). With a simple letter, she could—at least temporarily—turn any dealer's continued operation into a federal felony, punishable by up to 20 years in prison. *See* 15 U.S.C. §§ 78jjj(a), 78bbb, 78ff(a). That is certainly as much authority as, say, a clerk to an assistant treasurer in Boston, *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393–94 (1867), or "thousands of clerks" in the Treasury and "other[ ]" departments, *United States v. Germaine*, 99 U.S. 508, 511 (1878)—all of whom are "Officers" subject to the Appointments Clause.

The CEO, however, was not appointed in conformity with the Clause. She was appointed by the board, Bylaws of SIPC art. 4, § 1 (rev. no. 17, June 2020), https://tinyurl.com/y2sb4zdc; *see* 15

U.S.C. § 78ccc(b)(7), not the "President alone," a "Court[] of Law," or a "Head[ ] of Department[ ],"
U.S. Const. art. II, § 2, cl. 2.[10]  CVP had no obligation to subject itself to this unlawful regime.

## IV.    The Complaint Does Not State A Viable Claim For Disgorgement.

The "allegations in support of a request for disgorgement [are] lacking" and, accordingly, the
Court should "strike th[at] prayer for" relief now.  *SEC v. Berry*, 2008 WL 4065865, at *10 (N.D. Cal.
Aug. 27, 2008); *accord SEC v. City of Victorville*, 2014 WL 12588688, at *12 (C.D. Cal. Oct. 14, 2014).

### A.    The SEC Fails To Allege A Causal Link Between The Alleged Unlawful Activity And Any Disgorgement.

"The touchstone of a disgorgement calculation is identifying a causal link between the illegal
activity and the amount sought to be disgorged."  *SEC v. Benger*, 2015 WL 6859168, at *4 (N.D. Ill.
Nov. 9, 2015).  To demonstrate that causal link, the SEC must show that *but for* the violation, the
defendant would not have obtained the amount sought to be disgorged.  *See, e.g., SEC v. Razmilovic*,
738 F.3d 14, 35 (2d Cir. 2013) ("had it not been for the fraud"); *In re Jay T. Comeaux*, 2014 WL 4160054,
at *3 (Aug. 21, 2014) (SEC must "show but-for causation").  Here, the Commission alleges only that
CVP should have "register[ed] as a dealer with the SEC."  Compl. ¶ 38.  That is it.  The SEC does not
allege—and could not reasonably allege[11]—that CVP could not, and would not, have executed the
same deals, in the same manner, had it registered.  Thus, the Commission has failed to allege that, *but
for* the purported failure to register, CVP would not have lawfully earned the amounts sought to be
disgorged.  *See CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999) (because a "failure to register, by
itself, is not causally related to . . . ill-gotten profits," the court was "not aware of any case in which a
court ha[d] disgorged profits from a defendant whom it [found] liable solely for fail[ing] to register as

---

[10]  While some board members could theoretically be part of a multi-member Head of Department, the board
as a whole cannot; some members lack presidential nomination and Senate confirmation.  *See* § 78ccc(c)(2).

[11]  The SEC does not object to how CVP's trades were executed.  CVP traded through registered brokers, *see*
Compl. ¶¶ 27, 29–30, who are subject to the *same* standards as registered dealers.  *Compare id.* ¶¶ 41–42, *with* 15
U.S.C. §§ 78o(a)(1), (b)(1), 78q(b)(1), *and* 17 C.F.R. § 240.15b1-1; *see also* FINRA Rules 2010, 5210.03(a), 5290.

a principal"); *Biedron v. Futures*, 1989 WL 134796, at *4 (N.D. Ill. Oct. 17, 1989) ("Biedron does not say how the fact that Dorsey was not registered served to cause him, Biedron, to suffer [a] financial loss."). For that reason alone, the Commission "has failed to present any specific allegations to support its claim for disgorgement." *City of Victorville*, 2014 WL 12588688, at *10.

### B. Congress Has Not Authorized Disgorgement In These Circumstances.

The disgorgement claim also runs headlong into *Liu v. SEC*, 140 S. Ct. 1936 (2020). Because the Exchange Act does not authorize "disgorgement," the Commission is limited to seeking "equitable relief," 15 U.S.C. § 78u(d)(5), which "requires the SEC to return a defendant's gains to wronged investors," 140 S. Ct. at 1948. But here, it is not just that disgorged funds "cannot practically be distributed to the victims," *id.* at 1948–49; *there are no victims*. Rule 144-compliant transactions are, by definition, perfectly lawful, and "the fact of [CVP] being unregistered would have had no effect on" others. *Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017); *see also CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1331 (11th Cir. 2018) (seeing "no showing that the registration violations caused [any] losses"). Moreover, the loans are publicly disclosed in virtually every case, *supra* p. 6, and the board of directors of any company that obtained such a loan would necessarily have concluded—as did the Commission that amended Rule 144 to encourage these transactions in the first place—that the loan was "in the best interests of the Company and the stockholders." *See, e.g.*, CIK No. 0001455819, Form 8-K, Exh. 10.1, Schedule I (Dec. 8, 2014), https://tinyurl.com/yygsqxd4, *incorporated by reference in* Compl. ¶ 36(c). The Commission has not alleged otherwise. In the total absence of wronged investors—even if the SEC somehow established that CVP were a dealer—the agency cannot obtain disgorgement; the Court should "strike the prayer" now. *Berry*, 2008 WL 4065865, at *10.

### CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

Dated:  December 7, 2020

Respectfully submitted,

/s/ Helgi C. Walker
_____

Helgi C. Walker*
Brian A. Richman*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
hwalker@gibsondunn.com

Michael J. Diver
Elliott M. Bacon
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200
michael.diver@katten.com

Barry Goldsmith*
M. Jonathan Seibald*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2440
bgoldsmith@gibsondunn.com

_____

* pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of December, 2020, I electronically filed a copy of the foregoing Defendants' Brief In Support Of Motion To Dismiss through the Court's CM/ECF System, which will send notifications of the filing to all counsel of record.

*/s/ Helgi C. Walker*