**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:20-cv-5227** |
| | ) | |
| **v.** | ) | **Hon. Robert M. Dow** |
| | ) | |
| | ) | |
| | ) | |
| **JOHN M. FIFE, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF SECURITIES AND EXCHANGE**
**COMMISSION'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

Eric M. Phillips
Jaclyn J. Janssen
United States Securities and Exchange
Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

# TABLE OF CONTENTS

**FACTS** ................................................................................................4

**STATUTORY SCHEME** ..................................................................7

    I. The Exchange Act's Dealer Registration Requirement...................................7

    II. What Is A Dealer? ......................................................................8

**ARGUMENT** ....................................................................................9

    I. The Complaint Sufficiently Alleges That Defendants Acted As Unregistered Dealers...9

        A. The Plain Language of the Exchange Act's Definition of "Dealer" Encompasses Defendants' Conduct ......................................................9

        B. The Court Should Reject Defendants' Effort to Create a More Restrictive Definition of "Dealer" Than What Congress Specified........................................11

        C. Defendants Are Dealers Even Under the "Historical" Definition of the Term.13

        D. The "Ordinary" Meaning of "Dealer" Covers Defendants' Conduct ...............16

        E. Section 15(a) Does Not Conflict With the "Broader Statutory Scheme"..........16

    II. The Court Should Reject Defendants' Due Process Claims ........................................18

    III. Defendants' Other Constitutional Arguments Are Meritless......................................23

        A. The Structure of the SEC Is Constitutional........................................................23

        B. Defendants' Appointment Clause Argument Fails ...........................................25

    IV. The SEC Has Adequately Pleaded Its Disgorgement Theory ....................................27

## TABLE OF APPENDICES

APPENDIX A:     *Black's Law Dictionary* 521 (3d ed. 1933)

# TABLE OF AUTHORITIES

**CASES**                                                                         **PAGE(S)**

*Agostini v. Felton,*
  521 U.S. 203 (1997) ............................................................................. 23

*Alvarez v. U.S.,*
  862 F.3d 1297 (11th Cir. 2017) ........................................................... 27

*Am. Bakeries Co. v. City of Opelika,*
  229 Ala. 388 ......................................................................................... 13

*Biedron v. Futures,*
  No. 87 C 8425, 1989 WL 134796 at *4-*5 (N.D. Ill. Oct. 18, 1989) ................................... 29

*Bond v. United States,*
  572 U.S. 844 (2014) ............................................................................. 16

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ......................................................................... 12

*Bravo Enters. Ltd.,*
  SEC Rel. No. 34-75775, 2015 WL 5047983, at *5 (Aug. 27, 2015) ..................................... 8

*Buckley v. Valeo,*
  424 U.S. 1 & n.162 (1976) .................................................................... 26

*Burgess v. United States,*
  553 U.S. 124 (2008) ....................................................................... 11, 12

*CFTC v. S. Tr. Metals, Inc.,*
  894 F.3d 1313 (11th Cir. 2018) ........................................................... 28

*CFTC v. Sidoti,*
  178 F.3d 1132 (11 Cir. 1999) .............................................................. 28

*Christopher v. SmithKline Beecham Corp.,*
  567 U.S. 142 (2012) ............................................................................. 19

*CMR D.N. Corp. v. City of Philadelphia,*
  703 F.3d 612 (3d Cir. 2013) ................................................................ 20

*Copeland v. Vance,*
  893 F.3d 101 (2d Cir. 2018) ................................................................ 23

*Dep't of Transp. v. Ass'n of Am. R.Rs.,*
  575 U.S. 43 (2015) .............................................................................. 26

*Dickerson v. Napolitano,*
  604 F.3d 732 (2d Cir. 2010) ................................................................ 22

*Digital Realty Trust, Inc. v. Somers,*
  138 S. Ct. 767 (2018) ........................................................................... 13

*Distribution by Broker-Dealers of Unregistered Securities,*
  SEC Rel. No. 4445, 1962 WL 69442 (Feb. 2, 1962) ......................................... 7

*Eastside Church of Christ v. Nat'l Plan, Inc.,*
  391 F.2d 357 (5th Cir. 1968) ...................................................... 9, 15, 21

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) ...................................................................... 18-19

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) ............................................................... 23-24, 25

*Freytag v. Commissioner,*
  501 U.S. 868 (1991) .............................................................................. 26

*FTC v. Wyndham Worldwide Corp.,*
  799 F.3d 236 (3d Cir. 2015) ..................................................... 18, 19, 20, 21

*Gordon Wesley Sodorff, Jr.,*
  50 S.E.C. 1249, 1992 WL 224082 (Sept. 2, 1992) ............................... 8, 9, 15, 21

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ................................................................................. 23

*Horne v. Department of Agriculture,*
  576 U.S. 350 (2015) .............................................................................. 25

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) .......................................................................... 3-4,

*ICC v. Chatsworth Co-op. Marketing Association,*
  347 F.2d 821 (7th Cir. 1965) ................................................................ 24

*In re Grand Jury Investigation,*
  916 F.3d 1047 (D.C. Cir. 2019) ............................................................ 26

*Independents Gas & Serv. Stations Ass'ns, Inc. v. City of Chicago,*
  112 F.Supp.3d 749 (N.D. Ill. 2015) ........................................................ 19

*In the Matter of Ironridge Global Partners, LLC,*
  SEC Rel. No. 34-75272, 2015 WL 3862868 ............................................ 21

*Iosello v. Leiblys, Inc.,*
  502 F.Supp.2d 782 (N.D. Ill. 2007) ........................................................ 19

*Irvine v. 233 Skydeck, LLC,*
  597 F.Supp.2d 799 (N.D. Ill. 2009) ........................................................ 19

*Jones v. Harris Assocs. L.P.,*
  559 U.S. 335 (2010) ........................................................................ 16-17

*Karlin v. Foust,*
  188 F.3d 446 (7th Cir.1999) .................................................................. 19

*Levas & Levas v. Village of Antioch,*
  684 F.2d 446 (7th Cir. 1982) ................................................................ 23

*Liu v. SEC*,
  140 S. Ct. 1936 (2020) ................................................................................ 4

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) .............................................................................. 26

*Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*,
  411 F. Supp. 411 (D. Mass. 1976) ........................................................... 12

*Morrison v. Olson*,
  487 U.S. 654 (1988) ................................................................................. 24

*Nat'l Archives & Records Admin v. Favish*,
  541 U.S. 157 (2004) ................................................................................. 13

*Nat'l Assn. of Mfrs. v. Dept. of Defense*,
  138 S. Ct. 617 (2018) ...................................................................... 11-12, 13

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
  135 F.3d 266 (3d Cir. 1998) ..................................................................... 21

*Norris Bros. v. Commonwealth*,
  27 Pa. 494 (Sup. Ct. Pa. 1856) ........................................................... 13, 14

*PHH Corp. v. CFPB*,
  839 F.3d 1 (D.C. Cir. 2016) ...................................................................... 18

*PHH Corp. v. CFPB*,
  881 F.3d 75 (D.C. Cir. 2018) .................................................................... 24

*Public Printing*,
  12 Pa. D. 790, 1903 WL 3830 (Pa. Att'y Gen. June 12, 1903) ............... 13

*Puerto Rico v. Franklin Cal. Tax–Free Trust*,
  136 S. Ct. 1938, (2016) ............................................................................ 12

*Record Head v. Sachen*,
  682 F.2d 672 (7th Cir. 1982) .................................................................... 20

*Roth v. SEC*,
  22 F.3d 1108 (D.C. Cir. 1994) .................................................................... 8

*SEC v. Almagarby*,
  No. 17-62255, 2020 WL 4783405 (S.D. Fla. Aug. 17, 2020) ........................ *passim*

*SEC v. Berry*,
  No. C-07-04431 RMW, 2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ............... 27

*SEC v. Big Apple Consulting USA, Inc.*,
  783 F.3d 786 (11th Cir. 2015) .......................................................... 8-9, 15, 21

*SEC v. Black*,
  No. 04 C 7377, 2009 WL 1181480 at *2 (N.D. Ill. Apr. 30, 2009) ................. 28

*SEC v. Blinder, Robinson & Co.*,
  855 F.2d 677 (10th Cir. 1988) .................................................................. 24

*SEC v. Buntrock,*
No. 02 C 2180, 2004 WL 1179423 at *3 (N.D. Ill. May 25, 2004) ...................................... 27

*SEC v. China Energy Sav. Tech., Inc.,*
No. 06-CV-6402, 2009 WL 875997 (E.D.N.Y. Mar. 27, 2009) .............................................. 8

*SEC v. City of Victorville,*
ED CV13-00776 JAK (DTBx), 2014 WL 12588688 at *10-*11 (C.D. Cal. Oct. 21, 2014)...29

*SEC v. ConnectAJet.com, Inc.,*
No. 3:09-CV-1742-B, 2011 WL 5509896 at *7 (N.D. Tex. Nov. 9, 2011) .......................... 29

*SEC v. Dropil, Inc.,*
No. 8:20-cv-00793-SB (DFMx), 2020 WL 7348021 at *6 (C.D. Cal. Oct. 23, 2020) .......... 27

*SEC v. Enviro Board Corp.,*
No. CV 16-6427-R. 2017 WL 4586335 at *4 (C.D. Cal. May 9, 2017) ............................... 29

*SEC v. Erwin,*
No. 13-cv-03363-CMA-KMT, 2020 WL 7310583 at *4 (D. Colo. Dec. 11, 2020) ............. 30

*SEC v. Fierro,*
No. 20-CV-02104, 2020 WL 7481773 at *2-*5 (D.N.J. Dec. 18, 2020) ...................... *passim*

*SEC v. Fisher,*
No. 07 C 4483, 2008 WL 2062699 at *8 (N.D. Ill. May 13, 2008) ....................................... 27

*SEC v. Gibraltar Global Sec., Inc.,*
No. 13 Civ. 2575 (GBD) (JCF), 2015 WL 10910362 at *5-*6 (S.D.N.Y. Oct. 16, 2015) ..... 29

*SEC v. Keener,*
No. 20-CV-21254, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020) ................................ *passim*

*SEC v. Kenton Cap., Ltd.,*
69 F. Supp. 2d 1 (D.D.C. 1998) ........................................................................................... 9

*SEC v. Kik Interactive Inc.,*
19 Civ. 5244 (AKH), 2020 WL 5819770 at *10 (S.D.N.Y. Sept. 20, 2020) ........................ 22

*SEC v. Levin,*
232 F.R.D. 619 (C.D. Cal. 2005) ......................................................................................... 27

*SEC v. Mizrahi,*
No. CV 19-2284 PA (JEMx), 2020 WL 6114913 at * 2 (C.D. Cal. Oct. 5, 2020) ............... 30

*SEC v. Moddha Interactive, Inc.,*
No. 18-000264 DKW-WRP, 2020 WL 6701538 at *4 (D. Hawaii Oct. 26, 2020) .............. 29

*SEC v. Offill,*
No. 3:07-CV-1643-D, 2012 WL 246061 at *8-9 (N.D. Tex. Jan. 26, 2012) ........................ 21

*SEC v. River North Equity LLC,*
415 F. Supp. 3d 853 (N.D. Ill. 2019) ............................................................................ *passim*

*SEC v. Teo,*
746 F.3d 90 (3d Cir. 2014) .................................................................................................. 28

*SEC v. Ustian*,
    229 F. Supp. 3d 739 (N.D. Ill. 2017) .................................................................. 27

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ...................................................................... 24, 25

*State v. Yearby*,
    82 N.C. 561 (1880) ......................................................................................... 14

*Stokeling v. United States*,
    139 S. Ct. 544 (2009) ..................................................................................... 13

*Tager v. SEC*,
    344 F.2d 5 (2d Cir. 1965) .............................................................................. 17

*United States v. Am. Nat'l Can Co.*,
    126 F. Supp. 2d 521 (N.D. Ill. 2000) ............................................................ 19

*United States v. Dimitrov*,
    546 F.3d 409 (7th Cir. 2008) .......................................................................... 20

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ............................................................................. 19-20, 23

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) .......................................................................... 8

*Wiener v. United States*,
    357 U.S. 349 (1958) ......................................................................................... 24

*Wisc. Res. Protection Council v. Flambeau Min. Co.*,
    727 F.3d 700 (7th Cir. 2013) .......................................................................... 19

*Word v. City of Chicago*,
    946 F.3d 391 (7th Cir. 2020) ............................................................................ 9

**Statutes**

15 U.S.C. 78aaa ................................................................................................ 25
15 U.S.C. 78ccc(a), (c)(1) ................................................................................ 27
15 U.S.C. 78ccc(e) ............................................................................................ 26
15 U.S.C. 78ddd(c)(2) ....................................................................................... 27
15 U.S.C. 78jjj(a) .............................................................................................. 26
15 U.S.C. § 77e(a) ............................................................................................ 17
15 U.S.C. § 78c(a)(5)(A) ................................................................................ 1, 8
15 U.S.C. § 78c(a)(5)(B) ................................................................................... 8
15 U.S.C. § 78o(a)(1) ......................................................................................... 1

**Rules and Regulations**

17 C.F.R. § 230.144 .......................................................................................... 17

*Registration Requirements for Foreign Broker-Dealers*,
    SEC Release No. 34-27017, 54 Fed. Reg. 30013, (July 18, 1989) ....................... 8

*Revisions to Rules 144 & 145,*
  72 Fed. Reg. 71,546, 71,562 (Dec. 17, 2007) ..........................................................................22

**Other**

*Black's Law Dictionary,*
  521 (3d. 1933) ...................................................................................................................... 13

*Burton Securities,*
  SEC No-Action Letter, 1977 WL 10680, at *1 (Dec. 5, 1977) .................................. 14-15, 18

*Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Section 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934,*
  SEC Release No. 34-47364, 2003 WL 328058 at *4 (Feb. 13, 2003) ................................... 9

*Law of Stock Brokers and Stock Exchanges § 43-a,* *33 (Supp. 1933)...................................... 15

*Monthly Publication of a List of Significant Letters Issued by the Division of Corporation Finance,*
  SEC Rel. No. 430, 1976 WL 160377 at *1 (Mar. 17, 1976) ................................................. 18

*National Defense Authorization Act,* Pub. L. No 116-283 (2021)................................................ 29

*Securities Investor Protection Corp. Bylaws, Article IV § 1, Revision No 17.* (June 2020)......... 26

*SEC Staff Guide to Broker-Dealer Registration,*................................................................ 18, 20

*United States Constitution, Article II, § 2 cl. 2,*........................................................................... 26

The Securities and Exchange Commission's ("SEC") Complaint alleges in detail that (1) John M. Fife ("Fife") and five entities he owns and controls ("Entity Defendants") (together, with Fife, "Defendants") have operated a regular business, the very purpose of which is to buy and sell securities for their own accounts, and (2) Defendants have not registered with the SEC as required by the plain language of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"). *See* 15 U.S.C. § 78o(a)(1).

Defendants have moved to dismiss the Complaint, contending that the SEC has failed to state a claim for relief. Although Defendants effectively admit that they meet the Exchange Act's broad definition of "dealer," because they buy and sell securities for their own accounts, *see* 15 U.S.C. § 78c(a)(5)(A), they seek to dismiss the Complaint on several flawed grounds.

Courts across the country – including Judge Durkin in this District – recently rejected arguments similar to Defendants' arguments here. *See SEC v. River North Equity LLC*, 415 F. Supp. 3d 853, 858-59 (N.D. Ill. 2019) (Durkin, J.); (denying motion to dismiss SEC complaint alleging violations of Exchange Act's dealer registration requirements where defendant purchased discounted shares from a convertible note holder and sold the converted shares into the market); *SEC v. Fierro*, 20-CV-02104, 2020 WL 7481773 at *2-*5 (D.N.J. Dec. 18, 2020) (denying motion to dismiss where the SEC alleged that a convertible note holder operated as an unregistered securities dealer and sold billions of shares of newly-issued stock after converting); *SEC v. Keener*, No. 20-CV-21254, 2020 WL 4736205, at *2-*5 (S.D. Fla. Aug. 14, 2020) (same); *SEC v. Almagarby*, No. 17-62255, 2020 WL 4783405, at *4-*5 (S.D. Fla. Aug. 17, 2020) (granting summary judgment to the SEC on claim that defendants violated dealer registration requirements and rejecting defendants' arguments that their activities fell outside the statutory definition of a "dealer").

1

Like the courts in *River North*, *Fierro*, *Keener*, and *Almagarby*, this Court should reject Defendants' arguments and deny their motion to dismiss. Far from being "just wrong" (Br. 19-21), cases such as *River North*, *Fierro*, *Keener*, and *Almagarby* provide persuasive guidance that this Court can look towards in resolving the SEC's claims against Defendants.

The Court should see through the blizzard of meritless arguments that Defendants create and deny their motion to dismiss.

***First***, the Court should decline Defendants' invitation to substitute a new definition of "dealer" in place of the definition that Congress enacted. Although Defendants cloak their arguments with references to the "plain text" (Br. 7-9) and "ordinary meaning" of the Exchange Act (Br. 16), they in fact seek to rewrite Congress' "dealer" definition. The Court should not rewrite the Exchange Act's plain language.

***Second***, even if the Court were to accept Defendants' flawed argument that the "traditional" and "historical" definition of "dealer" prevails over the Exchange Act's plain text (Br. 9-15), Defendants would still qualify as "dealers." Defendants' business model is to privately acquire newly-issued stock at a significant discount directly from microcap issuers through convertible promissory notes and then resell the converted stock to the public as quickly as possible thereafter. (*See* Compl. ¶¶ 17, 24, 28, 30-32). Because Defendants' regular business is to buy stock for their own accounts and then quickly resell it, they qualify as "dealers" under the historical definition of the term.

***Third***, Defendants do not qualify for the Exchange Act's "trader exception" (Br. 12-16), which exempts from the "dealer" definition those persons who are buying and selling securities but "not as part of a regular business." Defendants acquired more than 21 billion shares of stock directly from microcap issuers at a significant discount -- unlike traders who buy in the market --

2

and they earned profits of more than $61 million by selling the shares at a marked-up price -- unlike traders who earn profits from an appreciation in the stock price.

**Fourth**, requiring Defendants to register as dealers makes sense under the "broader statutory scheme." (Br. 17-18). Regardless of whether Defendants have customers (Br. 17-18), their activities can, and did, impact the market. Because the billions of shares Defendants acquired and sold were newly-issued, their transactions exponentially increased the public float of microcap issuers' stock. Further, even if Defendants' transactions qualified for the safe harbor of Rule 144 under the Securities Act of 1933 ("Securities Act") and thus were exempt transactions (Br. 18), Defendants still must comply with the Exchange Act's dealer registration requirement. While Rule 144 carries out the Securities Act's goal of regulating transactions to protect purchasers in the market, the Exchange Act's dealer registration requirement regulates institutional participants to protect overall market integrity. Defendants must comply with all of the federal securities laws and the rules and regulations thereunder, not just some of them.

**Fifth**, Defendants had fair notice that their business model fell within the Exchange Act's "dealer" definition, and their due process argument (Br. 21-25) accordingly fails. Other courts have recently rejected similar fair notice arguments by those in the same business as Defendants. *See River North*, 415 F. Supp. 3d at 859; *Keener*, 2020 WL 4736205, at *5 (same); *Fierro*, 2020 WL 7481773, at *5. Defendants' claims that they lacked fair notice are not credible.

**Sixth**, the SEC's independent structure—a fixture of modern government shared by many other agencies—complies with constitutional requirements. (Br. 25-27). Defendants' position to the contrary flies in the face of longstanding Supreme Court precedent established nearly a century ago by *Humphrey's Executor v. United States*, 295 U.S. 602, 629 (1935) (upholding a restriction on the President's authority to remove commissioners of the Federal Trade

Commission based on what the Court considered the agency's "quasi-judicial" and "quasi-legislative" character).

**Seventh**, the structure of the Securities Investor Protection Corporation ("SIPC") has no bearing on whether Defendants were obligated to register with the SEC under the Exchange Act. (Br. 28-29). Here, the SEC seeks to enforce its own regulations, not SIPC's. In any event, Defendants fail to establish that SIPC's President & CEO must be appointed in accordance with the Appointments Clause.

**Finally**, the Complaint properly alleges a claim for disgorgement by alleging how Defendants' unregistered dealer operation resulted in their direct gains. Defendants' arguments about whether profits are causally connected to their violations is simply premature at the pleading stage. In any event, the Complaint amply demonstrates the required causal connection between Defendants' wrongdoing and their ill-gotten gains (Br. 29-30) and identifies "victims" of Defendants' misconduct (Br. 30), consistent with the Supreme Court's recent decision on disgorgement in *Liu v. SEC,* 140 S. Ct. 1936, 1940 (2020) (reaffirming the SEC's authority to seek disgorgement "that does not exceed a wrongdoer's net profits and is awarded for victims.")

Defendants' myriad arguments all lack merit. Accordingly, the Court should deny Defendants' motion to dismiss.

## FACTS

Defendants' admitted business model is to buy convertible notes—a type of security—from penny stock issuers, convert the notes into newly-issued shares of stock, and sell those shares into the public market. (Compl., ¶ 3). Defendants demanded and received highly favorable terms for these notes, including terms that gave Defendants deep discounts from the prevailing market price for the shares of counterparty microcap issuers. (*Id.*)

Defendants held themselves out to the public as being willing to buy convertible notes at a regular place of business. (*Id.*, ¶ 20). For example, Defendants operated a public website advertising that Defendants operated businesses engaged in private investment in public equity transactions through which Defendants would buy the issuers' stock. (*Id.*) Defendants also solicited microcap issuers by cold calling or emailing issuer representatives. (*Id.*) In these direct issuer solicitations through phone or email, Defendants typically represented to issuer representatives that Defendants sought to invest in the issuer's stock. (*Id.*) Defendants also attended conferences at which they solicited penny stock issuers. (*Id.*) Beyond advertising on their website and directly soliciting issuers by phone, email, and in person, Defendants also relied on third-party finders, who worked on commission, to solicit issuers. (*Id.*, ¶ 21).

Defendants obtained nearly all of the stock that they sold in their business directly from issuers, through note conversions, as opposed to secondary market purchases. (*Id.*, ¶ 25). Defendants' business model served as a conduit to bring shares of microcap issuers' stock to the market; the shares that Defendants obtained through their deals with microcap issuers were newly-issued, and the sales of the shares in the market increased both the amount of shares in the hands of the public and the issuers' outstanding share totals. Selling large quantities of newly-issued shares into the market is a common attribute of a securities dealer. (*Id.*, ¶ 25)

The convertible notes that Defendants bought from the issuers entitled them to receive issuer stock at a substantial discount from the prevailing market price. (*Id.*, ¶ 28). Each note provided for a discount, which ranged between 7 and 60 percent less than the prevailing market price of the stock preceding the conversion request. (*Id.*) Defendants normally sold the stock as soon after conversion as the market would bear the sales. Defendants did so to lock in their profits. The majority of Defendants' profits resulted from the discounted prices at which they

acquired shares from the issuers to sell into the market. This mechanism, which gave Defendants a spread or markup on the stock that they sold, is a common attribute of a securities dealer. (*Id.*)

After holding the convertible debt acquired in a convertible note deal for the six-month period or one-year period required by Rule 144 under the Securities Act, Defendants typically sent a conversion notice to a counterparty issuer and its transfer agent showing the number of shares owed. (*Id.*, ¶ 29). Once brokers deposited the converted shares from the counterparty issuers into Defendants' brokerage accounts, Defendants typically began selling the shares into the public market immediately. (*Id.*, ¶ 30). Defendants' practice then was to sell the shares they had acquired in a convertible note deal continuously until Defendants had sold all of their shares. Defendants mostly completed this process in a couple of weeks or less. (*Id.*, ¶ 31). Defendants' practice of selling thousands of a counterparty issuer's newly-issued shares into the market on multiple trading days, as well as their practice of converting additional shares soon after they sold previously-converted shares, frequently led to a significant decrease in the stock price of counterparty microcap issuers over time. (*Id.*, ¶ 33).

Defendants obtained their profits from the discounts in the purchase price that they negotiated with the counterparty issuers, rather than from any stock price appreciation. (*Id.*, ¶ 34). Also, many of Defendants' agreements with counterparty microcap issuers contained "true-up" provisions that compelled the issuer to issue additional shares to Defendants if the issuer's stock price decreased in the 15 to 20 business days following a conversion. Defendants' sales of thousands of newly-issued shares into the market frequently led to a decrease in the stock price, and, consequently, triggered the true-up provision in these agreements. For deals that included these true-up provisions, Defendants further guaranteed themselves a profit by insulating themselves against any risk of a decrease in the counterparty issuer's stock price. (*Id.*, ¶ 35).

6

Defendants sold more than 21 billion newly-issued shares of penny stock from more than 250 convertible notes that they purchased from approximately 135 penny stock issuers. (*Id.*, ¶ 3). By engaging in a regular business of buying convertible notes and then selling the resulting newly-issued shares of microcap companies' stock into the public market, Defendants collectively generated more than $61 million in net profits. (*Id.*)

Defendants engaged in this conduct without registering with the SEC as securities dealers. (*Id.*, ¶ 40). An applicant seeking to register as a dealer must provide important information to the SEC, including information about past regulatory actions against the dealer or any associated person that controls the business. (*Id.*, ¶ 42). Further, registration requires the dealer to join a self-regulatory organization, such as FINRA, or a national security exchange, and registered dealers are subject to inspection by the SEC and FINRA. (*Id.*)

Fife – the owner and control person of all of the Entity Defendants (*Id.*, ¶¶ 12-16) -- is a recidivist violator of the federal securities laws. (*Id.*, ¶ 2). He settled a 2007 case brought against him by the SEC in this District for his alleged violations of the antifraud provisions of the federal securities laws in participating in an alleged annuity market timing scheme. (*Id.*, ¶ 11). In 2012, in an unrelated case, FINRA barred him from associating with any FINRA member. (*Id.*)

## STATUTORY SCHEME

### I.     The Exchange Act's Dealer Registration Requirement

Brokers and dealers act as intermediaries between the investing public and the securities markets. As gatekeepers, one of their most important responsibilities is to ensure that they are not participating in an unregistered public offering of securities, particularly "those of relatively obscure and unseasoned companies"— i.e. microcap securities. *Distribution by Broker-Dealers of Unregistered Securities*, SEC Release No. 4445, 1962 WL 69442, at *1 (Feb. 2, 1962).

7

Microcap stocks typically trade in low volumes, are closely held, are highly volatile, and are not typically followed by mainstream analysts and the press, making "[a]ccurate information … difficult to locate for anyone who is not an insider." *See Bravo Enters. Ltd.*, SEC Release No. 34-75775, 2015 WL 5047983, at \*5 (Aug. 27, 2015). This lack of information makes penny stocks unusually susceptible to fraud, manipulation, and abuse. *Id.; SEC v. China Energy Sav. Tech., Inc.*, No. 06-CV-6402, 2009 WL 875997, at \*4 (E.D.N.Y. Mar. 27, 2009). For these reasons, the gatekeeper role entrusted to dealers is particularly essential.

In light of their importance to the securities markets, dealers must register with the SEC unless they are specifically exempt from registration. *Warfield v. Alaniz*, 569 F.3d 1015, 1024-25 (9th Cir. 2009). This registration requirement "serves as the keystone of the entire system of broker-dealer regulation." *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (cites and quotes omitted).

## II.     What Is A Dealer?

The Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities … for such person's own account." 15 U.S.C. §78c(a)(5)(A). This statutory definition was "drawn broadly by Congress to encompass a wide range of activities involving investors and securities markets." *Registration Requirements for Foreign Broker-Dealers*, SEC Release No. 34-27017, 54 Fed. Reg. 30013, 30015 (July 18, 1989). Under the "trader exception," however, the Exchange Act provides that a person is not a "dealer" if he or she buys or sells securities "not as part of a regular business." 15 U.S.C. § 78c(a)(5)(B).

"[T]he primary indicia . . . that a person has 'engaged in the business' . . . is that the level of participation in purchasing and selling securities involves more than a few isolated transactions." *See Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at \*4-\*5 (Sept. 2, 1992) (SEC opinion finding that respondent was a dealer where he sold hundreds of thousands

of shares to 17 investors over the course of two months); *SEC v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1, 12 (D.D.C. 1998) ("regularity of participation is the primary indicia of being 'engaged in the business'"); *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 361-62 (5th Cir. 1968) (finding defendant was a dealer because it purchased many church bonds as part of its regular business and sold some of them).

Persons generally qualify as dealers when they hold themselves out to a regular clientele as regularly buying and selling securities at an established place of business. *See* Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, SEC Release No. 34-47364, 2003 WL 328058 at *4 (Feb. 13, 2003). Similarly, participating in the sale or public distribution of new issuances of securities is a dealer function. *Id.* Moreover, when a person's trading profits do not "result from appreciation in the value of the securities," but rather from a markup over the price paid to acquire the securities, the person is likely to be engaged in dealer activity. *Sodorff*, 1992 WL 224082, at *5.

## ARGUMENT

### I.   The Complaint Sufficiently Alleges That Defendants Acted As Unregistered Dealers.

On a motion to dismiss, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party. *Word v. City of Chicago,* 946 F.3d 391, 393-94 (7th Cir. 2020). The facts of the SEC's Complaint show that Defendants acted as "dealers."

### A.   The Plain Language of the Exchange Act's Definition of "Dealer" Encompasses Defendants' Conduct.

In analyzing the definition of "dealer" under the federal securities laws, courts apply the common meaning to the word "business," which is "a commercial enterprise carried on for

9

*profit*, a particular occupation or employment habitually engaged in for *livelihood* or *gain*." *See SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809-10 (11th Cir. 2015) (emphasis in original) (affirming summary judgment to SEC on unregistered dealer claim). When courts apply the Exchange Act's "dealer" definition to convertible debt buyers, courts look to the number of transactions, issuer counterparties and deals, and the amount of profits. *See Almagarby*, 2020 WL 4783405 at *5 ("[T]he number of deals and the large sums of profit . . . gives credence to the proposition that [d]efendants were engaged in the 'business' of buying and selling securities.").

Other relevant considerations to whether a person is a "dealer" include the extent to which the convertible debt lender held itself out as buying and selling securities through advertising and solicitation and whether it had an office and employees to locate and execute these transactions. *See generally, id.* ("Defendants even went so far as employing and paying 'finders' who were in the business of soliciting referral companies . . . ."); *Keene*r, 2020 WL 4736205, at *4 (Defendant "operated a website advertising his business to issuers, . . . hired employees to solicit issuers who were willing to sell convertible notes to him," and "held himself out to the public as being willing to buy convertible notes at a regular place of business."); *River North*, 415 F. Supp. 3d at 858 ("[I]t is likewise clear from the allegations that River North held itself out publicly through its website as willing to buy securities.").

Courts have held that where, as here, the SEC alleges that a convertible debt buyer regularly bought and sold securities in more than a few isolated transactions, the allegations were sufficient to show that the buyer was engaged in the "business" of buying and selling securities. For example, in *Keener*, 2020 WL 4736205, at *4, the court denied the defendant's motion to dismiss an unregistered dealer claim where the SEC alleged the "[d]efendant engaged in buying and converting over 100 convertible notes securities from more than 100 different microcap

10

issuers during [a] three year period" and "sold into the public market approximately 17.5 billion shares of newly issued stock derived from the converted notes," for a $21.5 million profit.

Similarly, in *Fierro*, 2020 WL 7481773 at *4, the court denied the defendants' motion to dismiss an unregistered dealer claim where the SEC alleged that for more than two years the defendants "purchased and converted over fifty notes from more than twenty penny stock issuers and then sold the newly issued shares of stock into the public market, generating about $2.3 million in profits."

And in *River North*, 415 F. Supp. 3d at 858, Judge Durkin denied a motion to dismiss an unregistered dealer claim against a defendant whom the SEC alleged bought and sold more than 10 billion shares of stock of 62 microcap issuers at a discount, and then quickly resold them to the investing public, receiving some $31 million in profit.

The SEC's allegations against Defendants here are similar to its allegations against unregistered dealers in *River North, Keener,* and *Fierro*. Defendants fail to distinguish these cases. (Br. 19-21). Indeed, the most significant distinction between this case and the defendants in *River North, Keener,* and *Fierro* is that in this case, Defendants were much more prolific in their dealer activities, having engaged in more than 250 convertible note deals over a period of more than five years (and counting). Thus, the SEC has sufficiently alleged a violation of the dealer registration requirements under Exchange Act Section 15(a).

## B. The Court Should Reject Defendants' Effort to Create a More Restrictive Definition of "Dealer" Than What Congress Specified.

The statutory definition of "dealer" is broad, and intentionally so. Absent special circumstances, "statutory definitions control the meaning of statutory words." *See Burgess v. United States*, 553 U.S. 124, 129-130 (2008). The Supreme Court has "decline[d] the . . . invitation to override Congress' considered choice by rewriting" the words of a statute. *Nat'l*

*Assn. of Mfrs. v. Dept. of Def.*, 138 S. Ct. 617, 632 (2018) (citing *Puerto Rico v. Franklin Cal. Tax–Free Trust*, 136 S. Ct. 1938, 1948-49, (2016)). "If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and [their] own imaginations, [they] would risk amending statutes outside the legislative process . . ." *Bostock v. Clayton Cnty*, 140 S. Ct. 1731, 1738 (2020). "[A] definition . . . declares what a term 'means' [and] generally excludes any meaning that is not stated." *Burgess*, 553 U.S. at 130.

Congress' express definition of "dealer" in the Exchange Act governs this case. *See, e.g., Fierro*, 2020 WL 7481773, at *4 ("declin[ing] [d]efendants' invitation to look past the express language of the [dealer] statute"). "The term[] "dealer" [is] a word[] of art, with a specific meaning both in the industry and to those members of Congress intimately involved in the drafting of the securities legislation." *Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976). Accordingly, there is no basis for this Court to depart from the literal meaning of the "dealer" definition as set forth in the Exchange Act.

Defendants argue that to qualify as a dealer, a person must satisfy a myriad of conditions, including that he or she engaged in a "public securities business" serving customers and bought and sold "the *same* type of securities, in the *same* condition, around the *same* time." (Br. 7-9) (emphasis in original). But those conditions do not appear in Congress' definition of "dealer." To support their far more restrictive definition, Defendants selectively pluck snippets from cases dating back as far as 1880 (Br. 9-10) to create a laundry list of activities a person must engage in for classification as a dealer. In doing so, Defendants cherry pick only the activities or attributes that they believe do not apply to them and draw from cases that have absolutely no connection or application to securities, such as a case from a state court in Texas involving shrimp. (Br. 10-11).

Defendants' argument that Congress "cabined 'dealer' to its historical roots" (Br. 19) represents nothing more than an "invitation to override Congress' considered choice by rewriting the words of the statute." *See generally, Nat'l Ass'n of Mfrs.,* 138 S. Ct. at 632. The cases cited by Defendants are readily distinguishable as they interpret *undefined* terms. *See Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 169 (2004) (Br. 8) (holding that the undefined term "personal privacy" encompassed the right of family members to assert their own privacy rights against public intrusions into the details of their family member's death); *Stokeling v. United States,* 139 S. Ct. 544, 551 (2009) (Br. 8, 10) (holding that the undefined term "force" retained the same meaning as under common law). Accordingly, '[t]he definition section of the statute supplies an unequivocal answer" as to whether Defendants are properly alleged to be dealers; they are. *See generally, Dig. Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018)*.

### C.     Defendants Are Dealers Even Under the "Historical" Definition of the Term.

At the time of the Exchange Act, "[a] dealer in the popular . . . sense of the word, [was] not one who buys to keep, or makes to sell, but one who buys to sell again." *Norris Bros. v. Commonwealth*, 27 Pa. 494, 494 (Sup. Ct. Pa. 1856); Black's Law Dictionary 521 (3d. 1933) (defining dealer as "one who buys to sell,—not one who buys to keep, or makes to sell."); *see also Public Printing*, 12 Pa. D. 790, 1903 WL 3830, **1 (Pa. Att'y Gen. June 12, 1903) ("a dealer is one who buys and sells and who is constantly engaged in the business of buying and selling the article in which he deals"). This meaning of "dealer" was widely adopted, reflecting the meaning of dealer at the time. *See Am. Bakeries Co. v. City of Opelika*, 229 Ala. 388, 391-92 (Ala. Sup. Ct. 1934) (collecting cases).

Defendants are dealers under the "traditional" and "historical" meaning of "dealer." They "buy to sell." As alleged in the Complaint, Defendants profited based on a markup rather than

any appreciation in the stock price. (Compl. ¶ 28). Hence, Defendants do not "buy to keep" like an investor or trader, but "buy to sell" like a dealer. *See Norris Bros.*, 27 Pa. at 494.

Defendants wrongly argue that at the time Congress enacted the Exchange Act "buying and selling" meant purchasing and selling the same type of article in the same form and condition. (Br. 9). But recent cases refute Defendants' tortured reading of the phrase "buying and selling." The *Keener* and *Fierro* courts held that allegations that the defendants bought convertible promissory notes and sold the converted shares into the market properly alleged that the defendants engaged in the "buying and selling" of securities. *Keener,* 2020 WL 4736205, at *4; *Fierro*, 2020 WL 7481773, at *4. Similarly, in *Almagarby*, 2020 WL 4783405, at *5, the court granted summary judgment to the SEC on an unregistered dealer claim, holding that "it is indisputable that [d]efendants were 'in the business of . . . buying [and] selling securities. . . .'"

The handful of non-securities cases cited by Defendants to support their understanding of "buying and selling" are also readily distinguishable because they seek to differentiate a dealer from a manufacturer—not a dealer from a trader. Moreover, those cases held a person was a manufacturer rather than a dealer because the person applied "labor and skill" to "change" the article and "enhance the price." *See State v. Yearby*, 82 N.C. 561, 562 (1880) (Br. 9-10). By contrast, Defendants applied no "labor and skill" to "change" securities.

Defendants assert without support that a person is a dealer only if he or she carries on a public securities business. (Br. 7-9). Nothing in the *Burton Securities* no-action letter, treatise, or speech cited by Defendants requires that to be a dealer, one *must* carry on a public securities business. Rather, carrying on a public securities business is something a dealer *may* do. The only definitional requirement repeated in each of those sources is that a dealer engages in the business of buying and selling securities. *See Burton Sec.*, 1977 WL 10680, at *1 (SEC No-Action Letter

14

Dec. 5, 1977). ("Section 3(a)(5) of the Act defines a 'dealer' to mean 'any person engaged in the business of buying and selling securities for his own account … .'"); Law of Stock Brokers and Stock Exchanges § 43-a, at 33 (Supp. 1933) ("[A] person [who is] engaging in the business of buying and selling securities for his own account as principal . . . is a security dealer.").

Courts have recognized that the phrase "not as part of a regular business" in the exception to the Exchange Act's "dealer" definition refers to traders. *See River North,* 415 F. Supp. 3d at 858; *Almagarby,* 2020 WL 4783405 at *4; *see also Sodorff,* 1992 WL 224082, at *5 (noting that the purpose of the trader exception is to "exclude from the definition of 'dealer' members of the public who buy and sell securities for their own account as ordinary traders," even though their trading may involve more than isolated transactions). Based on the structure of the statute, a person must behave as a trader or ordinary investor to be entitled to the "trader exception." In other words, persons are not entitled to claim they qualify for the "trader exception" simply because they do not engage in certain dealer activities, as Defendants claim.

On multiple occasions, courts have held that persons qualify as "dealers" even if they do not resemble the narrow definition of "dealer" advanced by Defendants. In *Eastside Church of Christ*, 391 F.2d at 361-62, the court held that the defendant who purchased many church bonds and "sold some of them" was a dealer under the explicit terms of the Exchange Act. And in *Big Apple,* 783 F.3d at 809-810, the Eleventh Circuit affirmed a district court judgment finding that businesses providing investor relations and public relations services to microcap companies were "dealers" because the defendants' "*entire* business model was predicated on the purchase and sale of securities" and "depended upon acquiring client stock" at a discount as compensation and "selling that stock to support operations and earn a profit.") Thus, Defendants' claim that only those who fit within their narrow definition must register as dealers is false.

### D.     The "Ordinary" Meaning of "Dealer" Covers Defendants' Conduct.

Defendants urge this Court to apply the "ordinary" meaning of the term "dealer" to limit the scope of Exchange Act Section 15(a). (Br. 16-17). The Exchange Act already limits its scope by excepting traders from the definition of "dealer." Applying the literal definition of "dealer" will not require "every family office, hedge fund, investment company and day trader" to register, as Defendants claim (Br. 16), nor will it "sweep in thousands of businesses that no one" would call a dealer. (Br. 17). *Cf. Bond v. United States,* 572 U.S. 844, 863 (2014) (Br. 16) (narrowly reading "toxic chemical" because applying it as defined could cause a parent to be guilty of a federal offense by dropping vinegar into a fish tank). Here, Defendants, already savvy players in the securities industry, solicited microcap issuers to sell them convertible promissory notes, bought hundreds of convertible promissory notes at a discount from those microcap issuers, acquired billions of shares directly from those microcap issuers at a discount from the market price, and then sold billions of shares into the market. (Comp. ¶¶ 3, 17). Moreover, they profited from transaction fees and a markup, and, therefore, did not face genuine price risk like other market participants. (Compl. ¶¶ 17, 26, 28). Defendants acted as conduits for introducing billions of newly-issued shares into the market. Their conduct has a meaningful impact on the market, and requiring them to register comports with the "ordinary" meaning of the term "dealer."

### E.     Section 15(a) Does Not Conflict With the "Broader Statutory Scheme."

Defendants argue that their interpretation of the term "dealer" in the Exchange Act—which includes the additional requirement that the dealer "buy and sell the *same* security in the *same* condition"—"accords with the dealer-registration provision's 'place in the statutory scheme and, in particular, its relationship to the other protections that the Act affords.' *Jones v.*

*Harris Assocs. L.P.*, 559 U.S. 335, 348 (2010)." (Br. 17, 20) (emphasis in original). Defendants assert that "[r]egistration of dealers 'is a means of protecting' a dealer's customers. *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965)." (Br. 17). But despite Defendants' misleading citation, *Jones* did not embrace Defendants' interpretation of the "dealer" definition. Rather, *Jones* was about compensation for a mutual fund investment adviser. *Jones*, 559 U.S. at 338. And *Tager* did not hold that dealer registration is intended *only* to protect the dealer's customers. Rather, *Tager* stated that the "[r]egistration of *broker*-dealers is a means of protecting *the public*."[1] *Tager*, 344 F.2d at 8 (emphasis added). Whether Defendants have customers or not, their dealer activities still affect the market. The requirements of the Exchange Act and Securities Act work together in a complementary manner, with the Securities Act regulating offering transactions to protect purchasers, and the Exchange Act regulating institutional participants to protect the overall integrity of the market.

Defendants claim that it is nonsensical for the SEC to provide them with a Rule 144 "exemption"[2] from registering securities under Section 5 of the Securities Act if they still have to comply with the dealer registration requirement. (Br. 18). Not so. Defendants conflate the registration of securities *transactions* with the registration of securities *actors*. Rule 144 allows market participants to sell unregistered stock without violating Securities Act Section 5's registration requirement for transactions. 17 C.F.R. § 230.144; 15 U.S.C. § 77e(a). Nothing in Rule 144 states that a dealer or underwriter need not register. Section 15(a)(1) requires persons

---

[1] *Tager* had little to do with dealer registration and instead dealt with the SEC's authority to set sanctions for misconduct. *See id.* at 8 ("the determination of the sanctions necessary to protect the public rests primarily within the competence of the Commission").

[2] Rule 144 is not an exemption from registration, but rather a safe harbor from underwriter status (which otherwise results in a seller of securities forfeiting the general registration exemption under Securities Act Section 4(a)(1)). *See* 17 C.F.R. § 230.144 (Preliminary Note: "Rule 144 creates a safe harbor from the … definition of 'underwriter.'").

engaged in the business of buying and selling securities for their own accounts to be registered as dealers, regardless of whether the securities transactions they engage in need to be registered.

## II. The Court Should Reject Defendants' Due Process Claims.

In Defendants' due process argument, they attempt to elevate the SEC staff's Guide to Broker-Dealer Registration into an official agency interpretation of the law. But the Guide states on its face that it simply "highlights certain provisions of the Act" and is "not comprehensive." Guide to Broker-Dealer Registration, §1. The Guide also explicitly warns readers that: "*You should not rely on this guide without referring to the actual statutes, rules, regulations, and interpretations*." *Id*., § 9 (emphasis added).[3] A guide that summarizes and highlights statutory and regulatory obligations as a means to direct securities professionals to conduct an appropriate inquiry is neither a prior interpretation of a statute or agency rule, nor is it a rule itself.

Properly viewed, this case is about applying a federal statute to Defendants' conduct. As the Third Circuit explained in *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 253-54 (3d Cir. 2015), when applying a statute, "[t]the relevant question is not whether [the defendant] had fair notice of the *[agency's] interpretation* of the statute, but whether [the defendant] had fair notice of what the *statute itself* requires." (emphasis in original). The line of authority cited by Defendants (Br. 21)—where courts analyze agency rules and agency interpretation of agency rules—is thus inapplicable. *See, e.g., FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253

---

[3]Defendants also cite (Br. 3) no-action letters from the SEC's Division of Trading & Markets, but these make clear that "the practical distinction between a 'trader' and a 'dealer' is often difficult to make and would depend substantially upon the facts of a given situation." *See, e.g., Burton Sec*., 1977 WL 10680, at *1 (SEC No-Action Letter Dec. 5, 1977). No-action letters are "not rulings of the Commission or its staff on questions of law or fact and are not dispositive of the legal issues raised as to the applicability of the federal securities laws to a given transaction." *Almagarby*, 2020 WL 4783405, at *5 (*quoting* Monthly Publication of a List of Significant Letters Issued by the Division of Corporation Finance, SEC Rel. No. 430, 1976 WL 160377 at *1 (Mar. 17, 1976)).

(2012) (finding a due process violation when the agency abruptly changed its prior interpretation of the indecency provisions of the Communications Act that had required repetition of conduct in favor of a new interpretation imposing sanctions for fleeting expletives); *PHH Corp. v. CFPB*, 839 F.3d 1, 46, 49 (D.C. Cir. 2016) (reversing agency sanctions where it retroactively applied a changed interpretation to past conduct).[4] It is for this Court to determine whether Defendants come within the statutory definition of a dealer, and "[a]s a necessary consequence, [a defendant] is only entitled to notice of the meaning of the statute and not to the agency's interpretation of the statute." *Wyndham Worldwide Corp.*, 799 F.3d at 255.

With respect to the statutory definition of "dealer," "[t]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Indeps. Gas & Serv. Stations Ass'ns, Inc. v. City of Chicago*, 112 F.Supp.3d 749, 754 (N.D. Ill. 2015) (*quoting Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir.1999)). The standard for fair notice of civil statutes that regulate economic activities is whether the law is "sufficiently clear that its prohibitions would be understood by an ordinary person operating a profit-driven business." *Irvine v. 233 Skydeck, LLC*, 597 F.Supp.2d 799, 803 (N.D. Ill. 2009); *Iosello v. Leiblys, Inc.,* 502 F.Supp.2d 782, 785 (N.D. Ill. 2007). As the Supreme Court has explained,

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

---

[4] Defendants' other cited cases (Br. 21) are inapplicable for the same reason. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012) (refusing to defer to the Department of Labor's retroactive application of a changed interpretation of its own regulations); *United States v. Am. Nat'l Can Co.*, 126 F. Supp. 2d 521, 530 (N.D. Ill. 2000) ("We are presented here with one of those unusual cases in which an agency's interpretation of its own regulation cannot survive judicial review."); *Wisc. Res. Prot. Council v. Flambeau Min. Co.*, 727 F.3d 700, 708 (7th Cir. 2013) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule.").

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (internal citations omitted). *See also Record Head v. Sachen*, 682 F.2d 672, 676 (7th Cir. 1982) (economic regulation is "directed at people who are assumed to have some expertise and some ability to demand clarification."); *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631-32 (3d Cir. 2013) (for civil laws regulating economic activity, a party lacks fair notice when the relevant standard is "so vague as to be no rule or standard at all") (internal quotation marks omitted).[5] Here, Defendants were sophisticated players "in the business" of buying and selling securities, a highly regulated field. *See, e.g., United States v. Dimitrov*, 546 F.3d 409, 414 (7th Cir. 2008) (defendant "operated his business in a highly regulated industry, and could reasonably have been expected to know that there may be licensing requirements").

So too, the Guide quotes statutory language and explicitly states that "a person who holds himself out as being willing to buy and sell a particular security on a continuous basis" "may need to register as a dealer." *See* Guide to Broker-Dealer Registration, §2.B; *see also Wyndham Worldwide Corp.*, 799 F.3d at 257 (the agency's guidebook "could certainly have helped Wyndham determine in advance that its conduct might not survive the cost-benefit analysis"). While the Guide is not an official interpretation of the Exchange Act, it is notice to professionals in the securities industry. And prior court decisions and SEC actions between 1968 and 2015 provided Defendants additional notice that their business model could be considered unregistered

---

[5] Defendants argue (Br. 21) that they could not identify the relevant standards with "ascertainable certainty." That standard, however, is used when an agency exercises its authority to fill gaps in a statutory scheme by promulgating regulations. *See Wyndham Worldwide Corp.*, 799 F.3d at 251. "There the agency is primarily responsible for interpreting the statute because the courts must defer to any reasonable construction it adopts. * * * Courts appear to apply a more stringent standard of notice to civil regulations than civil statutes: parties are entitled to have 'ascertainable certainty' of what conduct is legally required by the regulation." *Id.* (internal citation omitted). This, of course, is a case about a civil statute and not SEC regulations.

dealer activity.[6] *See Wyndham Worldwide Corp.*, 799 F.3d at 257 (stating that the agency's

publicly available consent agreements and complaints provide notice).[7]

Defendants' remaining arguments are also unavailing. Nothing in the Guide suggests

Defendants could take comfort that their business model was exempt, which is how they premise

their argument. (Br. 21-25). In essence, Defendants invite this Court to interpret SEC guidance as

setting forth exclusive dealer factors, without which one is conclusively not a dealer. That

construction cannot be squared with the language in the guidance or the relevant case law, both

of which underscore that the dealer analysis is based on facts and circumstances, and that

meeting any one factor might be sufficient to establish dealer liability. *See, e.g., River North*, 415

F. Supp. 3d at 858 (noting that "these factors (and any decisions construing them) are not

controlling" and that "[t]hey are neither exclusive, nor function as a checklist through which a

court must march"); *Keener*, 2020 WL 4736205, at *4 (finding that "the SEC Guide provides

that a 'yes' answer to any one of the referenced factors 'indicates that you may need to register

as a dealer.' Under that same reasoning, a 'no' answer to one or even all of the factors does not

foreclose the possibility that someone is a 'dealer.'"). Contrary to Defendants' assertions, the

SEC's action neither "cast[s] those factors aside" nor "changes course" with the Guide. (Br. 22-

23). A reasonable person could not read the Guide to suggest otherwise.

Defendants' argument that the SEC "encouraged" them to "enter the convertible debt

market to pursue the agency's policy goal of expanding small-business access to capital," when

---

[6]*See Eastside Church of Christ,* 391 F.2d at 361; *Sodorff*, 1992 WL 224082, at *4-5; *SEC v. Offill*, Case No. 3:07-CV-1643-D, 2012 WL 246061 at *8-9 (N.D. Tex. Jan. 26, 2012); *Big Apple*, 783 F.3d at 809-10; *Ironridge Global Partners, LLC*, SEC Release No. 75272, 2015 WL 3862868 (June 23, 2015).

[7] In any event, even were this the first unregistered dealer case against a convertible note purchaser, that still would not present a fair notice question. As explained in *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc*., 135 F.3d 266, 274 (3d Cir. 1998), the district court is not deprived of enforcement authority "just because no court or regulator had previously chosen to exercise such authority with respect to the practice challenged here."

the SEC twice shortened the required resale holding period in Rule 144, fares no better. (Br. 24).

The SEC did not shorten the resale holding period to enable the kind of business activity

practiced by Defendants. By shortening the holding period, the SEC anticipated issuers would be

*less* inclined to enter into dilutive convertible loans. *See* Revisions to Rules 144 & 145, 72 Fed.

Reg. 71,546, 71,562 (Dec. 17, 2007) ("For example, by making private offerings more attractive,

the amendments may allow some companies to avoid certain types of costly financing structures

involving the issuance of extremely dilutive convertible securities."). There is nothing in the

2007 SEC release that encouraged Defendants to develop their business model without

complying with the dealer registration requirement under the Exchange Act.

Defendants argue that the SEC has known of their business model for the "years" and

that its failure to "so much as hint[]" that registration was required is "fatal." (Br. 23). This is

wrong. <u>First</u>, the SEC was not obliged to warn Defendants of the statutory requirement to

register as a dealer. *See SEC v. Kik Interactive Inc.*, 19 Civ. 5244 (AKH). 2020 WL 5819770,

*10 (S.D.N.Y. Sept. 30, 2020) ("The law does not require the Government to reach out and warn

all potential violators on an individual or industry level.") (*citing Dickerson v. Napolitano*, 604

F.3d 732, 745-46 (2d Cir. 2010) ("Courts ask whether the law presents an ordinary person with

sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not

whether a particular [party] actually received a warning that alerted him or her to the danger of

being held to account for the behavior in question.") (internal quotation marks and citations

omitted)). <u>Second</u>, whether an issuer fully disclosed any particular convertible note sold to

Defendants does not thereby put the SEC "on notice" of Defendants' potential unregistered

dealer activity across the hundreds of issuers that sold Defendants convertible notes. Thus, it

cannot be equated to repeatedly informing the SEC of Defendants' business practices such that Defendants could rely on agency silence as acquiescence.

Defendants also complain that the SEC has not sued other market players that also may be operating as unregistered dealers. (Br. 25). But a person "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law" as applied to others. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (quoting *Vill. of Hoffman Estates*, 455 U.S. at 495 (1982)). Because Defendants' challenge must be applied solely to the case at hand, "a finding of unconstitutional vagueness cannot be based on uncertainty at the margins, or on a parade of bizarre hypothetical cases: problems of that order can be resolved in challenges to the [law] as applied." *Levas & Levas v. Vill. of Antioch*, 684 F.2d 446, 451 (7th Cir. 1982). And, in any event, discretion to enforce a business regulation does not demonstrate lack of fair notice or any other vagueness characteristic. *See Vill. of Hoffman Estates*, 455 U.S. at 503; *Copeland v. Vance*, 893 F.3d 101, 120 (2d Cir. 2018) ("A pattern of discriminatory enforcement, without more, would not show that the statute is unconstitutionally vague.")

## III. Defendants' Other Constitutional Arguments Are Meritless.

### A. The Structure of the SEC Is Constitutional.

Defendants devote four paragraphs of their brief to arguing that the SEC's independent structure is unconstitutional. (Br. 25-27). That position conflicts with longstanding Supreme Court precedent. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (lower courts must follow controlling Supreme Court precedent unless and until it is expressly overruled).

The Supreme Court's 1935 opinion in *Humphrey's Executor* has long been understood to apply to other multimember commissions with similar features and functions, including the SEC. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 487, 509 (2010)

(assuming SEC commissioners may be removed only for "inefficiency, neglect of duty, or malfeasance in office" and remedying constitutional defect in two-layer removal protection scheme by striking one layer and leaving SEC's for-cause protection in place); *Morrison v. Olson*, 487 U.S. 654, 724-25 (1988) (Scalia, J., dissenting); *Wiener v. United States*, 357 U.S. 349, 355-56 (1958); *see also ICC v. Chatsworth Co-op. Mktg. Ass'n*, 347 F.2d 821, 822 (7th Cir. 1965); *PHH Corp. v. CFPB*, 881 F.3d 75, 170, 173 (D.C. Cir. 2018) (Kavanaugh, J., dissenting); *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681-82 (10th Cir. 1988).

Defendants' contention (Br. 26) that independent agencies may no longer exercise "significant executive authority" after *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), misreads that decision. In *Seila Law*, the Court refused to "extend" *Humphrey's Executor* to a "novel context:" "an independent agency led by a single Director and vested with significant executive power." 140 S. Ct. at 2192, 2201. The Court characterized the "vesting [of] significant governmental power in the hands of a single individual accountable to no one" as a "historical anomaly." *Id.* at 2202-03. It held that Congress may not limit the President's authority to remove "principal officers who, acting alone, wield significant executive power." *Id.* at 2211.

In arguing that *Seila Law* implicitly upended the "deeply rooted tradition" of multimember independent agencies, *PHH Corp.*, 881 F.3d at 173, 177 (Kavanaugh, J., dissenting), Defendants rely not on the Court's holding, but on a single sentence describing *Humphrey's Executor* as applying to "multimember expert agencies that do not wield substantial executive power." (Br. 26) (quoting 140 S. Ct. at 2199-2200). But that sentence cannot bear the weight Defendants place on it. The Court—twice—expressly declined to "revisit" its earlier decisions affirming Congress's authority to "create expert agencies led by a *group* of principal officers removable by the President only for good cause." *Id.* at 2192, 2206 (emphasis in

24

original). If the Court had intended to "clarif[y]" that such agencies may not exercise significant enforcement authority, as Defendants assert (Br. 26), it could have resolved the case based on the CFPB's "potent enforcement powers" alone. *Id.* at 2193. Instead, the Court made clear that it was "the CFPB's leadership by a single independent Director" that "violate[d] the separation of powers." *Id.* at 2207. Indeed, far from calling into question the validity of the multimember agency structure, the Court invited Congress to remedy the "problem" by "converting the CFPB into a multimember agency" like the SEC. *Id.* at 2211.

### B. Defendants' Appointments Clause Argument Fails.

Most registered broker-dealers automatically become members of SIPC, a private, non-profit corporation established by Congress in 1970 to protect customers upon a member firm's failure. 15 U.S.C. 78aaa *et seq.* Defendants contend (Br. 28-29) that they had no obligation to register as dealers because SIPC's President & CEO was not appointed in conformity with the Appointments Clause.

Neither *Free Enterprise Fund*, 561 U.S. 477, nor *Horne v. Department of Agriculture*, 576 U.S. 350 (2015) (Br. 27), remotely suggest that the comprehensive statutory and regulatory scheme governing broker-dealers may simply be ignored if there is a constitutional defect in one component of the scheme. *Free Enterprise Fund* did not suggest that the unconstitutional removal restrictions relieved accounting firms of their obligation to register with the PCAOB— let alone any obligations imposed by other regulatory entities—it simply invalidated the offending restrictions. 561 U.S. at 508. And in *Horne*, the Court refused to enforce a fine against a grower that had not complied with an agricultural regulation that, the Court concluded, violated the Takings Clause. 576 U.S. at 364-65, 370. Here, if Defendants object to SIPC membership,

they can file suit against SIPC. *See, e.g.*, 15 U.S.C. 78jjj(a) (providing mechanism to challenge SIPC member assessments).

In any case, Defendants' argument that SIPC's President & CEO must be appointed in accordance with the Appointments Clause is unavailing. The Appointments Clause prescribes the exclusive manner of appointing federal officials who (1) hold a "continuing" position "established by law" and (2) "exercis[e] significant authority." *Lucia v. SEC*, 138 S. Ct. 2044, 2051(2018) (quotations omitted). The position of SIPC President & CEO is plainly not "established by Law." U.S. Const. art II, § 2 cl. 2; *see Lucia*, 138 S. Ct. at 2051. The position and its "duties, salary, and means of appointment" are not "specified by statute," *Freytag* v. *Commissioner*, 501 U.S. 868, 881 (1991), or "created pursuant to a regulation," *In re Grand Jury Investigation*, 916 F.3d 1047, 1052 (D.C. Cir. 2019), but instead are addressed in the corporation's bylaws. Bylaws of SIPC art. 4, § 1 (rev. no. 17, June 2020), https://www.sipc.org/about-sipc/statute-and-rules/bylaws; 15 U.S.C. 78ccc(e). Nor have Defendants shown that SIPC's President & CEO exercises any "significant authority" in her own right, but instead serves as a "lesser functionar[y] subordinate to" SIPC's Board. *Buckley v. Valeo*, 424 U.S. 1, 126 & n.162 (1976). *Cf.* Bylaws of SIPC art. 7, § 1 (authorizing only SIPC Board or Chairman to apply for protective decree).

Defendants have also failed to demonstrate that the Appointments Clause would even apply to SIPC. Defendants analogize SIPC to Amtrak, but SIPC does not share the "unique features" that led the Supreme Court to conclude that Amtrak is a "federal actor" for constitutional purposes. *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 51-55 (2015). Among other differences, the government does not own SIPC, does not fund it, does not set and

26

supervise its budget, and does not control its day-to-day operations. *See, e.g.*, 15 U.S.C. 78ccc(a), (c)(1); *id.* 78ddd(c)(2).

## IV. The SEC Has Adequately Pleaded Its Disgorgement Theory.

Defendants' request for dismissal of the SEC's disgorgement claim fails.

First, Defendants' request is premature. *See, e.g., SEC v. Levin*, 232 F.R.D. 619, 625 (C.D. Cal. 2005) ("With respect to the SEC's claim for disgorgement, the Court finds that it would be premature to determine whether the specific forms of disgorgement sought by the SEC are prohibited as a matter of law."). A determination of the availability of the relief sought would be more appropriate "after the case has been factually and legally developed." *Id.* Accordingly, courts in this District have rejected motions to dismiss SEC disgorgement claims, like Defendants' here, as premature. *See SEC v. Fisher*, No. 07 C 4483, 2008 WL 2062699 at *8 (N.D. Ill. May 13, 2008); *SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423 at *3 (N.D. Ill. May 25, 2004); *SEC v. Ustian*, 229 F. Supp. 3d 739, 775-76 (N.D. Ill. 2017). Defendants, meanwhile, fail to cite a single case from this District resolving a SEC disgorgement request at the pleading stage.[8] Defendants also do not cite any case in which a court dismissed a SEC disgorgement request at the pleading stage based on the Supreme Court's *Liu* decision. *Cf. SEC v. Dropil, Inc.*, No. 8:20-cv-00793-SB (DFMx), 2020 WL 7348021 at *5-*6 (C.D. Cal. Oct. 23, 2020) (denying motion to dismiss SEC disgorgement claim based on *Liu*).[9]

---

[8] Defendants' reliance on the California case of *SEC v. Berry*, No. C-07-04431 RMW, 2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) (Br. 29), is misplaced. In *Berry*, an options backdating case, the court struck the SEC's disgorgement claim where the SEC never alleged that the defendant exercised any backdated stock options or continued to possess any such options. *Id.* at *9-*10. In contrast to *Berry,* here the SEC has alleged in detail how Defendants profited from their regular business of buying and selling securities for their own accounts without registering as dealers. (*See* Compl. ¶¶ 3, 17, 28, 34-37).

[9] The two cases that Defendants' cite (Br. 30) are off point. In the first case, *Alvarez v. U.S.,* 862 F.3d 1297, 1302 (11th Cir. 2017), the Eleventh Circuit affirmed the dismissal of claims against the federal government under the Federal Tort Claims Act by investors in a fraud perpetrated by a non-government

Second, even if the Court decides to address disgorgement at the pleading stage, the SEC plausibly alleges that Defendants were unjustly enriched from their unregistered dealer business. Compl. ¶¶ 1, 3, 17, 34, 36). The SEC's allegations are sufficient to state a claim for disgorgement. *See SEC v. Teo*, 746 F.3d 90, 105-07 (3d Cir. 2014) (holding that SEC established "but for" causation for disgorgement). Further, the Complaint's allegations about Fife's disciplinary history fortify the causal connection. Registration requires a dealer to register with an SRO such as FINRA (Compl. ¶ 42), but FINRA has barred Fife from associating with any FINRA member. (*Id.*, ¶ 11). The Complaint provides a plausible inference that the FINRA bar against Fife would have presented an obstacle towards Fife's registration as a dealer and his receipt of gains through dealer activity. And any uncertainty about whether Fife *could* have successfully registered as a dealer, *if* he had tried to do so, should be resolved against Fife. *See SEC v. Black,* No. 04 C 7377, 2009 WL 1181480 at *2 (N.D. Ill. Apr. 30, 2009).

The cases that Defendants cite regarding causation are distinguishable. In *CFTC v. Sidoti*, 178 F.3d 1132 (11 Cir. 1999) (Br. 29-30), the Commodity Futures Trading Commission ("CFTC") charged several defendants with fraud. *Id.* at 1136. The CFTC also charged one defendant with failing to register as a principal of an introducing broker. *Id.* at 1137-38. The Eleventh Circuit vacated the district court's disgorgement award, stating that a court "may not disgorge profits, unless there is record evidence the defendant is liable (either directly or indirectly) for fraud." *Id.* In contrast to *Sidoti*, the SEC bases its case on Defendants' own

---

actor. In the second case, *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1331 (11th Cir. 2018), the Eleventh Circuit – citing *Alvarez* – held that the CFTC failed to establish that registration violations were the *proximate* cause of investor losses, as required for the CFTC to obtain *restitution.* As Defendants admit, however, the SEC is only required to establish "but for" causation to obtain disgorgement. (Br. 29). Indeed, Defendants completely ignore the remainder of the Eleventh Circuit's opinion stating that on remand, the district court could consider whether to award disgorgement to the CFTC because the statutory language governing CFTC disgorgement only required "but for" causation. *Id.* at 1331-32.

violations of Section 15(a) of the Exchange Act, not on an alleged fraud perpetrated by others.

In addition, while *Sidoti* found that CFTC disgorgement is available only in fraud cases, that is

not the law here, as disgorgement is routinely ordered in SEC cases for non-fraud violations. *See,*

*e.g., SEC v. ConnectAJet.com, Inc.*, No. 3:09-CV-1742-B, 2011 WL 5509896 at *7 (N.D. Tex.

Nov. 9, 2011) (rejecting argument that the SEC cannot obtain disgorgement for violations of

securities registration provisions); *SEC v. Enviro Bd. Corp.*, No. CV 16-6427-R, 2017 WL

4586335 at *4 (C.D. Cal. May 9, 2017) (ordering disgorgement for violations of securities and

broker-dealer registration provisions); *SEC v. Moddha Interactive, Inc.*, No. 18-000264 DKW-

WRP, 2020 WL 6701538 at *4 (D. Hawaii Oct. 26, 2020) (ordering disgorgement for violations

of broker-dealer-registration provisions); *SEC v. Gibraltar Global Sec., Inc.*, No. 13 Civ. 2575

(GBD) (JCF), 2015 WL 10910362 at *5-*6 (S.D.N.Y. Oct. 16, 2015).[10]

The two other cases that Defendants cite besides *Sidoti* are also distinguishable. In the

first case, *Biedron v. Futures*, No. 87 C 8425, 1989 WL 134796 at *4-*5 (N.D. Ill. Oct. 18,

1989) (Br. 30), the Court addressed whether a private plaintiff who lost money trading in

commodities could recover damages because his broker was unlicensed. In quantifying

Defendants' disgorgement liability, the SEC is not required to establish investor losses or loss

causation. In the second case, *SEC v. City of Victorville*, ED CV13-00776 JAK (DTBx), 2014

WL 12588688 at *10-*11 (C.D. Cal. Oct. 21, 2014) (Br. 30), the SEC admitted that the

defendant did not receive any personal benefit from the alleged fraud. Here, by contrast, the SEC

---

[10] Indeed, on January 1, 2021, Congress enacted the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 (2021) (the "NDAA" or the "Act"), including Section 6501 of the Act. This section of the Act amended Exchange Act Section 21(d) by, among other things, adding Exchange Act Section 21(d)(7), which states: "In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement." *See* Pub. L. No. 116-283, § 6501(a)(3). This provision of the NDAA confirms the SEC's authority to obtain disgorgement for any securities law violation, not just fraud.

has alleged that Defendants obtained millions of dollars in illegal profits through operating a regular business as a dealer without complying with the dealer registration requirements under Section 15(a) of the Exchange Act.

Third, the SEC has plausibly alleged the existence of "victims." (Br. 30).[11] At the remedies stage, courts have held that disgorgement is "awarded for victims" under *Liu* where the SEC represents that it will distribute any funds collected to investors. *See, e.g., SEC v. Erwin*, No. 13-cv-03363-CMA-KMT, 2020 WL 7310583 at *4 (D. Colo. Dec. 11, 2020); *SEC v. Mizrahi*, No. CV 19-2284 PA (JEMx), 2020 WL 6114913 at * 2 (C.D. Cal. Oct. 5, 2020). Because the SEC has not asked the Court to make any final determinations about Defendants' liability, the SEC does not need to determine a plan of distribution for any disgorgement award now.

Regardless, the Complaint amply alleges investor harm. Defendants conducted an unregistered dealer business of acquiring newly-issued shares directly from the issuer at a substantial discount. Defendants then resold those securities into the market, thereby injecting massive new float and frequently depressing the stock price of counterparty microcap issuers. Defendants' conduct reduced the value of shares held by the counterparty issuers' shareholders. (Compl. ¶ 33, 34). When Defendants sold securities into the market, they captured extraordinary gains directly through the discount feature of Defendants' conversion of newly-issued shares. These allegations plausibly describe how Defendants' violations of the federal securities laws resulted in direct harm to market participants.

---

[11] In making their argument, Defendants assert that "the Exchange Act does not authorize" disgorgement. (Br. 30). As explained above, however, Congress has now explicitly provided for disgorgement in the Exchange Act after the January 1, 2021 enactment of the NDAA.

Dated: January 29, 2021     Respectfully submitted,

             **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

             <u>/s/ Eric M. Phillips</u>

             By: One of Its Attorneys

Eric M. Phillips
Jaclyn J. Janssen
United States Securities and Exchange Commission
175 W. Jackson Blvd., Suite 1450
Chicago, IL 60604
(312) 353-7390

*Counsel for the SEC*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on January 29, 2021, he caused the foregoing document to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system, which shall send notification of such filing to the following counsel of record:

Helgi C. Walker
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. NW
Washington, DC 20036
Email: hwalker@gibsondunn.com

Barry Goldsmith
M. Jonathan Seibald
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Email: bgoldsmith@gibsondunn.com

Michael J. Diver
Elliott M. Bacon
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Email: Michael.diver@kattenlaw.com

*Counsel for Defendants*

/s/ Eric M. Phillips
Eric M. Phillips