# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>         Plaintiff, <br><br>    v. <br><br> JOHN M. FIFE, CHICAGO VENTURE PARTNERS, L.P., ILIAD RESEARCH AND TRADING, L.P., ST. GEORGE INVESTMENTS LLC, TONAQUINT, INC., and TYPENEX CO-INVESTMENT, LLC, <br><br>         Defendants. | Case No. 1:20-cv-05227 <br><br> Judge Robert M. Dow, Jr. <br><br> Magistrate Judge Heather K. McShain <br><br> **Oral Argument Requested** |

## DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF MOTION TO DISMISS

Michael J. Diver
Elliott M. Bacon
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200
michael.diver@katten.com

Helgi C. Walker*
Brian A. Richman*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
hwalker@gibsondunn.com

Barry Goldsmith*
M. Jonathan Seibald*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2440
bgoldsmith@gibsondunn.com

*Attorneys for Defendants*

March 12, 2021

_____

* *pro hac vice*

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................................1

ARGUMENT ..................................................................................................................................2

I.   The SEC's Ahistorical, Hyperliteral, And Overbroad Interpretation Of The Exchange
     Act Should Be Rejected. ......................................................................................................2

     A.   The SEC's Brief Is Entirely Beside The Point. ..........................................................2

     B.   The SEC Fails To Address The Exchange Act's Contemporary Meaning. ................3

          1.   The SEC Ignores How The Phrase "Buying And Selling Securities For One's
               Own Account" Was Used At The Time Of The Exchange Act. ...........................4

          2.   The SEC Cannot Evade The Contemporary Meaning Of "Buying And
               Selling." ................................................................................................................6

          3.   The SEC Disregards The Body Of Learning From Which Congress Took
               The Phrase "As Part Of A Regular Business." ....................................................7

     C.   The SEC Fails To Reconcile Its Theory With The Larger Regulatory Structure. ......9

     D.   The SEC Cannot Avoid The Absurdities Of Its Novel Construction. .....................10

     E.   The SEC's Argument Is Flawed For Other Reasons. ...............................................12

II.  The SEC's Due Process Responses Are Foreclosed By Binding Precedent. ....................14

III. The SEC Cannot Avoid Other Constitutional Limitations. ...............................................16

     A.   *Seila Law* Forecloses The SEC's Claim To Authority To Bring This Case. ..........16

     B.   The SEC Cannot Force CVP To Subject Itself To The Jurisdiction Of SIPC. ........18

IV.  The Disgorgement Claims Should Be Dismissed. ............................................................19

CONCLUSION .............................................................................................................................20

## TABLE OF APPENDICES

**Available at Dkt. 23-1 (Appendix to Brief in Support of Motion to Dismiss):**

APPENDIX A:  C.H. Meyer, Law of Stock Brokers and Stock Exchanges § 43-a (Supp. 1933)

APPENDIX B:  SEC, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker, *Introduction* (1936)

APPENDIX C:  Webster's New International Dictionary, *dealer* (2d ed. 1934)


**Additional Appendices for Reply Brief in Support of Motion to Dismiss:**

APPENDIX D:  Elray Resources Inc., Quarterly Report (Form 10-Q) (Aug. 15, 2016)

APPENDIX E:  SEC, Exchange Act Release No. 211, 1935 SEC LEXIS 179 (May 6, 1935)

APPENDIX F:  1 L. Loss et al., Fundamentals of Securities Regulation § 3.A.4 (7th ed. 2021 Cum. Supp.)

APPENDIX G:  H.R. Rep. No. 73-85, at 11–14 (1933)

APPENDIX H:  H.R. Rep. No. 76-2639, at 9–10 (1940)

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abuelhawa v. United States*,
556 U.S. 816 (2009) ........................................................................................................... 4

*Air Wis. Airlines Corp. v. Hoeper*,
571 U.S. 237 (2014) ........................................................................................................... 7

*Alvarez v. United States*,
862 F.3d 1297 (11th Cir. 2017) ....................................................................................... 20

*Avalos v. Pulte Home Corp.*,
474 F. Supp. 2d 961 (N.D. Ill. 2007) .............................................................................. 20

*Chapel Invs., Inc. v. Cherubim Interests, Inc.*,
177 F. Supp. 3d 981 (N.D. Tex. 2016) ............................................................................ 10

*Cox v. Louisiana*,
379 U.S. 559 (1965) ......................................................................................................... 14

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
575 U.S. 43 (2015) ........................................................................................................... 18

*Donander Co. v. Comm'r*,
29 B.T.A. 312 (1933) .......................................................................................................... 7

*Eastside Church of Christ v. Nat'l Plan, Inc.*,
391 F.2d 357 (5th Cir. 1968) ............................................................................................. 9

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .................................................................................................... 14, 15

*FEC v. NRA Political Victory Fund*,
6 F.3d 821 (D.C. Cir. 1993) ............................................................................................. 18

*Free Enter. Fund. v. PCAOB*,
561 U.S. 477 (2010) .................................................................................................... 18, 19

*Garza v. Henderson*,
779 F.2d 390 (7th Cir. 1985) ........................................................................................... 19

*Herrmann v. Cencom Cable Assocs.*,
978 F.2d 978 (7th Cir. 1992) ............................................................................................. 4

*Horne v. Dep't of Agric.*,
569 U.S. 513 (2013) ......................................................................................................... 19

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Horne v. Dep't of Agric.*,
  576 U.S. 350 (2015)......................................................................................................19

*Humphrey's Ex'r v. United States*,
  295 U.S. 602 (1935)................................................................................................17, 18

*Lamar, Archer & Cofrin, LLP v. Appling*,
  138 S. Ct. 1752 (2018) ...................................................................................................6

*Liu v. SEC*,
  140 S. Ct. 1936 (2020) .................................................................................................20

*Mass. Fin. Servs. v. SIPC*,
  411 F. Supp. 411 (D. Mass. 1976)................................................................................13

*Michigan v. U.S. Army Corps of Eng'rs*,
  2010 WL 5018559 (N.D. Ill. Dec. 2, 2010) ...................................................................3

*Morrison v. Olson*,
  487 U.S. 654 (1988)................................................................................................17, 18

*New Prime Inc. v. Oliveira*,
  139 S. Ct. 532 (2019)......................................................................................................2

*Ocampo v. GC Servs., Ltd. P'ship*,
  2018 WL 6198464 (N.D. Ill. Nov. 28, 2018) .................................................................3

*Oceana Capitol Grp. v. Red Giant Entm't, Inc.*,
  150 F. Supp. 3d 1219 (D. Nev. 2015) ..........................................................................10

*Padilla v. DISH Network LLC*,
  2014 WL 539746 (N.D. Ill. Feb. 11, 2014)..................................................................10

*PHH Corp. v. CFPB*,
  839 F.3d 1 (D.C. Cir. 2016) .........................................................................................14

*Pub. Printing*,
  1903 WL 3830 (Pa. Att'y Gen. 1903) ............................................................................6

*SEC v. Almagarby*,
  479 F. Supp. 3d 1266 (S.D. Fla. 2020) ........................................................................13

*SEC v. Big Apple Consulting USA, Inc.*,
  783 F.3d 786 (11th Cir. 2015) ..................................................................................8, 13

*SEC v. Blinder, Robinson & Co.*,
  855 F.2d 677 (10th Cir. 1988) ......................................................................................17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*SEC v. Bolla,*
550 F. Supp. 2d 54 (D.D.C. 2008) ................................................................................. 2

*SEC v. Buntrock,*
2004 WL 1179423 (N.D. Ill. May 25, 2004) ................................................................ 20

*SEC v. Fierro,*
2020 WL 7481773 (D.N.J. Dec. 18, 2020) ................................................................... 13

*SEC v. Keener,*
2020 WL 4736205 (S.D. Fla. Aug. 14, 2020) .................................................... 3, 12, 13

*SEC v. River N. Equity LLC,*
415 F. Supp. 3d 853 (N.D. Ill. 2019) ........................................................................... 13

*SEC v. Ustian,*
229 F. Supp. 3d 739 (N.D. Ill. 2017) ........................................................................... 20

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183 (2020) .................................................................................... 16, 17, 18

*SIPC v. Barbour,*
421 U.S. 412 (1975) ...................................................................................................... 18

*State v. San Patricio Canning Co.,*
17 S.W.2d 160 (Tex. App. 1929) .................................................................................... 6

*State v. Yearby,*
82 N.C. 561 (1880) ......................................................................................................... 6

*Stiles v. Int'l BioResources, LLC,*
726 F. Supp. 2d 944 (N.D. Ill. 2010) ............................................................................. 3

*Upton v. SEC,*
75 F.3d 92 (2d Cir. 1996) ............................................................................................. 16

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ...................................................................................................... 12

*Weisbrod v. Lowitz,*
282 Ill. App. 252 (1935) ............................................................................................. 4, 5

*Wiener v. United States,*
357 U.S. 349 (1958) ...................................................................................................... 18

*Wis. Cent. Ltd. v. United States,*
138 S. Ct. 2067 (2018) .................................................................................................... 3

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*In re Xonics Photochemical, Inc.,*
841 F.2d 198 (7th Cir. 1988)...........................................................................................10

**Statutes**

15 U.S.C.
§ 77b(a)(12) ..............................................................................................................14
§ 78c(a)(4)(A) .............................................................................................................5
§ 78c(a)(5)(A) .............................................................................................................5
§ 78c(a)(5)(B) .........................................................................................................7, 11
§ 78ccc(a)(1) ...............................................................................................................18
§ 78ccc(a)(1)(B) ........................................................................................................19
§ 78ccc(b)(7) ..............................................................................................................19
§ 78ccc(e)(1)(B) .........................................................................................................19
§ 78ff(a)...............................................................................................................1, 10, 12
§ 78fff-4(c)..................................................................................................................10
§ 78o(a)(1) ...........................................................................................................1, 10, 12
§ 78o(c)(3)(A) ............................................................................................................10
§ 78o(e) ......................................................................................................................10
§7211(a) .....................................................................................................................18
§7211(b) .....................................................................................................................18

625 Ill. Comp. Stat. Ann. 5/6-507.5(c) ........................................................................20

D.C. Code §29-406.40(a) ..............................................................................................19

District of Columbia Nonprofit Corporation Act, Pub. L. No. 87-569,
76 Stat. 265 (1962)............................................................................................... 18, 19

**Regulations**

17 C.F.R. § 230.144.................................................................................................9, 13

17 C.F.R. § 230.144(d)(3)(ii) .......................................................................................16

**Other Authorities**

*In re Accounting Consultants, Inc.,*
2006 WL 1765159 (June 27, 2006) ........................................................................16

Concept Release, 75 Fed. Reg. 3594 (Jan. 21, 2010)...................................................11

*Dep't of Enforcement v. Scottsdale Cap. Advisors Corp.,*
2017 WL 2644541 (FINRA Mar. 31, 2017) ............................................................7

*In re Elray Res., Inc.,*
2016 WL 5571631 (Sept. 30, 2016)........................................................................16

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Exchange Act Release No. 211,
   1935 SEC LEXIS 179 (May 6, 1935) ................................................................5

Further Definition of "Swap Dealer," 77 Fed. Reg. 30,596 (May 23, 2012) .........................7

S. Goldfarb & M. Wirz, *Borrowing Binge Reaches Riskiest Companies*,
   Wall St. J. (Feb. 15, 2021), https://tinyurl.com/494tz34u ................................11

*In re Gordon Wesley Sodorff, Jr.*,
   1992 WL 224082 (Sept. 2, 1992) ..........................................................15

H.R. Rep. No. 73-85 (1933) ..................................................................14

H.R. Rep. No. 76-2639 (1940) ..................................................................6

*In re Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. §1464*,
   16 FCC Rcd. 7999 (2001) ..................................................................15

1 L. Loss et al., Fundamentals of Securities Regulation (7th ed. 2021 Cum. Supp.).............14

D. MacMillan et al., *Spotify Raises $1 Billion in Debt Financing*,
   Wall St. J. (Mar. 29, 2016), https://tinyurl.com/sajnuzud ................................11

C.H. Meyer, Law of Stock Brokers and Stock Exchanges (1933) ....................... 4, 5, 8

*Planning Research Corp.*,
   1980 WL 14999 (SEC No-Action Letter Dec. 8, 1980) ....................................16

Revisions to Rule 144, 72 Fed. Reg. 71,546 (Dec. 17, 2007) ................................16

Rule 144 Holding Period, 86 Fed. Reg. 5063 (Jan. 19, 2021) ..............................9,11

A. Scalia & B. Garner, *Reading Law* (2012) ...............................................3, 4

SEC, *"Restricted" Securities: Removing the Restrictive Legend*,
   tinyurl.com/53lnab4e (last modified Jan. 16, 2013) .......................................7

SEC, Report on the Feasibility and Advisability of the Complete Segregation of the
   Functions of Dealer and Broker (1936) ............................................. 4, 5, 6

Testimony of Richard L. Lindsey, Div. of Mkt. Reg.,
   1998 WL 781102 (Oct. 1, 1998) .............................................................8

## INTRODUCTION

The SEC claims to have discovered in a long-extant statute a transformative legal rule over-looked by all at the time of the law's adoption, and by everyone since—until the SEC started this and other retroactive enforcement actions. Stripping the Exchange Act of its historical and statutory context—and marginalizing five decades of the Commission's own guidance as "not dispositive"—the agency insists that Congress swept within the definition of "dealer" "literal[ly]" any "business" that "b[uys] and s[ells] securities" for "profit" on "more than a few" occasions. SEC Br. 9–10, 12, 18 n.3. That is absurd, and is not the law. The SEC's theory would make a felon of virtually any person who has been associated with any hedge fund, investment company, or family office—firms that buy and sell billions of dollars of securities each year, yet have never registered as dealers. *See* 15 U.S.C. §§ 78o(a)(1), 78ff(a). Although the SEC tries to claim the high ground of "plain language," the agency's hyperliteral approach is not faithful to traditional tools of statutory construction based on the text, context, and history of the definition. If the definition really means what the SEC now says it does, one would think somebody would have recognized that over the course of the last century.

The only authority the SEC can muster for this illogical and expansive theory is four non-precedential district court decisions—all decided in the last 16 months, and cited on nearly every page of the Commission's brief—*that do not even purport to interpret the statutory text*, because no party had raised a statutory argument. The SEC's brief is thus entirely beside the point. It does not engage the foundational question of statutory interpretation: how would a reasonable person have interpreted the Exchange Act's text at the time of the Act's adoption? On that question, there is no doubt. As CVP's opening brief demonstrated, no one at the time would—indeed, *no one ever has*—read the Exchange Act the way today's Commission would prefer. Every court, every commentator, and every previous Commission adopted a far narrower reading—one that tracked decades of legal precedent and ordinary parlance, and readily conformed to the broader statutory structure.

The SEC presses its sweeping theory here for a simple reason: it cannot implement its pre-ferred policy without it. Convertible debt lending is perfectly legal. The SEC's own regulations ex-pressly provide a safe harbor to lenders to offer public companies an alternative form of financing—one where the lender can recoup its investment by converting the outstanding debt into common stock and selling the stock into the market. CVP Br. 4–5. As the SEC previously acknowledged, this type of funding is critical to small, emerging (often unlisted) companies and their shareholders, because it provides access to capital that these companies cannot obtain from other sources. *Id.* at 5. That today's Commission has changed its mind—and thinks the terms of these loans too "favorable" to the lender, or the "discounts" on conversion too "deep," or finds this legitimate business distasteful—is irrelevant. SEC Br. 4. That is the stuff of rulemaking—not civil enforcement actions with claims for retroactive penalties and disgorgement. If the SEC really wants to shut down convertible loan financing in the over-the-counter markets or place further restrictions on it, the agency is free to pro-pose a rule change—in fact, after CVP filed its motion to dismiss in this case, the SEC proposed an amendment that would place limitations on the exact type of convertible loans at issue here. But what the SEC cannot do, in 2021, is pluck a few words from a 90-year-old statute—strip them of all histor-ical and statutory context—and selectively wield them against a newly disfavored class of lenders.

## ARGUMENT

## I.      The SEC's Ahistorical, Hyperliteral, And Overbroad Interpretation Of The Exchange Act Should Be Rejected.

### A.      The SEC's Brief Is Entirely Beside The Point.

The SEC devotes nearly every page of its brief (at 1, 2, 3, 10, 11, 12, 14, 15, 18, 21) to four district court decisions that, significantly, do not "actually analyz[e]" the statutory text. *SEC v. Bolla*, 550 F. Supp. 2d 54, 62 (D.D.C. 2008). Those decisions are thus irrelevant, *id.*; they do not shed any light on the actual question in *this* case: how would a reasonable person have interpreted the Exchange Act's text "at the time of the Act's adoption"? *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019).

On numerous occasions, this Court has given little weight to cases that do not consider the issue for which they are cited. *See, e.g.*, *Ocampo v. GC Servs., Ltd. P'ship*, 2018 WL 6198464, at *10 n.15 (N.D. Ill. Nov. 28, 2018) (Dow, J.); *Michigan v. U.S. Army Corps of Eng'rs*, 2010 WL 5018559, at *17 n.19 (N.D. Ill. Dec. 2, 2010) (Dow, J.); *Stiles v. Int'l BioResources, LLC*, 726 F. Supp. 2d 944, 951–52 (N.D. Ill. 2010) (Dow, J.). This time should be no different. The SEC's four hand-picked cases come from the agency's newly launched broadside against the convertible note industry. But presumably because no one knew that the SEC would suddenly disavow all of its prior guidance as "not disposi-tive," the initial defendants all offered the same defense: they followed the SEC's guidance. *See, e.g.*, *SEC v. Keener*, 2020 WL 4736205, at *3 (S.D. Fla. Aug. 14, 2020) ("Defendant contends that he is . . . not a dealer, based on various factors mentioned in the SEC's Guide to Broker-Dealer Registration."). As a result, none of the courts had occasion to consider—much less decide—to what extent the SEC's theory conformed to the *statutory* text. The decisions in those cases are thus of little help in *this* case.

## B. The SEC Fails To Address The Exchange Act's Contemporary Meaning.

In this case, CVP raises a statutory argument that the SEC's cases and its opposition do not address. In 30 pages, the SEC has nothing to say about the contemporary meaning of the Exchange Act's text. Rather, the agency takes just nine words—"buying and selling securities for such person's own account"—and insists on reading them as if they fell fully-formed from the sky in 2021, without any prior meaning or history. That is not how statutory interpretation works. Simply repeating—even 35 times (at 1, 2, 3, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19)—that a phrase appears in a "definition" does not absolve an agency of "the usual criteria of interpretation." A. Scalia & B. Garner, *Reading Law* 228 (2012). A definitional phrase—like any other phrase—must be given its "ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (cleaned up) (construing a statutory definition).

Ordinary meaning is not "literal" (SEC Br. 12) meaning. Scalia & Garner, *Reading Law* 356; *see, e.g.*, *Abuelhawa v. United States*, 556 U.S. 816, 820 (2009) (choosing "common usage" over "literal sweep"). A law that punishes whoever "draws blood in the streets" would literally condemn a surgeon who opens the vein of a person who has fallen in the street due to illness. Scalia & Garner, *Reading Law* 357. But no sensible person would interpret the statute that way because the phrase "drawing blood in the streets," in its ordinary, "conventional meaning," refers to a violent attack that pierces the skin, not a medical procedure. *Id.* The SEC here would hang the surgeon. It has no response to the indisputable fact that at the time Congress enacted the Exchange Act, everyone used the statutory phrase—"buying and selling securities for one's own account"—to distinguish the dealer's method of effectuating a customer's order from that of a broker. Only by "[s]licing" the statute into an isolated snippet, while ignoring the "background understandings," can the Commission even attempt to defend this suit. *Herrmann v. Cencom Cable Assocs.*, 978 F.2d 978, 982 (7th Cir. 1992).

   1.   **The SEC Ignores How The Phrase "Buying And Selling Securities For One's Own Account" Was Used At The Time Of The Exchange Act.**

CVP's opening brief demonstrated (at 7–8, 13–14) that at the time Congress enacted the Exchange Act, everyone knew that a broker bought and sold securities "*for*" his customer, whereas a dealer bought and sold securities "*from*" and "*to*" his customer. C.H. Meyer, Law of Stock Brokers and Stock Exchanges § 43-a, at 32–34 (1933) ("Law of Stock Brokers 1933") (emphases added).

The distinction between a "broker" and a "dealer" was thus expressed in terms of whose "account" facilitated the customer's trade. A broker, who acts "as the customer's representative," Law of Stock Brokers 1933, at 32, would simply trade "for the account of the customer," SEC, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker, at XIV (1936) ("SEC Report"). As the standard trade confirmation of the day put it, "We have this day bought (or sold) *for your account* and risk." *E.g.*, *Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (1935) (emphasis added). A dealer, in contrast, would execute the customer's trade by taking the opposite

side in "his own account." *Id.* When a customer wanted to sell, for example, a dealer would effectuate the sale by "buy[ing] from [the] customer . . . for his own account." Law of Stock Brokers 1933, at 34. The phrase "own account" referred to the method by which a dealer effectuated his customers' orders; it "distinguished" the "*dealer['s]*" way of doing business "from [that of] a *broker*." *Id.* at 32.

Against this contextual backdrop, the SEC's case falls apart. Adopting the established understanding of the "other's account" versus "own account" distinction between brokers and dealers, Congress plainly defined those businesses in functional terms of *how* they effectuate customer trades. CVP Br. 2. Thus, a "broker" is a person "engaged in the business of effecting transactions in securities for the account of others," 15 U.S.C. § 78c(a)(4)(A), while a "dealer" is a person "engaged in the business of buying and selling securities . . . for such person's own account," *id.* § 78c(a)(5)(A). In 1934, everyone understood this text as distinguishing the two ways of effectuating a customer's order.

The SEC has nothing to say about the contemporary evidence that when people spoke of a dealer "buying and selling securities for one's own account," it was always in the context of customer-order facilitation. For instance, a leading treatise in 1933 stated that a dealer "engages in the business of buying and selling securities for his own account," immediately adding: "He sells to his customers . . . securities which he has purchased for his own account elsewhere, or buys from his customers securities for his own account with a view of disposing of them elsewhere." Law of Stock Brokers 1933, at 32–33. The SEC itself used the phrase "own account," but again, always in the context of facilitating a customer order—e.g., a "broker or dealer must disclose to his customer . . . whether he is acting as a dealer for his own account, . . . or as a broker." Exchange Act Release No. 211, 1935 SEC LEXIS 179, at *5 (May 6, 1935); *see also* SEC Report, at XIV ("The characteristic activities of a dealer . . . [are that he] sells securities to his customer . . . or buys securities from his customer . . . . In any such transaction he acts for his own account[.]"). The SEC cannot cite any contemporary source that suggests a dealer operates without customers. Nor can it explain why no one at the time even

5

contemplated that possibility. *See, e.g.*, H.R. Rep. No. 76-2639, at 10 (1940) (simply assuming "the great majority of investment companies have never come within the purview of" the Exchange Act).

> **2.     The SEC Cannot Evade The Contemporary Meaning Of "Buying And Selling."**

The SEC also makes no serious effort to deny (at 14) that at the time Congress enacted the Exchange Act, the phrase "buying and selling" meant to buy and sell the *same* type of security, in the *same* condition, around the *same* time. CVP Br. 9–11. Every contemporary case comports with CVP's reading. *See State v. San Patricio Canning Co.*, 17 S.W.2d 160, 162 (Tex. App. 1929) (same "form and condition"); *State v. Yearby*, 82 N.C. 561, 562 (1880) ("*same article and in the same condition*").

The SEC's attempt (at 14) to "distinguish[ ]" these cases—on the ground that "they seek to differentiate a dealer from a manufacturer," "not a dealer from a trader"—is wrong on numerous levels. It is incompatible with the agency's longstanding admonition that the "characteristic activities of a dealer in securities are similar to those of a dealer . . . in merchandise." SEC Report, at XIV. And it is just not true. While the defendants may have been manufacturers, the courts did not "seek to differentiate a dealer from a manufacturer," SEC Br. 14; they tried to discern, as a matter of "language," *Yearby*, 82 N.C. at 562, "common acceptation," or "plain language," *San Patricio*, 17 S.W.2d at 162, whether the statutory phrase at issue here—"buying and selling"—applied to a particular firm. It is inconceivable that Congress would have been unaware of these prior judicial interpretations of the operative statutory phrase. *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018).

The SEC's theory unravels further as one considers the multitude of authorities that uniformly recognize that a "dealer" trades the same article in the same condition. *See, e.g.*, *Pub. Printing*, 1903 WL 3830, at *1 (Pa. Att'y Gen. 1903) (SEC Br. 13) ("In law, a dealer is one who buys and sells the same articles in the same condition."); CVP Br. 10–11. The SEC has no response. It relies instead on two arguments; both are meritless. *First*, the SEC invokes (at 14) "recent cases" to "refute" the historical interpretation of "buying and selling," but none of those cases even *attempted* to construe the statutory

text.  *Second*, the SEC says that maybe CVP buys and sells the same securities after all—on the theory that CVP does not apply "labor and skill to change" the notes into stock.  SEC Br. 14 (cleaned up). That is nonsense.  The SEC alleges that CVP "convert[s]" Rule-144-"restricted" notes into freely tradeable stock.  Compl. ¶ 27.  That is a "highly detailed and technical" process, *Dep't of Enforcement v. Scottsdale Cap. Advisors Corp.*, 2017 WL 2644541, at *2 (FINRA Mar. 31, 2017); the SEC itself warns parties not to try it without a lawyer and broker to guide them, *see* SEC, *"Restricted" Securities: Removing the Restrictive Legend*, tinyurl.com/53lnab4e (last modified Jan. 16, 2013).  The conversion indisputably requires "labor and skill," and the note and stock are not the same thing.  CVP Br. 11.

In any event, the SEC does not even try to argue that CVP's trading exhibits the requisite temporal proximity.  CVP Br. 12.  The SEC itself has held the "conjunctive 'buying *and* selling' . . . connotes a degree of offsetting two-sided activity."  Further Definition of "Swap Dealer," 77 Fed. Reg. 30,596, 30,607 n.174 (May 23, 2012).  To offset one's activity, one must buy and sell, as the SEC's website puts it, "on a continuous basis"—or, as the SEC's former Deputy Director explains, "simul-taneously."  CVP Br. 10–11 (emphases omitted).  The SEC does not explain how CVP meets this standard when it buys one type of security and then—*if* there is any sale at all—sells a different type of security six or more months later.  Compl. ¶ 27.  That is not "continuous" or "simultaneous."

### 3. The SEC Disregards The Body Of Learning From Which Congress Took The Phrase "As Part Of A Regular Business."

The SEC's brief confirms that CVP does not buy or sell securities "as part of a regular busi-ness."  15 U.S.C. § 78c(a)(5)(B).  The SEC does not dispute that at the time of the Exchange Act, federal regulations already excluded from "dealer" status any person who bought or sold securities "not in the course of an established business."  *Donander Co. v. Comm'r*, 29 B.T.A. 312, 313 (1933); *see* CVP Br. 13.  That should end the matter.  When Congress employed the same exclusionary phrase in the Exchange Act—nearly verbatim—it is "presum[ed]" to have "adopt[ed] the cluster of ideas" that were attached to "the body of learning from which [the phrase] [wa]s taken."  *Air Wis. Airlines Corp.*

*v. Hoeper*, 571 U.S. 237, 248 (2014); *see* CVP Br. 13. And that body of learning plainly excluded from "dealer" status any firm that did not perform traditional public-facing dealer services for *customers*. CVP Br. 13–14 (collecting cases). The SEC does not cite, address, or acknowledge these authorities.

This is not "rewriting" the statute, SEC Br. 13, but interpreting Congress's words in accordance with ordinary tools of construction—to which the SEC has no real response. The best the SEC can do is pluck three sources from CVP's brief—seemingly at random—and declare that "[n]othing" in them "requires that to be a dealer, one *must* carry on a public securities business." *Id.* at 14. But each source (and many others the SEC doesn't address, *see* CVP Br. 15) say exactly that. Take what the SEC calls a "speech"—i.e., the Director of Market Regulation's testimony to Congress. In prepared remarks, the Director explained that hedge funds "are not registered . . . [as] broker-dealers" because they do "*not carry on a public securities business*." Testimony of R.L. Lindsey, 1998 WL 781102, at *1, *2 n.2 (Oct. 1, 1998). The treatise makes a similar point, which is why the SEC is forced to misleadingly quote it (at 15); the portion quoted by the SEC is bolded below. The actual text confirms that a dealer, as distinguished from a broker, uses his "own account" to facilitate customer orders:

> [T]he broker does not himself sell to or buy from the customer, but acts as the customer's representative in making a purchase from or a sale to a third party.
>
> However, there is nothing in the law which prevents **a person** from **engaging in the business of buying and selling securities for his own account as principal**. Such a person **is a security *dealer*** as distinguished from a *broker*. His rights and duties have been before the courts for adjudication repeatedly. He sells to his customers . . . securities which he has purchased for his own account elsewhere, or buys from his customers securities for his own account with a view of disposing of them elsewhere[.]

Law of Stock Brokers 1933, at 33. That *this* is the SEC's best contemporary authority says it all.

The SEC's final argument (at 15)—that "[o]n multiple occasions, courts have held that persons qualify as 'dealers' even if they" are not in a public securities business—does not withstand scrutiny. By "[o]n multiple occasions," the SEC means two. *See id.* The first—*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015)—arose under a *different* statute, CVP Br. 20, *infra* p. 13. And the

second—*Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968)—has four sentences on the issue, *see id.* at 361–62, which may not have been briefed, *see id.* at 361 (district court "did not decide" the issue). In any event, the dealer there was plainly involved in a public securities business. It was literally an underwriter; it traveled the country selling bonds over-the-counter to customers. *Id.*

C. **The SEC Fails To Reconcile Its Theory With The Larger Regulatory Structure.**

Dealers are expressly excluded from using Rule 144. 17 C.F.R. § 230.144 ("other than" a dealer). The SEC never mentions that reality. Instead, the SEC insists—*twice* (at 17, 3)—that it makes perfect "[ ]sense for the SEC to [have] provide[d] [lenders like CVP] with [a] Rule 144 'exemption' . . . [even] if they still have to comply with . . . dealer registration"—*even though that is legally impossible.*

The SEC's position is mystifying. If the SEC's theory were really the law—if executing "convertible note deals" were really "sufficient[ ]" to make one a dealer, SEC Br. 11—then the SEC, *in a pending rulemaking*, would be advocating illegality. In that rulemaking, the SEC explains that "after the Rule 144 holding period is satisfied," lenders can "convert [their notes] into . . . common stock[ ] at a . . . discount to the market price" and "quickly" resell the stock "into the public market." Rule 144 Holding Period, 86 Fed. Reg. 5063, 5066 (Jan. 19, 2021); *cf.* SEC Br. 5–6. That business model, the SEC says—*later citing an article by undersigned counsel about CVP's business model*, *id.* at 5073 n.76—is permissible "under Rule 144's current formulation," *id.* at 5066–67—even though, again, *Rule 144 excludes dealers from using it.* The SEC, moreover, proposes an amendment that would effectively bar convertible lending to unlisted issuers—but would explicitly allow it for listed issuers. *Id.* at 5067. Again, the SEC does not explain how that is possible: all the deals would either be (i) executed by non-registered dealers (as the SEC alleges here) or (ii) ineligible for Rule 144 (because the lenders *were* dealers). Inexplicably, the SEC, in its brief, fails to mention this rulemaking; and the SEC, in the rulemaking, fails to mention this case—even though they were filed ten days apart and cannot rationally coexist.

In its rush to condemn a newly disfavored class of lenders, the SEC misreads other aspects of

the statutory structure as well. Contrary to the SEC's assertion (at 17), exempt "*transactions*" under the Securities Act (e.g., through Rule 144) cannot turn "*actor*s" into dealers under the Exchange Act. That is the point of *Chapel Investments., Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981 990–91 (N.D. Tex. 2016), and *Oceana Capitol Group v. Red Giant Entertainment, Inc.*, 150 F. Supp. 3d 1219, 1225–26 (D. Nev. 2015)—cases the SEC just ignores, *see* CVP Br. 18.

The SEC is also off base complaining (at 4) about "highly favorable terms" CVP allegedly struck with issuers and insisting (at 17) that registration is required, "[w]hether [CVP] ha[s] customers or not," because its "activities still affect the market." None of that has anything to do with registering *as a dealer*—a regulatory scheme that is entirely premised on the existence of customers. The SEC does not say why Congress would have forced firms such as CVP to send "notice[s] to [their] customers" (which they do not have), 15 U.S.C. § 78o(e); to meet "financial responsibility requirements" to keep "custody . . . of customers' securities" (which they do not hold), *id.* § 78o(c)(3)(A); to join a fund to insure "each of [their] customers" accounts (which do not exist), *id.* § 78fff-4(c); and to license and train their employees on providing customer services (which they do not provide), CVP Br. 18.

### D.    The SEC Cannot Avoid The Absurdities Of Its Novel Construction.

The construction of "dealer" advanced by the SEC would mean that every hedge fund, investment company, and family office has been operating unlawfully since the Exchange Act's adoption because they failed to register as dealers. "The proposition is absurd." *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199 (7th Cir. 1988). It would make a felon of any person associated with those entities, *see* 15 U.S.C. §§ 78o(a)(1), 78ff(a), which is presumably why the SEC has never applied its theory except as to convertible lenders, a newly disfavored class. *See Padilla v. DISH Network LLC*, 2014 WL 539746, at *3 (N.D. Ill. Feb. 11, 2014) (Dow, J.) (rejecting interpretation with "absurd[ly]" broad "results").

The SEC's *ipse dixit* (at 16)—that "[a]pplying [its] literal definition of 'dealer' [would] not require 'every family office, hedge fund, [and] investment company'" to register—is unavailing. The

agency cannot explain *how* its reading of the statute would exclude those firms. The SEC repeatedly insists that Congress swept within the "dealer" definition "literal[ly]" any "business" that "b[uys] and s[ells] securities" for "profit"; and that buying and selling "in more than a few" transactions is "sufficient" to make one a dealer. SEC Br. 9–10, 12. Every firm listed above does exactly that.

The seemingly random facts about convertible lenders the SEC lists (at 16) is no answer to the absurd breadth of its theory. The agency does not even try to connect those facts to a definition of dealer. Nor do most of the facts even distinguish convertible lenders from other businesses that are obviously not dealers. A hedge fund, for example, is a "savvy player[ ]" that also "solicit[s]" "convertible promissory notes" "at a discount," SEC Br. 16,[1] or profits—in the case of a high frequency trader—from buying and selling alone, not "from appreciation," *id.* at 9.[2] To the extent the SEC offers anything that could differentiate convertible lenders from hedge funds or similar entities, it distinguishes such lenders from its *own* dealer definition. It insists (at 16) that convertible lenders do "not face genuine price risk like other market participants." That contention is absurd;[3] but even if it were true, it proves CVP is *not* a dealer. The SEC has long said dealers *do* face "risk." SEC Report, at XIV.

The SEC's so-called "traders" exception is no solution for the absurdity of the SEC's interpretation either. SEC Br. 16. The agency says that the "trader exception" is just SEC-speak for the statutory exclusion for firms that buy or sell securities but "not as part of a regular business." SEC Br. 8 (quoting 15 U.S.C. § 78c(a)(5)(B)). And the word "business," the SEC insists (at 9–10), means any "commercial enterprise carried on for *profit*." The SEC cannot seriously maintain that hedge funds and other similar entities are not commercial enterprises that buy and sell securities for profit. Nor

---

[1] *See, e.g.*, S. Goldfarb & M. Wirz, *Borrowing Binge Reaches Riskiest Companies*, Wall St. J. (Feb. 15, 2021), https://tinyurl.com/494tz34u (detailing Apollo's acquisition of convertible notes); D. MacMillan et al., *Spotify Raises $1 Billion in Debt Financing*, Wall St. J. (Mar. 29, 2016), https://tinyurl.com/sajnuzud.

[2] *See* Concept Release, 75 Fed. Reg. 3594, 3606 (Jan. 21, 2010) (high frequency traders are often not dealers).

[3] Lending to small companies is highly risky and isn't inherently profitable; many investments literally go to zero. CVP Br. 4 n.2 (citing borrower's bankruptcy); 86 Fed. Reg. at 5072 n.75 (lenders "are exposed to risk").

can the SEC simply abandon its statutory interpretation, and insist that the "trader exception" is some-times just factors listed in SEC guidance. That guidance, in the SEC's view (at 18 n.3), is "not disposi-tive." So even if every hedge fund, investment company, and family office answers "no" to "all of the factors"—just like CVP—they (on the SEC's view) may *still* be a "dealer." SEC Br. 21. And even if those firms can somehow qualify for whatever amorphous "trader exception" the SEC comes up with to arbitrarily carve out from the agency's theory everyone except convertible lenders, the SEC's construction is still absurd. That is because (again, on the SEC's view) the so-called "trader exception" must be litigated at "summary judgment or trial" because there is no telling what factors will (or will not) control. *See* SEC Opp'n 15, *SEC v. Keener*, No. 1:20-cv-21254 (S.D. Fla. July 6, 2020), 2020 WL 5611950. It beggars belief that Congress would have subjected every hedge fund, investment com-pany, and family office to a civil enforcement action—and their employees to indictment, *see* 15 U.S.C. §§ 78o(a)(1), 78ff(a)—whenever government lawyers choose, even if the firms may ultimately prevail.

Indeed, even the SEC does not seem to take its theory seriously. When CVP noted that the SEC itself had ordered the well-known buyer and seller of securities—Point72—to restructure as a "family office," the agency in its brief did not even attempt to deny (at 23) that this firm "may be operating as [an] unregistered dealer[ ]." The agency simply assured the Court that a "pattern of dis-criminatory enforcement" aimed at convertible lending is no reason to doubt the SEC's broader the-ory. *Id.* But of course it is. The need to abandon the full sweep of its theory "should have alerted [the SEC] that it had taken a wrong interpretive turn." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). "Agencies are not free to 'adopt . . . unreasonable interpretations of statutory provisions'" and then selectively enforce those interpretations "to mitigate the unreasonableness.'" *Id.*

### E. The SEC's Argument Is Flawed For Other Reasons.

All in all, the SEC has nothing to offer except four recent, non-precedential district court decisions that do not address the statutory issues raised here. But even to the extent the SEC's cases

could be read as hinting at a statutory basis (and they cannot), they are distinguishable and plainly wrong. CVP's opening brief already distinguished the cases (at 19–20); and the SEC had no meaning-ful response, *see* SEC Br. 11 (denying this, but offering no analysis). The SEC's cases, moreover, are predicated on two inapposite and poorly reasoned decisions that are ultimately not persuasive: *River North* and *Big Apple. See SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1272 (S.D. Fla. 2020) ("*Big Apple* guides this analysis."); *Keener*, 2020 WL 4736205, at *4–5 (following *River North* and *Big Apple*); *SEC v. Fierro*, 2020 WL 7481773, at *3–4 (D.N.J. Dec. 18, 2020) (following *Keener* and *River North*).

*River North* has no application to convertible lenders that *comply* with Rule 144. *See SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019). The SEC itself said so. There, the Commission alleged that River North *lied* about Rule-144 holding periods, *see* Compl. ¶ 74, *River North*, No. 1:19-cv-1711 (Mar. 11, 2019), 2019 WL 1123962, and was thus acting as a "statutory underwriter[ ]," and therefore a dealer, SEC Opp'n to Mots. to Dismiss 14 & n.6, *River North*, No. 1:19-cv-1711 (July 8, 2019), 2019 WL 7599481. This "most important fact" is entirely absent here. *Id.* at 13; *cf.* SEC Br. 6.

*River North* also misquotes a 1976 case in passing. It quotes the first half of a sentence—that a dealer has a "certain regularity of participation in securities transactions," 415 F. Supp. 3d at 858—but omits the second half—"at key points in the chain of distribution," *Mass. Fin. Servs. v. SIPC*, 411 F. Supp. 411, 415 (D. Mass. 1976). That latter part is key, because a convertible lender that complies with Rule 144 (like CVP) is *not* involved in a "distribution." 17 C.F.R. § 230.144. *Massachussetts Finan-cial* actually confirms that the Act uses "words of art" to "limit[ ]" its reach. 411 F. Supp. at 415.

*Big Apple* is worse. It concerned the *Securities* Act, not the *Exchange* Act. 783 F.3d at 809–10. And the Supreme Court explicitly rejected the court's methodology. CVP Br. 20–21. Yes, *Big Apple* said in *dicta* that the two definitions were "very similar," 783 F.3d at 809 n.11, but the arguments were "abandoned," *id.* at 806, and the assertion is obviously wrong. The Securities Act's definition does not include "merely the ordinary dealer," but sweeps in a host of businesses—including "part" "time"

"trad[ers]," 15 U.S.C. § 77b(a)(12)—that Congress wanted to subject to the "same" restrictions. H.R. Rep. No. 73-85, at 14 (1933). "This over-economy of language was corrected" in the Exchange Act, which returned "dealer" to "the English language." 1 L. Loss et al., Fundamentals of Securities Regulation § 3.A.4 (7th ed. 2021 Cum. Supp.).

## II.  The SEC's Due Process Responses Are Foreclosed By Binding Precedent.

As CVP explained (at 21), even if the SEC's definition of "dealer" were permissible (it is not), fundamental principles of fair notice would still bar the imposition of liability. Unable to answer CVP's argument on its own terms, the SEC attacks a number of strawmen, insisting, first (at 19), that the statutory definition of dealer is not void for "vagueness." But no one is arguing that it is void for vagueness. Instead, CVP's argument is that, in light of the "regulatory history," CVP did not have "sufficient notice" of what conduct was proscribed. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012). That fair notice issue is far different from vagueness. *See Cox v. Louisiana*, 379 U.S. 559, 572 (1965) (statute was not vague, but "reliance on the officials' construction" excused liability).

And on fair notice, the SEC cannot prevail—which is why the agency attacks a second strawman: it insists (at 18) that CVP "attempt[s] to elevate the SEC staff's Guide to Broker-Dealer Registration into an official agency interpretation of law." That contention is baffling. Outside of a single footnote (at 22 n.8), CVP does not mention the Guide in its due process argument. Instead, CVP documents decades of agency interpretations—spanning four rulemakings, five no-action letters, one adjudicated case, and two other guidance documents—that repeatedly and consistently define a "dealer" in terms of traditional dealer activities, such as holding customer funds, none of which CVP engages in. *See* CVP Br. 22 & n.8. The SEC just pretends this history does not exist.

The SEC complains (at 18) that the one guide is not an "official" interpretation. But that is irrelevant; non-binding guidance "trigger[s] . . . due process protection" all the same. *PHH Corp. v. CFPB*, 839 F.3d 1, 48 (D.C. Cir. 2016) (Kavanaugh, J.); *see, e.g.*, *Fox*, 567 U.S. at 254 (guidelines); *Cox*,

379 U.S. at 570 (police statement). It is also no answer to the interpretations published in the *Federal Register*, or issued in an adjudicated case. Those *are* "official" interpretations, yet the SEC won't acknowledge them. *Sodorff* alone ends this case. There, the SEC held that Sodorff was a dealer because he "solicited investors and handled their money and securities, rendered investment advice, and sent subscription agreements for investors for their review and signature, all of which are characteristics of dealer activity." 1992 WL 224082, at *5 (Sept. 2, 1992). CVP had every right to believe "[t]hese factors distinguish the activities of a dealer" from a non-dealer; that is what the SEC said. *Id.* at *5 n.27.

Even accepting the SEC's false premise that CVP relied solely on one guide, the Commission loses. *FCC v. Fox Television* resolves this case. Just as here, that case applied "a federal statute to Defendants' conduct," SEC Br. 18; federal law barred the broadcast of "any obscene, indecent, or profane language." 567 U.S. at 243. And just as here (at least according to the SEC), a regulated party objected that a single "Guidelines" document had misled the industry. *Id.* at 254. Those guidelines used the same cautionary language the SEC flags: they were not "comprehensiv[e]," 16 FCC Rcd. 7999, 8003 (2001); *cf.* SEC Br. 18; they were "highly fact-specific," 16 FCC Rcd. at 8003; *cf.* SEC Br. 18 n.3; and "[n]o single factor" controlled, 16 FCC Rcd. at 8003; *cf.* SEC Br. 21. Indeed, the FCC's guidelines did not even purport to set out a standard; they simply summarized "factors that have proved significant in [the agency's] decisions to date." 16 FCC Rcd. at 8003. Nevertheless, because one of those "consideration[s]" was whether the broadcast had "dwell[ed] on" the indecent language, the Court held that the industry lacked sufficient "notice" that "a fleeting expletive" "could be action-ably indecent." 567 U.S. at 254. The same goes for trading without a connection to customers here.

The SEC's one-sentence attempt to distinguish *Fox* fails. The agency claims (at 18) that *Fox* is "inapplicable" because the Court "analyzed agency rules," whereas here, the Court must "apply[ ]" a "statute." But the SEC admits (at 19) that *Fox* applied "the Communications Act" to the defendants; no rule is cited there. Just switch the Exchange Act for the Communications Act, and the cases are

the same—except this is worse. The FCC abandoned one guidance; the SEC disavows all of them.[4]

The SEC's claim (at 21) that it did not "encourage[ ]" firms like CVP to "enter the convertible debt market" rings hollow. Although the SEC avoids any mention of this fact, the SEC amended Rule 144 (*see* CVP Br. 5) for the explicit purpose of encouraging firms to make convertible loans. *See* Revisions to Rule 144, 72 Fed. Reg. 71,546, 71,555 & n.143 (Dec. 17, 2007) (codifying in Rule 144(d)(3)(ii) the "letter to Planning Research Corp. (Dec. 8, 1980)," which permitted lenders to "conver[t]" restricted "Notes" into stock and "immediately sell the . . . stock," 1980 WL 14999, at *2).

Finally, the SEC's studied ignorance (at 22) of decades of transactions that are identical to CVP's by firms that have never been registered as dealers is not credible. As indicated above, the SEC itself authorized these exact loans *under a rule that excludes dealers* from using it. *See Planning Research*, 1980 WL 14999, at *2; *supra* p. 9. *Thousands* of these loans have been disclosed in the SEC's EDGAR database for over a decade. *See, e.g.*, CVP Br. 6 & nn.3–4. And the SEC has sued firms for not properly disclosing these loans. *See, e.g.*, *In re Elray Res., Inc.*, 2016 WL 5571631, at *2 (Sept. 30, 2016); *In re Accounting Consultants, Inc.*, 2006 WL 1765159, at *4 (June 27, 2006). In *Elray*, for example, the SEC faulted the issuer for not filing Form 8-Ks for a series of "convertible notes" issued from 2014 to 2015. 2016 WL 5571631, at *2. CVP invites the Court to compare the public filings describing those deals—at pages 8–10 of Appendix D—to the SEC's allegations here; they are identical. Yet not one of the 11 convertible lenders listed in those filings has ever been registered as a dealer. The SEC has been "aware" of this industry for "years." *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996).

## III. The SEC Cannot Avoid Other Constitutional Limitations.

### A. *Seila Law* Forecloses The SEC's Claim To Authority To Bring This Case.

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) forecloses the SEC's claim to authority to file

---

[4] The one factor the SEC identifies—holding out as "willing to buy and sell a particular security on a continuous basis," SEC Br. 20—has no relevance here. The SEC doesn't allege that CVP held itself out to sell. CVP traded different securities, not "a particular security." And trades were months apart, not "continuous."

this case.  Unable to respond to the Court's actual analysis in *Seila Law*, the SEC tries to collapse three holdings into one, and to pass off portions of a minority opinion as the opinion of "the Court," *see* SEC Br. 25 (citing 140 S. Ct. at 2207, which is actually the opinion of three justices).

In Parts III.A, B, and C of the opinion, the actual majority demolishes the SEC's claim to authority.  *First*, in Part III.A, the Court sets the bounds of the only two "exceptions to the President's unrestricted . . . power" to remove other executive officers.  140 S. Ct. at 2198.  As relevant here, the Court makes clear that the *Humphrey's Executor* exception applies only to agencies that do not wield executive power:  "Because the Court limited its holding 'to officers of the kind here under consideration,' the contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency before the Court.  Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'"  *Id.*  (citations omitted).  *Second*, in Part III.B, the Court holds that the CFPB's structure "cannot be settled by *Humphrey's Executor*."  *Id.* at 2201.  Why?  Because (among other reasons) the CFPB's Director has the power to seek "penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*."  *Id.* at 2200.  *Finally*, in Part III.C, the Court declines to "extend" *Humphrey's* to the "new situation" of the CFPB.  *Id.* at 2201.  In doing so, the Court acknowledges that the agency's "single Director" feature makes the CFPB's structure "even more problematic," but it is clear that the Director's (i.e., an executive officer's) "insulation from removal by an accountable President is enough to render the agency's structure unconstitutional."  *Id.* at 2204.  As with the CFPB, so too with the SEC.

The SEC's only response is to recycle the arguments of the *dissent*.  Note that the SEC does not claim that *Humphrey's* actually applies to agencies wielding Executive Power; rather, "*Humphrey's Executor* has long *been understood* to apply to" such agencies.  SEC Br. 23 (emphasis added).  Where does that understanding come from?  *Morrison v. Olson*, 487 U.S. 654 (1988).  *See* SEC Br. 24 (citing *Morrison* and *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677 (10th Cir. 1988), which relies on *Morrison*).

That was Justice Kagan's argument—she thought that *Morrison* "extended" *Humphrey's* (and *Wiener* (SEC Br. 24)) to "executive" officials. 140 S. Ct. at 2235 (Kagan, J., dissenting). But the majority rejected that view: although the "dissent would have us ignore the reasoning of *Humphrey's Executor* and instead apply the decision only as part of a reimagined *Humphrey's*-through-*Morrison* framework," "[w]e take the [*Humphrey's*] decision on its own terms, not through gloss added by a later Court [in *Morrison*] in dicta." *Id.* at 2200 n.4 (maj. op.). "[W]hat matters," the Court stressed again, "is the set of powers the [*Humphrey's*] Court considered as the basis for its decision," *id.*—and *that* Court did "not consider[ ]" the "power to seek . . . penalties against private parties"—the "quintessentially executive power" the SEC is wielding here, *id.* at 2200. The SEC's structure falls outside the "outermost constitutional limits of permissible . . . restrictions on the President's removal power." *Id.* at 2199–200. And because "no theory" "would permit [this Court] to declare the Commission's structure unconstitutional without providing relief" to CVP, the Court must dismiss this case. *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 828 (D.C. Cir. 1993).

### B. The SEC Cannot Force CVP To Subject Itself To The Jurisdiction Of SIPC.

The SEC makes no meaningful attempt to defend the constitutionality of the regulatory regime it seeks to compel CVP to join. The SEC does not dispute that the President of the Securities Investor Protection Corporation was not appointed in conformity with the Appointments Clause. CVP Br. 27–29. The SEC instead tries to deny the clause applies. But its rote denials (at 26) are demonstrably incorrect. SIPC is plainly part of the government for constitutional purposes; it has the *same* corporate structure as the PCAOB, *see Free Enter. Fund. v. PCAOB*, 561 U.S. 477, 484 (2010); *cf.* 15 U.S.C. §§ 7211(a), (b), 78ccc(a)(1); and the "similarities between" it and Amtrak are so "undeniable" as to be "insurmountable," *SIPC v. Barbour*, 421 U.S. 412, 420 (1975). SIPC's President is also an Officer of the United States—just like Amtrak's President, *see Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 65 (2015) (Alito J., concurring). Congress created SIPC under "the District of Columbia Nonprofit

18

Corporation Act," 15 U.S.C. § 78ccc(a)(1)(B), which created the office of "president," Pub. L. No. 87-569, § 24(a), 76 Stat. 265, 275 (1962), and, to this day, makes her "responsible for [SIPC's] management," D.C. Code § 29-406.40(a). Congress also prescribed the means of establishing her appointment and setting her pay. *See* 15 U.S.C. § 78ccc(b)(7). And for good measure, the SEC approves SIPC's bylaws as it would a regulation. *See id.* § 78ccc(e)(1)(B). The SIPC's President is an Officer.

The SEC's argument really boils down to the assertion that it may compel CVP to subject itself to the jurisdiction of an unconstitutional entity. The SEC tries to downplay this aspect of its argument, writing the SIPC off (at 25) as some ancillary "defect in one component of the scheme." But make no mistake: the SEC seeks to compel CVP to execute the very document—Form BD, *see* Compl. ¶ 41—that would immediately and automatically subject CVP to a "here-and-now" constitutional injury. *Free Enter. Fund*, 561 U.S. at 513. The SEC's only defense (at 25–26)—that CVP can wait for its member assessment and then "file suit against SIPC"—is foreclosed by *Horne v. Department of Agriculture*, 576 U.S. 350 (2015). There, as here, the government argued that the Hornes should have voluntarily subjected themselves to a constitutional injury and then "resort[ed] to the Court of Federal Claims." *Id.* at 368. While that might have been the safer option, the Court held that defendants are also "free to raise" their objection in an "enforcement proceedin[g]." *Horne v. Dep't of Agric.*, 569 U.S. 513, 528 (2013). And if they prevail, they are "relieved" of the constitutional injury *and* the "civil penalty" from "resist[ing]" the unlawful scheme. 576 U.S. at 370. CVP is entitled to the same relief.

## IV. The Disgorgement Claims Should Be Dismissed.

The SEC's disgorgement claim fails as a matter of law. To show the but-for causation needed to establish disgorgement, SEC Br. 28, it is "not enough . . . to show" that CVP "should have" registered as a dealer; the SEC must show that *had* CVP registered, registration "would have *prevented*" the gains the SEC seeks to claw back. *Garza v. Henderson*, 779 F.2d 390, 396 (7th Cir. 1985). The SEC, however, does not even *argue* that a registered dealer could not have done the exact same deals as CVP.

19

The SEC cannot manufacture but-for causation from the dubious proposition that CVP *could not* have registered. *See Avalos v. Pulte Home Corp.*, 474 F. Supp. 2d 961 (N.D. Ill. 2007). Consider a truck driver who is not eligible for a commercial license because he lacks a regular license. *Id.* at 969; *see, e.g.*, 625 Ill. Comp. Stat. Ann. 5/6-507.5(c). That ineligibility does not turn every commercial-licensing violation into a but-for cause of every accident. If the "accident would have occurred *even if* [he] had the proper licensing," the licensing violation is not the "'but for' cause." *Avalos*, 474 F. Supp. 2d at 970. The same reasoning applies here. *See Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017) (registration failure did not cause investor losses, even though no registration was possible).

The SEC's disgorgement claim also fails because the SEC does not identify any "victims." CVP Br. 30. The SEC, to be sure, tries to create some victims by asserting that CVP "sold securities into the market," which "depress[ed] the stock price" of the issuers. SEC Br. 30. But when confronted with multiple cases holding that registration violations are not the cause of investor losses, *see* CVP Br. 29–30, the SEC essentially concedes the argument. Its only comeback is that the "SEC is not required to establish investor losses," SEC Br. 29, or show that investors are owed "restitution," *id.* at 28 n.9. But that is exactly what the SEC must show to establish investor "victims." *See Liu v. SEC*, 140 S. Ct. 1936, 1940 & n.1, 1942–43, 1945, 1948 (2020) (disgorgement is a form of restitution).

Yet again, the SEC's real argument is that the Court cannot consider any of this—at least at this stage—because the issue is "premature." SEC Br. 27. That is wrong. The agency's own cases— *SEC v. Ustian*, 229 F. Supp. 3d 739, 776 (N.D. Ill. 2017), and *SEC v. Buntrock*, 2004 WL 1179423, at *3 (N.D. Ill. 2004)—were resolved *on the merits* on a motion to dismiss; this Court should reach the merits as well. No rule requires this Court to shelter on its docket the threat of business-ending disgorgement, as extra pressure to settle, where, as here, the SEC's claims fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

Dated:  March 12, 2021

Respectfully submitted,

_/s/ Helgi C. Walker_
_____

Helgi C. Walker*
Brian A. Richman*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
hwalker@gibsondunn.com

Michael J. Diver
Elliott M. Bacon
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200
michael.diver@katten.com

Barry Goldsmith*
M. Jonathan Seibald*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2440
bgoldsmith@gibsondunn.com

_____

_* pro hac vice_

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of March, 2021, I electronically filed a copy of the fore-going Defendants' Reply Brief In Support Of Motion To Dismiss through the Court's CM/ECF System, which will send notifications of the filing to all counsel of record.

*/s/ Helgi C. Walker*