## APPENDIX

**Available at Dkt. 23-1 (Appendix to Brief in Support of Motion to Dismiss):**

APPENDIX A:  C.H. Meyer, Law of Stock Brokers and Stock Exchanges § 43-a (Supp. 1933)

APPENDIX B:  SEC, Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker, *Introduction* (1936)

APPENDIX C:  Webster's New International Dictionary, *dealer* (2d ed. 1934)


**Additional Appendices for Reply Brief in Support of Motion to Dismiss:**

APPENDIX D:  Elray Resources Inc., Quarterly Report (Form 10-Q) (Aug. 15, 2016)

APPENDIX E:  SEC, Exchange Act Release No. 211, 1935 SEC LEXIS 179 (May 6, 1935)

APPENDIX F:  1 L. Loss et al., Fundamentals of Securities Regulation § 3.A.4 (7th ed. 2021 Cum. Supp.)

APPENDIX G:  H.R. Rep. No. 73-85, at 11–14 (1933)

APPENDIX H:  H.R. Rep. No. 76-2639, at 9–10 (1940)

# Appendix D

10-Q 1 elra_10q.htm FORM 10-Q

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

x QUARTERLY REPORT PURSUANT SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended **June 30, 2016**

¨ TRANSITION REPORT UNDER SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File # **000-52727**

# ELRAY RESOURCES, INC.
*(Exact name of small business issuer as specified in its charter)*

**Nevada**
*(State or other jurisdiction of incorporation or organization)*

**98-0526438**
*(IRS Employer Identification Number)*

**3651 Lindell Road, Suite D, Las Vegas, NV 89103**
*(Address of principal executive offices)*

**(917) 775-9689**
*(Issuer's telephone number)*

Indicate by check mark whether the registrant(1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 day. x Yes    o No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). o Yes    x No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | o | Accelerated filer | o |
| Non-accelerated filer | o | Smaller reporting company | x |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). o Yes    x No

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date. The issuer had 1,001,938,251 shares of common stock issued and outstanding as of August 10, 2016.

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| **PART I. FINANCIAL INFORMATION** | |
| **ITEM 1.** CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) | 3 |
| CONSOLIDATED BALANCE SHEETS (UNAUDITED) | 3 |
| CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED) | 4 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED) | 5 |
| NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) | 6 |
| **ITEM 2.** MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION | 15 |
| **ITEM 3.** QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 19 |
| **ITEM 4.** CONTROLS AND PROCEDURES | 19 |
| **PART II. OTHER INFORMATION** | |
| **ITEM 1.** LEGAL PROCEEDINGS | 20 |
| **ITEM 1A.** RISK FACTORS | 20 |
| **ITEM 2.** UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS | 20 |
| **ITEM 3.** DEFAULTS UPON SENIOR SECURITIES | 20 |
| **ITEM 4.** MINE SAFETY DISCLOSURES | 20 |
| **ITEM 5.** OTHER INFORMATION | 20 |
| **ITEM 6.** EXHIBITS | 20 |
|  | 21 |
| **SIGNATURES** | 22 |

2

**PART I – FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS**

**ELRAY RESOURCES, INC.**
**Consolidated Balance Sheets**
**(Unaudited)**

| | June 30, 2016 | December 31, 2015 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 295,459 | $ 111,133 |
| Accounts receivable | 1,730,769 | 310,500 |
| Other receivable | 131,599 | 131,599 |
| Prepaid expenses | 13,644 | 11,414 |
| Total current assents | 2,171,471 | 564,646 |
| Rent deposit | 7,535 | 7,535 |
| Other assets | 5,000 | 5,000 |
| Total assets | $ 2,184,006 | $ 577,181 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $ 1,505,037 | $ 1,400,492 |

| | | |
|---|---:|---:|
| Accounts payable – related parties | 3,412,824 | 1,699,415 |
| Advances from shareholders | 59,391 | 58,491 |
| Settlement payable | 2,162,159 | 2,163,092 |
| Notes payable | 182,081 | 188,286 |
| Convertible notes payable, net of discounts | 2,764,748 | 2,474,637 |
| Derivative liabilities - note conversion feature | 2,422,274 | 2,985,575 |
| Total liabilities | 12,508,514 | 10,969,988 |

Commitments and contingencies

Shareholders' deficit:

| | | |
|---|---:|---:|
| Series A preferred stock, par value $0.001, 300,000,000 shares authorized, 0 issued and outstanding | - | - |
| Series B preferred stock, par value $0.001, 280,000,000 and 280,000,000 shares authorized, issued and outstanding, respectively | 192,000 | 192,000 |
| Series C preferred stock, par value $0.001, 10,000,000 shares authorized, 7,083,333 shares issued and outstanding | 7,083 | 7,083 |
| Common stock, par value $0.001, 1,500,000,000 shares authorized, 1,001,938,251 and 51,885,020 shares issued and outstanding, respectively | 1,001,938 | 51,885 |
| Additional paid-in capital | 16,930,391 | 17,586,393 |
| Subscriptions receivable | (75,672) | (75,672) |
| Accumulated deficit | (28,380,248) | (28,154,496) |
| Total shareholders' deficit | (10,324,508) | (10,392,807) |
| Total liabilities and shareholders' deficit | $ 2,184,006 | $ 577,181 |

See accompanying notes to unaudited consolidated financial statements.

3

Table of Contents

**ELRAY RESOURCES, INC.**
**Consolidated Statements of Operations**
**(Unaudited)**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---:|---:|---:|---:|
| | 2016 | 2015 | 2016 | 2015 |
| Revenues | $ 1,703,372 | $ 483,372 | $ 3,080,304 | $ 614,076 |
| Operating expenses: | | | | |
| Software usage costs | 1,242,131 | - | 2,398,386 | - |
| General and administrative | 453,163 | 365,822 | 838,365 | 727,008 |
| Amortization of intangible asset | - | 288,979 | - | 577,956 |
| Total operating expenses | 1,695,294 | 654,801 | 3,236,751 | 1,304,964 |
| Gain (loss) from operations | 8,078 | (171,429) | (156,447) | (690,888) |
| | | | | |
| Other income (expense): | | | | |
| Interest expense | (236,547) | (335,402) | (462,802) | (859,880) |
| Unrealized gain on change in fair value of derivative liabilities – note conversion feature | 186,659 | 170,640 | 373,622 | 25,264 |
| Loss on settlement of accounts payable and notes payable | 25,611 | (41,843) | 19,875 | (132,517) |
| Total other income (expense) | (24,277) | (206,605) | (69,305) | (967,133) |
| Net loss | $ (16,199) | $ (378,034) | $ (225,752) | $(1,658,021) |
| | | | | |
| Net loss per common share - basic and diluted | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.03) |

| | | | | |
|---|---|---|---|---|
| Weighted average number of common shares outstanding - basic and diluted | 642,368,207 | 88,897,055 | 738,262,636 | 47,829,094 |

See accompanying notes to unaudited consolidated financial statements.

4

Table of Contents

## ELRAY RESOURCES, INC.
### Consolidated Statements of Cash Flows
### (Unaudited)

| | For the Six Months Ended June 30, | |
|---|---|---|
| | 2016 | 2015 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (225,752) | $(1,658,021) |
| Adjustments to reconcile net loss to cash provided by (used in) operations activities: | | |
| Stock-based compensation | - | 17,094 |
| Amortization of intangible assets | - | 577,956 |
| Amortization of debt discount | 375,708 | 782,959 |
| Non-cash interest expense related to conversion feature of notes payable | - | 42,745 |
| Unrealized gain on change in fair value of derivative liabilities | (373,622) | (25,264) |
| Loss on settlement of accounts payable and notes payable | (19,875) | 132,517 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (1,420,269) | (98,797) |
| Prepaid expenses | (2,230) | (5,000) |
| Accounts payable and accrued liabilities | 114,081 | 160,258 |
| Accounts payable – related parties | 1,803,409 | 43,027 |
| **Net cash provided by (used in) operating activities** | **251,450** | **(30,526)** |
| | | |
| **Cash flows from financing activities:** | | |
| Proceeds from convertible notes payable | - | 40,000 |
| Proceeds from short-term notes payable | 60,000 | - |
| Repayment of short-term notes payable | (128,024) | - |
| Advances from related party | 900 | - |
| **Net cash provided by (used in) financing activities** | **(67,124)** | **40,000** |
| | | |
| **Net increase in cash and cash equivalents** | **184,326** | **9,474** |
| **Cash and cash equivalents at beginning of period** | **111,133** | **27,447** |
| **Cash and cash equivalents at end of period** | **$ 295,459** | **$ 36,921** |
| | | |
| **Supplemental disclosure of cash flows information:** | | |
| Cash paid for interest | $ 42,422 | $ - |
| Cash paid for income taxes | $ - | $ - |
| | | |
| **Non-cash investing and financing activities:** | | |
| Common stock issued for conversion of debt | $ 137,703 | $ 1,236,586 |
| Common stock issued to acquire other asset | $ - | $ 5,000 |
| Debt discount - derivative liabilities on notes payable conversion feature | $ - | $ 40,000 |

See accompanying notes to unaudited consolidated financial statements.

5

Table of Contents

**ELRAY RESOURCES, INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

NOTE 1 – BASIS OF PRESENTATION AND ACCOUNTING POLICIES

Elray Resources, Inc. ("Elray" or the "Company"), a Nevada Company formed on December 13, 2006, has been providing marketing and support for online gaming operations.

The accompanying unaudited interim consolidated financial statements of Elray Resources, Inc. ("Elray" or the "Company") have been prepared in accordance with accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission ("SEC"), and should be read in conjunction with the audited financial statements and notes thereto contained in the Company's annual report for the year ended December 31, 2015 on Form 10-K filed on March 30, 2016.

In the opinion of management, all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of financial position and the results of operations for the interim periods presented have been reflected herein. The results of operations for interim periods are not necessarily indicative of the results to be expected for the full year. Notes to the consolidated financial statements which would substantially duplicate the disclosure contained in the audited consolidated financial statements for the most recent fiscal year ended December 31, 2015 have been omitted.

Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the balance sheet. Actual results could differ from those estimates.

Cash and Cash Equivalents

The Company considers all highly liquid short-term investments purchased with an original maturity of three months or less to be cash equivalents.

Allowance for doubtful accounts

The allowance for doubtful accounts reflects our best estimate of probable losses inherent in the accounts receivable balance. The Company determines the allowance based on known troubled accounts, historical experience, and other currently available evidence. As of June 30, 2016 and December 31, 2015, there were no allowances for doubtful accounts.

Derivative Instruments

Derivatives are measured at their fair value on the balance sheet. In determining the appropriate fair value, the Company uses the Black- Scholes-Merton option pricing model. Changes in fair value are recorded in the statement of operations.

Debt Discount

Debt discount is amortized over the term of the related debt using the effective interest rate method.

Revenues

Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable.

6

Table of Contents

Stock-Based Compensation

Stock-based compensation expense is recorded for stock and stock options awarded in return for services rendered. The expense is measured at the grant-date fair value of the award and recognized as compensation expense on a straight-line basis over the service period, which is typically the vesting period. The Company estimates forfeitures that it expects will occur and records expense based upon the number of awards expected to vest.

Loss Per Common Share

Basic loss per common share has been calculated based on the weighted average number of shares of common stock outstanding during the period. During a loss period, the potentially dilutive securities have an anti-dilutive effect and are not included in the calculation of dilutive net loss per common share. As of June 30, 2016 and 2015, potentially dilutive securities include notes convertible to 36,555,562,222 and 39,544,318,889 shares, respectively, of the Company's common stock. As of June 30, 2016 and 2015, potentially dilutive securities also include preferred stock convertible to 2,126 and 2,363 shares of the Company's common stock, respectively.

Recent Accounting Pronouncements

In May 2014, a pronouncement was issued that creates common revenue recognition guidance for U.S. GAAP and International Financial Reporting Standards. The new guidance supersedes most preexisting revenue recognition guidance. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The new standard is effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period, with an option to adopt the standard one year earlier. The new standard is to be applied either retrospectively to each period presented or as a cumulative-effect adjustment as of the date of adoption. The Company is currently evaluating the impact of the new pronouncement on its financial statements.

In February 2016, a pronouncement was issued that creates new accounting and reporting guidelines for leasing arrangements. The new guidance requires organizations that lease assets to recognize assets and liabilities on the balance sheet related to the rights and obligations created by those leases, regardless of whether they are classified as finance or operating leases. Consistent with current guidance, the recognition, measurement, and presentation of expenses and cash flows arising from a lease primarily will depend on its classification as a finance or operating lease. The guidance also requires new disclosures to help financial statement users better understand the amount, timing, and uncertainty of cash flows arising from leases. The new standard is effective for annual reporting periods beginning after December 15, 2018, including interim periods within that reporting period, with early application permitted. The new standard is to be applied using a modified retrospective approach. The Company is currently evaluating the impact of the new pronouncement on its financial statements.

Elray's management does not believe that any other recently issued effective pronouncements, or pronouncements issued but not yet effective, if adopted, would have a material effect on the accompanying financial statements.

Subsequent Events

Elray evaluated subsequent events through the date these financial statements were issued for disclosure purposes.

NOTE 2 – GOING CONCERN

The accompanying unaudited consolidated financial statements of Elray have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company sustained a net loss of $225,752 for the six months ended June 30, 2016. The Company had a working capital deficit and stockholders' deficit of $10,337,043 and $10,324,508, respectively, at June 30, 2016. These factors raise substantial doubt regarding the Company's ability to continue as a going concern. Without realization of additional capital, it would be unlikely for Elray to continue as a going concern. Elray's management plans on raising cash from public or private debt or equity financing, on an as needed basis, and in the longer term, revenues from the gambling business. Elray's ability to continue as a going concern is dependent on these additional cash financings, and, ultimately, upon achieving profitable operations through the development of its gambling business.

7

Table of Contents

NOTE 3 – SETTLEMENT PAYABLE

On December 20, 2013, the Company entered into a settlement agreement with Tarpon Bay Partners LLC ("Tarpon") whereby Tarpon acquired certain notes and accounts payable against the Company in the amount of $2,656,214. Pursuant to the agreement, the Company and Tarpon submitted the settlement agreement to the Circuit Court of the Second Judicial Circuit, Leon County, Florida for a hearing on the fairness of the agreement and the exemption from registration under the Securities Act of 1933 for the shares that will be issued to Tarpon for resale ("Settlement Shares"). 75% of the proceeds less all applicable fees and charges from the resale of the Settlement Shares will be remitted to the original claim holders of the Company ("Remittance Amount"). The Company agreed to issue sufficient shares to generate proceeds such that the aggregate Remittance Amount equals $2,656,214. Additionally, the Company agreed to issue a convertible note of $132,000, maturing in 6 months and convertible to the Company's common stock at a 50% of the lowest closing bid price for the 20 days prior to the conversion. The settlement agreement was effective on January 27, 2014 when the court granted approval.

On December 29, 2015, the Company issued Tarpon 4,101,000 shares which were sold during the six months ended March 31, 2016. During the six months ended June 30, 2016, the Company issued Tarpon 5,136,000 common shares which have been sold entirely. Net proceeds from the sale amounted to $933 was remitted to the original claim holders. As of June 30, 2016, the Company has settlement payable of $2,162,159.

NOTE 4 – NOTES PAYABLE

Notes payable

Notes payable at June 30, 2016 and December 31, 2015 consisted of the following:

| | Final Maturity | Interest Rate | June 30, 2016 | December 31, 2015 |
|---|---|---|---|---|
| Morchester International Limited | July 14,2012 | 15% | $ 35,429 | $ 35,429 |
| Morchester International Limited | July 14,2012 | 8% | 10,000 | 10,000 |
| PowerUp Lending Group, Ltd | August 15,2016 | 43% | 21,428 | 96,428 |
| PowerUp Lending Group, Ltd | August 5,2016 | 54% | 8,929 | 46,429 |
| PowerUp Lending Group, Ltd | February 22, 2017 | 33% | 49,476 | - |
| Auctus Private Equity Fund, LLC | June 27, 2016 | N/A | 56,819 | - |
| Total | | | $ 182,081 | $ 188,286 |

On December 9, 2011, Elray entered into an Amended Splitrock Agreement whereby the Company acquired certain assets and liabilities of Splitrock. As part of the liabilities assumed in terms of the Amended Splitrock Agreement, the Company assumed notes payable of $292,929 bearing interest of 8% or 15% per annum.

On January 27, 2014, the court granted an approval of the settlement agreement with Tarpon whereby the Company would issue shares to Tarpon for resale to pay off certain liabilities. As a result, principal of $247,500 and associated accrued interest acquired by Tarpon were reclassified to settlement payable.

The remaining notes not purchased by Tarpon are currently in default.

On October 19, 2015, the Company entered into a loan agreement with PowerUp Lending Group, Ltd. ("PowerUp") for $125,000. Total repayment amount for the loan is $168,750. The loan is payable daily at $804.

Table of Contents

On December 10, 2015, the Company entered into another loan agreement with PowerUp for $50,000. Total repayment amount for the loan is $67,500. The loan is payable daily at $402.

On May 6, 2016, the Company entered into a third loan agreement with PowerUp for $60,000. Total repayment amount for the loan is $76,000. The loan is payable daily at $360.

On June 27, 2016, the Company reached a settlement agreement with Auctus. Pursuant to the settlement agreement, the Company agreed to pay $61,819 in full and final settlement of all outstanding convertible notes and accrued interest. During the six months ended June 30, 2016, the Company made a payment of $5,000.

<u>Convertible notes payable</u>

Convertible notes payable, at June 30, 2016 and December 31, 2015, consisted of the following:

| | Interest Rate | June 30, 2016 | December 31, 2015 |
|---|---|---|---|
| JSJ Investments, Inc. | 10%~12% | $ 128,853 | $ 133,293 |
| LG Capital Funding, LLC | 8% | 13,000 | 28,250 |
| WHC Capital, LLC | 12% | 116,936 | 116,936 |
| Beaufort Capital Partners, LLC | 12% | 10,966 | 10,966 |
| Tangiers Investment Group, LLC | 0%~10% | 51,178 | 69,356 |
| GSM Fund Management, LLC | 12% | 40,937 | 48,666 |
| Auctus Private Equity Fund, LLC | 8% | - | 40,000 |
| Microcap Equity Group, LLC | 10% | 18,892 | 18,892 |
| Virtual Technology Group, Ltd | 0% | 481,500 | 481,500 |
| Gold Globe Investments Ltd | 0% | 2,324,000 | 2,324,000 |
| Vista Capital Investments, LLC. | 12% | 5,800 | 5,800 |
| Subtotal | | 3,192,062 | 3,277,659 |
| Debt discount | | (427,314) | (803,022) |
| Total | | $2,764,748 | $2,474,637 |

***JSJ Investments, Inc.***

On May 31, 2013, the Company entered into a convertible promissory note with JSJ Investments, Inc. ("JSJ") for $50,000. The note matured on December 2, 2013. The note holder has the option to convert the note to common shares in the Company at a discount of 50% of the average closing price over the last 120 days prior to conversion, or the average closing price over the last seven days prior to conversion. As of June 30, 2016, the remaining principal of $10,670 has not been converted.

On August 21, 2014, the Company entered into a convertible promissory note with JSJ for $50,000 cash. The note matured on February 21, 2015. Upon the maturity, the note has a cash redemption premium of 150% of the principal amount. The note is convertible to the Company's common shares at a discount of 60% of the average of the three lowest bids on the twenty days before the date this note is executed, or 60% of the average of the three lowest bids during the twenty trading days preceding the delivery of any conversion notice, whichever is lower. The note is currently in default and has a default interest rate of 20% per annum. During the six months ended June 30, 2016, JSJ converted $4,440 of its note to 56,061,179 shares of common stock. As of June 30, 2016, balance of this note was $45,560.

9

Table of Contents

On January 20, 2015, the Company entered into a convertible promissory note with JSJ for $40,000. The note bears interest at 12% and matures on July 20, 2015. Upon the maturity, the note has a cash redemption premium of 150% of the principal amount. The note is convertible to the Company's common shares at 40% of the lowest trading price on the twenty days before the date this note is executed, or 40% of the lowest trading price during the twenty trading days preceding the delivery of any conversion notice, whichever is lower. As of June 30, 2016, balance of this note was $40,000.

On January 20, 2015, the Company entered into a convertible promissory note with JSJ for $60,000, which was issued in exchange for a portion of the promissory note issued to VTG on January 23, 2014. The note bears interest at 12% and matures on January 20, 2015. JSJ has the right to convert the balance outstanding into the Company's common stock at a rate equal to 50% of the lowest trading price on the twenty days before the date this note is executed, or 50% of the lowest trading price during the twenty trading days preceding the delivery of any

conversion notice, whichever is lower. The Company recorded a loss on extinguishment of debt of $441 related to the exchange. As of June 30, 2016, balance of this note was $32,623.

### LG Capital Funding, LLC

On November 10, 2014, the Company entered into a convertible promissory note with LG for $37,000. The note matures on November 10, 2015. LG has the right after a period of 180 days to convert the balance outstanding into the Company's common stock at a rate equal to 50% of the average lowest three trading prices during the fifteen trading days prior to the conversion date. During the six months ended June 30, 2016, the Company issued 203,625,734 shares of common stock for the conversion of this note in the amount of $15,250 and accrued interest of $1,765. As of June 30, 2016, balance of this note was $13,000. The note is currently in default and has a default interest rate of 24% per annum.

### WHC Capital, LLC

On September 23, 2014, the Company entered into a convertible promissory note with WHC Capital, LLC ("WHC") for $75,000. The note bears interest at 12% and matures on September 23, 2015. WHC has the right at any time during the period beginning on the date of this note to convert the balance outstanding into the Company's common stock at a rate equal to 50% of the lowest intra-day trading price during the fifteen trading days prior to the conversion date. On September 23, 2015, the Company failed to repay the outstanding balance of this note and a penalty of $41,978 was added to the outstanding balance pursuant to the note terms. As of June 30, 2016, balance of this note was $116,936. This note is currently in default and has a default interest rate of 22% per annum.

### Beaufort Capital Partners, LLC

On September 2, 2014, the Company entered into a convertible promissory note with Beaufort Capital Partners, LLC ("Beaufort") for $21,000. The note matured on March 2, 2015. Beaufort has the right after the maturity date to convert the balance outstanding into the Company's common stock at a rate equal to 50% of the lowest trading prices during the fifteen trading days prior to the conversion date. Under certain conditions, the conversion price would be reset to $0.0001 or 65% off the lowest price of the previous five trading days. As of June 30, 2016, balance of this note was $10,966. This note is currently in default.

### Tangiers Investment Group, LLC

On October 13, 2014, the Company entered into a convertible promissory note with Tangiers Investment Group LLC ("Tangiers") for $55,000. The note matures on October 13, 2015. Tangiers has the right after a period of 180 days to convert the balance outstanding into the Company's common stock at a rate equal to 45% of the lowest trading prices during the twenty trading days prior to the conversion date. During the six months ended June 30, 2016, the Company issued 320,350,758 shares of common stock for the conversion of this note in the amount of $18,178. As of June 30, 2016, balance of this note was $18,178. This note is currently and has a default interest rate of 20% per annum.

On October 13, 2014, the Company entered into a convertible promissory note with Tangiers for $33,000. The note bears interest at 10% and matures on October 13, 2015. Tangiers has the right after a period of 180 days to convert the balance outstanding into the Company's common stock at a rate equal to 45% of the lowest trading prices during the twenty trading days prior to the conversion date. This note is currently in default and has a default interest rate of 20% per annum.

10

---

Table of Contents

### GSM Fund Management LLC

On January 30, 2015, the Company entered into an assignment and modification agreement to assign $62,500 of the convertible promissory note of VTG dated January 23, 2014 to GSM Fund Management LLC ("GSM"). The note bears interest at 12% and matures on January 30, 2016. GSM has the right after a period of 180 days to convert the balance outstanding into the Company's common stock at a rate equal to 50% of the lowest closing bid price in the 15 trading days prior to the conversion date. The Company recorded a loss on extinguishment of debt of $52,364 related to the exchange. During the six months ended June 30, 2016, the Company issued 128,701,226 shares of common stock for the conversion of this note in the amount of $7,729. As of June 30, 2016, balance of this note was

$40,937. The note is currently in default and has a default interest rate of 18%.

### Auctus Private Equity Fund LLC

On November 7, 2014, the Company entered into a convertible promissory note with Auctus Private Equity Fund LLC ("Auctus") for $40,000. The note matures on August 7, 2015. Auctus has the right after a period of 180 days to convert the balance outstanding into the Company's common stock at a rate equal to 50% of the average of the lowest two trading prices during the twenty-five trading days prior to the conversion date. During the six months ended June 30, 2016, the Company issued 2,845,000 shares of common stock for the conversion of accrued interest in the amount of $341.

On June 27, 2016, the Company reached a settlement agreement with Auctus. Pursuant to the settlement agreement, the Company agreed to pay $61,819 in full and final settlement of all outstanding convertible notes and accrued interest. The Company removed note principal of $40,000, accrued interest of $7,430, derivative liabilities on note conversion feature of $40,000 and recorded a gain of $25,611 related to this settlement.

### Microcap Equitp Group, LLC

On February 23, 2015, the Company entered into a convertible promissory note with Microcap Equity Group LLC ("Microcap") for $20,000, which was issued in exchange for a portion of the promissory note issued to VTG on January 23, 2014. The note matures on January 23, 2017. Microcap has the right to convert the balance outstanding into the Company's common stock at a rate equal to 40% of the lower of the lowest bid price during the thirty trading days prior to the conversion date, or the lowest bid price on the day that the converted shares are cleared for physical delivery. The Company recorded a loss on extinguishment of debt of $28,213 related to the exchange.

### Virtual Technology Group, Ltd

On January 23, 2014, the Company entered into a convertible promissory note with VTG for $1,500,000. VTG has the right after a period of 180 days to convert the balance outstanding into the Company's common stock at a rate equal to 100% of the average of the closing bid prices for the seven trading days prior to the conversion date when the Company's shares are traded in the OTCQB or during the ten trading days prior to the conversion date when the Company's shares are traded on another other exchange. On November 10, 2014, $50,000 of this note was replaced with a note issued to LG. On January 20, January 23 and January 30, 2015, $60,000, $20,000 and $62,500 of this note were replaced with notes issued to JSJ, Microcap and GSM.

### Gold Globe Investments Ltd

On January 23, 2014, the Company entered into a convertible promissory note with GGIL for $2,800,000. GGIL has the right after a period of 180 days to convert the balance outstanding into the Company's common stock at a rate equal to 100% of the average of the lowest three trading prices during the seven trading days prior to the conversion date when the Company's shares are traded in the OTCQB or during the ten trading days prior to the conversion date when the Company's shares are traded on another exchange. On December 3, 2014, $45,000 of this note was replaced with a note issued to Tangiers.

### Vista Capital Investments, LLC.

On April 15, 2014, the Company entered into a convertible promissory note with Vista Capital Investments, LLC ("Vista") for $250,000. The note has an original issuance discount of $25,000. The note matures 2 years from the date of each payment of the principal from Vista. In the event that the note remains unpaid at maturity date, the outstanding balance shall immediately increase to 120% of the outstanding balance. Vista has the right to convert the outstanding balance into the Company's common stock at a rate equal to the lesser of $0.008 per share or 60% of the lowest trade occurring during the twenty-five consecutive trading days preceding the conversion date. Due to certain events that occurred during 2014, the conversion price has been reset to $0.005 per share or 50% of the lowest trade occurring during the twenty-five consecutive trading days preceding the conversion date. Pursuant to the agreement, if the conversion price calculated under this agreement is less than $0.01 per share, the principal amount outstanding shall increase by $10,000 ("Sub-Penny"). $25,000 net proceeds were received on April 23, 2014. The remaining fund of this note has not been received.

11

Table of Contents

Debt Discount

The table below presents the changes of the debt discount during the six months ended June 30, 2016:

|  | Amount |
|---|---|
| December 31, 2015 | $ 803,022 |
| Amortization | (375,708) |
| June 30, 2016 | $ 427,314 |

Loans from shareholders

On September 5, 2008, Elmside Pty Ltd, a company related to a former director, agreed to an interest free loan of $55,991 to the Company on an as-needed basis to fund the business operations and expenses of the Company until December 9, 2011, the due date of the loan. The note is in default.

During six months ended June 30, 2016, the Company received a loan of $900 from its officer to open a new bank account. As of June 30, 2016, the Company had advances of $3,400 from its officer.

NOTE 5 – DERIVATIVE LIABILITIES – NOTE CONVERSION FEATURE

Due to the conversion features contained in the convertible notes issued, the actual number of shares of common stock that would be required if a conversion of the note as further described in Note 5 was made through the issuance of the Company's common stock cannot be predicted, and the Company could be required to issue an amount of shares that may cause it to exceed its authorized share amount. As a result, the conversion feature requires derivative accounting treatment and will be bifurcated from the note and "marked to market" each reporting period through the income statement. The fair value of the conversion future of these notes was recognized as a derivative liability instrument and will be measured at fair value at each reporting period.

The Company remeasured the fair value of the instrument as of June 30, 2016, and recorded an unrealized gain of $373,622 for the six months ended June 30, 2016. The Company determined the fair values of these liabilities using a Black-Scholes valuation model with the following assumptions:

|  | December 31, 2015 | Various Dates in 2016 | June 30, 2016 |
|---|---|---|---|
| Stock price on measurement date | $0.0006 | $0.0002~0.0006 | $0.0001 |
| Exercise price | $0.00024~$0.0006 | $0.00004~$0.0001 | $0.00004~$0.00005 |
| Discount rate | 0.14%~0.65% | 0.09%~0.49% | 0.36% |
| Expected volatility | 282% | 277%~281% | 274% |
| Expected dividend yield | 0.00% | 0.00% | 0.00% |

The following table provides a summary of the changes in fair value of the derivative financial instruments measured at fair value on a recurring basis using significant unobservable inputs:

| Fair value at December 31, 2015 | $2,985,575 |
|---|---|
| Reclassification to equity | (149,679) |
| Gain (Loss) on settlement | (40,000) |
| Change in fair value of derivative liabilities | (373,622) |
| Fair value at June 30, 2016 | $2,422,274 |

12

Table of Contents

NOTE 6 – COMMITMENTS AND CONTINGENCIES

Legal Proceedings

From time to time, we may be party to litigation or other legal proceedings that we consider to be a part of the ordinary course of our business. We are not involved currently in legal proceedings that could reasonably be

expected to have a material adverse effect on our business, prospects, financial condition or results of operations. We may become involved in material legal proceedings in the future.

Commitments and Contingencies

On July 1, 2013, the Company entered into a lease agreement for office space in Australia. The agreement, as amended, expires on October 31, 2016. Rent is approximately $42,000 per year and the Company paid a $7,535 security deposit.

NOTE 7 – RELATED PARTY TRANSACTIONS

As of June 30, 2016 and December 31, 2015, loans from Elmside, a shareholder, were $55,991. The loans are currently in default.

As of June 30, 2016 and December 31, 2015, the Company had accounts payable of $3,293,722 and $1,604,915, respectively, to its chief executive officer and a company controlled by the chief executive officer for reimbursement of expense, compensation, and liabilities assumed from Splitrock.

On May 15, 2013, the Company entered into an agreement with Jay Goodman, son of the Company's chief executive officer, to provide consulting services assisting the Company with data segmentation, financial and statistical services. In consideration for such services, the Company pays $3,000 per month to Jay Goodman. As of June 30, 2016 and December 31, 2015, the Company has a $112,500 and $94,500 payable to Jay Goodman, respectively.

NOTE 8 – EQUITY

Preferred Stock – Series A

On May 3, 2012, the Company authorized the creation of 300,000,000 shares of Series A preferred stock. The Class A Preferred Series shares are convertible at a rate of 0.0003 common shares for each Series A Preferred Share. As of June 30, 2016 and December 31, 2015, there were no Series A Preferred Stock outstanding.

Preferred Stock – Series B

On July 1, 2012, the Company authorized the creation of 100,000,000 shares of Series B preferred stock. On September 24, 2012, the authorized Series B Preferred Stock was increased from 100,000,000 to 280,000,000. After a series of reverse stock splits, the Series B Preferred stock is convertible at a rate of 0.000000003 common stock for each Series B Preferred stock.

On July 14, 2013, the Company entered into a 12-month consultancy agreement with VTG to assist the Company in developing marketing and supporting the technology of virtual online horse racing products and to provide the Company the exclusive use right to certain website domains. In consideration for such services and domains, the Company issued 192,000,000 Series B Preferred shares to VTG. The 192,000,000 Series B Preferred stock have been recorded at their estimated market value of $43,031.

13

Table of Contents

Preferred Stock – Series C

On June 20, 2014, the Company authorized the creation of 10,000,000 shares of Series C preferred stock. The Series C preferred shares are convertible at a rate of 0.0003 common shares for each Series C Preferred Share.

On September 18, 2014, the Company entered into an agreement to acquire a 25% interest in Global Tech Software Solutions LLC doing business as Golden Galaxy ("Golden Galaxy") which operates online casinos. Under the terms of the purchase agreement, the Company will be entitled to 1% of the gross wagering generated by Golden Galaxy. In consideration for the purchase, the Company issued 5,000,000 shares of the Company's Series C preferred stock in June 2015 and recorded $5,000 of other asset. On April 1, 2015, the Company terminated the agreement and stopped receiving 1% of the gross wagering generated by Golden Galaxy.

On September 18, 2014, the Company entered into an agreement with Yangjiu Xie, owner of Asialink Treasure Limited ("ATL"). Pursuant to the agreement, the Company issued 2,083,333 shares of its Series C preferred stock as part of the consideration to acquire 49% of the outstanding shares of ATL in a series of transactions. These shares were recorded at their par value of $2,083 with a subscription receivable at the same amount. The Company has not received the certificate of ownership from ATL.

Common Stock

On December 29, 2015, the Company issued Tarpon 4,101,000 shares which were sold during the six months ended June 30, 2016. During the six months ended June 30, 2016, the Company issued Tarpon 5,136,000 shares of its common stock according to the settlement agreement discussed in Note 3. These shares were valued at $6,669 based on the market price on the issuance date. $933 net proceeds from the sale were used to pay the original creditors of the claims Tarpon acquired. The remaining $5,736 was recorded as loss on settlement.

On April 14, 2016, the Company issued 233,333,334 shares of common stock to settle accounts payable of $90,000 with Mr. Goodman.

During the six months ended June 30, 2016, the Company issued 950,053,231 shares of common stock for the conversion of notes payable and accrued interest of $45,597 and $2,106, respectively. See Note 5.

NOTE 9 – CONCERNTRATION

The Company's revenues for the six months ended June 30, 2016 were from one customer. As of June 30, 2016, the aggregate amount due from this one customer was $1,862,368. The Company's software usage cost for the six months ended June 30, 2016 was all related to charges pass through to Elray by an entity controlled by the Company's chief executive officer.

14

Table of Contents

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION

*The following discussion and analysis summarizes the significant factors affecting our consolidated results of operations, financial condition and liquidity position for the six months ended June 30, 2016. This discussion and analysis should be read in conjunction with our audited financial statements and notes thereto included in our Annual Report on Form 10-K for our year-ended December 31, 2015 and the consolidated unaudited financial statements and related notes included elsewhere in this filing. The following discussion and analysis contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements.*

### Forward-looking statements

This Quarterly Report on Form 10-Q contains forward looking statements, including without limitation, statements related to our plans, strategies, objectives, expectations, intentions and adequacy of resources. Investors are cautioned that such forward-looking statements involve risks and uncertainties including without limitation the following: (i) our plans, strategies, objectives, expectations and intentions are subject to change at any time at our discretion; (ii) our plans and results of operations will be affected by our ability to manage growth; and (iii) other risks and uncertainties indicated from time to time in our filings with the Securities and Exchange Commission.

In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "could," "expects," "plans," "intends," "anticipates," "believes," "estimates," "predicts," "potential," or "continue" or the negative of such terms or other comparable terminology. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance, or achievements. Moreover, neither we nor any other person assumes responsibility for the accuracy and completeness of such statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. We are under no duty to update any of the forward-looking statements after the date of this Report.

### Overview

Elray Resources, Inc. ("Elray" or "Company") was incorporated in Nevada on December 13, 2006.

On February 23, 2011, Elray entered into a Purchase Agreement (the "Splitrock Agreement") to acquire 100% of the issued and outstanding shares of Splitrock Ventures (BVI) Limited ("Splitrock"), a British Virgin Islands company, as consideration for the issuance of 197 shares of common stock of the Company. Splitrock is in the online gaming business. On the closing date, pursuant to the terms of the Splitrock Agreement, Anthony Goodman, representing the shareholders of Splitrock, acquired the 197 shares of Elray's common stock, which resulted in a change of control under which 70% of the shares of Elray are now held by the previous shareholders of Splitrock (Share number adjusted for Reverse Stock Split). In accordance with the Splitrock Agreement, Barry J. Lucas resigned as Chairman and Director and Anthony Goodman was elected as a replacement; Neil Crang resigned as Director and Donald Radcliffe and Roy Sugarman were elected as replacements; and Michael J. Malbourne resigned as Secretary and David E Price, Esq. was appointed as a replacement.

On December 9, 2011, Elray entered into an Amended Purchase Agreement ("Amended Splitrock Agreement") which amended certain elements of the Splitrock Agreement originally entered into by the parties of February 23, 2011. Whereas under the Splitrock Agreement, the Company was to acquire 100% of the shares of Splitrock, pursuant to the Amended Splitrock Agreement, the Company shall instead acquire only certain assets and liabilities of Splitrock.

The existing officers and directors of Elray resigned and the directors nominated by Splitrock; Messrs. Radcliffe, Sugarman, and Goodman, were elected to the board of Elray. Mr. Goodman was appointed Chief Executive and Chief Financial Officer of Elray. On October 27, 2011, Donald Radcliffe resigned as director and Michael Silverman was appointed as his replacement.

As part of the Amended Splitrock Agreement, Elray acquired gaming intellectual property, gaming domains, trademarks and player databases ("Splitrock IP"), and is currently in the process of developing a new online casino utilizing third party software. Elray's strategy is to provide online gaming to players in markets where such activities are legal.

15

Table of Contents

The Company has opened a virtual managed corporate office located in Las Vegas in order to meet potential requirements put forth by lawmakers in pending state and federal legislation. Under the proposed bills, Internet-enabled gaming operations must adhere to strict rules including locally-based operations and technology that allows for IP address restrictions and user age verification.

On April 10, 2013, the Company entered into a 12-month consultancy agreement with online casino operator, Universal Technology Investments Limited ("UTI"). The company would assist in the marketing and support of UTI's online casino for a twelve-month term with a provision to provide additional services as UTI expands their gaming portfolio. The consultancy service was not started until January 2014. This agreement not only brings operating revenue to the company, but also solidifies the expertise in the online gaming market, and assists in positioning the company with respect to being a premier turnkey service provider for both the online and mobile gaming sector.

On January 23, 2014, the Company entered into a Know-How and Asset Purchase Agreement, with VTG and Gold Globe Investments Limited, a BVI company ("GGIL"). VTG and GGIL are engaged in the development of web technology and have jointly developed both an E-store and a virtual exchange platform that facilitate trading of virtual items and casino credits as well as bitcoins. The Company acquired these assets to assist the Company to continue to build and support its marketing and support business for online casinos and social games.

On June 27, 2016, the Company's Board of Director approved a reverse split of the Company's issued and outstanding shares of common stock, par value $0.001, at a ratio of 150:1, such that every 150 shares of common stock becomes 1 shares of common stock, reducing the number of authorized shares to 10 million. The reverse split is yet to be approved by Financial Industry Regulatory Authority.

**Plan of Operation**

Elray has developed and acquired unique valuable technology that provides state of the art turnkey, marketing tools and CRM systems for online gaming operators.

Our primary competition is expected from overseas based online gaming technology companies. With few exceptions, significant listed gaming companies (many of which are listed on the London Stock Exchange) operate using their own software. As an independent online gaming technology provider, we believe that we retain the ability to provide the best turnkey solutions allowing operators to choose the best of breed and most profitable content available. Additionally, by ensuring that we operate in compliance with U.S. laws, we believe that in the event of legalized gaming in the U.S., we would not be precluded from taking advantage of U.S.-based gaming.

### Results of Operations

**Three months ended June 30, 2016 compared to the three months ended June 30, 2015.**

### Revenues

We generated $1,703,372 revenues during the three months ended June 30, 2016 compared to $483,372 for the three months ended June 30, 2015. Revenues for the three months ended June 30, 2016 was related to the marketing tools and CRM systems provided to customers.

### Operating Expenses

Software usage costs were $1,242,131 and $0, respectively, for three months ended June 30, 2016 and 2015. Software usage costs represent cost paid through our related company to an online game provider. The arrangement with the game provider was entered after June 30, 2015, as such, there was no such cost in the three months ended June 30, 2016.

During the three months ended June 30, 2016 and 2015, general and administrative expenses were $453,163 and $365,822, respectively. The increase in general and administrative expense was primarily a result of the increase of consulting fee. Consulting fee was $280,514 and $243,872 for the three months ended June 30, 2016 and 2015, respectively.

---

16

Table of Contents

---

During the three months ended June 30, 2016 and 2015, amortization expense was $0 and $288,979, respectively. The decrease was due to the uncertain recoverability of intangible assets acquired in 2014; management evaluated the carrying value on the intangible and recorded an impairment of $1,252,244 in 2015.

### Interest Expenses

During the three months ended June 30, 2016 and 2015, interest expense was $236,547 and $335,402, respectively. The decrease of interest expense was mainly due to the decrease of interest expense occurred on issuance of convertible debt during the three months ended June 30, 2016.

### Unrealized Gain on Derivative Liabilities - Note Conversion Feature

Unrealized gain on derivative liabilities - note conversion feature was $186,659 for the three months ended June 30, 2016 compared to gain of $170,640 for the three months ended June 30, 2015. The change was primarily resulted from the fluctuation of the Company's stock price.

### Gain (loss) on Settlement of Accounts and Notes Payable

Gain on settlement of extinguishment of debt was $25,610 for the three months ended June 30, 2016 and loss on settlement of extinguishment of debt was $41,843 for the three months ended June 30, 2015. The decrease was mainly due to the settlement on Auctus note.

### Net Loss

We incurred net loss of $16,199 and $378,034 for the three months ended June 30, 2016 and 2015, respectively. The decrease of net loss in 2016 was as a result of the items discussed above.

**Six months ended June 30, 2016 compared to the six months ended June 30, 2015.**

**Revenues**

We generated $3,080,304 revenues during the six months ended June 30, 2016 compared to $614,076 for the six months ended June 30, 2015. Revenues for the six months ended June 30, 2016 was related to the marketing tools and CRM systems provided to customers.

**Operating Expenses**

Software usage costs were $2,398,386 and $0, respectively, for six months ended June 30, 2016 and 2015. Software usage costs represent cost paid through our related company to an online game provider. The arrangement with the game provider was entered after June 30, 2015, as such, there was no such cost in the three months ended June 30, 2015.

During the six months ended June 30, 2016 and 2015, general and administrative expenses were $838,365 and $727,008, respectively. The increase in general and administrative expense was primarily a result of the increase in consulting fee. Consulting fee was $534,381 and $495,361 for the six months ended June 30, 2016 and 2015, respectively.

During the six months ended June 30, 2016 and 2015, amortization expense was $0 and $577,956, respectively. The decrease was due to the uncertain recoverability of intangible assets acquired in 2014; management evaluated the carrying value on the intangible and recorded an impairment of $1,252,244 in 2015.

17

Table of Contents

**Interest Expense**

During the six months ended June 30, 2016 and 2015, interest expense was $462,802 and $859,880, respectively. The decrease of interest expense was mainly due to decrease of interest expense occurred on issuance of convertible debt during the six months ended June 30, 2015.

**Unrealized gain on Change in Fair Value of Derivative Liabilities - Note Conversion Feature**

Unrealized gain on change in fair value of derivative liabilities - note conversion feature was $373,622 for the six months ended June 30, 2016 compared to unrealized gain of $25,264 for the six months ended June 30, 2015. The change was primarily resulted from the fluctuation of the Company's stock price.

**Gain (loss) on Settlement of Accounts and Notes Payable**

Gain on settlement of accounts and notes payable was $19,875 for the six months ended June 30, 2016 and loss on settlement of accounts and notes payable was $132,517 for the six months ended June 30, 2015. The decrease was mainly due to the settlement on Auctus note and less loss associated with the issuance of common shares to Tarpon for settlement payable resulted a gain during the six months ended June 30, 2016.

**Net Loss**

We incurred net losses of $225,752 and $1,658,021 for the six months ended June 30, 2016 and 2015, respectively. The decrease in net loss in 2016 was as a result of the combination of items discussed above.

**Liquidity and Capital Resources**

The Company had $295,459 in cash at June 30, 2016.

Our cash provided by operating activities for the six months ended June 30, 2016 was $251,450 compared to cash used in operating of $30,526 for the six months ended June 30, 2015. The change was primarily attributable to more payment made for professional and consulting fees during the six months ended June 30, 2016.

Our cash used in financing activities for the six months ended June 30, 2016 was $67,124 compared to $40,000 for

the six months ended June 30, 2015. Cash used in financing activities for the six months ended June 30, 2016 was related to payments on short-term notes. Cash provided from financing activities was related to proceeds from convertible notes.

Since its inception, the Company has financed its cash requirements from the sale of common stock, issuance of notes and shareholder loans. Uses of funds have included activities to establish our business, professional fees, exploration expenses and other general and administrative expenses.

Due to our lack of operating history and present inability to generate sufficient revenues, there is substantial doubt about our ability to continue as a going concern.

**Material Events and Uncertainties**

Our operating results are difficult to forecast. Our prospects should be evaluated in light of the risks, expenses and difficulties commonly encountered by comparable development stage companies.

There can be no assurance that we will successfully address such risks, expenses and difficulties.

18

Table of Contents

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information required under this item.

**ITEM 4. CONTROLS AND PROCEDURES**

**Disclosure controls and procedures**

As of the end of the period covered by this report (the "Evaluation Date"), the Company carried out an evaluation, under the supervision and with the participation of the Company's Principal Executive Officer and Principal Financial Officer (the "Certifying Officers") of the effectiveness of the design and operation of the Company's *disclosure controls and procedures* (as defined in rules 13a-15(e) and 15d-15(e)) under the *Exchange Act.* Based on that evaluation, the Certifying Officers have concluded that, as of the Evaluation Date, the disclosure controls and procedures in place were not effective to ensure that information required to be disclosed by us in reports that we file or submit under the *Exchange Act*, is recorded, processed, summarized and reported on a timely basis in accordance with applicable rules and regulations.

**Internal control over financial reporting**

The Certifying Officers reviewed our *internal control over financial reporting* (as defined in rules 13a-15(f) and 15d-15(f)) under the *Exchange Act* as of the Evaluation Date and concluded that no changes occurred in such control or in other factors during the quarter ended June 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

19

Table of Contents

**PART II – OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

There are no litigation pending or threatened by or against us.

**ITEM 1A. RISK FACTORS**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide

the information required under this item.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

On April 14, 2016, the Company issued 233,333,334 shares of common stock to settle accounts payable of $90,000 with Mr. Goodman.

During the six months ended June 30, 2016, the Company issued 711,583,897 shares of common stock for conversions of notes payable.

On December 29, 2015, the Company issued Tarpon 4,101,000 shares which were sold during the six months ended June 30, 2016. During the six months ended June 30, 2016, the Company issued Tarpon 5,136,000 shares of its common stock according to an settlement agreement.

The offer and sale of such shares of our common stock were effective in reliance on the exemptions for sales of securities not involving a public offering, as set forth in Rule 506 promulgated under the Securities Act of 1933 and in Section 4(2) of the Securities Act of 1933. A legend was placed on the certificates representing each such security stating that it was restricted and could only be transferred if subsequent registered under the Securities Act of 1933 or transferred in a transaction exempt from registration under the Securities Act of 1933.

## ITEM 3. DEFAULTS UPON SENIOR SECURITIES

The Company has no senior securities outstanding.

## ITEM 4. MINE SAFETY DISCLOSURES

Not Applicable.

## ITEM 5. OTHER INFORMATION

None.

20

Table of Contents

## ITEM 6. EXHIBITS

| Number | Exhibit Description |
|---|---|
| 3.1 | Articles of Incorporation of Elray Resources, Inc.* |
| 3.2 | Bylaws of Elray Resources, Inc.* |
| 31.1 | Certificate of principal executive officer and principal financial officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 302 of the *Sarbanes-Oxley Act of 2002* |
| 32.1 | Certificate of principal executive officer and principal financial officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the *Sarbanes-Oxley Act of 2002* |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Label Linkbase Document |
| 101.PRE | XBRL Presentation Linkbase Document |

\* Filed as an exhibit to our registration statement on Form SB-2 filed June 11, 2007 and incorporated herein by this reference

21

Table of Contents

## SIGNATURES

Pursuant to the requirements of the *Securities Exchange Act of 1934*, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ELRAY RESOURCES, INC.**

Date: August 15, 2016                    By: */s/ Anthony Goodman*
                                             Anthony Goodman,
                                             President and Chief Financial Officer

22

# Appendix E

## *1935 SEC LEXIS 179*

Securities and Exchange Commission

SECURITIES EXCHANGE ACT OF 1934, Release No. 211 (Class B)

May 6, 1935

*SEC Decisions, Orders & Releases*

**Reporter**
1935 SEC LEXIS 179 *


May 6, 1935


## Core Terms

broker, dealer, registration, customer, registration statement, register


## Text

 [*1]

The Securities and Exchange Commission today announced the adoption of rules for the regulation of over-the-counter markets.  These rules are the initial step in the program of the Commission to insure to investors in such markets protection comparable to that provided in the case of organized exchanges.

The rules provide for the registration  with the Commission of brokers  and dealers  throughout the country, who use the mails  or any instrumentality  of interstate commerce  to effect securities transactions on markets other than national securities exchanges.

On and after August 1, 1935, unless he has been registered  with the Commission, no broker  or dealer  may use the mails  or any instrumentality  of interstate commerce  for the purpose of making or creating, or enabling another to make or create a market otherwise than on a national securities exchange, for both the purchase and sale of any security nor may he use any facility of any such market.

The only brokers  and dealers  exempted  from registration  are those who deal exclusively in exempted   securities, commercial paper, bankers' acceptances or commercial bills, or in securities which have not been registered  or listed on an exchange [*2]  and the market in which is predominantly intrastate.  This exemption is provided by the act itself.

In order to obtain registration, a broker or dealer must file with the Commission in Washington, a registration statement on Form 1-M to be supplied by the Commission. Printed copies of this form together with instructions for its filing, and printed copies of the rules, will be available for distribution on May 15, 1935, at the office of the Commission in Washington and at its regional offices in New York, Chicago, and Boston.

Registration will become effective on August 1, 1935, unless the statement is filed after July 1st, in which event registration will not become effective until thirty days after such filing. Since no unregistered broker or dealer may use the mails or any instrumentality of interstate commerce after August 1, 1935, and since thirty days must elapse after the filing of the registration statement before registration becomes effective, the Commission emphasized the necessity for the filing by brokers and dealers of accurate registration statements prior to July 1, 1935.

The Commission may, after a hearing, deny registration to any broker or dealer who willfully [*3] misrepresents or conceals any material fact in his registration statement or in any application, document or report submitted in connection with his registration or in any proceeding before the Commission with respect to his registration.

Registration may also be denied if the applicant has been convicted within ten years preceding the filing of the registration statement of any crime involving the purchase or sale of any security or arising out of the conduct of the business of a broker or dealer; or if he is under injunction issued by any court within ten years preceding the filing of the registration statement, restraining him from continuing any conduct or practice in connection with the purchase or sale of any security.

The Commission may, after a hearing, revoke the registration of any broker [TEXT ILLEGIBLE] cause which would justify the denial of registration [TEXT ILLEGIBLE] 274,3f any provision of the Securities Act or the Securities [TEXT ILLEGIBLE] rule of the Commission, or if the registrant [TEXT ILLEGIBLE] duct of the business of a broker or dealer.

Pending the determination as to whether registration shall be revoked, registration may be suspended after a hearing. [*4]

Records which have been compiled by the Commission with the cooperation of state securities commissions and other governmental agencies, Better Business Bureaus and other voluntary agencies will enable the Commission to verify the accuracy of information submitted in registration statements of brokers and dealers.

The rules make provision for facilitating the registration of a broker or dealer who is the successor to the business of a registered predecessor and of an executor, receiver, trustee in bankruptcy or similar fiduciary appointed or qualified by a court.

Upon the discovery of any inaccuracy in his registration statement, or after any change occurs which renders his statement no longer accurate, the broker or dealer is required to file with the Commission an amendment on Form 2-M. This form will also be available for distribution on May 15.

1935 SEC LEXIS 179, *4

The rules relating to the conduct of the business of a registered broker or dealer establish certain standards of fair practice.

No registered broker or dealer may act as agent of both buyer and seller unless he procures their written consent at or before the completion of the transaction, or makes written disclosure to both before [*5] the completion of the transaction that he is so acting.

A registered broker or dealer must disclose to his customer in writing whether he is acting as a dealer for his own account, as a broker for such customer, or as a broker for some other person. He must also disclose whether he is controlled by or controls or is under common control with the issuer of the security sold to a customer. If he acts as a broker, he must disclose either the name of the person from whom the security was purchased or to whom it was sold and the time of such transaction or the fact that he will furnish such information upon request of the customer; and he must also disclose the commissions or service fee charged by him and the commission paid by him to any other broker.

Any broker or dealer who manages a discretionary account or acts as investment counsel for a customer is placed under restrictions consistent with his fiduciary obligations. Such a broker or dealer in effecting any transaction for a customer in any security must disclose to the customer the fact that he has a long or short position or an option in the security or a financial interest in its distribution or accumulation; and must obtain [*6] the written consent of the customer to each transaction. Whenever he deals with a customer for his own account, he must obtain the written consent of such customer to each purchase or sale.

Registration under the present program will expire on July 31, 1936, unless the Commission otherwise orders. A broker or dealer, however, may cancel his registration on ten days' notice except in cases where the Commission finds it necessary in the public interest to prevent such cancellation.

To avoid misrepresentations as to the effect and meaning of registration with the Commission, brokers and dealers are prohibited from making misleading statements as to this matter.

 [TEXT ILLEGIBLE] filing of a registration statement is not construed [TEXT ILLEGIBLE] constitutional rights.


**Load Date:** 2018-09-27


SEC Decisions, Orders & Releases

---

# Appendix F

Cheetah®



# Fundamentals of Securities Regulation - Loss, Seligman and Paredes, 4. *Dealer* [§2(a)(12)]

Fundamentals of Securities Regulation - Loss, Seligman and Paredes
1 Louis Loss, (late), Joel Seligman & Troy Paredes, Fundamentals of Securities Regulation 3.A.4 (7th Edition, 2021 Cum. Supp. 2018)
7th Edition, 2021 Cum. Supp.

Click to open document in a browser

**Last Updated: 10/2020**

Two propositions are apparent on the face of the definition of *dealer* as "any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person."

(1) In contrast to the definition of *underwriter*, this definition does depend on the person's general activities rather than his conduct in the particular offering. It is settled in a variety of contexts, as has been said of §2(a)(12), that the concept of *doing business* requires a degree of continuity — certainly more than an isolated transaction. [295]

(2) Although in common parlance a dealer is a principal and a broker is an agent, and although §4(a)(4) exempts certain *brokers' transactions* without defining *broker*, §2(a)(12) defines *dealer* to include a *broker*. This overeconomy of language was corrected for purposes of the 1934 Act, which separately defines the two terms in accordance with the English language. [296] "The sole object of this definition," the 1933 House Report states, "is thus to subject brokers to the same advertising restrictions [and, it might have added, to the same prospectus delivery requirement pursuant to the dealers' exemption in the present §4(a)(3)] that are imposed upon dealers, so as to prevent the broker from being used as a cloak for the sale of securities." [297]

---

**Footnotes**

295   deBruin v. Andromeda Broadcasting Sys., Inc., 465 F. Supp. 1276, 1279 (D. Nev. 1979).

296   §§3(a)(4), 3(a)(5).

297   H.R. Rep. No. 85, 73d Cong., 1st Sess. 14 (1933).

# Appendix G

| 73d Congress | HOUSE OF REPRESENTATIVES | Report |
|---|---|---|
| *1st Session* | | No. 85 |

## FEDERAL SUPERVISION OF TRAFFIC IN INVESTMENT SECURITIES IN INTERSTATE COMMERCE

MAY 4, 1933.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. RAYBURN, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

### [To accompany H.R. 5480]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H.R. 5480) to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes, report favorably thereon and recommend that the bill do pass with the following amendments:

Page 6, line 18, strike out "or any political".

Page 6, line 19, strike out "subdivision thereof" and insert "or by any political subdivision of a State or Territory, or by any public instrumentality of one or more States or Territories exercising an essential governmental function".

Page 6, line 23, after the words "national bank," insert "or by any banking institution organized under the laws of any State or Territory, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official;".

Page 8, line 19, after the word "underwriter" insert "and not involving any public offering".

### I. INTRODUCTORY STATEMENT

#### 1. THE PRESIDENT'S MESSAGE

On March 29, 1933, the President sent the following message to Congress:

*To the Congress:*

I recommend to the Congress legislation for Federal supervision of traffic in investment securities in interstate commerce.

In spite of many State statutes the public in the past has sustained severe losses through practices neither ethical nor honest on the part of many persons and corporations selling securities.

to punish an attempt to use interstate commerce in defiance of the very purpose for which the protection of the interstate commerce clause was withdrawn. The wisdom of such an exertion of congressional power bases itself upon the uncontested fact that dealers in securities have cleverly organized their means of distributing securities so as to evade State blue-sky legislation by never entering the State. Such a policy does not interfere with legitimate business, but only by a resort to such a policy can interstate commerce be closed to illegitimate business.

### III. SUMMARY OF THE BILL BY SECTIONS

#### SECTION 1. TITLE

This section provides a short title for the bill.

#### SECTION 2. DEFINITIONS

Paragraph (1) defines the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security. The definition is broad enough to include as securities, for example, certificates of interest in oil, gas, or mining leases or royalties. The definition is again comprehensive enough to bring within its terms certificates of deposit issued by protective committees. It also includes warrants or rights to subscribe to a security, so that the control exerted by this bill commences with the initiation of any scheme to sell securities to the public.

Paragraph (2) defines "person" in terms sufficiently broad to include within that conception not only an individual but also every form of commercial organization that may issue securities. It includes within the concept of "person" a government or a political subdivision thereof, although later sections of the bill exempt from its provisions securities issued by the United States, a State, or a Territory, or a political subdivision of any of these governmental units. The term "trust" is defined to exclude the ordinary noncommercial trust but to include that type of organization, commonly known as a "business trust" or a "Massachusetts trust", which, without resort to the device of incorporation, is used to achieve many of the purposes of the ordinary business corporation.

Paragraph (3) defines the term "sale" or "sell" broadly to include every attempt or offer to dispose of a security for value. It includes within the definition of "sale" an offer to buy, thereby preventing dealers from making offers to buy between the period of the filing of the registration statement and the date upon which such a statement becomes effective. Otherwise, the underwriter, although only entitled to accept such offers to buy, after the effective date of the registration statement, could accept them in the order of their priority and thus bring pressure upon dealers, who wish to avail themselves of a particular security offering, to rush their orders to buy without adequate consideration of the nature of the security being offered. From the definition of sale, however, is excluded the exchange of an instrument for another instrument which merely evidences exactly the same right embodied in the original instrument, thus exchanges of a stock certificate for another stock certificate of

the same character or of an interim receipt for the permanent security are excluded from the operation of the act. Special care is taken to except from the definition of "sale" preliminary negotiations and agreements between an issuer and an underwriter. Underwriting agreements can thus be entered into prior to the time of the filing of the registration statement. The exception, however, extends no further than the agreement between issuer and underwriters, so as to delay the actual organization of the selling group and the disposition of the security to the dealers until the registration statement shall have become effective.

This paragraph also exempts from the concept of "sale" the giving to a holder of a security, at the time of the sale of such security to the holder, a right either to conversion or a warrant to subscribe, where neither of these rights are immediately exercisable. This makes it unnecessary to register such a security prior to the time that it is to be offered to the public, although the conversion right or the right to subscribe must be registered. When the actual securities to which these rights appertain are offered the public, the bill requires registration as of that time. This permits the holder of any such right of conversion or warrant to subscribe to judge whether upon all the facts it is advisable for him to exercise his rights.

Paragraph (4) defines the term "issuer" not only to include the actual issuer of the security but also the guarantor, if there be such a guarantor, in order that adequate disclosure may be made to the investor as to the worth of any such guaranty. Special provisions govern the definition of "issuer" in connection with security issues of an unusual character, such as fixed investment trusts and certificates of deposit. In instances of this nature basic securities are acquired by a depositing committee or corporation, which then deposits these securities with a trustee. The trustee actually issues the new securities, which represent an interest in the securities deposited with the trustee. These are then delivered to the depositor and are then distributed by the depositor to the public. Under such an arrangement, although the actual issuer is the trustee, the depositor is the person responsible for the flotation of the issue. Consequently, information relative to the depositor and to the basic securities is what chiefly concerns the investor—information respecting the assets and liabilities of the trust rather than of the trustee. For these reasons the duty of furnishing this information is placed upon the actual manager of the trust and not the passive trustee, and this purpose is accomplished by defining "issuer" as in such instances referring to the depositor or manager.

Paragraphs (5) and (6) are self-explanatory.

Paragraph (7) defines interstate commerce to include foreign commerce.

Paragraphs (8) and (9) need no detailed explanation.

Paragraph (10) defines "prospectus" broadly as including any written or radio communication offering a security for sale. Thus communications of this character, by virtue of this definition, must comply with the requirements of section 10. The bill, apart from section 16 (b), is not concerned with communications which merely describe a security. It is, therefore, possible for underwriters who wish to inform a selling group or dealers generally of the nature of a security that will be offered for sale after the effective date of the

ase: 1:20-cv-05227 Document #: 28-1 Filed: 03/12/21 Page 32 of 37 PageID #:26

registration statement, to circulate among them full information respecting such a security. This could easily and effectively be done by circulating the offering circular itself, if clearly marked in such a manner as to indicate that no offers to buy should be sent or would be accepted until the effective date of the registration statement. From the definition of "prospectus" two exceptions are made: The first allows dealers, after they have opened negotiations with a prospective purchaser by giving him the required prospectus, to give him such additional information as they may deem desirable. This additional information, of course, by virtue of the provisions contained in sections 12 (2) and 16 (a) (2) must not contain fraudulent statements or statements that are themselves untrue, either because of the misstatements that they contain or the facts of a relevant character that are omitted. The second exception to the inclusive definition of "prospectus" permits the ordinary type of broker and dealer advertising. Brokers and dealers are allowed to advertise a security by name and to state the price at which they will procure it for purchasers, provided that they also inform prospective purchasers where a detailed prospectus can be obtained. To avoid the inclusion in such advertisements of misleading and insufficient statements, dealers and brokers are not permitted to go farther in their advertising, unless they are willing to set forth the detailed statements required by the prospectus. It should be noted in this connection that section 10 (b) (4) permits the Commission to prescribe forms for prospectuses to be used in newspaper, periodical, and other general advertising.

Paragraph (11) sets forth the important definition of "underwriter." The term is defined broadly enough to include not only the ordinary underwriter, who for a commission promises to see that an issue is disposed of at a certain price, but also includes as an underwriter the person who purchases an issue outright with the idea of then selling that issue to the public. The definition of underwriter is also broad enough to include two other groups of persons who perform functions, similar in character, in the distribution of a large issue. The first of these groups may be designated as the underwriters of the underwriter, a group who, for a commission, agree to take over pro rata the underwriting risk assumed by the first underwriter. The second group may be termed participants in the underwriting or outright purchase, who may or may not be formal parties to the underwriting contract, but who are given a certain share or interest therein.

The term "underwriter", however, is interpreted to exclude the dealer who receives only the usual distributor's or seller's commission. This limitation, however, has been so phrased as to prevent any genuine underwriter passing under the mark of a distributor or dealer. The last sentence of this definition, defining "issuer" to include not only the issuer but also affiliates or subsidiaries of the issuer and persons controlling the issuer, has two functions. The first function is to require the disclosure of any underwriting commission which, instead of being paid directly to the underwriter by the issuer, may be paid in an indirect fashion by a subsidiary or affiliate of the issuer to the underwriter. Its second function is to bring within the provisions of the bill redistribution whether of outstanding issues or issues sold subsequently to the enactment of the bill. All the out-

14    SECURITIES IN INTERSTATE COMMERCE

standing stock of a particular corporation may be owned by one individual or a select group of individuals.  At some future date they may wish to dispose of their holdings and to make an offer of this stock to the public.  Such a public offering may possess all the dangers attendant upon a new offering of securities.  Wherever such a redistribution reaches significant proportions, the distributor would be in the position of controlling the issuer and thus able to furnish the information demanded by the bill.  This being so, the distributor is treated as equivalent to the original issuer and, if he seeks to dispose of the issue through a public offering, he becomes subject to the act. The concept of control herein involved is not a narrow one, depending upon a mathematical formula of 51 percent of voting power, but is broadly defined to permit the provisions of the act to become effective wherever the fact of control actually exists.

Paragraph (12) defines the term "dealer" to include not merely the ordinary dealer in securities but also the broker.  Transactions by a broker, however, provided that they are true brokerage transactions, are not brought within the scope of the bill by the specific exemptions granted in paragraph (2) of section 4.  The sole object of this definition is thus to subject brokers to the same advertising restrictions that are imposed upon dealers, so as to prevent the broker from being used as a cloak for the sale of securities.

### SECTION 3. EXEMPTED SECURITIES

This section lists securities that are exempt from the act.  Paragraph (1) of subsection (a) exempts securities which prior to 60 days after the enactment of the act have either been sold or disposed of by the issuer or have been bona fide offered to the public.  Adequate care is taken to prevent the exemption of securities whose issuance has been authorized prior to this time but which have never been offered to the public.  Also the exemption does not apply to any redistribution of outstanding issues which would otherwise come within the act.

Paragraph (2) exempts United States, Territorial, and State obligations, or obligations of any political subdivision of these governmental units.  The term "political subdivision" carries with it the exemption of such securities as county, town, or municipal obligations, as well as school district, drainage district, and levee district, and other similar bonds.  The line drawn by the expression "political subdivision" corresponds generally with the line drawn by the courts as to what obligations of States, their units and instrumentalities created by them, are exempted from Federal taxation.  By such a delineation, any constitutional difficulties that might arise with reference to the inclusion of State and municipal obligations are avoided.  Securities of instrumentalities of the Government of the United States are also exempted, as well as securities issued by a national bank or by a Federal Reserve bank.  Securities issued by Governmental instrumentalities are not generally sold in the market while adequate supervision over the issuance of securities of a national bank is exercised by the Comptroller of the Currency.  A committee amendment makes it clear that there are also exempt securities issued by a public instrumentality of one or more State or Territories exercising an essential governmental function.

# Appendix H

Case: 1:20-cv-05227 Document #: 28-1 Filed: 03/12/21 Page 35 of 37 PageID #:263

76TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
3d Session } { No. 2639

# INVESTMENT COMPANY ACT OF 1940 AND INVESTMENT ADVISERS ACT OF 1940

JUNE 18, 1940.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. COLE of Maryland, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

[To accompany H. R. 10065]

The Committee on Interstate and Foreign Commerce to whom was referred the bill (H. R. 10065) to provide for the registration and regulation of investment companies and investment advisers, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill, as amended, do pass.

The amendments are as follows:

Page 12, line 9, strike out "prescribed" and insert in lieu thereof "described".

Page 19, line 2, after the word "securities", insert "or the issuer thereof".

Page 20, line 3, strike out all the line and insert in lieu thereof:

so determined is not in excess of market value or asset value of such securities in the case of majority-owned subsidiaries, and is not in excess of market value in the case of other controlled companies.

Page 31, after line 23, insert a new paragraph as follows:

(3) Any company which since the effective date of this title or within five years prior to such date has been reorganized under the supervision of a court of competent jurisdiction, if (A) such company was not an investment company at the commencement of such reorganization proceedings, (B) at the conclusion of such proceedings all outstanding securities of such company were owned by creditors of such company or by persons to whom such securities were issued on account of creditors' claims, and (C) more than 50 per centum of the voting securities of such company, and securities representing more than 50 per centum of the net asset value of such company, are currently owned beneficially by not more than 25 persons; but such exemption shall terminate if any security of which such company is the issuer is offered for sale or sold to the public after the conclusion of such proceedings by the issuer or by or through any underwriter. For the purposes of this paragraph, any new company organized as part of the reorganization shall be deemed the same company as its predecessor; and beneficial ownership shall be determined in the manner provided in section 3 (c) (1).

Case: 1:20-cv-05227 Document #: 28-1 Filed: 03/12/21 Page 36 of 37 PageID #:264

of the companies have been carried at highly fictitious values and in some cases inadequate reserves have been maintained to meet the obligation of the companies of their outstanding certificates. No uniform actuarial reserve system is required by law for these companies.

With respect to the management of the assets of investment companies many abuses have existed. First the promoters and managers of investment companies determine the direction and scope of the business activities of the company and have the power to change, without the prior approval of the security holders, investment policies originally undertaken. The security holder has, therefore, no assurance of the stability of any announced investment policies of his company and no voice in the determination of any desire of the management to change such policies. Similarly, after investors have invested in investment companies on their faith in the reputation and standing of the existing managements, control of the public's funds has frequently been transferred without the prior knowledge or consent of stockholders to other persons who have looted the assets of such companies or to other investment companies which have subjected the stockholders to grossly unfair plans of merger, consolidation, or other corporate readjustments.

Second, unscrupulous individuals in control of investment companies have not hesitated to engage in self-dealing; that is, transactions between officers, directors, and similar persons and the investment companies with which they are associated. These individuals have sold worthless securities at extravagant prices to their controlled companies, have purchased securities and other property from such companies at unfairly low prices, and have borrowed extensively and without repayment from such companies. The industry recognized that even for the most conscientious managements, transactions between these affiliated persons and the investment companies present many difficulties. Many investment companies have voluntarily barred this type of transaction.

Finally, the investor has been unable to obtain adequate financial information as to the operations of investment companies. The accounting practices and financial reports to stockholders of management investment companies frequently are deficient and inadequate in many respects. Often they are misleading. In many cases dividends have been paid without notifying stockholders that such dividends did not constitute earnings but were a return of the capital invested by the stockholder.

## NECESSITY FOR LEGISLATION

It is not to be implied or inferred that most investment trusts and investment companies at present operating in this country were guilty of unfair practice or were mismanaged. In the last decade some progress has been made by the members of the industry voluntarily to eliminate some of the major malpractices, and to improve generally standards of practice in the light of experience. However, it is clear that malpractices cannot be eliminated without the enactment of a Federal law to regulate these institutions. This conclusion was conceded by virtually every witness who appeared before the subcommittee and is the virtually unanimous opinion of the entire industry itself.

The Securities Act of 1933 and the Securities Exchange Act of 1934 have not acted as deterrents to the continuous occurrence of abuses in the organization and operation of investment companies. Generally these acts provide only for publicity. The record is clear that publicity alone is insufficient to eliminate malpractices in investment companies. Further, the great majority of investment companies have never come within the purview of these acts.

In the opinion of the committee, the Securities and Exchange Commission, and the industry itself, this legislation is needed to protect small investors from breaches of trust upon the part of unscrupulous managements and to provide such investors with a regulated institution for the investment of their savings. This legislation will also prevent those abuses which have damaged the reputation of the industry as a whole.

Representatives of the Securities and Exchange Commission in connection with the bill and members of the industry who appeared at the hearings called the attention of the subcommittee to the serious tax problem affecting investment companies. This problem has already been recognized by the Congress in the case of certain open-end management investment companies which receive special tax treatment under existing Federal revenue acts. The record before the committee indicates that the tax problem is very pressing with respect to closed-end management investment companies of the type classified in this bill as "diversified." If the bill is passed the committee believes that the tax problem of these companies should receive prompt consideration by the Congress.

### ANALYSIS, BY SECTIONS

Section 1: Findings and declaration of policy.
Section 2: General definitions.
Section 3: Definition of investment company.
Section 4: Classification of investment company.
Section 5: Subclassification of management companies.
Section 6: Exemptions.
Section 7: Transactions by unregistered investment companies.
Section 8: Registration of investment companies.
Section 9: Ineligibility of certain affiliated persons and underwriters.
Section 10: Affiliation of directors.
Section 11: Office of exchange.
Section 12: Functions and activities of investment companies.
Section 13: Changes in investment policy.
Section 14: Size of investment companies.
Section 15: Changes in boards of directors; provisions relative to strict trusts.
Section 17: Transactions of certain affiliated persons and underwriters.
Section 18: Capital structure.
Section 19: Dividends.
Section 20: Proxies, voting trusts, circular ownership.
Section 21: Loans.
Section 22: Distribution, redemption, and repurchase of redeemable securities.