IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 20-cv-5227 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| JOHN M. FIFE, CHICAGO VENTURE PARTNERS, L.P., ILIAD RESEARCH AND TRADING, L.P., ST. GEORGE INVESTMENTS LLC, TONAQUINT, INC., and TYPENEX CO-INVESTMENT, LLC, | ) ) ) ) ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The United States Securities and Exchange Commission ("SEC") brings this action against Defendant John M. Fife and five entities under his control alleging violations of Section 15(a)(1) of the Securities Exchange Act of 1934 by acting as unregistered securities dealers. 15 U.S.C. § 78o(a)(1); [1]. Before the Court is Defendants' motion to dismiss [22] for failure to state a claim. For the reasons below, Defendants' motion [22] is denied. Counsel are directed to file a joint status report no later than January 14, 2022 that includes (a) a proposed discovery plan and (b) a statement in regard to any settlement discussions and/or any mutual request for a referral to the assigned Magistrate Judge for a settlement conference. The Court will set further case management deadlines following review of the joint status report.

**I.      Background**

Defendant John M. Fife has solely owned and controlled five entities since at least 2015: Chicago Venture Partner, L.P. ("CVP"), Iliad Research and Trading, L.P. ("Iliad"), St. George Investments LLC ("St. George"), Tonaquint, Inc. ("Tonaquint"), and Typenex Co-Investment,

LLC ("Typenex"). [1 at ¶ 1.] Each entity is established in Utah but maintains its principal place of business in Chicago, Illinois. [*Id.* at ¶¶ 12–16.] Plaintiff alleges the following facts.[1]

### A. Defendants' Business Model

Defendants operate in the business of buying convertible notes from penny stock issuers and converting the notes into newly issued shares of stock that are heavily discounted from the prevailing market price. [1 at ¶ 17.] Defendants then sell that stock in the market for substantial profit. [*Id.*] Between 2015 and 2020, Defendants purchased convertible notes from approximately 135 penny stock issuers, and netted approximately $61 million in profits, derived primarily from the spread between the discounted acquisition cost for the stock and the prevailing market price. [*Id.*] The Defendant entities maintain several full-time employees, but Fife has ultimate decision-making power for each entity. [*Id.* at ¶ 18.]

According to the complaint, Defendants held themselves out to the public as being willing to buy convertible notes at their regular place of business in Chicago, Illinois. [1 at ¶ 20.] Defendants operated a public website on which they advertised to issuers that their business engaged in private investment in public equity ("PIPE") transactions through which Defendants would buy issuers' stock. [*Id.*] In addition to maintaining their website, Defendants directly solicited microcap issuers through cold-calls and emails in which Defendants explained to issuers the benefits of convertible debt transactions and that they were interested in investing in the issuer's stock. [*Id.*] Defendants also solicited business in person by attending conferences where their employees could speak directly to penny stock issuers. [*Id.*] In addition, Defendants relied

---

[1] For purposes of Defendants' motion to dismiss, the Court accepts as true all well-pled allegations set forth in the complaint [1] and draws all reasonable inference in Plaintiffs' favor. *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

on third-party finders who sought on Defendants' behalf issuers willing to sell convertible notes in exchange for financing. [*Id.* at ¶ 21.]

The microcap issuers with whom Defendants conducted most of their business had minimal assets, negative cash flow from operations, and unstable operating histories, making the issuers poor candidates for bank financing and allowing Defendants to negotiate highly favorable terms governing the deals with the issuers. [1 at ¶ 22.] Defendants sought out issuers with historically strong trading volumes and a large number of authorized but unissued shares, enabling Defendants to easily convert and sell the issuers' shares acquired through the deals. [*Id.* at ¶ 23.] In general, Defendants targeted microcap issuers in industries generating public attention, such as marijuana, blockchain, bitcoin, vapor, lithium, and gold mining, believing that these industries would capture the attention of individual investors who would be willing to buy the shares that Defendants acquired through their deals. [*Id.* at ¶ 24.]

Defendants obtained nearly all of the stock sold in their businesses directly from the microcap issuers through note conversions, rather than purchasing the issuers' shares in the secondary market. [1 at ¶ 25.] By converting the notes to newly issued shares and selling them in the market, Defendants increased significantly the number of shares owned by the public, as well as the issuers' total outstanding shares. [*Id.*] Not only did Defendants generate income through profit gained from stock sales, but they also collected transaction fees from microcap issuers, which ranged from $5,000 to $25,000 per deal. [*Id.* at ¶ 26.] Between 2015 and 2020, Defendants collected at least $2.12 million in transaction fees from the microcap issuers. [*Id.*]

The convertible notes that Defendants bought from issuers entitled them to discounts ranging from 7 to 60 percent less than the prevailing market price. [1 at ¶ 28.] Defendants sold the stock after conversion as soon as the market allowed to secure maximum profits. [*Id.*] To

comply with Rule 144, Defendants held onto the convertible note for periods of six months or one year, then as soon as the required holding period terminated, Defendants would typically send conversion notices to their counterparty issuer and transfer agent indicating the number of shares owed to Defendants. [*Id.* at ¶ 29.] Defendants would then work with the issuer's transfer agent and broker to have the shares issued and deposited into Defendants' brokerage accounts as quickly as possible. [*Id.*] Defendants often paid additional fees to expedite this transfer process. [*Id.*]

Once an issuer's broker converted the issuer's shares into Defendants' brokerage accounts, Defendants would usually begin selling the shares into the public market immediately. [1 at ¶ 30.] Defendants typically divided the total quantity of the issuer's shares acquired through one convertible note deal into smaller portions that Defendants would then sell into the market over several trading days to avoid placing significant downward pressure on the issuer's stock price in a single trading day. [*Id.*] On a given trading day, Defendants aimed to have their sales account for no more than approximately 9 to 15 percent of the stock's daily trading volume [*id.*], thus selling the total quantity of shares obtained from a single convertible note transaction in the course of approximately two weeks of consecutive trading days. [*Id.* at ¶ 31.] According to the complaint, Defendants would convert as many shares at a time that they believed they could sell into the market at a profit in the 10 to 20 days following conversion. [*Id.* at ¶ 32.] As a result, if the total number of shares from a single convertible note transaction could not be sold into the market within this 10- to 20-day period, Defendants would hold the remaining newly issued shares until the next cycle. [*Id.*]

Despite limiting the number of shares sold into the market on a given day to try to avoid putting downward pressure on the issuer's stock, Defendants' practices, in fact, did frequently result in such downward pressure—Defendants would sell into the market thousands of newly

4

issued shares from its microcap issuers, often resulting in an inevitable decrease in the company's stock price over time. [1 at ¶ 33.] In the process of diluting the market value of the issuer's shares, however, Defendants reaped large profits resulting from the discounted purchase price they had negotiated with the counterparty issuers, rather than needing to rely on any appreciation in the market-value of the stock. [*Id.* at ¶ 34.]

In addition, Defendants often negotiated "true-up" provisions into their agreements with counterparty microcap issuers that required the issuer to issue additional shares to Defendants if the issuer's stock price decreased in the 15 to 20 business days following a conversion. [*Id.* at ¶ 35.] Because Defendants' standard post-conversion selling practices often drove down the price of the issuer's shares, the true-up provisions were often triggered in these agreements, resulting in situations in which Defendants "essentially guaranteed themselves a profit by insulating themselves against any risk of a decrease in the counterparty issuer's stock price." [*Id.*]

The complaint details some of Defendants' specific transactions to illustrate the lucrative nature of Defendants' business. See [*id.* at ¶ 36.] In one transaction, for example, Defendants generated profits of $1,083,410 after receiving 56 million newly issued shares from a single microcap issuer at a 40% discount from the market price of the stock prior to conversion. See [*id.* at ¶ 36(a).]

### B. Alleged Securities Law Violations

The SEC filed a single-count complaint against defendants on September 3, 2020 alleging that Defendants have acted as unregistered dealers in violation of Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a)(1). The SEC more specifically alleges that Defendants "used the means or instrumentalities of interstate commerce to buy and sell securities as part of their regular business" without registering as dealers with the SEC as the Exchange Act requires.

[*Id.* at ¶¶ 38–40.] The complaint seeks four forms of relief: (i) injunctive relief against future securities law violations; (ii) disgorgement of ill-gotten gains; (iii) civil penalty pursuant to Section 21(d)(3) of the Exchange Act, § 78u(d)(3); (iv) an injunction permanently restraining Defendants from participating in the offering of any penny stock. [1 at 16–17.] Defendants move to dismiss the complaint primarily on the ground that their businesses do not fall within the definition of "dealer" under the Exchange Act.

## II.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir. 2007). However,

"[t]o survive a motion to dismiss, the well-pleaded facts of the complaint must allow the court to infer more than the mere possibility of misconduct." *Langworthy v. Honeywell Life & Acc. Ins. Plan*, 2009 WL 3464131, at *2 (N.D. Ill. Oct. 22, 2009) (citing *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)). Additionally, the Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Evaluating whether a "claim is sufficiently plausible to survive a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. (quoting *McCauley*, 671 F.3d at 616).

**III.     Analysis**

    **A.     Adequacy of the Complaint Under Rule 12(b)(6)**

Under Section 15(a)(1) of the Exchange Act, it is "unlawful for any broker or dealer *** to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security *** unless such broker or dealer is registered" with the SEC. 15 U.S.C. § 78o(a)(1). The primary dispute in this case is whether the SEC has plausibly alleged that Defendant is a "dealer" within the meaning of the Exchange Act.

The Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities *** for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(5)(A). Conversely, "a person that buys or sells securities *** for such person's own account, either individually or in a fiduciary capacity, but not as part of their regular business" is *not* a dealer under the Act. 15 U.S.C. § 78c(5)(B). In essence, two factual inquiries determine whether a person is a "dealer" under the Exchange Act: (1) whether a person is "buying and selling securities" and (2) whether a person engages in such conduct "as part of a regular business."

However, the Act does not define "buying and selling securities" nor what it means to do so "as part of a regular business."

Defendants contend that "dealer" as defined in the Exchange Act refers to someone who is engaged in the "traditional" business of dealing. According to Defendants, for a person to be a dealer within the meaning of the Act, that person must buy and sell the same securities in the same condition around the same time (this, Defendants urge, is what is meant by "buying and selling securities"), and perform "traditional public-facing dealer services" [23 at 13] such as "handling investor clients' money and securities, rendering investment advice to investors, and sending investors subscription agreements for their review and execution." [23 at 15 (quoting *Chapel Invs., Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016)).] Defendants maintain that they are not dealers under the Exchange Act because they "do[] not buy and sell the same security in the same condition" [see 23 at 11], nor are they in a public securities business [*id.* at 15.] The SEC responds that "dealer" is not so narrowly defined. It asserts that, in general, a dealer as defined in the Exchange Act refers to persons or entities that buy and sell securities over "more than a few isolated transactions" and hold themselves out to the public as doing so. According to the SEC, this broader construction more accurately reflects the plain meaning of the term.

The parties thus raise issues of statutory interpretation. "When interpreting statutes, first and foremost, we give words their plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006). Both parties insist that their

8

own interpretations of the terms adhere to their plain meanings, yet the parties' proposed interpretations result in conflicting meanings of the term "dealer" under the Exchange Act.

At this stage in the litigation, the Court need not resolve whether Fife (or any of the Defendant entities that he allegedly controls) *is* a dealer, as such determination is "better suited for a complete factual record." *SEC v. Keener*, 2020 WL 4736205, at *4 (S.D. Fla. Aug. 14, 2020). "Instead, the Court must ascertain simply whether the complaint adequately *alleges* that [each] Defendant is a dealer, subject to the Exchange Act's provisions, based on the underlying allegations." *Id.*

Two years ago, Judge Durkin observed that "there is no binding authority construing either 'dealer' or 'broker' under Section 15(a)." *SEC v. River North Equity LLC*, 415 F.Supp.3d 853, 857 (N.D. Ill. 2019). And, as best the Court can tell, that remains true today. In the absence of controlling law from the Supreme Court or the Seventh Circuit, the Court looks first to the text of the statute. The Court's "job is to interpret the words consistent with their 'ordinary meaning *** at the time Congress enacted the statute.'" *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). The Court "find[s] words' ordinary, contemporary, common meaning by looking at what they meant when the statute was enacted, often by referencing contemporary dictionaries." *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020).

The parties here reference two dictionary definitions of "dealer," which, when considered together, do not resolve the issue at hand. Citing a 1939 dictionary definition, Fife contends that the contemporary meaning of a "dealer in stocks" at the time the Exchange Act was enacted was "one who buys and sells stocks 'without altering their condition.'" [23 at 10 (citing WEBSTER'S NEW INT'L DICTIONARY 675 (2d ed. 1939)).] The SEC cites instead to a 1933 BLACK'S LAW

DICTIONARY definition of "dealer" which is "one who buys to sell,—not one who buys to keep, or makes to sell." [27 at 13 (quoting BLACK'S LAW DICTIONARY 521 (3d. 1933)).] Neither of these definitions is inherently superior or more reliable than the other, see, *e.g.*, Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 GREEN BAG 2D 419, 426–27 (2012), thus the Court looks beyond dictionaries alone to discern the plain meaning of "dealer." After all, context is important, and often critical, to the meaning of words or phrases. See, *e.g.*, *United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012); *In re Erickson*, 815 F.2d 1090, 1092 (7th Cir. 1987); see also *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (L. Hand., J.) (observing that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of a dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning").

As further support for its position that the "traditional" meaning of dealer requires that a person buy and sell the same securities in the same condition, Defendants point to a series of contemporary state court decisions which, they maintain, reflect the "established meaning" of "buying and selling" which Congress "replanted" in the Exchange Act. [23 at 10.] The SEC counters with the "broad" definition of "dealer" under the Act and judicial observations that the "broker-dealer registration requirement is 'of the utmost importance in effecting the purposes of he Act,' as it enables the SEC to 'exercise discipline over those who may engage in the securities business,' and 'establishes necessary standards with respect to training, experience, and records.'" *River North*, 415 F. Supp. 3d at 858 (quoting *SEC v. Berger*, 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010)).

Every other district court to have confronted this issue on similar allegations has allowed the action to proceed past the pleadings stage.² First, in 2019, Judge Durkin denied the defendants' motion to dismiss in *SEC v. River North Equity LLC*, 415 F.Supp.3d 853 (N.D. Ill. 2019). That action arose out of the defendants' distribution of more than 1 billion shares of stock from microcap companies. There, as here, the defendant, River North, generated profit by purchasing large sums of microcap shares at discounted prices, and quickly reselling the stock to investors at market price in unregistered transactions. The SEC initiated an action alleging, in relevant part, that River North acted as an unregistered dealer in violation of Section 15(a) of the Exchange Act. River North sought dismissal on grounds that "it acted as a trader, not a dealer, so Section 15(a)'s registration requirement did not apply." *Id.* at 858. The court found the SEC's allegations sufficient and denied defendants' motion to dismiss. The court considered whether the SEC had plausibly alleged "certain regularity of participation in securities transactions," *River North*, 415 F.Supp.3d at 858 (citations omitted), because the complaint stated that River North "(1) purchased stocks at a discounted price directly from numerous issuers * * * (instead of purchasing stocks already in the marketplace, like a trader); and (2) turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price." *Id.* at 859. The complaint stated that River North "bought and sold over 10 billion shares of stock from more than 62 microcap issuers, and then quickly resold them to the investing public, receiving some $31 million in profit." *Id.* at 858. From those allegations, the court ruled, "it is more than plausible that River North meets the statutory 'dealer' definition." *Id.*

The court reached the same conclusion in *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020). As in *River North*, the SEC brought an action against the defendant pursuant to

---

² To the Court's knowledge, these are the only courts that have construed the Exchange Act's "dealer" definition in the context of a motion to dismiss.

Section 15(a)(1) of the Exchange Act after the defendant "bought and sold billions of newly issued shares of microcap securities (penny stocks) and generated millions of dollars in profits from those sales" without complying with the Exchange Act's dealer registration requirements. The defendant there also moved to dismiss on the grounds that he conducted business as a trader, not a dealer, therefore did not need to register as a dealer with the SEC. The court considered whether the complaint stated facts reflecting a "level of participation in purchasing and selling securities invol[ving] more than a few isolated transactions" so as to plausibly allege that defendant was "engaged in the business" to deem him a dealer. 2020 WL 4736205, at *4 (citations omitted). In denying defendant's motion, the court found the complaint's allegations sufficient: "Defendant engaged in buying and converting over 100 convertible notes securities from more than 100 different microcap issuers during the three year period[,] **** [h]e sold into the public market approximately 17.5 million shares of newly issued stock derived from the converted notes, and he made a $21.5 million profit." *Id.* The allegations thus plausibly identified the defendant's participation in "more than a few isolated" securities transactions. *Id.* (quoting *River North*, 415 F. Supp. 3d at 858).

Three days later, another judge in the same district denied a motion to dismiss in *SEC v. Almagarby*, 479 F.Supp.3d 1266 (S.D. Fla. 2020). As in the other cases, the court looked to the statutory definition of "dealer" in Section 15(a) and rejected arguments that SEC releases and no-action letters negated the plausibility of the SEC's claim. Among other things, the court looked to the allegations that the defendants "purchased securities from issuers at deep discounts and sold them back on the market for profit," as well as the "sheer volume of the deals and the large sums of profit Defendants generated," in concluding that the SEC's allegations were sufficiently

12

plausible to state a claim based on the defendants engagement in the business of buying and selling securities. *Id*. at 1272.

Finally, in December 2020, a court considered the same issue in *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020), and determined that the SEC had pled sufficient facts to withstand dismissal. As in *River North* and *Keener,* the defendants in *Fierro* sought dismissal on the grounds that they acted as traders and not dealers and therefore did not need to register with the SEC. But the court disagreed, determining that the complaint's allegations that the defendants purchased and converted more than fifty notes from more than 20 penny stock issues, sold almost 6.5 billion newly issued shares into the public market, and generated $2.3 million in profit, among others, were sufficient to plausibly allege that the defendants had acted as unregistered dealers.

Defendants seek to cast these decisions aside as "inapposite," "poorly reasoned," "ultimately not persuasive." [28, at 13.] Defendants' assertion that these admittedly non-precedential decisions "*do not even purport to interpret the statutory text*" [28, at 1 (emphasis in original)] is not accurate. Regardless of the focus of the defendants' arguments in those cases, each of the courts cited and quoted the relevant statutory text, compared it to the factual allegations of each complaint, and extracted the key allegations supporting the plausibility of the SEC's theory of the case. Each also stressed that they were making a preliminary assessment of plausibility based on the pleadings alone, reserving the ultimate thumbs-up or thumbs-down decision on that theory would come at summary judgment or trial based on a more complete record.

Though none of these cases constitutes binding precedent, the Court finds their reasoning persuasive. The salient points for each court—which apply here as well—included (a) the regularity of Defendants' participation in securities transactions and (b) the level of participation, whether measured by volume of trades or profit realized. Again, the question at the pleadings

13

stage is only plausibility. The ultimate legal question of whether there is at least a triable issue of fact on the SEC's theory that Defendants are, both factually and legally, dealers subject to registration and associated regulatory requirements is better suited for a complete factual record, as other courts routinely have concluded. See *River North*, 415 F.Supp.3d at 853; *Keener*, 2020 WL 4736205, at *4; *Fierro*, 2020 WL 7481773, at *3. In sum, at this early stage in the case, the Court sees no reason to depart from the conclusions reached by each of the other district courts that have confronted this issue and assures Defendants that allowing a case to clear the threshold of plausibility under the Rule 8 pleading standards is not incompatible with viewing an agency's legal theory "with a measure of skepticism." *Util. Air. Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). The full gamut of Defendants' trading activities will be measured against the parties' nuanced expositions of the statutory scheme at each later stage of the case. For now, however, the case moves forward.

> **B.  Defendants' Due Process Argument**

Defendants also raise a due process challenge to the SEC's complaint, contending that they did not have fair notice of the "novel interpretation" of "dealer" advanced in this case at the time that they engaged in the conduct about which the SEC now complains. More specifically, Defendants point to the SEC's regulatory guidance, which they suggest not only lulled Defendants into thinking that their conduct was appropriate, but actually encouraged that conduct. But as other courts have concluded, this argument elevates SEC staff materials into official agency interpretations of the law. The standard against which the SEC seeks to measure Defendants' conduct is the statute itself, the language of which Defendants and all others even arguably involved in securities transactions plainly have had notice. And it is for the courts—not the parties—to determine whether particular conduct falls within the scope of the statute. Moreover,

as Judge Durkin noted, the statutory definition is "broad"; the factors to consider are numerous and non-exclusive; and the players on both sides are "not new to this field." *River North*, 415 F.Supp.3d at 859. All of these reasons support the Court's determination to follow its colleagues in rejecting Defendants' arguments for dismissal based on fair notice and due process. See *id.*; see also *Keener*, 2020 WL 4736205, at *5; *Fierro*, 2020 WL 7481773, at *5.

### C. Defendants' Other Constitutional Arguments

Defendants next argue that the Supreme Court's decision in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), forecloses the SEC's authority to bring this case at all. This Court does not read the Court's decision as expansively as Defendants, for if they are right, then the SEC and several other multimember commissions and agencies would be rendered toothless.

In *Seila Law*, the majority opinion noted that in *Humphrey's Executor v. United States*, "we held that Congress could create expert agencies led by a *group* of principal officers removable by the President only for good cause." 140 S. Ct. at 2192. The CFPB, by contrast, "is run by a single individual who cannot be removed by the President unless certain statutory criteria are met." *Id*. The majority held that "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers." *Id*. at 2197. But seven Justices—all but Justices Thomas and Gorsuch—agreed that the unconstitutional removal provision could be severed from the Dodd-Frank law that created the CFPB. *Id*. at 2211; see also *id*. at 2224 (Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in the judgment with respect to severability and dissenting in part).

As Justice Thomas acknowledged, the decision in *Seila Law* thus "takes a restrained approach on the merits by limiting *Humphries* * * * rather than overruling it." *Id*. at 2211 (Thomas, J., joined by Gorsuch, J., concurring in part and dissenting in part). In fact, observing that "[w]e

think it clear that Congress would prefer that we use a scalpel rather than a bulldozer in curing the constitutional defect we identify today," the plurality and dissenting Justices suggested a potential cure: "converting the CFPB into a multimember agency." *Id*. at 2211 (from Part IV of Chief Justice Roberts' opinion, joined by Alito and Kavanaugh, JJ.); see also *id*. at 2245 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part) (making the same point). It may suffice for present purposes to say that if Defendants were correct in reading *Seila Law* to have stripped the SEC of its enforcement authority, the Court would have overruled *Humphrey's Executor* (as two Justices advocated) and no Justice would have characterized that outcome as the "restrained" work of a "scalpel."

In regard to Defendants' remaining constitutional argument under the Appointments Clause, the Court again finds *Seila Law* instructive. Even assuming for purposes of this motion that Defendants are correct in their argument that the cannot be compelled to register with the Securities Investor Protection Corporation ("SIPC") because its CEO was not appointed in conformity with the Appointments Clause—an issue that the Court does not decide today—it seems likely that the appointment provision of the SIPC's enabling statute, like the removal provision of Dodd-Frank, would be severable. And if that were the case, then all of the work of the SEC, and the SIPC as an adjunct to the SEC's regulatory authority, would not be for naught. In short, derailing this case at the pleadings stage on the basis of a potential and likely remediable flaw in the regulatory regime for dealers makes no sense. See *Lyng v. Northwest Indian Cemetery Prot. Ass'n*, 485 U.S. 439, 445-46 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them"). If, at a later stage of the case, the Court determines that one or more of the Defendant entities *is* indeed a dealer—as opposed to simply facing a *plausible allegation* to that

16

effect—and thus Defendants would be required to join the SIPC, Defendants may renew this constitutional argument.

### D. Disgorgement

Defendants' final argument is that the Court should strike the reference to disgorgement as a potential remedy from the SEC's prayer for relief. There appears to be a split of authority in regard to the proper timing for a court to consider such a request. But the majority view, as best the Court can tell, sides with the SEC on this point. The SEC's lead case, *SEC v. Levin*, 232 F.R.D. 619, 625 (C.D. Cal. 2005), concluded that it would be premature at the pleadings stage "to determine whether the specific forms of disgorgement sought by the SEC are prohibited as a matter of law," and that instead any determination on the availability of specific forms of relief should be undertaken "after the case has been factually and legally developed." In this district, Judge Andersen denied a motion to strike claims for disgorgement, explaining that the defendants' "challenge is rejected as untimely because none of the defendants have yet been found liable for any securities violation." *SEC v. Buntrock,* 2004 WL 1179423, at *3 (N.D. Ill. May 25, 2004). This Court need not go so far as to say that liability must be *established* before Defendants can seek a ruling on the availability of disgorgement as a remedy. But it does agree with the *Levin* court that additional factual and legal development—at least to show that the SEC's claim can make it past summary judgment—would aid in the assessment of what forms of relief, if any, might be available in the event that liability is proven.

### IV. Conclusion

For the reasons explained above, Defendants' motion to dismiss for failure to state a claim [22] is denied. Counsel are directed to file a joint status report no later than January 14, 2022 that includes (a) a proposed discovery plan and (b) a statement in regard to any settlement discussions

and/or any mutual request for a referral to the assigned Magistrate Judge for a settlement conference. The Court will set further case management deadlines following review of the joint status report.

Dated: December 20, 2021

                                                    Robert M. Dow, Jr.
                                                    United States District Judge