**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br> v.<br><br>JOHN M. FIFE, et al.,<br><br>     Defendants. | Case No. 1:20-cv-05227<br><br>Honorable Robert M. Dow, Jr.<br><br>JURY TRIAL DEMANDED |

## DEFENDANTS' ANSWER TO COMPLAINT

Defendants John M. Fife ("Fife"), Chicago Venture Partners, L.P., Iliad Research and Trading, L.P., St. George Investments LLC, Tonaquint, Inc., and Typenex Co-Investment, LLC (collectively, "Defendants"), by and through their attorneys, for its Answer and Affirmative Defenses to Plaintiff Securities and Exchange Commission's ("Plaintiff's") Complaint, states as follows:

## NATURE OF THE ACTION

1. From at least 2015 through the present Defendant John M. Fife ("Fife") and five entities he owns and controls – Chicago Venture Partners, L.P. ("CVP"), Iliad Research and Trading, L.P. ("Iliad"), St. George Investments LLC ("St. George"), Tonaquint, Inc. ("Tonaquint"), and Typenex Co-Investment, LLC ("Typenex") (collectively, the "Entity Defendants") – bought and sold billions of newly-issued shares of microcap securities (i.e., penny stocks) and generated millions of dollars from those sales.

**ANSWER**: Defendants deny the allegations in paragraph 1, except they admit Fife owns and controls the Entity Defendants. Defendants did not buy the aforementioned shares; rather, they made convertible loans, which could, pursuant to negotiated terms, be repaid through cash or converted shares.

2.      In doing so, Fife – who is a recidivist violator of the federal securities laws – and the Entity Defendants (together with Fife, "Defendants") have violated, and continue to violate, the mandatory dealer registration requirements of the federal securities laws.

**ANSWER**: Defendants deny the allegations in paragraph 2.  Fife is not a recidivist violator of

the federal securities laws and Defendants have not violated the dealer registration requirements

of the federal securities laws.

3.      Defendants' business model has been to buy convertible promissory notes–a type of security–from penny stock issuers, convert the notes into newly-issued shares of stock, and rapidly sell those shares into the public market at a profit. During 2015 through 2019, Defendants purchased more than 250 such notes from approximately 135 different microcap issuers. Defendants demanded and received highly favorable terms for these notes, including terms that gave Defendants deep discounts from the prevailing market price for the shares of counterparty microcap issuers.  By engaging in a regular business of buying convertible notes and then selling the resulting newly-issued shares of microcap companies' stock into the public market, Defendants operated as unregistered securities dealers and collectively generated more than $61 million in net profits.

**ANSWER**: Defendants admit that they made, in addition to numerous other types of investments,

more than 250 convertible loans to approximately 135 microcap issuers from 2015 through 2019,

but otherwise deny the allegations in paragraph 3.  These loans, which are a common financing

structure for public companies of all sizes, were negotiated through arms-length negotiations with

sophisticated public companies.  The convertible notes that Defendants purchased are different

securities from the shares that Defendants would sell at a later time.

4.      In violating the dealer registration requirements of the federal securities laws, Defendants avoided regulatory obligations for dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records in accordance with applicable regulatory requirements.

**ANSWER**: Defendants deny the allegations in paragraph 4.

5.      Through these activities, the Defendants violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") by acting as unregistered securities dealers. [See 15 U.S.C. § 78o(a)(1)] The SEC requests, among other things, that this Court enjoin Defendants

2

from committing further violations of the federal securities laws as alleged in this Complaint, and order them to pay disgorgement and monetary penalties based upon these violations.

**ANSWER**: Defendants deny the allegations in the first sentence of paragraph 5. Defendants deny

that Plaintiff is entitled to the relief it requests in the second sentence of paragraph 5.

## JURISDICTION AND VENUE

6. The SEC brings this action pursuant to the authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] seeking to restrain and enjoin Defendants from engaging in the acts, practices, transactions and courses of business alleged herein, and for such other equitable relief as may be appropriate or necessary for the benefit of investors.

**ANSWER**: Defendants deny that Plaintiff is entitled to the relief it requests in paragraph 6.

7. The SEC also seeks a final judgment ordering Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon, and ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**ANSWER**: Defendants deny that Plaintiff is entitled to the relief it requests in paragraph 7.

8. This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u(d) and 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. These transactions, acts, practices and courses of business occurred in the Northern District of Illinois, which is where the Entity Defendants are located and where Fife resides and does business on the Entity Defendants' behalf.

**ANSWER**: Defendants admit that they are located in the Northern District of Illinois and have

engaged in interstate commerce in connection with certain transactions or acts alleged in this

Complaint. Paragraph 8 otherwise contains legal assertions and conclusions to which no responsive pleading is required.

9. Defendants have, directly and indirectly, made, and are making, use of the mails, and of the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

3

**ANSWER**: Defendants admit that they engaged in interstate commerce in connection with certain transactions or acts alleged in this Complaint, and otherwise deny the allegations in paragraph 9.

10.     There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this Complaint, and transactions, acts, practices and courses of business of similar purport and object.

**ANSWER**: Defendants deny the allegations in paragraph 10.

11.     **John M. Fife**, age 59, resides in Chicago, Illinois.  In 2007, the SEC charged Fife with violations of 10(b) of the Exchange Act and Rule 10b-5 thereunder for his participation in an annuity market timing scheme. *SEC v. Fife*, No. 07-C-0347 (N.D. Ill. Jan. 18, 2007).  That case settled after Fife consented to an injunction, monetary relief, and a bar from associating with an investment adviser, with the right to reapply after 18 months. In 2012, in an unrelated action, the Financial Industry Regulatory Authority ("FINRA") barred Fife from association with any FINRA member for failing to respond to FINRA requests for information. FINRA Case No. 2011029203701 (March 2012).

**ANSWER**: Defendants admit the allegations as to Fife's residence and, at the time Plaintiff filed the Complaint, age.  Although Defendants do not admit any misconduct, Defendants admit that the SEC filed charges alleging the conduct described above approximately 15 years ago and that the case settled on the terms described above approximately 14.5 years ago.  Although Defendants deny any misconduct or that FINRA had jurisdiction over Fife, Defendants admit that FINRA took the actions described above almost 10 years ago.

12.     **Chicago Venture Partners, L.P.**, is a Utah limited partnership, with its principal place of business in Chicago, Illinois. Fife solely owns and controls CVP.

**ANSWER**: Defendants admit the allegations in paragraph 12.

13.     **Iliad Research and Trading, L.P.**, is a Utah limited partnership, with its principal place of business in Chicago, Illinois. Fife solely owns and controls Iliad.

**ANSWER**: Defendants admit the allegations in paragraph 13.

4

14. **St. George Investments, LLC** is a Utah limited company, with its principal place of business in Chicago, Illinois. Fife solely owns and controls St. George.

**ANSWER**: Defendants admit the allegations in paragraph 14.

15. **Tonaquint, Inc.** is a Utah corporation, with its principal place of business in Chicago, Illinois. Fife solely owns and controls Tonaquint.

**ANSWER**: Defendants admit the allegations in paragraph 15.

16. **Typenex Co-Investment, LLC** is a Utah limited liability company, with its principal place of business in Chicago, Illinois. Fife solely owns and controls Typenex.

**ANSWER**: Defendants admit the allegations in paragraph 16.

## FACTS

17. Defendants have operated a regular business through which they buy convertible notes, a type of short-term debt security, from penny stock issuers in need of cash. After typically holding the notes for a holding period required by an SEC rule (six months for issuers that are required to file periodic and other reports with the SEC, one year for issuers that are not required to do so), Defendants convert the notes into newly-issued shares of stock at a deep discount to the prevailing market price. After conversion, Defendants promptly sell that stock into the market, locking in a substantial profit. During 2015 through 2020, Defendants sold into the public market more than 21 billion newly-issued shares of penny stock from convertible notes that they purchased from approximately 135 penny stock issuers. Defendants' collective net profits from this business during 2015 through 2020 were approximately $61 million, the majority of which came from the spread between Defendants' discounted acquisition cost for the stock and the prevailing market price.

**ANSWER**: Defendants deny the allegations in paragraph 17, except they admit that in full compliance with SEC Rule 144, from 2015 through 2020, in addition to numerous other types of investments, they provided convertible loans to 135 microcap issuers in which the issuers, often at their election, repaid the loans with issuer stock instead of cash.

18. Fife has the ultimate decision-making power over the Entity Defendants, including the power to decide whether to enter each of the convertible deals, to negotiate and approve the final deal terms, and to monitor the status of the Entity Defendants' investments and their sales of stock. Several full-time employees of the Entity Defendants assist Fife in locating, negotiating, and managing the entities' transactions.

5

**ANSWER**: Defendants admit the allegations in paragraph 18.

19.     Fife, personally or through employees of the Entity Defendants, negotiated the terms of the convertible notes that Defendants purchased from penny stock issuers (as well as amendments to the original terms). Fife or employees of the Entity Defendants also signed the contracts by which the Entity Defendants acquired the convertible notes.

**ANSWER**: Defendants admit the allegations in paragraph 19.

20.     Defendants held themselves out to the public as being willing to buy convertible notes at a regular place of business, which was in Chicago, Illinois. For example, Defendants operated a public website, located at www.chicagoventure.com, that advertised to issuers that the Defendants operated businesses engaged in private investment in public equity ("PIPE") transactions through which Defendants would buy the issuers' stock. Defendants also directly solicited microcap issuers by cold calling or emailing issuer representatives. In these direct issuer solicitations through phone or email, Defendants typically represented to issuer representatives that Defendants sought to invest in the issuer's stock and explained the benefits of a convertible debt transaction. Defendants also attended conferences at which they solicited penny stock issuers in person.

**ANSWER**: Defendants admit that they operated a public website, located at www.chicagoventure.com, and that they discussed convertible note transactions with issuers on calls, in emails, and at conferences, but otherwise deny the allegations in paragraph 20.

21.     Beyond advertising on their website and directly soliciting issuers by phone, email, and in person, Defendants also relied on third-party finders, who worked on commission, to solicit issuers who were willing to sell convertible notes in exchange for financing from the Defendants.

**ANSWER**: Defendants deny the allegations in paragraph 21.

22.     Because the counterparty microcap issuers in Defendants' convertible note deals often had minimal assets, negative cash flow from operations, and unstable operating histories, these companies were typically unable to obtain financing from banks. Therefore, Defendants were able to negotiate highly favorable terms governing the deals with the financially-strapped issuers.

**ANSWER**:  Defendants admit the allegations in paragraph 22, except they deny that the terms were "highly favorable" or that the issuers were "financially-strapped" to the extent any implication is intended that the terms were somehow unfair to the issuers, inconsistent with market practice, or not commensurate with the risks Defendants incurred.  These risks include issuer default on the terms of the loans, issuer bankruptcy, issuers failing to maintain their reporting status (thereby preventing converted shares from being sold), and risks associated with fluctuations in share price between the time of conversion and sale.  Convertible loans, in which converted shares may be acquired at discounted prices, are a common type of financing option available to public companies of all sizes, and the terms of the convertible loan transactions at issue here were negotiated at arms-length, typically approved by issuer board members and executives, and compensated Defendants commensurate with the benefits the loan provided the issuers and the significant risks Defendants undertook in making the convertible loan.

23.     In soliciting issuers for potential convertible note deals, Defendants generally targeted microcap issuers that had historically strong trading volumes and a large number of authorized but unissued shares. Defendants targeted these types of issuers with the goal of easily converting and selling the issuers' shares acquired through the deals.

**ANSWER**: Defendants deny the allegations in paragraph 23, except admit that an issuer's trading volumes and authorized shares was one consideration in Defendants' analysis of potential convertible note transactions.

24.     Defendants sought to engage in convertible note deals with microcap issuers in industries that had recently generated attention. For instance, Defendants entered into convertible note deals with microcap issuers in the marijuana, blockchain, bitcoin, vapor, lithium, and gold mining industries. Defendants sought out these deals because they believed that public interest in these industries typically meant that individual investors would be willing to buy the shares that Defendants acquired through the deals.

**ANSWER**: Defendants deny the allegations in paragraph 24, except admit that they entered into convertible note transactions with OTC issuers, including, among others, issuers in the marijuana, blockchain, bitcoin, vapor, lithium, and gold mining industries.

25.     Defendants obtained nearly all of the stock that they sold in their business directly from the issuers, through note conversions, as opposed to purchases in the secondary market. The shares that Defendants obtained through their deals with microcap issuers were newly-issued, and the sales of the shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals. Selling large quantities of newly-issued shares into the market is a common attribute of a securities dealer.

**ANSWER**: Defendants deny the allegations in paragraph 25, except they admit that the shares they obtained through their convertible loan transactions with microcap issuers were newly-issued and sold into the market, in full compliance with SEC Rule 144, through registered broker-dealers.

26.     In addition to profiting from stock sales, the Entity Defendants also charged counterparty microcap issuers transaction fees, generally ranging from between $5,000 and $25,000 per deal. During the relevant period, the Entity Defendants collected at least $2.12 million in transaction fees from counterparty microcap issuers.

**ANSWER**:  Defendants deny the allegations in paragraph 26 to the extent they imply that Defendants profited from every convertible note transaction or that the fees charged were transaction fees, but otherwise admit that, as part of each convertible loan transaction, microcap issuers reimbursed Defendants in the amounts described above for the legal, due diligence, and other expenses associated with the transaction.

27.     SEC Rule 144 enables non-affiliates who acquire restricted stock directly from the issuer in a private transaction to resell it free of restriction into the market after observing a holding period, among other requirements. [See 17 C.F.R. § 210.144] Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144. For that reason, Defendants generally waited either six months (the required Rule 144 holding period for securities issued by SEC-reporting companies) or one year (the required Rule 144 holding period for securities issued by non-SEC-reporting companies) after purchasing a convertible note before

they began to exercise their right to convert the note to stock. Fife personally, or through employees acting at his direction, arranged for the converted stock to be transferred to Defendants' brokerage accounts either electronically or via mailed certificates. As part of this process, Defendants obtained attorney opinion letters to assure brokerage firms that the converted stock was not restricted and could be resold to the public.

**ANSWER**: The first sentence of paragraph 27 contains legal assertions and conclusions to which no responsive pleading is required. While Defendants admit the remaining allegations in paragraph 27 as Defendants always fully complied with Rule 144, Defendants deny any suggestion or implication that they failed to comply with, or somehow circumvented, Rule 144 and the SEC has not alleged to the contrary.

28.     The convertible notes that Defendants bought from the issuers entitled them to receive issuer stock at a substantial discount from the prevailing market price. Each note provided for a discount, which ranged between 7 and 60 percent less than the prevailing market price of the stock preceding the conversion request. Defendants normally sold the stock as soon after conversion as the market would bear the sales. Defendants did so to lock in their profits. Defendants used the telephone and the Internet to place these sell orders. The majority of Defendants' profits resulted from the discounted prices at which they acquired shares from the issuers to sell into the market. This mechanism, which gave Defendants a spread or markup on the stock that they sold, is a common attribute of a securities dealer.

**ANSWER**: Defendants admit the allegations in the second and fifth sentences of paragraph 28. Defendants deny the allegations in the first, third, fourth, sixth, and seventh sentences.

29.     After holding the convertible debt acquired in a convertible note deal for the six-month period or one-year period required by Rule 144, Defendants typically sent a conversion notice to a counterparty issuer and its transfer agent showing the number of shares owed to Defendants. Defendants then worked with the issuer's transfer agent and broker to have the shares issued and deposited into Defendants' brokerage accounts as quickly as possible, including often paying rush fees to expedite this process.

**ANSWER**: Defendants admit the allegations in paragraph 29. Defendants fully complied with Rule 144 in connection with the convertible loan transactions and the SEC does not allege otherwise.

30.     Once brokers deposited the converted shares from the counterparty issuers into the Defendants' brokerage accounts, Defendants typically began selling the shares into the public market immediately. However, Defendants generally did not sell all the shares they acquired in a convertible note deal all at once. Rather, Defendants staggered their sales over multiple trading days in an effort to avoid placing too much sudden downward pressure on the counterparty issuer's stock price in a single trading day. Defendants typically limited their sales in a single trading day, aiming for their sales to account for no more than roughly 9 to 15 percent of the stock's daily trading volume.

**ANSWER**:  Defendants admit the allegations in paragraph 30, except deny the allegations in the

first sentence to the extent they suggest that Defendants directly sold shares into the market; ra-

ther, Defendants sold the shares through a registered broker.  Defendants also deny the third sen-

tence to the extent that it suggests that this was the only reason that Defendants staggered their

sales over multiple trading days.

31.     Defendants' practice then was to sell the shares they had acquired in a convertible note deal continuously on a daily or near-daily basis until Defendants had sold all of their shares into the market. Defendants mostly completed this process in a couple of weeks or less.

**ANSWER**:  Defendants admit the allegations in paragraph 31, except deny the allegations in

paragraph 31 to the extent they suggest that Defendants directly sold shares into the market; ra-

ther, Defendants sold the shares through a registered broker.  Defendants also deny that they sold

any shares "continuously."

32.     Defendants typically aimed to convert only as many shares at a time as they believed they could sell into the market within the 10 to 20 days after a conversion. Therefore, Defendants commonly converted counterparty issuers' shares in several different cycles.

**ANSWER**:  Defendants deny the allegations in the first sentence of paragraph 32, but admit the

allegations in the second sentence.

33.     Notwithstanding Defendants' efforts to limit the amount of shares they would sell into the market in a single day, Defendants' conduct frequently depressed the stock price of counterparty microcap issuers. Defendants' practice of selling thousands of a counterparty issuer's newly-issued shares into the market on multiple trading days, as well as their practice of

10

converting additional shares soon after they sold previously-converted shares, frequently led to a significant decrease in the company's stock price over time.

**ANSWER**:  Defendants deny the allegations in paragraph 33.  Defendants provided critical financing to the counterparty microcap issuers, often when other alternative sources of capital were not available to these issuers, so that these issuers would have the necessary financing to execute their business plans, grow their companies, and increase long-term shareholder value.

34.    While Defendants' dealer activities frequently depressed the stock price of counterparty issuers, causing a decrease in the value of the holdings of those companies' shares owned by other shareholders, Defendants frequently reaped large profits. Defendants obtained their profits from the discounts in the purchase price that they negotiated with the counterparty issuers, rather than from any appreciation in the stock's price.

**ANSWER**:  Defendants deny the allegations in paragraph 34.  Defendants provided critical financing to the counterparty microcap issuers, often when other alternative sources of capital were not available to these issuers, so that these issuers would have the necessary financing to execute their business plans, grow their companies, and increase long-term shareholder value. Convertible loans, in which converted shares may be acquired at discounted prices, are a common type of financing option available to public companies of all sizes, and the terms of the convertible loan transactions at issue here were negotiated at arms-length, typically approved by issuer board members and executives, and compensated Defendants commensurate with the benefits the loan provided the issuers and the significant risks Defendants undertook in making the convertible loan.

35.    Moreover, many of Defendants' agreements with counterparty microcap issuers contained "true-up" provisions that compelled the issuer to issue additional shares to Defendants if the issuer's stock price decreased in the 15 to 20 business days following a conversion. Defendants' sales of thousands of newly-issued shares into the market frequently led to a decrease in the stock price, and, consequently, triggered the true-up provision in these agreements. For deals that included these true-up provisions, Defendants essentially guaranteed themselves a

11

profit by insulating themselves against any risk of a decrease in the counterparty issuer's stock price.

**ANSWER**: Defendants admit the allegations in the first sentence of paragraph 35, except they deny that many of the transactions contained such "true-up" provisions; rather, only a very small number did. Defendants deny the allegations in the second and third sentences of paragraph 35.

36. Defendants' dealer business was very lucrative. The following are examples of transactions in which Defendants acquired convertible notes from penny stock issuers, exercised their conversion rights, and sold the resulting newly-issued stock into the market for a significant profit:

**ANSWER**: Defendants deny the allegations in the first sentence of paragraph 36. Defendants deny the allegations in the second sentence of paragraph 36 to the extent they imply that the profits Defendants generated from the convertible note transactions were not commensurate with the significant risks that Defendants incurred or the benefits provided to the issuers, but otherwise admit the allegations in the second sentence of paragraph 36.

    a.     ("HEMP")

        i.     On March 31, 2015, Defendant Iliad entered into a securities purchase agreement with Hemp Inc., a company whose stock was listed for trading on the over-the-counter market (OTCMKTS, "HEMP"). According to HEMP's public filings, HEMP's business is to provide products and services to the medical and recreational marijuana industries and to provide products made from industrial hemp.

**ANSWER**: Defendants admit the allegations in paragraph 36(a)(i).

        ii.     Under Iliad's securities purchase agreement with HEMP, Iliad agreed to purchase a convertible note in the amount of $680,000 issued by HEMP. Under the securities purchase agreement, Iliad's purchase price for the convertible note was $500,000, after an origination discount and transaction expenses were set off against the principal amount of the note. Iliad made a $375,000 payment on March 31, 2015 and an approximately $125,575 payment on April 20, 2015.

**ANSWER**: Defendants admit the allegations in paragraph 36(a)(ii).

       iii.     Pursuant to the terms of the convertible note that Iliad acquired under the securities purchase agreement with HEMP, Defendants converted the amounts that HEMP owed under the agreement on three occasions between May 23, 2016 and August 15, 2016.  In so doing, Defendants received a total of over 56 million newly-issued HEMP shares.

**ANSWER**:  Defendants admit the allegations in paragraph 36(a)(iii).

       iv.     Pursuant to the favorable terms that Defendants negotiated, the conversion price for these HEMP shares was 40% less than the average of the two lowest closing prices for HEMP stock in the 20 trading days preceding each conversion. The terms that Defendants negotiated allowed them to spend significantly less money to acquire the shares than they would have paid on the open market.

**ANSWER**:  Defendants admit the allegations in paragraph 36(a)(iv), except they deny that the terms were favorable to the extent any implication is intended that the terms were somehow unfair to HEMP or not otherwise in line with other similar market transactions.  Convertible loans, in which converted shares may be acquired at discounted prices, are a common type of financing option available to public companies of all sizes.  The terms of the transaction with HEMP were negotiated at arms-length, approved by HEMP board members and executives, and compensated Defendants commensurate with the benefits the loan provided HEMP and the significant risks Defendants undertook in making the convertible loan.

       v.     Defendants sold the shares shortly after the shares from each conversion were deposited into their accounts, generating net profits of $1,083,410, most of which were attributable to the discounted acquisition prices that they negotiated.

**ANSWER**: Defendants admit the allegations in paragraph 36(a)(v).  The discount was consistent with market prices, and compensated Defendants for the significant risks they incurred in making the loan.  These risks included issuer default on the terms of the loans, issuer bankruptcy, the issuer failing to maintain its reporting status (thereby preventing converted shares from being

13

sold), and risks associated with fluctuations in share price between the time of conversion and sale.

      b.      ("OPMZ")

      i.      On December 10, 2015, Defendant Typenex entered into a securities purchase agreement with 1PM Industries, Inc., a company whose stock was listed for trading on the over-the- counter market (OTCMKTS, "OPMZ"). According to OPMZ's public filings at the time, OPMZ was primarily in the business of selling wellness and edible marijuana products to the public.

**ANSWER**: Defendants admit the allegations in paragraph 36(b)(i).

      ii.      Under Typenex's securities purchase agreement with OPMZ, Typenex agreed to purchase a convertible note in the amount of $170,000 issued by OPMZ. Under the securities purchase agreement, the purchase price of the note was $150,000, after an origination discount and transaction expenses were set off against the principal amount of the note. Typenex made payments to OPMZ of $45,000 on December 15, 2015; $45,000 on March 18,2016; $45,000 on March 22, 2016; $22,500 on July 18, 2016, and $22,500 on November 14, 2016. Typenex also made payments to afinder for the OPMZ deal of $5,000 on December 15, 2015; $5,000 on March 18, 2015; $2,500 on July 18, 2016; and $2,500 on November 14, 2016, as part of the purchase price.

**ANSWER**: Defendants admit the allegations in paragraph 36(b)(ii).

      iii.      Pursuant to the terms of the convertible note that Typenex acquired under the securities purchase agreement with OPMZ, Defendants converted the amounts that OPMZ owed under the agreement into shares of OPMZ stock on 18 separate occasions between August 2016 and November 2017. In so doing, Defendants received a total of over 777 million newly-issued shares of OPMZ stock.

**ANSWER**: Defendants admit the allegations in paragraph 36(b)(iii).

      iv.      Pursuant to the favorable terms that Defendants negotiated, the conversion price for these shares of OPMZ was at least 30% less than the average of the three lowest closing prices for the stock in the 20 trading days preceding each conversion. The terms that Defendants negotiated allowed them to spend significantly less money to acquire the shares than they would have paid on the open market.

14

**ANSWER**: Defendants admit the allegations in paragraph 36(b)(iv), except they deny that the terms were favorable to the extent any implication is intended that the terms were somehow unfair to OPMZ or not otherwise in line with other similar market transactions. Convertible loans, in which converted shares may be acquired at discounted prices, are a common type of financing option available to public companies of all sizes. The terms of the transaction with OPMZ were negotiated at arms-length, approved by OPMZ board members and executives, and compensated Defendants commensurate with the benefits the loan provided OPMZ and the risks Defendants undertook in making the convertible loan.

> v.  Defendants sold the shares shortly after the converted shares were deposited into Defendants' accounts, generating net profits of $738,751, most of which were attributable to the discounted acquisition prices that they negotiated.

**ANSWER**:  Defendants admit the allegations in paragraph 36(b)(v). The discount was consistent with market prices, and compensated Defendants for the significant risks they incurred in making the loan. These risks included issuer default on the terms of the loans, issuer bankruptcy, the issuer failing to maintain its reporting status (thereby preventing converted shares from being sold), and risks associated with fluctuations in share price between the time of conversion and sale.

> c.  ("VAPE")

> i.  On December 3, 2014, Defendant Typenex purchased a convertible note from Vape Holdings, Inc., a company whose stock was listed for trading on the over-the-counter market (OTCMKTS, "VAPE"). According to VAPE's public filings, VAPE's business is to manufacture and distribute vaporization products, which could be used in, among other applications, e-cigarettes.

**ANSWER**:  Defendants admit the allegations in paragraph 36(c)(i).

       ii.      Under Typenex's securities purchase agreement with VAPE, Typenex agreed to purchase a convertible note in the amount of $560,000 issued by VAPE. Under the securities purchase agreement, the purchase price of the note was $500,000, after an origination discount and transaction expenses were set off against the principal amount of the note. Typenex made a $475,000 payment to VAPE on December 4, 2014, and a $25,000 payment to another entity on behalf of VAPE that same day as part of the purchase price.

**ANSWER**: Defendants admit the allegations in paragraph 36(c)(ii).

       iii.     Pursuant to the terms of the convertible note that Typenex acquired under the securities purchase agreement with VAPE, Defendants converted the amounts that VAPE owed under the agreement into shares of VAPE stock on 17 occasions between August 2015 and February 2016. In so doing, Defendants received a total of over 91 million newly issued shares of VAPE stock.

**ANSWER**: Defendants admit the allegations in paragraph 36(c)(iii).

       iv.     Pursuant to the favorable terms that Defendants negotiated, the conversion price for these shares of VAPE was at least 30% less than the average of the three lowest closing prices for the stock in the 10 trading days preceding each conversion. The terms that Defendants negotiated allowed them to spend significantly less money to acquire the shares than they would have paid on the open market.

**ANSWER**: Defendants admit the allegations in paragraph 36(c)(iv), except they deny that the terms were favorable to the extent any implication is intended that the terms were somehow unfair to VAPE or not otherwise in line with other similar market transactions. Convertible loans, in which converted shares may be acquired at discounted prices, are a common type of financing option available to public companies of all sizes. The terms of the transaction with VAPE were negotiated at arms-length, approved by VAPE board members and executives, and compensated Defendants commensurate with the benefits the loan provided VAPE and the significant risks Defendants undertook in making the convertible loan.

       v.     Defendants sold the shares shortly after the converted shares were deposited into Defendants' accounts, generating net profits of $454,354, most of which were attributable to the discountedacquisition prices that they negotiated.

16

**ANSWER**:  Defendants admit the allegations in paragraph 36(c)(v).  The discount was consistent with market prices, and compensated Defendants for the significant risks they incurred in making the loan.  These risks included issuer default on the terms of the loans, issuer bankruptcy, the issuer failing to maintain its reporting status (thereby preventing converted shares from being sold), and risks associated with fluctuations in share price between the time of conversion and sale.

37.     Defendants continue to convert shares acquired in the convertible debt transactions with counterparty microcap issuers and then sell those shares into the market.

**ANSWER**:  While the types of investments that Defendants typically make have markedly changed, Defendants admit that if a counterparty microcap issuer to which Defendants previously loaned money repays the loan with shares, Defendants will sell those shares.

38.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer.  [15 U.S.C. § 78o(a)(1)].

**ANSWER**:  Paragraph 38 contains legal assertions and conclusions to which no responsive pleading is required.  Nevertheless, based on the plain language of the Securities Exchange Act of 1934 (the "Exchange Act"), Defendants deny that they are engaged in the business of buying and selling securities for their own account as part of a regular business, and deny that they were required to register as a dealer with the SEC or, in the case of Fife, associate with a registered dealer.

39.     Defendants used means or instrumentalities of interstate commerce to buy and sell securities as part of their regular business. For example, Defendants used the internet to solicit

17

microcap issuers, transferred cash through wire transfers, and used email and the telephone to ne-
gotiate and effectuate sales transactions. Defendants engaged in much of the conduct described
in this Complaint at their Chicago, Illinois addresses in this District.

**ANSWER**: The first sentence of paragraph 39 contains legal assertions and conclusions to which

no responsive pleading is required; to the extent a response is required, Defendants deny the alle-

gations in the first sentence.  Defendants admit the allegations in the second and third sentences

of paragraph 39, except that they deny they used the internet to solicit microcap issuers.

40.     While Defendants engaged in this conduct, they were not registered with the SEC
as dealers or associated with dealers registered with the SEC.

**ANSWER**: Defendants admit that they were not registered with the SEC as dealers or associated

with dealers registered with the SEC because they were not required to do so and, upon infor-

mation and belief, not a single similarly situated provider of convertible loans under Rule 144

has ever been registered as a "dealer."  Defendants fully complied with Rule 144 in connection

with the convertible loan transactions and the SEC does not allege otherwise.

41.     A person who seeks to register with the SEC as a dealer must file an application
on a form called Form BD. Form BD asks questions about the applicant and its principals, con-
trolling persons, and employees. An applicant must file the Form BD with the Central Registra-
tion Depository, which is operated by FINRA. To register as a dealer, the applicant must meet
the statutory requirements to engage in a business that involves high professional standards.

**ANSWER**: Paragraph 41 contains legal assertions and conclusions to which no responsive

pleading is required.

42.     Registration with the SEC requires the dealer to provide important information to
the SEC about its business, including but not limited to the names of the direct and indirect own-
ers and executive officers of the business; certain arrangements with other persons or entities, the
identities of those who control the business; the states in which the dealer does business; past
criminal or regulatory actions against the dealer or any affiliated person that controls the busi-
ness; and financial information, including bankruptcy history. Further, registration requires the
dealer to join a self-regulatory organization, such as FINRA, or a national security exchange,
which assist the SEC in regulating the activities of registered dealers. Finally, registered dealers

are subject to inspection by the SEC and FINRA to ensure that they comply with the securities laws.

**ANSWER**: Paragraph 42 contains legal assertions and conclusions to which no responsive

pleading is required.

43.     Defendants sold stock that did not meet any of the exceptions from the definition of a "penny stock," as defined by Exchange Act Section 3(a)(51) and Exchange Act Rule 3a511. [*See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51 1].

**ANSWER**: Paragraph 43 contains legal assertions and conclusions to which no responsive

pleading is required.

44.     Defendants therefore participated in the offering of penny stock by acting as securities dealers engaged in the selling of penny stocks.

**ANSWER**: Defendants deny the allegations in paragraph 44.

## <u>COUNT</u>

### Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)]

### [All Defendants]

45.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 above.

**ANSWER**: Defendants restate their answers to paragraphs 1 through 44.

46.     By engaging in the conduct described above, Defendants made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, and to attempt to induce, the purchase and sale of, securities as part of a regular business while not registered with the SEC as a dealer and when Defendants were not associated with an entity registered with the SEC as a dealer.

**ANSWER**: Defendants deny the allegations in paragraph 46.

47.     By reason of the foregoing, Defendants violated, and unless enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

**ANSWER**: Paragraph 47 contains legal assertions and conclusions to which no responsive pleading is required. Nevertheless, Defendants deny the allegations in paragraph 47.

## RELIEF REQUESTED

### I.

### (Injunctive Relief Against Future Securities Law Violations)

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

**ANSWER**: Defendants deny that Plaintiff is entitled to the relief requested.

### II.

### (Disgorgement of Ill-Gotten Gains)

Issue an Order requiring Defendants to disgorge, jointly and severally, the ill-gotten gains that they received, directly or indirectly, including prejudgment interest.

**ANSWER**: Defendants deny that Plaintiff is entitled to the relief requested.

### III.

### (Civil Penalties)

Issue an Order imposing appropriate civil penalties upon Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**ANSWER**: Defendants deny that Plaintiff is entitled to the relief requested.

### IV.

### (Penny Stock Bar)

Issue an Order permanently restraining and enjoining Defendants from participating in the offering of any penny stock, including engaging in activities with a broker, dealer, or issuer

for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

**ANSWER**:  Defendants deny that Plaintiff is entitled to the relief requested.

## V.

### (Retention of Equitable Jurisdiction)

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**ANSWER**: Defendants deny that Plaintiff is entitled to any relief against it, and Defendants request that the Court dismiss the Complaint with prejudice and order such further relief as the Court deems just and proper.

## VI.

### (Other Relief)

Grant such orders for further relief the Court deems appropriate.

**ANSWER**: Defendants deny that Plaintiff is entitled to any relief against it, and Defendants requests that the Court dismiss the Complaint with prejudice and order such further relief as the Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the SEC demands that this case be tried before a jury.

**ANSWER**: Defendants demand trial by jury on all issues so triable.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof, persuasion, or production not otherwise legally assigned to it as to any element of Plaintiff's claims, Defendants assert the following affirmative and other defenses:

### FIRST DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to state a claim upon which relief can be granted.

### SECOND DEFENSE

Under the plain language of the Exchange Act, using basic tools of statutory construction, Defendants were not required to register as dealers or associate with a registered dealer.

### THIRD DEFENSE

The Due Process Clause bars the government from retroactively imposing liability without giving fair notice of the conduct that is forbidden. Here, in light of the relevant regulatory history, including decades of Plaintiff's repeated and consistent pronouncements, Defendants lacked fair notice that their conduct was supposedly prohibited.

For decades, Plaintiff has encouraged lenders to make convertible loans to small (often unlisted) public companies. In 1980, Plaintiff created a safe harbor for lenders to offer a form of convertible financing where the lender could recoup its investment by converting the outstanding debt into common stock of the borrower and selling the stock into the market. *See Planning Research Corp.*, 1980 WL 14999, at *2 (Dec. 8, 1980). Plaintiff codified this safe harbor in 2007, in SEC Rule 144, for the explicit purpose of encouraging firms to make convertible loans to

small public companies. *Revisions to Rule 144*, 72 Fed. Reg. 71,546, 71,555 & n.143 (Dec. 17, 2007).

Numerous lenders responded to the SEC's encouragement and, in full compliance with the Rule 144 process established by Plaintiff to promote small-business access to capital, have provided small-cap companies with loan financing in exchange for convertible notes. Upon information and belief, not a single one of these lenders has ever been registered as a "dealer"—a fact that Plaintiff has known for years. Plaintiff itself authorized these transactions under Rule 144. Thousands of these loans have been disclosed in 10-Ks, 10-Qs, and 8-Ks publicly filed with Plaintiff. And Plaintiff has sued firms for not properly disclosing these loans. In *In re Elray Resources, Inc.*, for example, Plaintiff faulted an issuer for not filing Form 8-Ks for a series of "convertible notes" issued from 2014 to 2015. 2016 WL 5571631, at *2 (Sept. 30, 2016). Plaintiff, as part of its investigation, plainly examined the relevant loans, yet none of the 11 convertible lenders listed in the public filings describing those loans has ever been registered as a dealer. At the time of the *Elray* settlement, Plaintiff did not even suggest that any of the convertible lenders were operating unlawfully as unregistered dealers. Defendants and other observers reasonably understood Plaintiff's actions and inactions detailed above to indicate that Plaintiff would permit convertible lenders to continue to operate without registering as dealers.

This belief was bolstered by decades of Plaintiff's own pronouncements. Beginning in the 1970s and for decades thereafter, Plaintiff made clear that an entity would be considered a dealer only if it engaged in traditional dealer activities, such as quoting a two-way market, holding customer funds, or offering investment advice. *See, e.g.*, *Burton Sec.*, 1977 WL 10680, at *1

(SEC No-Action Letter Dec. 5, 1977). These factors were widely known and relied on in the industry. They were reflected in leading treatises. R. Colby et al., W*hat Is a Broker-Dealer, in Broker-Dealer Regulation* § 2:3.2, at 2-60 to 2-62 (updated 2016), *available at* https://tinyurl.com/yyapd5r7. They were acknowledged by the courts. *See, e.g.*, *SEC v. Federated Alliance Grp.*, 1996 WL 484036, at *4 (W.D.N.Y. Aug. 21, 1996). And they were frequently cited by Plaintiff, including in an adjudicated administrative proceeding. *See In re Sodorff*, 1992 WL 224082, at *5 (Sept. 2, 1992) (holding that certain "factors distinguish the activities of a dealer" from a nondealer, such as that a dealer "solicit[s] investors and handle[s] their money and securities, render[s] investment advice, and sen[ds] subscription agreements for investors for their review and signature, all of which are characteristics of dealer activity"). Because Defendants, like other convertible lenders, did not engage in any of these practices, they reasonably concluded that Plaintiff did not consider them to be dealers.

The lack of fair notice to Defendants and other market participants was exacerbated when, in 2014, Plaintiff ordered Steve Cohen to transfer his trading activities to a family office not registered with Plaintiff. *In re S.A.C. Capital Advisors, L.P.*, 2014 WL 2915930, at *4 (June 27, 2014). Because that family office bought and sold billions of dollars of securities each year as part of its business, R. Copeland, *Steven A. Cohen's Point72 Earns Big 2014 Trading Profit*, Wall St. J. (Jan. 5, 2015), https://tinyurl.com/y53e4ggu, Defendants and other reasonable observers understood that Plaintiff did not believe that purchasing and selling securities as part of a business would render an entity a securities "dealer" subject to registration with Plaintiff. Plaintiff's failure to indicate, ever, that any hedge fund, family office, investment company, or venture

24

capital fund was actually a "dealer" on the ground that it bought and sold securities confirmed Defendants' and other market participants' reasonable belief.

The *Guide to Broker-Dealer Registration*, which has been published on Plaintiff's website for more than a decade, provided Defendants and other market participants yet more evidence that they were not required to register as dealers. https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html. When market participants inquired to Plaintiff's staff about dealer-registration requirements, Plaintiff's staff would refer market participants to the *Guide*. And like Plaintiff's other pronouncements, the *Guide* spoke in terms of traditional dealer activities, such as making a market in securities. Convertible lenders, including Defendants, do not engage in any of the "dealer" activities identified in the *Guide to Broker-Dealer Registration*.

### FOURTH DEFENSE

Plaintiff's interpretation of the Exchange Act's definition of "dealer" is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment.

### FIFTH DEFENSE

Plaintiff is estopped from asserting that Defendants were required to register as dealers or associate with a registered dealer because, based on the factors, guidance, no-action letters, administrative decisions, and the like Plaintiff published to assist parties in assessing the Exchange Act's dealer registration requirements, Defendants were not required to do so.

## SIXTH DEFENSE

Plaintiff lacks constitutional authority to bring this enforcement action because its Commissioners who authorized this action are unconstitutionally independent of the President's oversight.

## SEVENTH DEFENSE

Defendants are not required to register as dealers or associate with a registered dealer because doing so would require them to subject themselves to an unlawful regulatory regime as the Securities Investor Protection Corporation's leadership is not appointed in conformity with the Constitution's Appointments Clause.

## EIGHTH DEFENSE

Plaintiff's claims are barred by the equal protection component of the Fifth Amendment's Due Process Clause. Principles of equal protection prohibit the government from intentionally and irrationally treating Defendants differently from other similarly situated market participants. Here, Plaintiff has adopted a theory of liability that would render unlawful the operations of the overwhelming majority of participants in the nation's financial markets, yet has intentionally, irrationally, and illegally singled out a single, disfavored market segment for selective prosecution.

According to Plaintiff, "[a]ny" person—literally—who "buy[s] and sell[s] securities" as "part of a regular business" must register as a securities "dealer" with the Securities and Exchange Commission. Compl. ¶ 38. Plaintiff's theory would render unlawful the operations of virtually every hedge fund, every investment company, every family office, and every venture capital fund—firms that buy and sell billions of dollars of securities each year as part of their regular businesses, yet are generally not registered as dealers. Plaintiff, however, has applied its

novel theory against only a single disfavored business line: convertible lenders and other related entities in the over-the-counter markets.

Aside from Plaintiff's apparent dislike of "penny stocks," Compl. ¶¶ 1, 3, 17, 19, 20, 36, 43, 44, Plaintiff's pattern of selective prosecution of convertible lenders in the over-the-counter markets is irrational and wholly arbitrary. To justify its case, Plaintiff claims that "[r]egistration with the SEC requires the dealer to provide important information to the SEC about its business," to "join a self-regulatory organization," and to subject itself "to inspection by the SEC and FINRA," *id.* ¶ 42, but these concerns are even *more* prevalent in the case of hedge funds, investment companies, family offices, and venture capital funds. Plaintiff, for example, alleges that Defendants generated more than $61 million in profits over five years, *id.* ¶ 3, yet many family offices, by contrast, buy and sell *billions* of dollars of securities *each year*. *E.g.*, Copeland, *supra*. Plaintiff cannot rationally claim that registration is warranted in this case, but not in those. Moreover, microcap issuers typically publicly disclose their convertible loans at or around the time they are made, so Plaintiff is already fully aware of these loans, whereas Plaintiff will often have much more limited information relating to other types of transactions that hedge funds, family offices, and venture capital funds engage in.

### NINTH DEFENSE

Plaintiff cannot obtain disgorgement because there is no causal link between the alleged unlawful activity and any alleged unlawful profits.

### TENTH DEFENSE

Plaintiff cannot obtain disgorgement under *Liu v. SEC*, 140 S. Ct. 1936 (2020), including because there are no victims here to whom disgorged funds can be distributed.

27

## ELEVENTH DEFENSE

Plaintiff's request for injunctive relief is barred because there is no reasonable likelihood that Defendants will violate the securities laws in the future.

## TWELFTH DEFENSE

Without conceding liability, Plaintiff's request for civil money penalties is barred because Defendants acted in good faith, the gravity of the violation was minor, investors did not suffer a risk of any significant losses, and Defendants otherwise have a strong compliance record. To the extent any civil penalties are imposed, the amount of the penalties cannot exceed first tier penalties because Defendants' conduct does not satisfy the criteria for second and third tier penalties under 15 U.S.C. § 78u(d)(3).

## THIRTEENTH DEFENSE

Plaintiff is not entitled to a penny stock bar because Defendants did not participate in the offering of penny stock by acting as dealers engaged in the selling of penny stocks.

## FOURTEENTH DEFENSE

Plaintiff's claim and Plaintiff's request for civil monetary penalties and disgorgement are barred in whole or part by an applicable statute of limitations.

## FIFTEENTH DEFENSE

Defendants reserve the right to raise any additional defenses or counterclaims, not asserted herein, of which it may become aware through discovery or other investigation, as may be appropriate at a later time.

Dated:  January 21, 2022

Respectfully submitted,

*/s/ Helgi C. Walker*

Helgi C. Walker*
Brian A. Richman*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
hwalker@gibsondunn.com

Michael J. Diver
Elliott M. Bacon
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200
michael.diver@katten.com

Barry Goldsmith*
M. Jonathan Seibald*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2440
bgoldsmith@gibsondunn.com

_____
* *pro hac vice*

29

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of January, 2022, I electronically filed a copy of the foregoing Answer through the Court's CM/ECF System, which will send notifications of the filing to all counsel of record.

*/s/ Helgi C. Walker*