**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:20-cv-05227 |
| v. | Judge Robert M. Dow, Jr. |
| JOHN M. FIFE, CHICAGO VENTURE PARTNERS, L.P., ILIAD RESEARCH AND TRADING, L.P., ST. GEORGE INVESTMENTS LLC, TONAQUINT, INC., and TYPENEX CO-INVESTMENT, LLC, | Magistrate Judge Heather K. McShain |
| Defendants. | |

## DEFENDANTS' MOTION TO COMPEL DISCOVERY

Chicago Venture Partners and the other defendants (collectively, "CVP") respectfully request this Court's assistance in remedying the Securities and Exchange Commission's near-total refusal to participate in discovery. CVP, for its part, has already produced to the SEC 29,437 pages of documents—on top of the 538,277 pages produced during the SEC's three-year investigation. The SEC, aside from providing parts of its investigative file to the defense (which in significant part consists of CVP's own documents), has produced just 65 pages (13 documents) in response to CVP's requests. And after months of meet and confers, the SEC—after saying over and over again that it would respond "soon"—continues obfuscating *whether* it will produce documents at all, let alone what documents and by when. Given the agency's near-total refusal to respond to CVP's discovery requests and its months-long attempt to delay CVP's fact-discovery efforts, CVP must turn to this Court and ask it to compel the Commission to respond to CVP's discovery requests—including by producing responsive documents—within 20 days.

## BACKGROUND

### A. The SEC Seeks To Effect A Transformative Expansion In Its Authority.

This case is part of a broader effort by the Commission—or, at the very least, a bare majority of the Commission—to effect a transformative expansion in the agency's regulatory authority. In what appears to be a series of 3-2 votes,[1] the Commission has begun filing lawsuits against convertible-note lenders, such as CVP. Convertible-note lending has been around for decades. In a convertible-lending transaction, undertaken pursuant to SEC Rule 144, 17 C.F.R. § 230.144(d)(3)(ii), the lender loans money to a publicly traded company in exchange for a convertible note. The borrower agrees to repay the loan in cash or to satisfy the debt by converting the debt into shares of the borrower and transferring those shares to the lender. As the Commission's rules have explicitly authorized for years, the lender may "resell" the shares to "recoup [its] capital." *Revision of Holding Period Requirements in Rules 144 and 145*, 62 Fed. Reg. 9242, 9244 (Feb. 28, 1997); *accord Rule 144 Holding Period and Form 144 Filings*, 86 Fed. Reg. 5063, 5066-67 (Jan. 19, 2021) (explaining that this is permissible "under Rule 144's current formulation"). The Commission's theory in this case is that, nevertheless, every convertible-note lender in the United States has been violating federal law for years—presumably since the Exchange Act's adoption—without anyone having noticed. Until now, many years later. According to the Commission in this case, every convertible-note lender is actually a "dealer" required to register with the Commission.

The Commission's theory represents a radical expansion in the agency's authority. As traditionally understood, "brokers" and "dealers" (often combined in the term "broker-dealer") are

---

[1] *See Commission Votes for District Court Actions* (2022), https://www.sec.gov/about/commission-votes/annual/commission-votes-inj-2022.xml (recording dissents, in the Crown Bridge Partners matter, of Commissioners Peirce and Uyeda).

in the business of effecting securities transactions *for customers*. At the time the Exchange Act was enacted, as today, a "broker" would buy and sell securities "for" the customer, as an "agent," whereas a "dealer" would buy and sell securities "from" and "to" the customer, as a merchant, at arm's length. SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936). In ordinary parlance, this distinction between brokers and dealers was expressed in terms of whose "account" facilitated the customer's order. A broker, acting as an agent, would be said to trade "for the account of the customer." *Id.* As the standard trade confirmation of the day put it, "We have this day bought (or sold) *for your account* and risk." *Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (1935) (emphasis added). A dealer, in contrast, would be said to effectuate the customer's order by taking the opposite side in "his own account." *Id.* When a customer wanted to sell, for example, a dealer would effectuate the sale by "buy[ing] from [the] customer . . . for [the dealer's] own account." C.H. Meyer, *Law of Stock Brokers and Stock Exchanges* § 43-a, at 34 (1933).

When Congress adopted the "other's account" versus "own account" distinction in the Exchange Act—defining "broker" as "the business" of effecting transactions "for the account of others," 15 U.S.C. § 78c(a)(4)(A), and "dealer" as "the business" of "buying and selling" for one's "own account," *id.* § 78c(a)(5)(A)—Congress adopted the established, idiomatic meaning of these phrases: when juxtaposed against one another, trading for the "account of others" and one's "own account" referred to the account used to facilitate customer orders.

This is not some ancient, esoteric technicality. Literally to this day every broker-dealer is required by law to inform its customers whether it "act[ed] [as an] agent, on [the customer's] behalf" (as a "broker"), *or* whether it traded "directly" with the customer "as an opposite party" using it "own account" (as a "dealer"). *How to Read Confirmation Statements* (2012),

3

https://www.sec.gov/files/ib_confirmations.pdf; *see also* 15 U.S.C. § 78k(d); 17 C.F.R. § 240.10b-10(a)(2).

The Commission in this case claims that the phrase "own account" can be wrenched from this customer-order facilitation context and read hyperliterally—that buying and selling securities for one's "own account" means *literally* buying and selling securities for one's "own account." *See, e.g.*, Dkt. 27 at 12 (pressing the "literal meaning"). So, the Commission asserts, when CVP loans money to a public company, it "buys" a security (a note), and, then, if the note is repaid in stock, it "sells" another security (the stock). And it does so for its "own account." Thus, the Commission says, CVP is in the business of buying and selling securities for its "own account," and is therefore a "dealer"—even though CVP has never effectuated any customer order ever.

CVP raises three main defenses in its answer (Dkt. 36), none of them relating to the facts of CVP's lending activities, which are not in dispute. *First*, the Commission's reading of the Exchange Act is patently wrong. *Second*, the Commission's enforcement action violates fundamental principles of fair notice. Given the extensive regulatory history concerning convertible-note lending (not to mention the definition of "dealer"), no reasonable person would have known—indeed, no one ever has known—that convertible-note lending was supposedly "dealing." *Third*, the Commission's claims are barred by the equal protection component of the Fifth Amendment. The Commission's theory—that any person who "buys and sells securities" as "part of a regular business" must register as a "dealer"—would apply to every hedge fund, investment company, and family office in the country. But the Commission has arbitrarily and irrationally sought to retroactively enforce this new theory against only a single, disfavored industry.

**B.     The SEC Refuses To Participate In Discovery.**

To support its case, CVP served the Commission with three sets of discovery requests on

4

April 11, 2022, consisting of requests for documents (Richman Declaration Exhibit A), interrogatories (Exhibit B), and requests for admission (Exhibit C). The Commission's responses were due on May 11, 2022, but the Commission requested—and CVP agreed—to extend the Commission's deadline for most of the requests by a month and a half, until the end of June.

When the Commission did respond, it refused to provide virtually any information. The most common rote response to CVP's requests for documents reads: "The SEC will not produce the requested materials and will not search for information responsive to the Request." *See* SEC Responses to Document Requests (Exhibit D) Nos. 7, 9, 11, 18, 19, 20, 21, 22, 23, 27, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 47, 48, 49, 50, 51, 53, 54, 55, 56, 57, 58. The Commission, likewise, failed to adequately answer CVP's interrogatories. *See* SEC Responses to Interrogatories (Exhibit E). And it casually refused to answer most of CVP's requests for admission, at least 53 of them, asserting that responding to even the most basic items—such as the simple question whether hedge funds buy and sell securities—would "not [be] proportional to the needs of the case." *See* SEC Responses to Requests for Admission (Exhibit F) Nos. 6, 7, 8, 9, 10, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 122, 123, 124, 125, 126, 127, 128, 129, 134, 135, 136, 137, 146, 147, 148.

Over the next three months, CVP sent multiple letters to the Commission documenting the agency's patently inadequate discovery responses, *see* Exhibits G, H, and participated in several telephonic meets and confers (on July 19, August 18, August 25, and September 8, 2022). In each of the discussions, counsel for the Commission claimed that they would reevaluate their responses and provide answers "soon." On August 25, CVP told the Commission that the end of discovery (scheduled for December 16, 2022) was approaching, and that CVP expected the Commission to respond to CVP's requests by the next meet and confer (scheduled for September 8) or, by that

5

date, provide firm dates, in the immediate future, by when the Commission would respond. The Commission did not. Instead, at the September 8 meet and confer, the Commission again claimed that responses might be coming "soon," but was unable to commit the agency to respond to any particular request—only that the Commission was evaluating a number of requests and might respond to some of them "fairly soon."

The Commission eventually served limited amended responses on September 16, *see* Exhibits I, J, but has otherwise continued to fail to respond to the vast majority of CVP's discovery requests—necessitating this motion. On October 7, 2022—the day CVP intended to file this motion—the Commission filed an amended response to CVP's document requests. *See* Exhibit K. In that response, the Commission agreed to produce a limited subset of documents in response to just two of the requests that are subject to this motion, but *still* failed to make any actual productions, or even identify by when it would produce documents.

## ARGUMENT

The Commission "voluntarily initiate[d] [this] action" and "[l]ike any other litigant," it must "abide by the Federal Rules of Civil Procedure." *SEC v. Collins & Aikman Corp.*, 256 F.R.D. 403, 414 (S.D.N.Y. 2009). Rule 26(a) allows "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). CVP is entitled to such discovery to defend itself, and the Court should compel the Commission to provide it.

### A. The Court Should Compel The SEC To Respond To Discovery Requests Concerning CVP's Defenses.

The Commission is withholding numerous categories of information that are plainly relevant to CVP's defenses.

***First***, **the Commission is withholding information that will show that no reasonable**

6

**person would have known—and, indeed, no one ever *did* know—that convertible-lending was "dealing."** This fact cuts against the plausibility of the SEC's newly-discovered statutory theory. *See, e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012); *Dong Yi v. Sterling Collision Cents.*, 480 F.3d 505, 510-11 (7th Cir. 2007). It supports CVP's "fair notice" defense—that no reasonable person would have (or ever did) read the Exchange Act the way the Commission now proposes. It adds context to the equal-protection violation the Commission is committing—it's prosecuting one group of defendants (convertible-note lenders), but irrationally and arbitrarily ignoring every hedge fund, investment company, and family office. And it gets to CVP's good faith—an important part of any remedies analysis; if no one else knew that the Exchange Act swept as broadly as the Commission now insists, it was reasonable for CVP to operate under the same understanding. Each of the below categories of information goes to this issue—each shows that no reasonable person would have known (or did know) about the SEC's new theory.

CVP first served narrow requests to establish that no convertible-note lender has *ever* registered as a "dealer." The Commission has over the years brought a number of other types of non-dealer-related enforcement actions concerning convertible notes and, in a pending rulemaking, purports to have studied the convertible-lending industry and even compiled a list of transactions. CVP sought documents sufficient to identify the convertible-note lenders in those enforcement actions for which the lender is not identified in the SEC's filings (**Requests for Documents Nos. 54-57**) and in the Commission's study (**Request for Document No. 27**), and asked the Commission to identify any other convertible-note lenders it was aware of (**Interrogatory No. 1**). This information would allow CVP to check the registration status of those entities to show that no one

7

in this industry has ever registered as a "dealer." The Commission has not answered these demonstrably relevant questions.

CVP next sought to establish that not only has no convertible-note lender ever registered as a "dealer," but also that the Commission itself has closely regulated this industry for years, and that throughout this time, no one at the Commission ever raised the "dealer" issue. For example, in 2007, the Commission created a special screening process for disclosures concerning convertible notes. As part of that process, the Division of Corporation Finance corresponded with public companies about their convertible-note transactions—correspondence that explicitly acknowledges that convertible-note lenders were not registered as dealers. CVP sought information about the Commission's screening process (**Request for Documents No. 41**), on the ground that if the Commission's own personnel didn't believe for years that convertible-note lenders were supposedly "dealers," an ordinary person wouldn't know that either. The Commission, again, has not provided any information.

CVP also sought the Commission's communications with third-parties about the "dealer" registration issue (**Requests for Documents Nos. 28-32, 38**) to show that no one in the market, including the Commission's personnel, was aware of the theory the Commission presses today, and that the Commission is using its theory as a pretext to target a single, disfavored industry. CVP knows that the Commission is withholding relevant communications because CVP has a number of highly relevant communications that the Commission should have produced, but did not. For example, CVP is aware of individuals—including an inhouse lawyer for a broker-dealer—who, after the Commission filed its first "dealer" case, immediately reached out to the Divisions of Examinations and Trading and Markets, and others, for guidance on how to comply with the unexpected *change* in the law the Commission's enforcement theory represented. *See,*

8

*e.g.*, Exhibits L, M. CVP is also aware that the Commission's lawyers have been communicating with private plaintiffs' lawyers about convertible-note cases; the plaintiffs' lawyers brag about this collaboration on podcasts and have filed a number of copy-cat suits based on the Commission's complaints. In total, the Commission has produced just thirteen documents in response to these requests. With the exception of three documents that CVP itself told the Commission about (as examples of documents the Commission failed to produce), the Commission's production consisted in its entirety of communications with a single SEC lawyer. As for communications with *other* SEC personnel, the Commission's counsel refused to produce them, stating that those other individuals "don't want to produce [their] documents."[2]

CVP further sought to establish, not only that the Commission has known about convertible-note lending for years, and never mentioned the "dealer" issue, but also that the Commission has known about *CVP's* business for years, and never mentioned the "dealer" issue. The Commission denied this at the motion to dismiss stage, asserting the Commission was not "on notice" of CVP's trading activity simply because a "particular convertible note" was "fully disclosed" to the Commission. Dkt. 27 at 22. But, in reality, CVP's transactions have been disclosed to the

---

[2] On October 7, 2022, six months after the document requests were served, the SEC agreed to partially respond to Requests for Documents Nos. 32 and 38. *See* Exhibit K. Request No. 32 seeks what are easily obtainable communications between the public and the Division of Trading and Markets concerning the broker-dealer registration requirements. Although the Commission has now agreed to produce *some* responsive documents, the Commission has still not actually produced any—months after being served with the request.

The Commission also agreed to respond to Request No. 38, but the Commission has not only failed to produce the documents, its response is facially inadequate. Request No. 38 seeks: (1) documents concerning a telephone call between private lawyers and certain SEC staff to discuss the change in the Commission's interpretation of the word "dealer"; (2) communications between the Division of Trading and Markets and specific broker-dealers who have served CVP; and (3) communications between the Division of Examinations and specific broker-dealers who have served CVP. The Commission agreed to produce documents "stored in a non-legacy database … maintained by Trading and Markets' Office of Interpretation and Guidance." That is not responsive to (1) or (3) and only partially responsive to (2).

Commission on numerous of occasions. CVP now seeks documents concerning those disclosures (**Requests for Documents Nos. 45-47**). Indeed, CVP has identified specific examples of Commission personnel corresponding with public companies *about* CVP's trading activity (**Request for Document No. 44**) without mentioning the "dealer" issue. The Commission has not produced a single document in response to these requests.

CVP additionally sought to establish that the SEC's own Commissioners did not embrace the legal theory that the agency now presses against CVP. For example, in one speech, Chairman Gensler acknowledged that the Commission has been aware since at least 2015 that certain firms were in the "regular business and buying and selling Treasury securities," but were *not* registered as dealers. Mr. Gensler further acknowledged that the Commission would need to take affirmative action to "clos[e]" what he called the "regulatory gap" and "requir[e]" such firms to register as "dealers." These statements strongly imply that Mr. Gensler himself believed that "buying and selling securities" as part of a "regular business" was, in and of itself, insufficient to render a person a "dealer," and that the law would need to be changed to bring about that result. There are numerous examples of similar statements, and CVP seeks internal Commission communications concerning the Chairman's and other Commissioners' statements (**Requests for Documents Nos. 19-22**), as those communications could be valuable impeachment and rebuttal evidence. The court in *SEC v. Ripple Labs, Inc.*, 2022 WL 4584111 (S.D.N.Y. Sept. 29, 2022), recently ordered the Commission to produce these exact type of communications. In this case, however, the Commission has refused to respond to these requests.

Finally, CVP sought to establish the near-tautological proposition that market participants rely on SEC interpretive, no-action, and exemptive correspondence in assessing the application of the federal securities laws. This is important because decades of Commission guidance show that

10

CVP and other convertible-note lenders are not dealers, and CVP reasonably relied on that guidance. CVP tried to obviate the need for a document request by asking the Commission simply to admit that market participants rely on SEC guidance (Request for Admission No. 1), but the Commission claimed that it doesn't know. So CVP now seeks the comment file in the rulemaking in which the Commission provided for the publication of its guidance documents (**Request for Documents No. 58**)—a comment file that, CVP has reason to believe, contains scores of letters informing the Commission that market participants rely on Commission guidance. The Commission has refused to produce this file.

*Second*, **the Commission is withholding information on CVP's duly pled structural constitutional defenses.** As CVP has explained elsewhere, the Commission lacked authority to file this enforcement action, as the commissioners who authorized it were unconstitutionally insulated from presidential control. The Supreme Court in *Collins v. Yellen*, 141 S. Ct. 1761 (2020), held that the appropriate remedy for an improperly insulated executive officer turns on whether the President might have wanted to replace the officer but for the unconstitutional insulation from presidential control. *Id.* at 1788. The Commission refuses to produce any documents on this issue (**Request for Documents No. 34-35**). The Court should order the Commission to respond to CVP's requests.

In addition, as CVP has also explained elsewhere, the Commission seeks to compel CVP to join the Securities Investor Protection Corporation, a government entity whose leadership was not appointed in conformity with the Appointments Clause. The Commission argued, at the motion to dismiss stage, that the President of SIPC was a "lesser functionary," not an officer, so the Appointments Clause did not apply to her. CVP now seeks to test that assertion. CVP has requested the SEC's communications with SIPC's President and documents concerning her level of

responsibility (**Requests for Documents Nos. 36-37**). But the Commission now refuses to produce such information. The Court should order the Commission to fully respond. In fact, the Commission refuses even to admit that SIPC's president was not appointed pursuant to the Appointments Clause (**Request for Admission No. 89**). Whether she *needs* to be appointed pursuant to the Clause is one question, but no one can think that she actually *was*. The Commission's claim that it doesn't know how SIPC's President was appointed is absurd. SIPC's bylaws, which provide for the method of SIPC's President's appointment, are, as a matter of federal law, filed with and subject to approval *by the Commission*. *See* Securities Investor Protection Act of 1970, Pub. L. No. 91-598, § 3(e)(1), 84 Stat. 1636, 1639; 15 U.S.C. § 78ccc(e)(1). The Commission cannot just avoid an inconvenient admission by feigning ignorance. The Court should deem Request for Admission No. 89 admitted. *See* Fed. R. Civ. P. 36(a)(6).

      **B.**      **The Court Should Compel The SEC To Respond To Discovery Requests Concerning Its Own Allegations.**

In addition to seeking documents to support its defenses, CVP sought documents concerning specific allegations in the Commission's complaint. In its complaint, the Commission alleged that selling "newly-issued shares" or earning a "spread" are "common attribute[s] of a securities dealer," but the Commission has not produced *any* documents to support those claims (**Requests for Documents No. 25-26**). The Court should order the Commission to respond. If the Commission's claims are false (they are), the Commission must say so and withdraw them—but if the Commission believes they are true and wants to continue to assert that, say, selling "newly-issued shares" is a "common attribute of a securities dealer," the Commission must produce the documents that support that assertion.

In its complaint, the Commission also alleged that CVP, by not registering as a "dealer," avoided "inspection by the SEC and FINRA to ensure that [it] comp[lied] with the securities laws."

But the Commission now refuses to state what an inspector would actually do *at a convertible-note lender*, such as CVP, which has no customers (**Interrogatory No. 5**). If the answer is "nothing," because no convertible-note lender in the history of the United States has ever registered as a "dealer," and because no "dealer" regulations even conceivably apply to the convertible-lending business, the Commission must actually say that. It can't just say that an inspector "vistit[s] the physical premises" and call it a day. The Court should order the Commission to answer the question that was actually asked—what, *specifically*, would the Commission's inspector do at a convertible-note lender?

      **C.**    **The Court Should Compel The SEC To Respond To Discovery Requests Concerning Other Relevant Matters.**

Lastly, the Court should compel the Commission to produce prior versions of the Commission's "Guide to Broker-Dealer Registration" (**Request for Documents No. 33**), which will show how the Commission itself guided market participants in assessing who "may need to register as a dealer."

## CONCLUSION

For the above reasons, CVP respectfully moves for an order: (1) compelling the Commission to produce all documents responsive to Requests for Documents Nos. 19-22, 25-26, 27, 28-32, 33, 34-35, 36-37, 38, 41, 44, 45-47, 54-57, and 58; (2) compelling the Commission to fully respond to Interrogatories Nos. 1 and 5; and (3) deeming Request for Admission No. 89 admitted. Discovery in federal court litigation is a two-way street. Government agencies are not exempt from the requirements of the Federal Rules of Civil Procedure. The Commission initiated this litigation and is now required to participate fairly and fully in discovery. The Court should order the Commission to produce all responsive information within 20 days and, at that time, to serve

CVP with a detailed description of the steps the Commission took to identify responsive information.

### STATEMENT OF COMPLIANCE WITH LOCAL RULE 37.2

Counsel for Defendants, Barry Goldsmith, M. Jonathan Seibald, and Brian A. Richman, telephonically conferred with counsel for the Securities and Exchange Commission, Eric M. Phillips and Jaclyn J. Janssen, on July 19, 2022 at 11:00 am ET, August 18, 2022 at 4:30 pm ET, August 25, 2022 at 10:30 am ET, and September 8, 2022 at 11:30 am ET, in a good-faith effort to resolve the differences raised in this motion but were unable to reach an accord. In a further effort to reach an accord, counsel for Defendants sent counsel for the Commission detailed letters documenting the Commission's inadequate discovery responses. *See* Exhibits G, H.

Dated: October 7, 2022

Respectfully submitted,

/s/ Helgi C. Walker

Helgi C. Walker*
Brian A. Richman*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
hwalker@gibsondunn.com
brichman@gibsondunn.com

Michael J. Diver
Elliott M. Bacon
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200
michael.diver@katten.com
elliott.bacon@katten.com

Barry Goldsmith*
M. Jonathan Seibald*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2440
bgoldsmith@gibsondunn.com
jseibald@gibsondunn.com

---

* *pro hac vice*

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 7th day of October, 2022, I electronically filed a copy of the foregoing Motion To Compel Discovery through the Court's CM/ECF System, which will send notifications of the filing to all counsel of record.

                                                                                              */s/ Helgi C. Walker*