**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>   v.<br><br>JOHN M. FIFE, CHICAGO VENTURE PARTNERS, L.P., ILIAD RESEARCH AND TRADING, L.P., ST. GEORGE INVESTMENTS LLC, TONAQUINT, INC., and TYPENEX CO-INVESTMENT, LLC,<br><br>               Defendants. | Case No. 1:20-cv-05227<br><br>Judge Nancy L. Maldonado<br><br>Magistrate Judge Heather K. McShain |

**DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION TO COMPEL DISCOVERY**

| | |
|---|---|
| Michael J. Diver<br>Elliott M. Bacon<br>KATTEN MUCHIN ROSENMAN LLP<br>525 West Monroe Street<br>Chicago, IL 60661<br>(312) 902-5200 | Helgi C. Walker*<br>Brian A. Richman*<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, DC 20036-5306<br>(202) 955-8500<br><br>Barry Goldsmith*<br>M. Jonathan Seibald*<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>(212) 351-4000 |

*Attorneys for Defendants*

_____

\* *pro hac vice*

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 3

    A.    The Parties Disagree About The Meaning Of The Exchange Act, Not CVP's Trading Activity. ............................................................................... 3

    B.    The Parties Take Different Approaches To Discovery. ......................................... 7

        1.    CVP Promptly Produces Tens Of Thousands Of Pages Of Transaction Documents And Trading and Financial Records. .................. 7

        2.    The SEC Refuses To Produce Virtually Anything, Suggesting the Discovery Rules Apply Differently To The Agency. ................................ 8

ARGUMENT ........................................................................................................................ 11

    A.    The SEC Does Not Need An Additional 1,000,000-Plus Pages Of Emails And Attachments To Prove Undisputed Facts. ..................................................... 11

    B.    The SEC Cannot Reasonably Expect CVP To "Admit" The Results Of Complex Calculations For Which Neither CVP Nor The SEC Know The Answer. ................................................................................................................ 13

CONCLUSION ..................................................................................................................... 15

**INTRODUCTION**

Chicago Venture Partners and the other defendants (collectively, "CVP") loaned money to publicly traded companies in exchange for convertible notes. As the SEC's rules have explicitly authorized for years, the notes allowed the borrowers to repay the notes in cash or to satisfy the debt by converting the debt into shares and transferring those shares to CVP—shares that CVP may (and often did) resell. This is all perfectly legal "under Rule 144's current formulation." *Rule 144 Holding Period*, 86 Fed. Reg. 5063, 5066-67 (Jan. 19, 2021). And, aside from the SEC's new "everyone is required to register as a dealer" theory, the agency does not identify *any* regulation (for dealers or non-dealers) that would alter the terms of these transactions in any way—transactions that for decades the SEC has encouraged as a way of facilitating access to capital for small public companies. CVP admits the full scope of its convertible-lending activity. And it has already produced to the SEC transaction records *for every single one of these transactions*, and, at the SEC's request (and at significant expense), has produced 445,969 pages of emails and attachments concerning a sample of transactions selected by the SEC itself.

The SEC does not need a million-plus pages of *additional* emails and attachments to prove a set of facts that nobody disputes. The SEC cannot rationally explain *why*, given what it already has, it needs an additional million-plus pages of documents. The SEC says that it needs the emails to "show" the "jury" "that Defendants bought and sold securities on a near-constant basis"—but, respectfully, that is hard to believe. SEC Mot. (Dkt. 50) at 11. As noted, the SEC already has *all* of CVP's transaction documents that document each of these transactions and *thousands* of emails relating to them. The SEC cites examples in its brief. *See id.* at 10. The SEC cannot seriously contend that the agency plans to show the jury thousands of *additional* examples like: "You are approved to sell the following regular way today," Dkt. 50-5, at CVP0163787, *cited at* Mot. 10—all to prove that CVP engaged in the exact transactions CVP *admits* it engaged in.

1

The SEC, to justify its motion, tries to create the impression that there's actually some fact dispute here, Mot. 12—but there is not. In the SEC's complaint, and throughout discovery, the agency has tried to smuggle the disputed statutory language into requests and allegations, but, as CVP has "repeatedly explained, the dispute in this case is about what the statutory language means." Declaration of M. Jonathan Seibald Ex. 3, at 1. The language does not mean what the SEC claims; so, naturally, CVP has denied the requests that incorporate that language verbatim. At the same time, however, CVP has offered to admit any actual, discernable fact the SEC thinks relevant to its case, including that CVP "sold securities," "bought securities," and communicated with others "at whatever level of frequency the Commission deems" relevant. *See id.* Ex. 2, at 2-3. And far from "refus[ing] to produce" emails, Mot. 3, CVP repeatedly told the SEC that if there's some fact that CVP has not yet admitted, and for which the SEC does not *already* have scores of emails reflecting, CVP will "work[ ] with [the SEC] on crafting reasonable and proportional email search criteria." Seibald Decl. Ex. 3, at 2. The SEC refuses to respond to CVP's offer.

This is not a matter of keeping "email evidence" from the SEC, Mot. 12—the SEC already has hundreds of thousands of pages of emails and attachments concerning a sample of transactions the SEC itself selected. This is, rather, a matter of imposing reasonable limits on the SEC's demands. The SEC does not—and cannot—explain how it is proportional to the needs of this case to force CVP to review and produce *all* "emails between [CVP] and third-parties" and *all* internal emails involving the principal of CVP relating to convertible loans, Mot. 8, when the scope of CVP's trading activity is undisputed, CVP has already produced nearly a half-million pages of emails and attachments on these exact issues (in a sample selected by the SEC), *and* CVP does not dispute the facts the SEC seeks to establish through such a massive additional email review. The SEC's motion to compel the production of additional emails should be denied.

The SEC's other request—to compel additional responses to the SEC's irrelevant requests for admission—should also be denied. In over 100 variations of the same request, the SEC asked each defendant to admit, for each "calendar year," that its "principal business"—"as measured by net profits," "gross proceeds," or "total employees hours worked"—was buying convertible notes, and selling the converted shares. As CVP explained to the SEC, however, these answers are not reasonably ascertainable. CVP admitted that it engaged in the described transactions, and has produced transactions documents for *every* such transaction. But CVP operates through a number of entities, which all perform various activities, most of which have nothing to do with the convertible-loan activities that are the subject matter of this case.

Yes, they bought convertible notes, but they also traded regular common stock, invested in real estate, purchased royalty interests, and managed operating companies that engaged in oil and gas services, construction, and manufacturing, high-precision machining, and laser cutting in the medical device industry. The SEC does not explain how it expects CVP to aggregate all of the cash flows from these activities, value the non-cash-based activities (such as stock conversions), factor in the depreciation of assets (occurring over multiple years), somehow divvy up CVP's fixed costs and employee hours (which are not even tracked), and then deduce whether the "principal" activity, whatever that even means, involves convertible notes. CVP does not presently know how to answer these questions, and doubts the SEC does either. *Accurate* answers to the SEC's questions would require complex (and surely disputed) calculations and modeling from economic and accounting experts. There is nothing further reasonably to compel.

## BACKGROUND

**A.    The Parties Disagree About The Meaning Of The Exchange Act, Not CVP's Trading Activity.**

The SEC's case turns on a legal question of statutory interpretation—what is a "dealer"—

3

not a question of fact. The parties read the statute very differently; that is not a discovery dispute.

    **1.** CVP's reading is grounded in text and history. The Exchange Act, enacted in 1934, defined "broker" and "dealer" in back-to-back sentences, in parallel terms:

> (4) The term "broker" means any person engaged in the business of effecting transactions in securities for the account of others ….
>
> (5) The term "dealer" means any person engaged in the business of buying and selling securities for his own account … but does not include … any person insofar as he buys and sells securities for his own account … but not as part of a regular business.

Securities Exchange Act of 1934, ch. 404, § 3(a)(4), (5), 48 Stat. 881, 883. These definitions are still in effect today. *See* 15 U.S.C. § 78c(a)(4) (broker), (5) (dealer).

    Pursuant to the usual rules of statutory interpretation, CVP seeks to read the above words "in their context," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014), and with a view to their ordinary meaning "at the time of the Act's adoption," *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). On that score, there is no doubt. In 1934, as today, the functions of "broker" and "dealer" were merged in single entities—"broker-dealers"—that executed customer orders. *E.g.*, *Duker & Duker*, 1939 WL 36426, at *3 n.6 (SEC Dec. 19, 1939) (recognizing the "intimate relationship between customers and brokers and dealers"). The two functions—"broker," "dealer"— referred to the two different ways of doing the same thing: effectuating customer orders. A "broker" would trade "for" the customer, as an "agent," whereas a "dealer" would trade "from" and "to" the customer, as a merchant, at arm's length. SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936) ("SEC Report 1936"). As CVP's motion to compel explains (Dkt. 42, at 2-4), in ordinary parlance, this distinction between brokers and dealers was expressed in terms of whose "account" facilitated the customer's order. A broker, acting as an agent, would trade "*for the account* of the customer," whereas a dealer, acting as a principal, would take the opposite side of the customer's order in "his

[the dealer's] own account." *SEC Report 1936*, at XIV. The Exchange Act uses the "own account," "other's account" distinction in this exact way elsewhere—*e.g.*, requiring broker-dealers to "disclose[ ] to [their] customer[s] in writing" whether they are "acting as a dealer for [their] *own account*" or "as a broker for [the] customer." § 11(d)(2), 48 Stat. at 892 (emphasis added).

The evidence of this contemporaneous, widely-understood meaning of "own account," "other's account" is overwhelming. Prominent treatises of the time are replete with references to these phrases that could *only* be read as distinguishing the method by which broker-dealers effectuated customer orders. Charles Hodges' *Wall Street* (1930) treatise differentiated brokers and dealers as follows: "A dealer sells to and buys from a client whereas a broker buys and sells for the account of a client." *Id.* at 361. Charles Meyer's *Law of Stockbrokers and Stock Exchanges* (Cum. Supp. 1933), treatise similarly explained that a "broker" is the "agent" of "his customer"; he trades for the "*account* and risk" of the customer. *Id.* at 32, 34 (emphasis added). What "distinguishe[s]" the "*dealer* … from a *broker*" is the dealer "sells to his customers … securities which he has purchased *for his own account* elsewhere," or "buys from his customer securities *for his own account* with a view to disposing them elsewhere." *Id.* at 32-33 (emphases added).

The SEC itself spoke this way. In a report by James Landis, the SEC's founding father, and then-Commissioner (future-Justice) William O. Douglas, the SEC explained that the "characteristic activities of a dealer" are that he "sells securities to his customer which he has purchased … elsewhere or buys securities from his customer with a view of disposing of them elsewhere." *SEC Report 1936*, at XIV. "In any such transaction," the dealer "acts *for his own account* and not as agent for the customer." *Id.* (emphasis added). A "broker," "[o]n the other hand," "is the agent of his customer"; the broker's transaction "is solely for the account of the customer." *Id.*

In each of the above examples, "account" distinguishes the way in which the broker or

5

dealer effectuates customer orders.[1] CVP's argument is simple: CVP is not a broker or dealer because it does not effectuate customer securities orders; it does not use its "own account" to take the oppose side of a customer order. In the words of the then-Director of Market Regulation, CVP is not a dealer because it does not provide "services to investors." Testimony of Director Lindsey, Div. of Market Regulation, 1998 WL 781102, at *2 n.2 (Oct. 1, 1998).

**2.** The SEC in this case offers an entirely different reading of the Act. With no mention of context or history, the SEC argues that the "dealer" definition must be read hyperliterally. Literally anyone who "conduct[s] a regular business of buying and selling securities for [his] own account[ ]" is, according to this theory, a "dealer." Mot. 9. Thus, as applied here, the SEC alleges that CVP is a dealer because it bought securities (*i.e.*, loaned money to public companies in exchange for convertible notes) and sold securities (*i.e.*, sold common stock that it received as repayment on some notes). And CVP, the SEC points out, did all of this as part of a business. So automatically, the SEC says, CVP is now a "dealer."

As an initial matter, not even the SEC seems to take this theory seriously. To defense counsel's knowledge, no convertible-note lender has *ever* registered as a "dealer," despite decades

---

[1] The SEC has no real answer. At the motion to dismiss stage, the best the SEC could do was doctor a historical quotation. Below is the actual, full quote from a 1933 treatise; the bolded, underscored text is the extremely misleading "quotation" the SEC stitched together (at Dkt. 27, at 15), and the rest is what it left out. The actual text says *exactly* what CVP says—that a "dealer" uses his "own account" to facilitate customer orders:

> [T]he broker does not himself sell to or buy from the customer, but acts as the customer's representative in making a purchase from or a sale to a third party.

> However, there is nothing in the law which prevents **a person** from **engaging in the business of buying and selling securities for his own account as principal**. Such a person **is a security *dealer*** as distinguished from a *broker*. His rights and duties have been before the courts for adjudication repeatedly. He sells to his customers … securities which he has purchased for his own account elsewhere, or buys from his customers securities for his own account with a view of disposing of them elsewhere[.]

Meyer, *supra*, at 32-33 (bold, underscore added).

of SEC scrutiny. Moreover, if "conduct[ing] a regular business of buying and selling securities for [one's] own account[ ]," Mot. 9—read in the hyperliteral sense the SEC presses here—actually made someone a dealer, then every hedge fund, investment company, family office, and venture capital fund in the United States has been operating unlawfully for decades, because none of these entities are registered as dealers. The SEC has nothing to say about this. When asked in discovery, for example, to identify the "business activities of hedge funds, principal trading firms, and high-frequency traders that do *not* involve the purchase and sale of securities for their own accounts"— as the SEC interprets those words—the SEC was unable to answer: the SEC "lacks knowledge sufficient to answer this interrogatory." Seibald Decl. Ex. 6 (response to Interrogatory No. 8).

Nevertheless, the SEC continues to press its theory against CVP.

**B.     The Parties Take Different Approaches To Discovery.**

In discovery, the parties have taken different tacks. CVP immediately began collecting documents, and produced to the SEC tens of thousands of pages of transaction documents and trading records. The SEC, in contrast, refused to produce virtually any documents to CVP, refused to admit virtually anything, no matter how obviously true, and then moved to compel CVP to review and produce more than a million pages of emails and attachments on issues that are not disputed and for which the SEC already has 445,969 pages of emails and attachments anyway.

**1.     CVP Promptly Produces Tens Of Thousands Of Pages Of Transaction Documents And Trading and Financial Records.**

Because CVP has nothing to hide—and because the SEC's reading of the Exchange Act is so clearly wrong—CVP has no interest in fighting about any of the (irrelevant) facts the SEC seeks to establish. So CVP diligently worked to produce to the SEC everything CVP reasonably could. Since the opening of fact discovery in March 2022 (Dkt. 37), CVP has produced 29,560 pages of documents. Seibald Decl. ¶ 4. This production includes transaction documents, and trading and

financial records for *all* of CVP's convertible-note deals. The SEC therefore already knows the full scope and magnitude of CVP's convertible note transactions.

CVP also produced to the SEC 445,969 pages of emails and attachments concerning CVP's convertible-note business. During the SEC's multi-year investigation, the SEC selected a sample of 65 public companies with whom CVP had executed a convertible-note transaction. *See* Seibald Decl. ¶ 3, Ex. 1. CVP then searched for and produced every email and attachment associated with those transactions—totaling 445,969 pages. This was an expensive, burdensome production.

        **2.**    **The SEC Refuses To Produce Virtually Anything, Suggesting the Discovery Rules Apply Differently To The Agency.**

**a.** The SEC did not similarly cooperate in discovery. As CVP documented in its motion to compel (Dkt. 42), the SEC has spent months refusing to produce virtually any information.

Recent events raise further questions about the SEC's conduct. Four days after CVP filed its motion to compel, the SEC hurriedly produced a few hundred documents reflecting public inquiries submitted to the Division of Trading and Market's Office of Interpretation and Guidance about broker-dealer registration. CVP, however, obtained a copy of what appears to be the same production produced to another party in a different case over a year ago. *See* Seibald Decl. ¶¶ 16-17. Both sets of documents are stamped with the date on which they were printed to PDF from the SEC's database—*and that date was in the summer of 2021*. *See, e.g.*, Seibald Decl. Ex. 4 ("6/24/2021"). It thus appears that the SEC has spent six months refusing to produce hundreds of relevant documents—the whole time claiming that the "burden of complying with the Request outweighs the benefit," Dkt. 42-5, at 25—*when the SEC had already collected and processed the documents ten months before it received CVP's discovery request*. It is hard to imagine how, in these circumstances, the SEC's "burden" objection was legitimate; and the circumstances raise the

8

further question of what, exactly, the SEC has been doing since it received CVP's requests, because the SEC clearly was not collecting *these* documents, as they had already been collected.

**b.** To the extent the SEC has participated in discovery, it has been with respect to the *SEC's* requests. But, unlike the SEC, CVP has cooperated at every step. CVP promptly produced *all* of the relevant transaction records. And to the extent CVP has disagreed with the SEC on the relevance of a request—for example, the defendants' tax returns—CVP has erred on the side of cooperation and just produced the documents anyway. *See* Seibald Decl. ¶ 4.

Contrary to the SEC's assertion, CVP has also attempted to cooperate on the SEC's email requests. These requests are extremely burdensome. The SEC demands *all* of CVP's "emails with third-parties concerning [CVP's] convertible note transactions," and *all* of CVP's principal's emails concerning those transactions. Mot. 10. Working with internal and external e-discovery specialists, CVP has searched the emails of three custodians for the words "convert*" or "conversion*," plus the ticker symbols or names of each borrower involved in a convertible-lending transaction. Seibald Decl. ¶¶ 7-8. Excluding documents already produced to the SEC, and limiting the results to just the emails of CVP's principal and the external emails of two more custodians, returns 135,784 emails and attachments. *Id.* ¶¶ 8-9. Based on the email volume and data size, and counsel's experience in e-discovery, counsel estimate that a review of these results would require well over 1,000 attorney hours and involve more than one million pages of documents. *Id.* ¶ 9.

CVP has raised its burden concerns with the SEC and offered alternatives. CVP, for example, explained to the SEC that the SEC, in its investigation, had already selected a large sample of CVP's transactions, and that CVP (at significant expense) had already searched, reviewed, and produced 445,969 pages of emails and attachments concerning those transactions. CVP urged the SEC to explain what *additional* information the SEC needed. CVP also wrote to the SEC, again

9

explaining CVP's legal theory and that CVP had no intention of disputing the SEC's (irrelevant) assertions about CVP's trading activity. Seibald Decl. Ex. 2. CVP further offered to admit every specific fact CVP could think of—for example, that CVP "operated a business," that CVP, as part of its business, "sold securities," that CVP, as part of its business, "bought securities," and that CVP communicated with third-parties about its business "at whatever level of frequency" the Commission wanted—"in lieu of the Commission continuing to seek additional[, irrelevant] email production." *Id.* at 2-3. And CVP asked the SEC to identify any other "facts or variations of [the admitted] facts … [that] the Commission would like [CVP] to admit to avoid additional costly, voluminous, and irrelevant email production." *Id.* at 3.

The SEC did not identify any such facts. Instead, the SEC copied and pasted the statutory language verbatim and demanded that CVP admit that it engages "in a regular business of buying and selling securities for its [own] account[ ]." Seibald Decl. Ex. 3, at 3. CVP explained (once again) that the disputed statutory language does not mean what (today's) SEC thinks, and that CVP would not concede the SEC's reading of the text. *Id.* at 1-2. CVP again reiterated that it *was* willing "to produce … emails" if there were actually some disputed fact the emails were relevant to, and thus asked the SEC to identify the "*facts* [that] [the SEC] believe[ed] [it] need[ed] to establish through the email review," and to work with CVP "on crafting reasonable and proportional email search criteria" to identify records relevant to those facts. *Id.* at 2.

The SEC never responded. Instead, after CVP filed its own motion to compel, the SEC filed this one, falsely claiming that CVP was refusing to "produc[e] any emails in this case." Mot. 11. *Cf.* Seibald Decl. Ex. 3, at 2 (telling the SEC, prior to its filing, that "[y]ou incorrectly claim … that we are unwilling to produce any emails beyond the more than 400,000 pages … Defendants have already produced. That is not so. If there is a fact we have not yet admitted, and will not

10

admit, that you seek to establish through the email review, we continue to remain open to working with you on crafting reasonable and proportional email search criteria. So, let us ask again: what *facts* do you … need to establish through the email review, which we have not already" admitted").

## ARGUMENT

### A. The SEC Does Not Need An Additional 1,000,000-Plus Pages Of Emails And Attachments To Prove Undisputed Facts.

The SEC does not—and cannot—explain how the "cost and burden" of "search[ing] for and producing" more than 1,000,000 pages of emails and attachments "is proportional here, given the extensive email search that [has already] be[en] done." *MiMedx Grp. v. Fox*, 2017 WL 11571038, at *1 (N.D. Ill. Nov. 15, 2017) (denying motion to compel). The SEC says that it "may use Defendants' emails to show, among other things, that Defendants bought and sold securities on a near-constant basis and that [the firm's principal] was regularly involved with these activities." Mot. 11. That, of course, could be said of every hedge fund on the planet. But, regardless, the "facts underlying" that argument "are already" with the SEC, "and the [SEC] [has] not adequately explained what *additional* discovery would yield." *United States v. NCR Corp.*, 2012 WL 4955304, at *2 (E.D. Wis. Oct. 17, 2012) (denying motion to compel). The SEC already has 445,969 pages of emails and attachments concerning CVP's transactions, *and* the primary-source document trading records, transaction documents, and other financial information for every one of CVP's transactions. The SEC does not explain what information the 445,970th page of emails and attachments would reveal that the first 445,969 pages of emails and attachments has not.

The SEC argues that CVP's production of 445,969 pages of emails and attachments does not reference "dozens of issuers" and does not include "any emails from 2018 to the present." Mot. 12. But the SEC does not explain why that matters. Sampling is frequently used in litigation. The SEC, in its investigation, selected a massive sample of CVP's transactions, and CVP then

11

produced all emails and attachments concerning those transactions. Seibald Decl. ¶ 3, Ex. 1. And, in any event, CVP has already produced transaction documents, trading records, and other financial information relating to *all* its convertible-debt transactions, including "from 2018 to the present." Mot. 12. The SEC fails to say what *new* information a further search would reveal.

The SEC asserts that "[t]he emails are relevant to the issue of whether Defendants conducted a regular business of buying and selling securities for their own accounts," Mot. 9, but, again, that's just a copy and paste of the disputed statutory language. The SEC does not identify to what actual *fact* underlying that legal conclusion the emails are relevant.

The SEC claims that an additional email review is needed to establish the "volume of Defendant's trading activity," that CVP "operat[ed] a website," that CVP's transactions "involved a 'substantial number of shares and money,'" and that CVP's trading was "recurrent." Mot. 10-12. But the SEC already knows all of that, because it already has the relevant primary-source transaction documents, trading records, and financial information, and, besides, the information is reflected in the first 445,969 pages of emails and attachments. The SEC also has a copy of CVP's website, which CVP admits it used, *see* Dkt. 36 ¶ 20—a fact that isn't even covered by the SEC's email request. The SEC simply cannot explain *why* a massive new email production is needed.

The SEC says that "emails would be particularly important in a jury trial," Mot. 11, but that claim is hard to take seriously. The "samples of emails" the SEC attaches to its motion are almost farcical. *Id.* at 10. Take the example of CVP "engag[ing] in large volumes of securities transactions," *id.*—an email to a registered broker-dealer stating: "You are approved to sell the following regular way today," Dkt. 50-5, at CVP0163787. The SEC cannot seriously be planning to show a jury hundreds of emails approving transactions—transactions CVP admits it engaged in and for which the SEC already has relevant transaction documents, trading records, and financial

12

information. And if the SEC really wants to show the jury hundreds of emails (and the Court allows that repetition), presumably by the 445,969th page, the jury will have gotten the point.

Lastly, the SEC argues that it has a right to present "evidence," Mot. 13, but no one is denying the SEC the ability to present evidence. The SEC already has hundreds of thousands of pages of documents. We seriously doubt that the SEC wants to waste everyone's time by going through each and every one of those pages to prove a set of facts that nobody disputes. The SEC should not be allowed to force CVP to spend thousands of attorney hours reviewing more than 1,000,000 pages of documents for no discernable purpose. Seibald Decl. ¶ 9.

### B. The SEC Cannot Reasonably Expect CVP To "Admit" The Results Of Complex Calculations For Which Neither CVP Nor The SEC Know The Answer.

The SEC slaps onto the end of its brief a request to compel further answers to the SEC's irrelevant requests for admission, Mot. 13-15, but that request, too, should be denied. In over 100 variations of the same request, the SEC asked each defendant to admit, for each "calendar year," that its "principal business"—"as measured by net profits," "gross proceeds," or "total employees hours worked"—was buying convertible notes, and selling the converted shares. Dkt. 50-4, at 3-210. But CVP explained in detail why it is not able to answer the requests. CVP engages in numerous activities. Yes, it bought convertible notes, but it also traded common stock, invested in real estate, purchased royalty interests, *e.g.*, *id.* at 29, and managed operating companies that engaged in oil and gas services, construction, *e.g.*, *id.* at 78, and manufacturing, high-precision machining, and laser cutting in the medical device industry, *e.g.*, *id.* at 53, among other activities.

In these circumstances, answering the SEC's questions is not possible, at least not without expert discovery and analysis. The SEC does not explain *how* CVP should aggregate all of the cash flows from these activities, value the non-cash-based activities (such as stock conversions), factor in the depreciation of assets (occurring over multiple years), divvy up CVP's fixed costs,

13

overhead, rent, and employee hours (which are not even tracked), somehow assign all of this to a particular legal entity in a particular year—what happens when a note is executed in year one, converted in year two, and the stock sold in year three—and then determine whether the "principal" activity, whatever that even means, involves convertible notes. This is not asking whether CVP "provided [its] facsimile numbers" to someone, *Sadowski v. Med1online, LLC*, 2008 WL 11343444, at *3 (N.D. Ill. Oct. 7, 2008) (cited at Mot. 15), or whether a person "performed work" on a certain date, *Cent. States SE & SE Areas PenFd v. John Clark Trucking & Rigging Co.*, 2007 WL 9817724, at *1 (N.D. Ill. Nov. 13, 2007) (cited at Mot. 15)—issues that could easily be answered by reviewing "documents … within the responding party's control," *Ruzhinskaya v. HealthPort Techs., LLC*, 2020 WL 1467391, at *2 (S.D.N.Y. Mar. 26, 2020). Here, the SEC asks CVP "to adopt expert conclusions … regarding how" various financial metrics should "be calculated," *id.* at *1—calculations that even the SEC doesn't seem to know how to do, *see* Mot. 14 (offering only "common sense"). These are not "proper[ ]" requests. 2020 WL 1467391, at *2.

Respectfully, the SEC's response is disingenuous. The SEC, feigning ignorance, claims that CVP "fail[ed] to explain how [it] [was] able to deny all of the even-numbered Requests to Admit … but [was] unable to give a direct answer to the odd-numbered Requests to Admit." Mot. 14. But the SEC asked this exact question during the October 19, 2022 meet and confer, and CVP provided an explanation. Seibald Decl. ¶¶ 12-13. Specifically, CVP explained to the SEC that the even-numbered requests for admission asked whether CVP's "principal business…was buying and selling securities for its own account," but, based on the actual meaning of this statutory language, CVP denied the requests without the need for a complicated calculation because it never used its own account to facilitate a customer order. *See id.* ¶ 13.

The SEC's requests are not relevant anyway. Note that the SEC declines to say that the

14

requested admissions are relevant to *its* theory of the case—only that "[s]ome courts have held that the proportion of a person's business devoted to dealer-related activities bears heavily on the analysis." Mot. 13. That's all well and good, but the cited cases are not binding, one (*Big Apple*) concerns a *different* statute, the other (*Almagarby*) involved some "29-year-old college student" who failed to raise a statutory defense, *SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1268 (S.D. Fla. 2020), and, most importantly, the SEC does not raise the cited theory *here*. For good reason: it makes no sense. If the SEC would like to state that, *in its view*, a firm is not a "dealer" unless a majority of its business (however measured) is "devoted to dealer-related activities" (*i.e.*, buying and selling securities), Mot. 13, the SEC is free to say that—but it won't. Many actual broker-dealers have, for example, lucrative commodities businesses, which, by definition, cannot involve "dealer-related activities," because commodities aren't securities. No one, certainly not the SEC, would think it appropriate to let those firms execute customer securities orders without registering as dealers, just because their commodities trading happened to be particularly profitable. CVP's "principal business"—however defined—is thus irrelevant under *either* party's theory.

CVP's responses, furthermore, are more than sufficient under the SEC's *actual* theory. According to the SEC, "a person has 'engaged in the business'" when his "level of participation in purchasing and selling securities involves more than a few isolated transactions." Dkt. 27, at 8. CVP admitted that it "engaged in convertible debt transactions," Mot. 9, has produced *all* of CVP's convertible-debt transactions, and, during the October 19, 2022 meet and confer, offered to admit the exact language ("more than a few") taken straight from the SEC's briefing. Seibald Decl. ¶ 14. The SEC refused CVP's offer without explanation. The SEC has failed to show that CVP should reasonably be required to answer the excessive and unnecessary questions the SEC has posed.

## **CONCLUSION**

The SEC's motion to compel should be denied.

15

Dated: November 7, 2022                                    Respectfully submitted,

                                                                                                                  */s/ Helgi C. Walker*
                                                                                                                 Helgi C. Walker*
                                                                                                                 Brian A. Richman*
Michael J. Diver                                         GIBSON, DUNN & CRUTCHER LLP
Elliott M. Bacon                                        1050 Connecticut Avenue, N.W.
KATTEN MUCHIN ROSENMAN LLP                Washington, DC 20036-5306
525 West Monroe Street                           (202) 955-8500
Chicago, IL 60661                                hwalker@gibsondunn.com
(312) 902-5200                                     brichman@gibsondunn.com
michael.diver@katten.com
elliott.bacon@katten.com                         Barry Goldsmith*
                                                                                              M. Jonathan Seibald*
                                                                                              GIBSON, DUNN & CRUTCHER LLP
                                                                                              200 Park Avenue
                                                                                              New York, NY 10166-0193
                                                                                              (212) 351-4000
                                                                                              bgoldsmith@gibsondunn.com
                                                                                              jseibald@gibsondunn.com

---

\* *pro hac vice*

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 7th day of November, 2022, I electronically filed a copy of the foregoing document through the Court's CM/ECF System, which will send notifications of the filing to all counsel of record.

*/s/ Helgi C. Walker*
