## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SECURITIES AND EXCHANGE
  COMMISSION,

        Plaintiff,

      v.

JOHN M. FIFE, ET AL.,

        Defendants.

No. 20 CV 5227

District Judge Maldonado

Magistrate Judge McShain

### ORDER

      Pending before the Court are defendants' second motion to compel discovery [117][1] and plaintiff's amended motion to compel production of documents responsive to plaintiff's June 2023 second set of document requests [119]. The motions are fully briefed. [140, 143]. For the following reasons, defendants' motion is denied and plaintiff's motion is granted.[2]

### Legal Standard

      "In ruling on a motion to compel, the discovery standard set forth in Rule 26(b) applies." *Mendez v. City of Chicago*, 18-cv-6313, 2020 WL 4736399, at *3 (N.D. Ill. Aug. 14, 2020). Rule 26 "governs the scope of civil discovery and allows parties to obtain discovery regarding any matter that is: (1) nonprivileged; (2) relevant to any party's claim or defense; and (3) proportional to the needs of the case." *Barnes-Staples v. Murphy*, Case No. 20-cv-3627, 2021 WL 1426875, at *2 (N.D. Ill. Apr. 15, 2021). "The party requesting discovery bears the initial burden to establish its relevancy." *Mendez*, 2020 WL 4736399, at *3. "If the discovery appears relevant, the party objecting to the discovery request bears the burden of showing why that request is improper." *Id.* (internal quotation marks omitted). In resolving the parties' motions to compel, this Court exercises its "extremely broad discretion to control discovery." *Marshall v. Grubhub, Inc.*, Case No. 19 C 3718, 2022 WL 1055484, at *3 (N.D. Ill. Apr. 5, 2022).

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

[2] This decision presumes familiarity with the Court's rulings on the parties' previous discovery motions. *See* [89] (transcript of March 15, 2023 hearing); [100] (transcript of June 15, 2023 hearing).

**Discussion**

### A.   Defendants' Motion to Compel [117]

Defendants seek to compel the SEC to respond to three requests for production of documents (RFP) and one interrogatory. The Court addresses each in the order they are discussed in defendants' motion.

### 1.   RFP 60: SEC's Exam Manual and Subject Area Modules

First, defendants ask that the SEC be compelled to respond to RFP 60, which asks for "[a]ll procedures, policies, or manuals" referred to in the SEC's response to Interrogatory No. 5. [118-8] 3. Interrogatory No. 5, in turn, asked the SEC to describe "the inspection processes that apply to persons engaged in the type of conduct alleged in the complaint, including a description of the securities laws . . . the inspectors would seek to ensure compliance with, along with a description of the procedures, policies, or manuals that would guide such inspection processes." [118-7] 3 (internal capitalization omitted). The SEC's answer to that interrogatory referred to, *inter alia*, an "exam manual" and "subject area modules," both of which defendants contend should be turned over. [*Id.*] 6. Defendants maintain that the exam manual and modules are relevant because they would establish what a potential inspection of the defendants' businesses would entail and whether such examinations even contemplate that defendants' convertible-note business violates the securities laws. [118] 10-11. The SEC responds that the exam manual and modules are irrelevant, not proportional to the needs of the case, and privileged. [143] 7-8.

The Court denies the motion as to RFP 60 because the documents sought by defendant are not relevant. In so ruling, the Court relies on a declaration from Natasha Vij Greiner, the SEC's deputy director of the Investment Advisor and Investment Company Examination Program of the SEC's Division of Examinations. *See* [144]. According to Greiner, the exam manual at issue "establishes the framework of policies pursuant to which all examinations are conducted (regardless of the type of SEC-registered entity being examined)[.]" [*Id.*] 2, at ¶ 4. Greiner also stated that the exam manual "does not provide examination techniques on specific substantive areas of the federal securities laws. Rather, it is a process manual for how to conduct any type of exam of any type of registrant; [it] is not intended to provide a substantive step-by-step prescriptive process which examiners would use to identify specific deficiencies at a registrant." [*Id.*]. As for the exam modules, Greiner explains that they "provide guidance on examining certain specific subject areas and/or specific rules by explaining the relevant statutes and rules, the types of documents to request, information that should be sought in interviews with firm personnel, and tests that can be performed." [*Id.*] 2, ¶ 5. But, Greiner continues, the exam modules "are not intended to cover every type of registrant or every variation of different categories of registrants that are examined by the SEC, nor every subject matter or rule for which

[the agency] may examine a registrant for compliance." [*Id.*]. Because the modules are "created on an ad hoc basis as the need arises," Greiner opined that "the absence of an Exam Module addressing a specific type of registrant or subject area or rule has no significance as to the scope of the examination process." [*Id.*].

Given the substance of Greiner's declaration, the exam manual and modules are not relevant to any claims or defenses in this case. According to Greiner, neither the exam manual nor the modules are intended to be exhaustive and address the full range of conduct that might violate the securities laws. [144] 2-3, at ¶¶ 4-5. Rather, the manual is intended to guide examiners through an inspection of any type of business conducted by a registrant, while the modules are created on an ad-hoc basis as the need for a module arises. Therefore, whether or not the manual or modules address defendants' business model would not support defendants' fair notice defense because these materials are not intended to address every conceivable type of securities law violation.[3]

Finally, even if the exam manual and modules were relevant, the Court finds that requiring the SEC to produce these non-public and highly sensitive materials could harm the SEC's examination program by requiring disclosure of the materials to a target of the agency's investigative process. As Greiner explained, these materials "reveal [ ] processes internal to the SEC that have no bearing on this case and registrants could use the information about internal processes to avoid providing information that may reveal potential violations of the federal securities laws." [144] 3, at ¶ 7. Likewise, Greiner stated that "[r]evealing even high level information about our Exam Modules, including the specific subject areas, may provide a roadmap for registrants to potentially avoid regulatory scrutiny or obfuscate their actions." [*Id.*], at ¶ 8. The Court therefore exercises its authority under Rule 26(c) to forbid disclosure of the manual and modules. *See Dickstein v. Malzone*, Case No. 22-1360, 2023 WL 6536189, at *3 (C.D. Ill. Sept. 5, 2023) ("Rule 26(c) gives the Court the power to forbid disclosure or discovery, to specify the terms for disclosure or discovery, and to forbid the inquiry into certain matters.").

---

[3] The Court also rejects defendants' argument that the SEC has waived its relevance objection by previously agreeing to produce any documents that were referenced in its answer to Interrogatory No. 5. *See* [118] 10. Although the SEC did agree to produce such documents in its original answer to Interrogatory No. 5, it did so before the Court granted defendants' motion to compel and ordered the SEC to amend its response to the interrogatory by identifying any securities law, regulations, FINRA rules, policies, or the like that the SEC referenced in answering the interrogatory. *See* [85]. In these circumstances, where the substance of the SEC's answer changed significantly in response to a court order, the Court is not convinced that the SEC should be held to its earlier agreement–especially when the SEC has convincingly shown that the materials at issue are not relevant.

### 2.   RFP 77: SEC Internal Emails

In RFP 77, defendants seek twenty-three pages of emails that SEC employees exchanged among themselves between May 2020 and June 2020. *See* [118-17] 10-11. According to defendants, these emails show SEC employees discussing "frustration from the marketplace" regarding the SEC's supposed failure to "understand the impact on the corporate finance markets" of the allegedly "novel" theory of liability that the agency would later press in this case. [118] 12. Defendants have obtained redacted versions of these emails, *see* [118-9], but now seek unredacted versions of the emails. The SEC argues that these emails are irrelevant, disproportionate to the needs of the case, and protected by the work-product doctrine. *See* [143] 8-9, 11, 13-14

The Court holds that the emails are irrelevant and not discoverable. As the Court explained in ruling on the SEC's earlier motion for a protective order, the "personal opinions of SEC employees" and "the internal discussions among those employees" are irrelevant in this case. [89] 25; *see also SEC v. SBB Research Grp., LLC*, No. 19 C 6473, 2022 WL 2982424, at *12 (N.D. Ill. July 28, 2022) ("[t]he internal reactions, analyses, and deliberations of individual examiners are not relevant, whether consistent with the SEC's final and public positions in the lawsuit or not") (internal quotation marks omitted). The emails at issue in RFP 77 are internal communications among SEC employees, and there is no indication that the emails were ever shared publicly or that they were intended to represent authoritative SEC positions. For that reason, they are not relevant to defendants' fair-notice defense. *SBB Research Grp.*, 2022 WL 2982424, at *12. Nothing in the Second Circuit's recent decision in *Securities and Exchange Commission v. Govil*, 86 F.4th 89 (2d Cir. 2023), a decision primarily about disgorgement that defendants have submitted to the Court in a notice of supplemental authority, *see* [145], undermines this conclusion or those set forth during the Court's March 2023 oral ruling.

### 3.   RFP 67: SEC Internal Communications Relating to a 2013 Review of a Convertible Lender's Business

Next, defendants seek to compel the SEC to produce all documents and communications relating to a 2013 review by the SEC's Assistant Director of the Division of Corporation Finance, John Reynolds, of a public company whose business model appears to mirror that of defendants. [118] 8-9; [118-17] 4-5. Defendants maintain that, in reviewing this business, Reynolds "describes another convertible lender *in the exact same terms that appear in the SEC's complaint today*." [118] 15-16 (emphasis in original). Defendants seek Reynolds' internal communications with agency staff to determine whether "*the SEC official* knew that he was describing unregistered 'dealer' activity[.]" [*Id.*] 16 (emphasis in original). The SEC contends that these internal agency communications are irrelevant, not proportional to the needs of the case, and privileged. [143] 8, 11, 13.

The Court denies the motion as to RFP 67. In June 2023, the Court denied defendants' motion to compel the SEC to respond to RFP 41, which sought all documents concerning a screening process referenced in John White's February 2007 remarks concerning convertible securities. [100] 15-18. The Court held that "information about the SEC's screening process is of minimal probative value and does not outweigh the burden that would be imposed on plaintiff to produce the requested information." [100] 16. The Court was "unpersuaded that information on the SEC's screening process would relate to defendants' fair notice defense given that the requested information is internal and non-public." [*Id.*]. The Court also found that producing the internal communications would be disproportionate to the needs of the case because defendants could use the substance of White's remarks to demonstrate that "the SEC was aware of convertible securities lender activities, as early as 2007" but had not previously initiated enforcement actions targeting such activity. [*Id.*] 18.

Defendants characterize RFP as essentially a more narrowly targeted version of RFP 41 that seeks the underlying documents and communications relating to only one convertible-lending transaction that the SEC reviewed. Though the request is narrower than RFP 41, the Court still finds that the requested materials are irrelevant. "In determining whether a party received fair notice, courts frequently look to the regulations and other agency guidance. If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner[.]" *Wis. Resources Prot. Council v. Flambeau Mining Co.*, 727 F.3d 700, 707-08 (7th Cir. 2013). Internal agency communications that were not disclosed to the public–let alone to these defendants–are not relevant to whether defendants had fair notice that their activities could be characterized as unregistered dealer activity. *See id.* at 708; *see also SBB Research Grp.*, 2022 WL 2982424 at *12. Finally, the Court does not believe that these documents are proportional to the needs of the case, given the other ways in which defendants can establish an alleged lack of fair notice, some of which are described in the Court's June 2023 ruling. *See* [100] 17-18.

### 4. Interrogatory No. 19: SEC's Request for Disgorgement

Finally, defendants seek to compel the SEC to provide a more complete answer to Interrogatory 19, which asks the agency to describe in "meaningful detail" how it "will distribute any disgorgement award" and to "describe who the victims are, how you will identify the victims, and how you will calculate the amount to be distributed to each victim." [118-13] 3. In an amended response to this interrogatory that was served in May 2023, the SEC responded:

The SEC has not yet made any determination concerning the distribution of a potential disgorgement award and does not expect to make any such determination unless and until the Court awards

disgorgement. It is premature to make any determination regarding the methodology for such a distribution, as the feasibility of a distribution and the distribution methodology are dependent upon the amount of disgorgement awarded and collected. The SEC intends to make a distribution in this action in the event that doing so is feasible in light of the amount of disgorgement collected. At this time, the SEC expects that any distribution plan of disgorged amounts may seek to distribute funds to harmed investors (i.e., investors who suffered losses) in the issuers for which Defendants converted debt into stock and then sold that stock into the market. The SEC expects to use trading records and a notice and claims process to identify potentially harmed investors. Generally, the SEC's principal goal in fashioning a distribution plan is to identify a methodology that would allocate the available funds fairly and reasonably, in a manner proportional to the injury that harmed investors suffered as a result of the defendants' actions.

[*Id.*].

Defendants contend that this answer is deficient because disgorgement is not available "if there are no investor victims," and thus the SEC "cannot plead ignorance about victims now and then, once discovery is over and [defendants] can no longer test the SEC's facts, present the Court with purported victims in a *fait accompli*." [118] 17. The SEC responds that it has adequately answered the interrogatory by stating its intent to make a distribution, if feasible, and describing the rough contours of its distribution plan. [143] 15. The SEC also emphasizes that disgorgement focuses on the defendants' wrongful gains, and that the Supreme Court has never held that the SEC must identify specific victims to whom a disgorgement award will be distributed. [*Id.*] 16.

The Court denies the motion to compel as to Interrogatory No. 19. Federal Rule of Civil Procedure 33 governs the process for answering interrogatories. Under Rule 33, "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). The SEC has sufficiently answered the interrogatory by stating that (1) the amount of disgorgement will be based on the amount of losses that were incurred by the investors "in the issuers for which defendants converted debt into stock and then sold that stock into the market" [118-13] 3; (2) the potentially harmed investors are those who had invested in the counterparty issuers with whom defendant entered into the convertible-debt transactions at issue; and (3) it intends to use trading records and a notice-and-claims process to identify specific victims to whom the disgorged funds will be distributed. Defendants have not identified any relevant or binding authority to support their claim that more is required from the SEC at this juncture. To the contrary, no case addressing disgorgement in the context of the convertible-lending industry has accepted defendants' argument that the SEC must identify specific

investors that were harmed by the defendants' unregistered dealing activity–let alone that it must do so in response to an interrogatory during discovery and before a liability determination is made. *See Sec. & Exch. Comm'n v. Keener*, 644 F. Supp. 3d 1290, 1304-05 (S.D. Fla. 2022) (emphasizing that disgorgement "focuses on a defendant's gain, not investors' losses" and "reject[ing] Keener's assertion that there were no victims of his unlawful activity" where "SEC convincingly showed that 93% of issuers experienced stock price declines between Keener's first and last sales, indicating that the majority of investors who bought Keener's offerings suffered losses and could be considered victims of his unlawful dealing"); *Sec. & Exch. Comm'n v. Fierro*, Civ. Action No. 20-2104 (GC), 2023 WL 4249011, at *10 (D.N.J. Jun. 29, 2023) (rejecting argument that *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936 (2020) "created new disclosure requirements for the SEC" and finding that *Liu* did not "displace the processes . . . generally associated with a disgorgement remedy"); *Sec. & Exch. Comm'n v. Almagarby*, Case No. 17-62255-CIV-COOKE/HUNT, 2021 WL 4461831, at *3 (rejecting argument that *Liu* held that "SEC must identify specific victims to whom a disgorgement award should be distributed, or that all disgorged funds must be returned to investors, or that a disgorgement award should be limited to those funds that could be returned to investors"), *report and recommendation adopted*, 2022 WL 832279 (S.D. Fla. Feb. 15, 2022).

Finally, the Court does not believe that *Govil* requires a different result. In that case, the Second Circuit held that the district court erred at the remedies phase by ordering disgorgement without requiring the SEC to prove, and without the court having found, that the alleged victims of the fraud suffered pecuniary harm. 86 F.4th at 98. *Govil*, which is not binding on this Court in any event, has no bearing on the outcome of defendants' motion because the Court is not holding that the SEC is entitled to disgorgement even if it fails to show that any particular investors suffered pecuniary harm; the Court is holding only that the SEC's answer to Interrogatory No. 19 comports with Rule 33(b).

\* \* \*

For these reasons, defendants' motion to compel [117] is denied.

## B. SEC's Amended Motion to Compel

The SEC moves to compel defendants to respond to its second set of document requests, which seek documents relating to 52 convertible-debt transactions that defendants engaged in with "listed issuers"–that is, counterparties whose stock is listed on a national securities exchange–between 2015 and 2020. *See* [121] 2-5; [121-1]. More specifically, the SEC seeks, for each of these 52 transactions, four types of documents: (1) cash-out-from-sales spreadsheets, (2) Quickbook reports, (3) conversion notices, and (4) Google Drive sheets. As the SEC explains, defendants have produced or agreed to produce these documents for 199 different convertible-

debt transactions that defendants executed with "penny stock" issuers, whose stock trades not on a national exchange but "over the counter." [121] 3. But defendants have refused to produce these documents for their transactions with listed issuers. Defendants contend that the SEC's document requests seek irrelevant information because the SEC's complaint is limited to transactions with penny-stock issuers that involved variable-priced convertible loans, and that the SEC is attempting to expand the scope of the complaint via discovery requests for documents relating to transactions with listed issuers that involved fixed (rather than variable) conversion rates. [140] 3-6; *see also* [86] 3-5. Defendants also argue that the Court's June 2023 ruling on the SEC's first motion to compel forecloses the SEC from obtaining these documents, and that its pending motion is an improper motion for reconsideration. [140] 7-8. Finally, defendants argue that the SEC has waived its objection to their refusal to produce these documents because the agency has known since at least May 2022 that defendants were withholding documents relating to transactions with listed issuers that involved fixed-conversion rates, but the SEC did not challenge defendants' allegedly incomplete document productions until February and March 2023. [*Id.*] 15-16; *see also* [86] 4-6.

Having reviewed the parties' briefs and the Court's rulings at the June 15, 2023 hearing, and in the exercise of its broad discretion to control discovery, the Court grants the SEC's motion and orders defendants to produce the four categories of documents identified in the SEC's motion for defendants' 52 transactions with listed issuers.

First, the Court concludes that documents relating to defendants' transactions with listed issuers are within the scope of the SEC's complaint.[4] The complaint alleges that defendants violated the securities laws by engaging in "more than 250" convertible-debt transactions without registering as a dealer. [1] at ¶ 3. As defendants understandably point out, the complaint focuses largely on transactions with "penny stock" issuers, who, by definition, are not listed on a national securities exchange and whose stock instead trades in the over-the-counter market. *See* 15 U.S.C. § 78c(a)(51); *see also* [1] at ¶¶ 17, 19-20, 36, 43-44. But the complaint also discusses defendants' transactions with "microcap" issuers. *See* [1] at ¶¶ 1, 3, 20, 22-26, 33, 35, 37, 39. The complaint does not define a "microcap issuer," nor does the SEC cite to a definition of that term in the securities laws or federal regulations.[5] At one point in the complaint,

---

[4] In so holding, the undersigned emphasizes that this ruling is not intended to provide a binding interpretation of the SEC's complaint that will control the scope of this litigation as the case proceeds. Given the limited nature of the referral of this case to the undersigned for discovery supervision and settlement, only the District Judge could provide a dispositive ruling on the scope of the SEC's complaint. This ruling therefore interprets the SEC's complaint only for purposes of deciding whether the documents sought by the SEC are discoverable.

[5] Earlier in the case, the SEC maintained that a microcap issuer was an issuer with a market capitalization of $300 million or less. *See* [75] 6. However, the SEC's position was based on

the SEC appeared to define a microcap security as a penny stock. *See* [*id.*] at ¶ 1 (alleging that defendants "bought and sold billions of newly-issued shares of microcap securities (*i.e.*, penny stocks) and generated millions of dollars from those sales"). But even accepting that the bulk of the complaint focuses on defendants' transactions with penny-stock issuers, the Court does believe that defendants' transactions with listed issuers are not discoverable. For one thing, nowhere in the complaint did the SEC draw a hard line between transactions with penny-stock issuers and transactions with listed issuers and declare that whether defendants violated the securities law depended only on the former, and not the latter, transactions. For another, the complaint puts at issue "more than 250" transactions that defendants executed without registering as a dealer, and defendants have admitted that 199 of those transactions (all involving penny-stock issuers) are discoverable. The Court cannot accept that the remaining 52 transactions that are expressly contemplated by the SEC's complaint are somehow beyond the scope of discovery based on a line between penny-stock issuers and listed issuers that was drawn, not in the complaint itself, but by defendants' discovery responses. *See* pp. 11-12, *infra*. And in any event, "[d]iscovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues." *Bilek v. Fed. Ins. Co.*, ---F.R.D. ----, No. 21 CV 1651, 2023 WL 8270362, at *5 (N.D. Ill. Nov. 29, 2023) (internal quotation marks omitted). For the reasons discussed below, *see* pp. 9-10, *infra*, the transactions with listed issuers may "define and clarify" the damages that the SEC can recover in this case.[6]

Second, the Court agrees that defendants' transactions with listed issuers are likely to be relevant to the SEC's claimed entitlement to disgorgement. "The remedy of disgorgement is designed both to deprive a wrongdoer of unjust enrichment and to deter others from violating the securities laws. It should be fashioned so as to deprive the defendant of the unjust enrichment he derived from his securities violations, but should not be used punitively." *United States Sec. & Exch. Comm'n v. Berrettini*, 218 F. Supp. 3d 754, 761 (N.D. Ill. 2016) (internal citations and quotation marks omitted). To be permissible, a disgorgement award must "not exceed a wrongdoer's net profits[.]" *Liu*, 140 S. Ct. at 1940. As the SEC observes, courts that have ordered disgorgement in other unregistered-dealer cases in the convertible-loan context have based disgorgement awards on the profits generated by defendants' offerings of convertible notes. *See Keener*, 644 F. Supp. 3d at 1306-07 (basing disgorgement award in part on defendant's net profits generated by offerings of convertible notes); *Almagarby*, 2021 WL 4461831, at *2-3 (disgorgement amount calculated by

---

[6] an article prepared for the website Nasdaq.com by an industry analyst. *See* [75-15]. The SEC's pending motion does not offer a definition of a microcap issuer.

[6] For largely the same reasons, the Court rejects defendants' argument that the complaint is limited to convertible-debt transactions with variable, rather than fixed, conversion rates. No such hard-and-fast line was drawn by the complaint, and defendants must make the responsive production required by this order without regard to whether the documents relate to a transaction with a variable or fixed conversion rate.

"deduct[ing] the face amount of the aged debt, brokerage commission, fees paid to finders, fees paid for legal opinions, and fees paid to transfer agents from the gross proceeds generated by [defendant's] sale of each issuer's sale during the relevant period"). Accordingly, the underlying financial documents sought by the SEC are relevant to the issue of disgorgement because they may demonstrate the amount of profits, if any, that defendants' alleged unregistered dealing in securities generated from their transactions with listed issuers. The Court also finds that these documents are proportional to the needs of the case because (1) they relate to the important issue of disgorgement, (2) defendants alone have access to the documents, and (3) the burden of producing the documents does not appear significant, especially given that defendants have already produced identical documents for the much larger batch of transactions with penny-stock issuers.

Third, the Court rejects defendants' argument that the Court's June 2023 decision on the SEC's first motion to compel forecloses the relief that the SEC seeks in its second motion. At issue in the prior motion was the SEC's request for production of documents relating to all convertible debt transactions executed not only by defendants, but also by several non-party entities controlled by defendant John Fife, from 2015 to the present. Defendants opposed the motion, arguing that (1) documents relating to transactions entered into by the non-party, Fife-controlled entities were outside the scope of the SEC's complaint, and (2) because the SEC's complaint was limited to transactions with penny stock-issuers, documents relating to transactions with listed issuers were irrelevant. In their opposition brief, however, and during the motion hearing itself, defendants offered a compromise: they would produce "the transaction documents for each of these convertible loans to unlisted issuers that non-Defendant entities owned by Mr. Fife made from 2015 to the present." [86] 14-15 (emphasis added); *see also* [100] 24. After hearing from the SEC, the Court ruled as follows:

> With respect to the first portion of plaintiff's motion, so the request for all Fife-owned entities convertible debt transactions from 2015 to present, I am ordering the defendants to produce the universe of documents that they have said that they are willing to produce, which are these transaction documents for each of these convertible loans to unlisted issuers and non-defendant entities owned by Fife, made from 2015 to the present.

> And again, it is as stated in the defendants' opposition at Pages 14-15.

> I am denying the motion to the extent that there is a breath [*sic*] of additional documents that SEC thinks they are still entitled to.

In terms of if the SEC, upon reviewing or receiving this production from defendants, thinks that, you know, there is still relevant information that is missing, then they can file another motion.

But from the additional briefing that the Court has reviewed, as well as considering the argument that has been made on the record, the Court just does not see the need for additional production from the defendants – and, you know, for the reasons established in the defendants' brief – with respect to the arguments that were made.

So, that is the ruling with respect to the first portion of the plaintiff's motion.

[100] 30-31.

The Court acknowledges that certain language in this ruling supports defendants' argument that the ruling precludes the SEC from obtaining documents relating to their transactions with listed issuers. That said, it was not the Court's intention to preclude the SEC from obtaining documents relating to defendants' transactions with listed issuers. To the contrary, the Court has explained above why it believes that these transactions are relevant. Rather, the Court's intention during the June 2023 hearing was to adopt the defendants' compromise offer to produce the transaction documents from the non-Fife-controlled entities and leave it to the parties to determine whether there was still a need for the SEC to obtain the transaction documents between defendants and listed issuers. In hindsight, the Court recognizes that it conflated the two categories of documents, and the defense compromise offer could not have resolved the separate dispute over the relevance of the transactions with the listed issuers. The Court regrets that its mistake necessitated another round of motion practice. But given the Court's determination that the transactions with listed issuers are not outside the scope of the complaint and are relevant, the Court concludes that the June 2023 ruling does not foreclose the SEC's second motion to compel.

Finally, the Court rejects defendants' argument that the SEC has waived its objections to defendants' withholding of documents relating their transactions with listed issuers. The SEC served interrogatories and RFPs on defendants in March and April 2022, and both sets of requests defined the term "convertible debt" as "any type of loan where the debt can either be repaid in cash or converted into another form of repayment other than cash." [75-1] 4; [75-2] 4. Defendants responded to the interrogatories on May 2, 2022. They objected that the term "convertible debt" was overly broad, indefinite, vague, and ambiguous, and for purposes of responding to the interrogatories defendants redefined "convertible debt" to mean "any type of loan to *an unlisted issuer* where, at the time of the loan, the parties agreed the debt can either be repaid in cash or converted into common stock that *varies with the market*

*price* at the time of conversion." [75-9] 4 (emphasis added). Defendants thereafter served five sets of supplemental responses and accompanying document production between July 15, 2022 and September 28, 2022, and each time defendants reiterated their objection to the SEC's definition of "convertible debt" and made clear that their responses were based on their own definition of that term. *See* [75-16] 4; [75-17] 4; [75-18] 4; [75-19] 4; [75-5] 2. Even though defendants were apparently not producing documents relating to their transactions with listed issuers or to transactions with fixed-price conversion rates, the SEC did not seek to meet-and-confer about this issue until February 2023–nearly nine months after defendants' first allegedly deficient document production–and did not move to compel until March 2023. *See* [86] 4. And while defendants raised this waiver argument in opposition to the SEC's original motion to compel, the SEC has ignored the issue in its second motion to compel.

Despite the SEC's unexplained delay in challenging defendants' withholding of these documents, the Court declines to find that the SEC waived its objections or that its motion is untimely. Certainly, the SEC should have raised this issue much sooner and not allowed defendants to make multiple (and apparently voluminous) document productions without challenging a key premise of those productions. But more concerning to the Court is defendants' attempt to use the discovery process to eliminate a significant amount of their allegedly wrongful conduct from the case. "Modern discovery practices seek to facilitate . . . open and even-handed development of relevant facts so that justice may be delivered on the merits and not shaped by surprise or like tactical stratagems." *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 342 (N.D. Ill. 2005). In responding to the SEC's discovery requests, however, defendants adopted a narrow interpretation of "convertible debt" that is in obvious tension with the allegations in the SEC's complaint. As discussed above, the SEC maintains that defendants engaged in "more than 250" convertible debt transactions while acting as unregistered dealers. [1] at ¶ 3. But defendants' discovery responses were premised on a definition of "convertible debt" that eliminated 52 transactions– or twenty percent of the allegedly wrongful conduct–from the case. This was not an appropriate way to challenge the scope of the SEC's complaint, and in these circumstances the Court declines to find that the SEC waived its objections or that the SEC's motion is untimely.

## Conclusion

For the reasons set forth above, defendants' second motion to compel discovery [117] is denied and plaintiff's amended motion to compel [119] is granted. Within 21 days of the date of this order, defendants shall produce the four categories of documents identified in the SEC's motion for each of the 52 transactions at issue, regardless of whether the counterparty is a listed issuer or whether the loan involved a fixed conversion rate.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: January 25, 2024**